Emily Croston (ISB No. 12389)
ecroston@acluidaho.org
Paul Southwick (ISB No. 12439)
psouthwick@acluidaho.org
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750

Barbara Schwabauer*
bschwabauer@aclu.org
Eleanor Matheson*
ematheson@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street N.W.
Washington, DC 20005

Chase Strangio*
cstrangio@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
111 N 1st Avenue, Suite 2I, PO Box 2975
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Pelecanos*†
pelecanos@lambdalegal.org
A.D. Sean Lewis*
alewis@lambdalegal.org
Charlie Ferguson*†
cferguson@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600 (T) | (855) 535-2236 (F)

*Pro hac vice* admission forthcoming
*Attorneys for Plaintiffs (additional counsel identified on the following pages)*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EMILIE JACKSON-EDNEY; DANIEL DOE; DIEGO FABLE; AMELIA MILETTE; PETER POE; and ZOEY WAGNER,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho; JAN M. BENNETTS, in her official capacity as Prosecuting Attorney of Ada County; PETER DONOVAN in his official capacity as Prosecuting Attorney of Adams | **Case No.**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION** |

1

County; IAN JOHNSON in his official capacity as Prosecuting Attorney of Bannock County; RONNIE KELLER in his official capacity as Prosecuting Attorney of Bear Lake County; MARIAH DUNHAM in her official capacity as Prosecuting Attorney of Benewah County; RYAN JOLLEY in his official capacity as Prosecuting Attorney of Bingham County; MATT FREDBACK, in his official capacity as Prosecuting Attorney of Blaine County; ALEX SOSA in his official capacity as Prosecuting Attorney of Boise County; LOUIS MARSHALL in his official capacity as Prosecuting Attorney of Bonner County; RANDY NEAL in his official capacity as Prosecuting Attorney of Bonneville County; ANDRAKAY J. PLUID in his official capacity as Prosecuting Attorney of Boundary County; STEVE STEPHENS in his official capacity as Prosecuting Attorney of Butte County; JIM THOMAS in his official capacity as Prosecuting Attorney of Camas County; CHRIS BOYD, in his official capacity as Prosecuting Attorney of Canyon County; S. DOUG WOOD in his official capacity as Prosecuting Attorney of Caribou County; MCCORD LARSEN, in his official capacity as Prosecuting Attorney of Cassia County; JANNA BIRCH, in her official capacity as Prosecuting Attorney of Clark County; E. CLAYNE TYLER in his official capacity as Prosecuting Attorney of Clearwater County; PAUL ROGERS in his official capacity as Prosecuting Attorney of Custer County; SHONDI LOTT in her official capacity as Prosecuting Attorney of Elmore County; VIC PEARSON in his official capacity as Prosecuting Attorney of Franklin County; LINDSEY BLAKE in her official capacity as Prosecuting Attorney of Fremont County; ERICK B. THOMSON in his official capacity as Prosecuting Attorney of Gem County; TREVOR MISSELDINE in his official capacity as Prosecuting Attorney of Gooding and Lincoln Counties; KIRK A. MACGREGOR in his official capacity as Prosecuting Attorney of Idaho County; PAUL BUTIKOFER in his official capacity as Prosecuting Attorney of Jefferson County; SAM BEUS, in his official capacity as Prosecuting Attorney of Jerome County; STANLEY MORTENSEN, in his official capacity as Prosecuting Attorney of Kootenai County; BILL THOMPSON in

2

his official capacity as Prosecuting Attorney of Latah County; CHACE SLAVIN, in his official capacity as Prosecuting Attorney of Lemhi County; ZACHARY PALL in his official capacity as Prosecuting Attorney of Lewis County; ROB WOOD in his official capacity as Prosecuting Attorney of Madison County; LANCE STEVENSON in his official capacity as Prosecuting Attorney of Minidoka County; JUSTIN COLEMAN, in his official capacity as Prosecuting Attorney of Nez Perce County; ETHAN RAWLINGS, in his official capacity as the Prosecuting Attorney of Oneida County; CHRISTOPHER TOPMILLER in his official capacity as the Prosecuting Attorney of Owyhee County; MIKE DUKE, in his official capacity as Prosecuting Attorney of Payette County; BROCK BISCHOFF in his official capacity as Prosecuting Attorney of Power County; BEN ALLEN, in his official capacity as Prosecuting Attorney of Shoshone County; BAILEY A. SMITH in her official capacity as Prosecuting Attorney of Teton County; GRANT P. LOEBS, in his official capacity as Prosecuting Attorney of Twin Falls County; BRIAN OAKEY in his official capacity as Prosecuting Attorney of Valley County; and TRUE PEARCE in her official capacity as Prosecuting Attorney of Washington County,

       *Defendants*.

3

Katherine M. Forster*
katherine.forster@mto.com
Kyle A. Groves*
kyle.groves@mto.com
Jannet Gomez*
jannet.gomez@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
Qian Zhe (Danny) Zhang*
danny.zhang@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

*Pro hac vice admission forthcoming
Attorneys for Plaintiffs

Plaintiffs Emilie Jackson-Edney, Daniel Doe, Diego Fable, Amelia Milette, Peter Poe, and Zoey Wagner bring this action for injunctive and declaratory relief on their own behalf and on behalf of a class of those similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. They allege as follows.

**PRELIMINARY STATEMENT**

1.      This action arises out of Idaho's recent enactment of House Bill 752 ("H.B. 752"), one of the most punitive and broadest-sweeping laws in the country to restrict restroom use by transgender people. Set to go into effect on July 1, 2026, the law prohibits transgender people from using sex-designated restrooms aligned with their gender identity in all government-owned buildings and places of public accommodation.[1] A violation of H.B. 752 carries harsh criminal penalties including imprisonment for up to one year for a first offense and up to five years for a repeat offense. H.B. 752 presents transgender Idahoans with an impossible choice: use a restroom that does not align with their gender identity and risk severe physical and psychological harms, or continue to use restrooms in public in accordance with their gender identity and risk a criminal record and imprisonment. This law upends public life not only for transgender Idahoans but for everyone who uses public restrooms in Idaho. It creates confusion, increases suspicion and surveillance, and disrupts the status quo ante without any demonstrated need to do so.

2.      Plaintiffs Emilie Jackson-Edney, Daniel Doe, Diego Fable, Amelia Milette, Peter Poe, and Zoey Wagner are transgender Idahoans who have used restrooms in public that align with their gender identity, including in government-owned buildings and places of public

---

[1] Plaintiffs challenge several relevant provisions of this law as void-for-vagueness. In describing these prohibitions, Plaintiffs do not intend to concede in any way that H.B. 752 unambiguously—and to the degree necessary to provide clarity under the Due Process Clause for a criminal prohibition—applies to the conduct described.

accommodation, for years without issue. Like any non-transgender Idahoans, Plaintiffs need to use restrooms while they are in public, and they wish to continue doing so without being subject to life-changing criminal penalties or physical and psychological harm for simply using the restroom.

3.      H.B. 752 is part of a broader assault on the lives of transgender Idahoans. The legislature considered and enacted H.B. 752 alongside a slate of bills seeking to push transgender Idahoans out of public life. Idaho has no justification for barring Plaintiffs and putative Class Members from using restrooms that align with their gender identity. The law will not make restrooms in Idaho safer. It will, instead, expose Plaintiffs and putative Class Members to likely violence, harassment, and psychological harm. In passing H.B. 752, the Idaho legislature relied on inaccurate beliefs and stereotypes about transgender people and either inapposite or incorrect data, primarily conflating transgender people with sexual predators. At the same time, the legislature ignored countless objections from members of the public, including some of Idaho's most prominent law enforcement organizations, that this law was ill-conceived and counter-productive.

4.      If H.B. 752 goes into effect, it will require transgender Idahoans to limit their restroom use in public or use restrooms inconsistent with their gender identity. These options will place Plaintiffs at an increased risk of violence and harassment and negatively impact their physical and mental health, safety, dignity, and quality of life.

5.      This suit seeks a declaration that H.B. 752, as applied to restrooms, violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, and seeks preliminary and permanent injunctive relief maintaining the status quo in Idaho. Relief is necessary on a class-wide basis to prevent harm to thousands of transgender

people who use restrooms in government-owned buildings and places of public accommodation in Idaho.

**JURISDICTION AND VENUE**

6.      This action arises under 42 U.S.C. § 1983 to redress the deprivation of rights secured by the United States Constitution under the color of state law.

7.      This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and the laws of the United States and under 28 U.S.C. § 1343 because the action is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the U.S. Constitution.

8.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a) and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.      Venue lies in this District pursuant to 28 U.S.C. § 1391, as the Plaintiffs and Defendants are located in this District and a substantial part of the events or omissions giving rise to the action occurred in this District.

**PARTIES**

**I.      Plaintiffs**

**A.      Emilie Jackson-Edney**

10.      Plaintiff Emilie Jackson-Edney is a 77-year-old transgender woman, a lifelong Idahoan, and resident of Ada County.

11.      Emilie has used women's restrooms in public for the last 20 years without issue.

12.      Emilie frequents public accommodations throughout Idaho and is often unable to locate a gender-neutral restroom in her daily life.

13.    H.B. 752 bars Emilie from using women's restrooms in all government-owned buildings and places of public accommodation in Idaho.

## B.    Daniel Doe[2]

14.    Plaintiff Daniel Doe is a 32-year-old transgender man and resident of Twin Falls County.

15.    Daniel has lived as a man for 10 years, using the men's restroom without issue.

16.    Daniel frequents public accommodations and government buildings and is often unable to locate a gender-neutral restroom in his daily life.

17.    H.B. 752 bars Daniel from using men's restrooms in all government-owned buildings and places of public accommodation in Idaho.

## C.    Diego Fable

18.    Plaintiff Diego Fable is a 37-year-old transgender man and resident of Ada County.

19.    Diego has used the men's restroom for the last four years without issue.

20.    Diego frequents public accommodations and is often unable to locate a gender-neutral restroom in his daily life.

21.    H.B. 752 bars Diego from using men's restrooms in all government-owned buildings and places of public accommodation in Idaho.

## D.    Amelia Milette

22.    Plaintiff Amelia Milette is a 50-year-old transgender woman and resident of Ada County.

---

[2] Plaintiffs Daniel Doe and Peter Poe have filed a separate motion seeking to proceed pseudonymously in this litigation.

23. Amelia has used the women's restroom for the last five years without issue.

24. Amelia frequents public accommodations and must visit small businesses throughout Idaho for her job.

25. Amelia is often unable to locate a gender-neutral restroom in her daily life.

26. H.B. 752 bars Amelia from using women's restrooms in all government-owned buildings and places of public accommodation in Idaho.

### E.    Peter Poe

27. Plaintiff Peter Poe is a 33-year-old transgender man and resident of Bannock County.

28. Peter has used the men's restroom for over a decade without issue.

29. Peter frequents public accommodations and is often unable to locate a gender-neutral restroom in his daily life.

30. H.B. 752 bars Peter from using men's restrooms in all government-owned buildings and places of public accommodation in Idaho.

### F.    Zoey Wagner

31. Plaintiff Zoey Wagner is a 30-year-old transgender woman and resident of Ada County.

32. Zoey has used the women's restroom for two years without issue.

33. Zoey frequents public accommodations and government buildings and is often unable to locate a gender-neutral restroom in her daily life.

34. H.B. 752 bars Zoey from using women's restrooms in all government-owned buildings and places of public accommodation in Idaho.

## II.    Defendants

35.     Defendant Raúl Labrador is the Attorney General of Idaho, sued in his official capacity. The Idaho Attorney General is a proper defendant in a case challenging the enforcement of an Idaho statute because, under Idaho law, "unless the county prosecutor objects, the attorney general may, in his assistance, *do every act* that the county attorney can perform." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004) (emphasis in original) (citations omitted); *Almerico v. Denney*, 532 F. Supp. 3d 993, 1001 (D. Idaho 2021); I.C. §§ 67-802(7), 67-1401(7). He is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. Attorney General Labrador resides in Idaho.

36.     Defendants Jan M. Bennetts, Peter Donovan, Ian Johnson, Ronnie Keller, Mariah Dunham, Ryan Jolley, Matt Fredback, Alex Sosa, Louis Marshall, Randy Neal, Andrakay J. Pluid, Steve Stephens, Jim Thomas, Chris Boyd, S. Doug Wood, McCord Larsen, Janna Birch, E. Clayne Tyler, Paul Rogers, Shondi Lott, Vic Pearson, Lindsey Blake, Erick B. Thomson, Trevor Misseldine, Kirk A. Macgregor, Paul Butikofer, Sam Beus, Stanley Mortensen, Bill Thompson, Chace Slavin, Zachary Pall, Rob Wood, Lance Stevenson, Justin Coleman, Ethan Rawlings, Christopher Topmiller, Mike Duke, Brock Bischoff, Ben Allen, Bailey A. Smith, Grant P. Loebs, Brian Oakey, and True Pearce are the Prosecuting Attorneys for Ada, Adams, Bannock, Bear Lake, Benewah, Bingham, Blaine, Boise, Bonner, Bonneville, Boundary, Butte, Camas, Canyon, Caribou, Cassia, Clark, Clearwater, Custer, Elmore, Franklin, Fremont, Gem, Gooding and Lincoln, Idaho, Jefferson, Jerome, Kootenai, Latah, Lemhi, Lewis, Madison, Minidoka, Nez Perce, Oneida, Owyhee, Payette, Power, Shoshone, Teton, Twin Falls, Valley, and Washington Counties, respectively. Each of them is sued in their official capacity and is a proper defendant because they bear primary responsibility for enforcing H.B. 752 in their

10

respective counties. Idaho Code §§ 18-4117, 31-2227(1), 31-2604(1)- (2). The aforementioned Prosecuting Attorneys are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint. All reside in Idaho.

**FACTUAL ALLEGATIONS**

**I.      Background on Gender Identity and Transgender People**

37.      "Sex assigned at birth" refers to the designation of sex as male or female generally noted on a person's birth certificate shortly after birth, almost always based on the appearance of an infant's external genitalia.

38.      H.B. 752 does not use the term "Sex assigned at birth." It uses the term "biological sex." The term "biological sex" is less precise than "sex assigned at birth" because it does not account for variations among the different biological components of sex within a particular person, which include not only gender identity, but also chromosomes, gonads (glands that produce hormones and gametes), internal and external reproductive anatomy, hormonal profiles, and secondary sex characteristics. These variations demonstrate that sex is not rigidly binary as male or female because some individuals cannot be readily classified within either category.

39.      Gender identity refers to a person's internal sense of oneself as belonging to a particular gender.

40.      There is a medical consensus that gender identity cannot be consciously changed and that external efforts to change a person's gender identity are ineffective, harmful to a person's health and well-being, and unethical. Although the precise etiology of gender identity is not fully known, there is a medical consensus that gender identity has a biological basis.

41.     A transgender person is someone who has a gender identity that differs from their sex assigned at birth. A transgender woman has a female gender identity but was designated as male at birth. A transgender man has a male gender identity but was designated female at birth. A cisgender person is someone who is not transgender, *i.e.*, has a gender identity that matches their sex assigned at birth.

42.     The various components of "biological sex" may diverge for transgender individuals. For example, in addition to having a gender identity that is incongruent with their sex assigned at birth, a transgender person who receives gender-affirming medical care may have some biological characteristics consistent with their sex assigned at birth but have other sex characteristics that are not.

43.     As was found in an August 2025 report by the Williams Institute at UCLA based on survey data, 2.8 million Americans, or 1.0% of all Americans over the age of 13 (and 0.8% of those over the age of 18), identify as transgender.[3]

## II.     Prohibiting Transgender People from Using Restrooms Consistent with Their Gender Identity is Harmful.

44.     As the American Medical Association ("AMA") has concluded: "Evidence confirms that policies excluding transgender individuals from facilities consistent with their gender identity have detrimental effects on the health, safety and well-being of those individuals."[4]

---

[3] Jody Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Institute, UCLA School of Law 1 (2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Aug-2025.pdf [https://perma.cc/6PP4-2P7U].

[4] American Medical Ass'n, Issue Brief: Transgender Individuals' Access to Public Facilities (2025), https://www.ama-assn.org/system/files/transgender-public-facilities-issue-brief.pdf [https://perma.cc/8CWN-9Z8A] (citing E.g. Lance Weinhardt et al., *Transgender and Gender Nonconforming Youths' Public Facilities Use and Psychological Well-Being: A Mixed-Method*

45.     As the AMA also notes, excluding transgender individuals from facilities consistent with their gender identity can "undermine well-established treatment protocols for gender dysphoria, expose these individuals to stigma and discrimination as well as potential harassment and abuse and impair their social and emotional development, leading to poorer health outcomes throughout life."[5]

46.     Gender dysphoria is a serious medical condition characterized by clinically significant distress or impairment in functioning because of the incongruence between an individual's gender identity and their sex assigned at birth. Evidence-based treatment for gender dysphoria focuses on relieving this distress by supporting alignment between an individual's gender identity, physical characteristics, and lived experience.

47.     Social transition is a critical aspect of the recognized standard of care for treating gender dysphoria, supported by all major medical associations and reflecting the professional consensus. Social transition brings lived experience into alignment with one's gender identity. Social transition typically includes changes in clothing, name, pronouns, and hairstyles, and the corresponding use of sex-separated facilities, including restrooms, consistent with one's gender identity and outward expression of that identity.

48.     When transgender men and women are forced to use a restroom that aligns with their sex assigned at birth but does not align with their gender identity, as H.B. 752 requires, they

---

*Study*, 2 Transgender Health 1, 140-50 (Oct. 2017); Kristie Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 10, 1378-99 (Feb. 2016); Carolyn Port et al., *"Kicked out": LGBTQ youths' bathroom experiences and preferences*, 56 J. Adolescence 107-12 (Apr. 2017)).

[5] *Id*. (citing Jody Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 1, 65-80 (2013); Am. Psychoanalytic Ass'n, Position Statement on Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression (2012)).

are more likely to be verbally harassed for doing so or even blocked from accessing the facility because they are perceived as being in the "wrong restroom."[6] Put plainly, when a transgender man who looks indistinguishable from a cisgender man is forced to use a women's restroom, his presence is often met with a range of reactions from confusion and fear to anger and hostility. Similarly, when a transgender woman who looks indistinguishable from a cisgender woman is forced to enter a men's restroom, her presence is often met with confusion, suspicion, and aggression.

49.    Enforcement of policies like H.B. 752 necessarily relies on subjective judgments about a person's appearance, creating ambiguity in application and increasing the likelihood that individuals will be scrutinized or challenged in public settings, which in turn increases the risk of confrontation and harm.

50.    Policies preventing transgender individuals from accessing restrooms consistent with their gender identity result in significant psychological harm by creating situations that exacerbate gender dysphoria and increase anxiety, distress, and emotional dysregulation.

51.    To avoid situations that put them at risk of harm and distress, nearly one-third of transgender people report that they limited the amount they ate or drank at least once in the previous year, so they did not need to use a public restroom. Fifty-four percent of transgender individuals reported physical problems from avoiding restrooms at work or in public, including dehydration and continence issues. Eight percent of transgender individuals reported having a

---

[6] Jody Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities*, Williams Institute, UCLA School of Law 1 (2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf [https://perma.cc/G6H9-T3WK].

kidney or urinary tract infection, or another kidney-related medical issue, because they avoided restrooms.[7]

52.     H.B. 752's criminal penalties multiply the harms that this vulnerable population already faces from the simple, biological necessity of using the restroom. The threat of arrest or prosecution, or other accusations—false or otherwise—of violating a criminal law creates a persistent state of vigilance and fear, which is associated with increased anxiety, avoidance behavior, and impaired daily functioning.

53.     Given these harms, H.B. 752 will inevitably limit transgender individuals' willingness or ability to participate in public life, including, for example, attending school or work, traveling, advocating at the legislature, attending places of worship, or other activities outside their homes.

54.     There is no credible evidence that allowing transgender people access to restrooms aligning with their gender identity jeopardizes the safety or privacy of non-transgender users of those restrooms.[8] Scientific studies confirm that "fears of increased safety and privacy violations" are not empirically grounded.[9]

### III.     Legislative History for House Bill 752 ("H.B. 752")

---

[7] *Id*. (citing Sandy James, Jody Herman, et al., Nat'l Ctr. Transgender Equality, The Report of the 2015 U.S. Transgender Survey (Dec. 2016); Jody Herman, Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives, 19 J. Pub. Mgmt. & Soc. Pol'y 1, 65-80 (2013).

[8] *Id.* at 1.

[9] Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70, 81 (2018), https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e92d7f24b6c89dbd4bd4d27fbbcb.pdf
https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e92d7f24b6c89dbd4bd4d27fbbcb.pdf [https://perma.cc/U52D-W7NC].

55.     Between February 6, 2026, and March 27, 2026, the Idaho Legislature considered and heard testimony regarding H.B. 752. H.B. 752 was passed on March 27, 2026, and Governor Brad Little signed it into law on March 31, 2026.

56.     During this same period, at least seven other bills targeting transgender people were introduced in the legislature.

### A.     Testimony Regarding Purported Need for H.B. 752

57.     Bill sponsor Representative Cornel Rasor introduced the bill, saying that it "extends proven biological sex protections … for statewide consistency" and that it "prevents discomfort" while protecting "privacy, safety, and dignity, especially for women and girls."[10] When asked if the bill addressed a purported concern that assault was more likely when people are in the wrong restroom, Representative Rasor responded that it is meant to prevent "people of the biological sex that is not listed on the label of the restroom intentionally going in there for reasons other than what the restroom was designed for."[11]

58.     Representative Joe Alfieri characterized H.B. 752 as necessary to protect against indecent exposure because it was "perfectly acceptable" under current Idaho law for a transgender woman, whom he referred to as a man, to use a women's restroom—a situation which he found "indecent."[12] Representative Rasor later argued that this bill was to "tighten up the indecent exposure laws."[13]

---

[10] February 6, 2026 House State Affairs Committee at 00:00:23.

[11] February 6, 2026 House State Affairs Committee at 00:13:09.

[12] March 11, 2026 House Judiciary Rules & Administration Committee at 2:51:54.

[13] March 16, 2026 House Floor Debate at 00:35:52.

59.    The majority of the legislative testimony in support of the bill focused on locker rooms and changing rooms rather than restrooms. This testimony included, for example, a statement by Representative Edward H. "Ted" Hill that a "dude in a dress" going into a sex-designated locker room or shower "happens everywhere" and is "a big problem."[14] When Bill sponsor Senator Ben Toews discussed H.B. 752 in the context of restrooms, he acknowledged that the "proliferation of single-use bathrooms" is "very fortunate," but stated that H.B. 752 is necessary, "even when no one is present, to stop someone from doing something like placing cameras."[15] Throughout the legislative process, several legislators referred to transgender people as presumptively criminal, used harmful and inaccurate stereotypes, and speculated that legislators would commit violence if their family members encountered a transgender person in a sex-designated space. Representative Bruce Skaug stated that, when he learned that his daughter encountered a transgender woman in the SeaWorld restroom, "different things crossed [the Representative's] mind, including violence."[16] He compared transgender women to "men [who] were perverts" who used to be "flashers" and who, instead of flashing, go "into women's restrooms."[17] Representative Dale R. Hawkins stated that "[i]f someone followed [his] daughter into a shower room, [his] family would have to come visit [him] somewhere," because the Representative "wouldn't be waiting for police."[18]

---

[14] *Id*. at 00:31:33.

[15] March 23, 2026 Senate Judiciary & Rules Committee at 00:31:31; 00:54:58.

[16] February 6, 2026 Idaho House State Affairs Committee at 00:08:25.

[17] *Id*.

[18] March 16, 2026 House Floor Debate at 00:34:13.

60.     While some legislators denigrated transgender people, others falsely denied their existence. Senator Brandon Shippy claimed that transgender people are "a myth"[19] and stated that "we have to keep reminding ourselves that there is no oppressed community that we're dealing with here."[20] And Senator Joshua Kohl discussed his support of the bill, arguing that it was his role to "protect Idaho's cultural decency" because "[t]rans women aren't women. They're men. And they need to be treated as such."[21]

**B.    Testimony from Law Enforcement Community Raising Concerns About Enforceability of H.B. 752**

61.     Several law enforcement groups objected to H.B. 752 because of concerns about its enforceability.

62.     The Idaho Chiefs of Police Association opposed H.B. 752 because it "would create unnecessary law and place Idaho law enforcement in impossible situations[]" because it "place[s] an unrealistic and absurd burden on Idaho law enforcement officers to somehow know, or be able to readily identify visually [the] biological sex of another human being."[22] The association pointed out that "utilizing documentation and questioning [is] a way in which to potentially find the answers to" the question of biological sex, but noted that some individuals may have identity documents that do not reflect their sex assigned at birth.[23]

---

[19] March 23, 2026 Senate Judiciary & Rules Committee at 01:00:06.

[20] *Id*.

[21] March 27, 2026 Senate Floor Debate at 01:41:40.

[22] March 11, 2026 House Judiciary Rules & Administration Committee at 01:37:38.

[23] *Id*. at 01:39:40.

63.     The Idaho Fraternal Order of Police ("Idaho FOP") also provided written and oral testimony in opposition to H.B. 752. In their letter addressed to the House Committee on Judiciary, Rules & Administration, the Idaho FOP stated:

> While we understand the intent of the legislation, <u>this proposal presents significant practical enforcement challenges for law enforcement officers in the field</u>. Officers responding to a complaint would be placed in the difficult position of determining an individual's biological sex in order to enforce the statute. In many circumstances, there is no clear or reasonable way for officers to make that determination without engaging in questioning or investigative actions that could be viewed as invasive and inappropriate.

(Emphasis in original document).

64.     The letter also explained that the exceptions to the bill would be "extremely difficult for officers to evaluate in real time." For example, although the bill provides a "dire need" exception, it is "**unclear how an officer responding to a call would reasonably determine whether someone was truly in 'dire need,'** creating an unenforceable standard that places officers in a difficult position." (emphasis in original). Lastly, the letter concluded that Idaho police already have sufficient tools to address "inappropriate or disruptive behavior in restrooms."

65.     The Idaho FOP restated the positions from its letter at the hearing, stating that the bill could be "very invasive and intrusive" and would be "difficult to enforce" without a duty to depart provision.[24] Even if law enforcement had sufficient legal basis to request a suspect's identification documents, the FOP's testimony continued, "get[ing] enough information to determine someone's gender" at the scene would be "very, very difficult to do" because "we don't just [sic] make people undress and check for those things."[25]

---

[24] *Id*. at 02:12:21.

[25] *Id.* at 02:17:12.

66.     House Bill Sponsor Representative Rasor dismissed law enforcement groups' concerns about the enforcement of the law by stating that enforcement should be left to the police[26] and that he "was unaware that it was necessary for [him] to write an arrest procedure into every bill."[27] When pressed by another legislator about how police would "determine the biological sex of the person," Representative Rasor responded, "DNA comes to mind. It should be very simple, using modern forensic techniques to determine the biological physiology of the perpetrator."[28]

67.     Law enforcement also pointed out H.B. 752 is unnecessary.  The Idaho Fraternal Order of Police said in its letter addressed to the Idaho House Judiciary, Rules and Administration Committee that "Idaho law already provides tools to address inappropriate or disruptive behavior in restrooms or changing areas through existing statutes such as trespass or other criminal offenses."

68.     Other legislators, such as Representative Chris Mathias, agreed with the police that "[w]e already have all of these laws on the books that do just that."[29] Representative Mathias later confirmed that when men are "violating [others'] privacy" in sex-designated spaces "they're being arrested for indecent exposure, they're being arrested for video voyeurism, assault, battery, and in some cases criminal trespass."[30] Senator Ruchti agreed, asking "[w]hy aren't our already

---

[26] *Id*. at 02:30:30.

[27] *Id*.

[28] February 6, 2026 House State Affairs Committee at 00:03:49.

[29]  March 11, 2026 House Judiciary Rules & Administration Committee at 02:42:56.

[30] March 16, 2026 House Floor Debate at 00:24:34.

present criminal statutes, let me give you some examples here, assault, battery, indecent exposure, lewd and lascivious conduct, video voyeurism, why are those not sufficient?"[31]

### C.    Other Testimony Opposing H.B. 752

69.    Other testimony expressed concern that H.B. 752 was simply designed to target transgender individuals. Several Idahoans testified against H.B. 752. One such Idahoan emphasized the fact that "[t]rans people make up .4% of Idaho's population" and "in the past five years, [the Idaho legislature] has passed 17 laws targeting trans rights [and] 5 this session."[32] Senator Melissa Wintrow echoed this remark on the senate floor, stating that since 2020, including H.B. 752, the Idaho legislature had passed 30 bills targeting the transgender community.[33]

70.    In opposing H.B. 752, Senator James Ruchti highlighted that the legislature "can't take [the bill] out of the context that it's in […] over the last few years, we have had a lot of legislation here dealing with trans people and with bathrooms also dealing with trans people."[34] He pushed his colleagues to admit, "if we're gonna [pass H.B. 752], let's just do it, say why we're doing it," that it is because "[i]t's against trans people.[35] Senator Ruchti further stated, that "[i]f you're trans, this creates a crime for who you are."[36] Other legislators raised the plight of transgender people, making statements such as, "maybe [] some of us want [] to chase a

---

[31] March 23, 2026 Senate Judiciary & Rules Committee at 00:29:48.

[32] March 11, 2026 House Judiciary Rules & Administration Committee at 00:50:51.

[33] March 27, 2026 Senate Floor Debate at 01:55:17.

[34] March 23, 2026 Senate Judiciary & Rules Committee at 01:03:20.

[35] *Id.*

[36] March 27, 2026 Senate Floor Debate at 01:29:03.

population that's marginalized out of Idaho," and that H.B. 752 amounts to "discrimination flat out."[37]

## IV.    H.B. 752's Statutory Prohibition

71.    H.B. 752, codified at Idaho Code § 18-4117, prohibits any person:

> [K]nowingly and willfully enter[ing] a restroom . . . in a government-owned building or a place of public accommodation . . . that is designated for use by the opposite biological sex of such person[.]

§ 18-4117(1).[38]

72.    H.B. 752 is codified within Idaho Code Annotated Title 18, Chapter 41, which is the section setting forth criminal punishments for indecency and obscenity.

73.    H.B. 752 contains no legislative findings, so it has no findings identifying the justifications or evidence supporting those justifications.

74.    The statute defines "place of public accommodation" by referencing Idaho Code § 67-5902, which states:

> "Place of public accommodation" means a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind . . . whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made public.

75.    H.B. 752 does not define the term "biological sex."

76.    Any person who violates this provision is "guilty of a misdemeanor and may be imprisoned in the county jail for a period not to exceed one (1) year." Idaho Code § 18-4117(1).

77.    A subsequent offense is punished as a felony:

> Any person who pleads guilty to or is found guilty of a violation of [§ 18-4117(1)], a similar statute in another state, or any similar local ordinance for a second time within

---

[37] *Id*. at 01:46:13.

[38] Although the law also applies to "changing rooms," this complaint does not challenge that part of the prohibition.

22

five (5) years of the first conviction . . . shall be guilty of a felony and may be imprisoned in the state prison for a period not to exceed five (5) years."

§ 18-4117(1).[39]

78.    The statute provides ten exceptions when § 18-4117(2) does not apply to "an individual who enters a restroom . . . designated for the opposite sex." § 18-4117(2)(a)-(j).

79.    Six (6) of these exceptions apply to a person in circumstances that **do not involve** the person's own need to use restroom facilities. These include:

(a) To perform custodial service or maintenance;
(b) To render medical assistance;
(c) To provide law enforcement assistance or to supervise any arrestee, detainee, or inmate in a custodial setting;
(d) To provide services or render aid during a natural disaster, during a declared emergency, or when reasonably necessary to prevent a serious threat to good order or safety;
…
(h) To provide coaching or athlete training during athletic events;
(i) To accompany and render assistance to a person who is in need of assistance when the person rendering assistance is: (i) a family member; or (ii) the designee of the person [needing assistance who] is not a member of the designated sex for the single sex restroom[.]

§ 18-4117(2)(a)-(d), (h)-(i).

80.    The remaining four (4) exceptions apply to a person in specific circumstances that **do involve** that person's own need to use restroom facilities. These include:

(e) To use a single-user facility designated for the opposite sex, if such single-user facility is the only facility reasonably available at the time of the person's use of the facility;
(f) To use restroom facilities when the person is in dire need of urinating or defecating and such facility is the only facility reasonably available at the time of the person's use;

---

[39] *Compare* Idaho Code Ann. § 18-4117 (H.B. 752) (up to one year imprisonment for first offense, five years for second offense), *with id.*, § 18-902 (up to three months imprisonment for assault), § 18-904 (up to six months imprisonment for battery); § 18-8004 (up to six months imprisonment for first offense of driving under the influence and up to one year for second).

(g) To use restrooms . . . that have been temporarily designated for use by people of that person's biological sex;

…

(j) To a minor child who is in need of assistance and, for the purpose of receiving that assistance, is accompanied by a family member, legal guardian, or the individual's designee who is a member of the designated sex for the single-sex restroom[.]

81.    H.B. 752 does not define "reasonably available."

82.    H.B. 752 does not define "dire need."

83.    H.B. 752 does not include a "duty-to-depart" provision that would allow a person to avoid charges by leaving a restroom when asked.

## V.    Plaintiffs Are Six Transgender Idahoans

### A.  Plaintiff Emilie Jackson-Edney is a 77-year-old Life-Long Idahoan Who Uses the Women's Restroom Consistent with Her Gender Identity.

84.    Plaintiff Emilie Jackson-Edney is a 77-year-old Idahoan and transgender woman who has lived in Idaho for her entire life.

85.    Emilie has obtained legal name and gender marker changes. All of her identification documents reflect her name, Emilie Jackson-Edney, and her gender marker "F".

86.    Emilie is active in her community and frequents public accommodations around Idaho. Her only restroom options are multi-occupancy-gendered facilities when she goes to some movie theaters, the mall, and gas stations on extended road trips.

87.    For the last 20 years, Emilie has used the women's restroom in public in accordance with her gender identity without issue.

88.    However, since H.B. 752 passed, Emilie is afraid to use the women's restroom and constantly carries around her driver's license and copies of other identification documents in case she is confronted about her restroom use.

24

89.     Emilie is frequently unable to locate a gender-neutral restroom in her day-to-day life. If she were to use solely gender-neutral restrooms, it would make activities harder as she would have to search and walk further distances to find these restrooms. She would have to plan all of her outings to ensure that she could locate a safe restroom for her to use.

90.     Emilie dresses and expresses herself in a feminine way. She is addressed as "ma'am" and perceived as female by strangers. She fears that if she were to walk into a space designated for men, it would immediately cause attention and disruption. She would be worried that she could be exposed to violence by being perceived as a woman in an all-male space or being perceived as a transgender woman because of the law's new requirements. Complying with H.B. 752 would have serious negative impacts on her safety, dignity, mental health, and quality of life.

91.     If H.B. 752 goes into effect, she plans to decrease her time spent in public to reduce the need to use public restrooms. Emilie also plans to drink less water and eat less to ensure that she would not need to use public restrooms.

### B. Plaintiff Daniel Doe is an Idahoan Who Uses the Men's Restroom Consistent with His Gender Identity.

92.     Plaintiff Daniel Doe is a 32-year-old Twin-Falls County resident and transgender man. He has lived in Idaho since he was two years old.

93.     Daniel has obtained legal name and gender marker changes. All of his identity documents reflect his legal name and gender marker of "M".

94.     Daniel often travels for work or fun throughout Idaho where he frequents public accommodations and government-owned buildings. When he travels, often his only restroom options are multi-occupancy-gendered facilities when he goes to gas stations or rest stops. In his daily life in Twin Falls County, his only restroom options are usually multi-occupancy-gendered

25

facilities when he goes to grocery stores, local restaurants, movie theaters, or the hospital where he goes to support his wife when she is a patient.

95.    For the last four years, Daniel has used men's restrooms in public in accordance with his gender identity without issue. Daniel has a medical device and often uses public men's restrooms as private places to adjust or reposition his device when he is away from home.

96.    Daniel is frequently unable to locate gender-neutral restrooms in his day-to-day life. Using solely gender-neutral restrooms would make activities harder as he would have to search and walk further distances to find restrooms—something that may be difficult or impossible if he urgently needs to adjust or reposition his medical device. Daniel would have to plan all of his outings to ensure that he could locate a safe restroom for him to use.

97.    Daniel lives his life as a man. He has a beard and dresses and expresses himself in a masculine way. Strangers address him as "sir" and point him to the men's restroom when he asks for directions. If he were to use the women's restroom as H.B. 752 requires, he fears that he would face violence or harassment from others who may perceive him as a man entering an all-female space or as a transgender man because of the law's new requirements. Complying with H.B. 752 would have serious negative impacts on Daniel's safety, dignity, mental health, and quality of life.

98.    If H.B. 752 goes into effect, Daniel would be required to either avoid using the restroom altogether, leaving him without a private place to maintain his medical device, or risk violence by entering the women's restroom.

### C.  Plaintiff Diego Fable is an Idahoan Who Uses the Men's Restroom Consistent with His Gender Identity.

99.    Plaintiff Diego Fable is a 32-year-old Ada County resident and transgender man. He has lived in Idaho for the last 10 years.

100.    Diego has obtained legal name and gender marker changes. All of his identity documents reflect his legal name, Diego Fable, and gender marker of "M".

101.    Diego has been on gender-affirming hormone therapy for seven years and has received gender affirming surgeries.

102.    He has used the men's restroom in public and at his workplace in accordance with his gender identity for the past four years without issue. Diego's only restroom options at his government-owned workplace are multi-occupancy-gendered facilities.

103.    Diego is active in his communities in Ada County and frequents public accommodations in the Boise area. His only restroom options are multi-occupancy gendered facilities when he goes to grocery stores, some local restaurants, bars, conference centers, and gas stations. His only restroom options are single-user-gendered facilities when he goes to some local restaurants, clothing stores, game stores, and gas stations.

104.    Diego is frequently unable to locate a gender-neutral restroom in his daily life, including at his workplace. Using solely gender-neutral restrooms would make activities harder for Diego because he does not always have access to or know where gender-neutral restrooms are located. Diego would have to search and walk further distances to find these restrooms and would have to plan all of his outings to ensure that he could locate a safe restroom to use.

105.    Diego lives his life as a man. He dresses and expresses himself in a masculine way. He is perceived as male by strangers who address him as "sir" and point him to the men's restroom when he asks for directions. If he were to use the women's restroom, as H.B. 752 requires, he fears that he would face violence or harassment from others. He is concerned that if he were to enter the women's restroom, his presence as a masculine presenting person with facial hair would immediately cause attention and disruption. If he were to use a women's restroom, as

27

H.B. 752 requires, he fears that he would face violence by being perceived as a man in an all-female space or being perceived as a transgender man because of the law's new requirements. Complying with H.B. 752 would cause serious negative impacts on Diego's safety and mental health.

106. When H.B. 752 was passed, Diego began considering spending less time in public, drinking less water or foregoing restroom use in public altogether. He is concerned that these actions will have negative impacts on his bladder and overall health. As a direct result of these potential harms, he is planning to flee Idaho prior to the effective date of this law, July 1, 2026. Leaving his communities and the things he loves about Boise behind will be deeply upsetting. However, he is planning to move out of state because he does not feel he can live in Idaho safely when this law goes into effect. As a result of his move, though his employer will allow him to work out of state, he will be reclassified as a contractor, which will negatively impact his health insurance, retirement, life insurance, and other employee benefits. He may want to return to Idaho if this law no longer threatened him. He may also be asked to attend work conferences and events in Idaho.

### D. Plaintiff Amelia Milette is a Life-Long Idahoan Who Uses the Women's Restroom Consistent with Her Gender Identity.

107. Plaintiff Amelia Milette is a 50-year-old Ada County resident and transgender woman. Amelia has lived in Idaho for her entire life.

108. Amelia has obtained legal name and gender markers for her driver's license, birth certificate, and social security card which reflect her name, Amelia Milette, and her gender marker of "F".

109. Amelia has worked for a company that supports over 100 other organizations for almost nine years. She frequently travels to clients' offices to work on-site. Many of these clients

do not know that Amelia is transgender. Most of these offices' only restroom options are multi- or single-occupancy-gendered facilities.

110. Amelia frequents public accommodations in her daily life. Her only restroom options are multi-occupancy-gendered facilities when she goes to most local grocery and retail stores, restaurants, bars, and movie theaters. Her only restroom options are single-occupancy-gendered facilities when she goes to some local restaurants.

111. For the last six years, Amelia has used the women's restrooms in public and at work in accordance with her gender identity without issue.

112. However, since H.B. 752 passed, Amelia is concerned about her ability to navigate restrooms in the various offices she visits in her work while maintaining her privacy and dignity at her workplace.

113. Amelia is frequently unable to locate a gender-neutral restroom while at work and in public. If she were to use only gender-neutral restrooms, it would make all activities, including work, harder as she would have to figure out what to do if she needs to use the restroom while in public.

114. Amelia dresses and expresses herself in a feminine way and fears that she would face violence or harassment from others if she were to use the men's restroom. Complying with H.B. 752 would have serious negative impacts on her life, including on her safety, dignity, mental health, and quality of life.

115. If H.B. 752 goes into effect, Amelia plans to limit her food and liquid consumption to reduce the need to use the restroom in public places. She also plans to limit visiting places that lack appropriate restrooms and expects to try to avoid going to places altogether if she did not know that acceptable facilities were available.

**E. Plaintiff Peter Poe is a Bannock County Resident Who Uses the Men's Restroom Consistent with His Gender Identity.**

116.    Plaintiff Peter Poe is a 33-year-old Bannock County resident and transgender man. He has lived in Idaho since he was six years old.

117.    Peter has obtained legal name and gender marker changes. All of his state identification documents reflect his name and gender marker of "M".

118.    Peter frequents public accommodations in Idaho. His only restroom options are multi-occupancy-gendered facilities at his workplace and when he goes to grocery stores, gas stations, and concert venues. His only restroom options are single-occupancy-gendered facilities when he goes to the main office at his job each day.

119.    For over a decade, Peter has used men's restrooms in public in accordance with his gender identity without issue.

120.    Peter is frequently unable to locate a gender-neutral restroom in his day-to-day life, including while at work. If he were to solely use gender-neutral restrooms, it would make Peter's life harder as he would have to search and walk further distances to find these restrooms. Peter would have to plan all of his outings to ensure that he could locate a safe restroom to use.

121.    Peter lives his life as a man. He wears a beard and dresses and expresses himself in a masculine way. He is perceived as male by strangers who address him as "sir" and point him to the men's restroom when he asks for directions. If he were to use the women's restroom, as H.B. 752 requires, he fears that he would face violence or harassment from others. He is concerned that if he were to enter the women's restroom, his presence as a masculine presenting person with facial hair would immediately cause disruption. If he were to use a women's restroom, as H.B. 752 requires, he fears that he would face violence by being perceived as a man in an all-female space or being perceived as a transgender man because of the law's new

30

requirements. Complying with H.B. 752 would have serious negative impacts on Peter's safety, dignity, mental health, and quality of life.

122. If H.B. 752 goes into effect, and no gender-neutral restrooms were available, Peter plans to try to avoid using the restroom in public altogether.

**F. Plaintiff Zoey Wagner is an Ada County Resident Who Uses Women's Restrooms Consistent with Her Gender Identity.**

123. Plaintiff Zoey Wagner is a 30-year-old Ada County resident and transgender woman. She has lived in Idaho since she was two years old.

124. Zoey has obtained legal name and gender marker changes for her birth certificate, passport, and driver's license which reflect her name, Zoey Wagner, and her gender marker "F".

125. Zoey frequents government-owned buildings and public accommodations in Idaho. Her only restroom options are multi-occupancy-gendered facilities when she goes to some local grocery stores, restaurants, gas stations, malls, and coffee shops. Her only options are single-occupancy-gendered facilities when she goes to some local restaurants, game stores, and her workplace.

126. Zoey has used women's restrooms in public in accordance with her gender identity since 2024 without issue.

127. Zoey is frequently unable to locate a gender-neutral restroom in her daily life. If she were to use solely gender-neutral restrooms, it would make activities harder as Zoey would have to search and walk further distances to find these restrooms. She would have to plan all of her outings to ensure that she could locate a safe restroom to use.

128. Zoey was searching for a job earlier this year and sought out employers outside the state or who have single-occupancy gender-neutral restrooms in the workplace. She avoided job opportunities because they did not have single-occupancy restrooms.

31

129.    Zoey dresses and expresses herself in a feminine way and she is perceived as female by strangers who address her as "ma'am." She fears that she would face violence and harassment from others if she were to use the men's restroom. She is also worried that if she were to walk into a space designated for men, Zoey would immediately cause attention and disruption, potentially exposing her to violence and judgment for being perceived as a woman in an all-male space or being perceived as a transgender woman because of the law's new requirements. Complying with H.B. 752 would have serious negative impacts on her safety, dignity, mental health, and quality of life.

130.    Zoey uses a medication that makes her need to drink more and urinate more frequently. If H.B. 752 goes into effect, Zoey would try to avoid using public bathrooms in public by staying out in public less.

## CLASS ACTION ALLEGATIONS

131.    Plaintiffs Emilie Jackson-Edney, Daniel Doe, Diego Fable, Amelia Milette, Peter Poe, and Zoey Wagner bring this action on their own behalf and on behalf of a Class of those similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

132.    Plaintiffs seek certification of the following Class:

> All transgender people who seek to use a restroom consistent with their gender identity in a government-owned building or a place of public accommodation in Idaho.

133.    Excluded from the Class is any member of the family of (1) any Judge or Magistrate presiding over this action and (2) Defendants.

134.    As defined, the Class meets all the requirements of Rule 23(a).

135.    The Class is so numerous that joinder of all members of the Class is impractical. While the precise number of class members is unknown, the Williams Institute estimates that

32

there are 5,300 transgender youth (ages 13-17) and 9,600 transgender adults (age 18 or older) living in Idaho.[40]

136. There are questions of fact and law common to the Class, all as applied to restrooms, under H.B. 752, including:

    a. whether H.B. 752 is void for vagueness under the Due Process Clause of the Fourteenth Amendment.

    b. whether H.B. 752 discriminates based on sex, which requires the application of heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment;

    c. whether H.B. 752 discriminates based on transgender status, which requires the application of heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment;

    d. whether H.B. 752 violates the fundamental right to informational privacy under the Due Process Clause of the Fourteenth Amendment;

    e. whether H.B. 752 survives the requisite level of scrutiny, including:

        i. the legitimacy and strength of the governmental interests asserted in support of it; and

        ii. the extent to which H.B. 752 serves, is related to, or is tailored to those interests.

137. Plaintiffs' claims are typical of the claims of the Class they would represent. They are transgender, and H.B. 752 will exclude them from restrooms that align with their gender

---

[40] *See How Many Adults and Youth Identify as Transgender in the United States? - Williams Institute.*

identity in government-owned buildings and places of public accommodation when it goes into effect. They will be harmed by the same Defendants and on the same basis as all members of the Class they represent, including because Defendants' actions enforcing H.B. 752 will violate Plaintiffs' and Class Members' constitutional rights. The Plaintiffs seek the same relief as all Class Members they would represent.

138. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in similar litigation, including class actions. They are committed to the vigorous prosecution of this suit and have no interests that are adverse to the Class. Plaintiffs are represented by experienced counsel from Munger, Tolles & Olson LLP, Alturas Law Group, PLLC, the American Civil Liberties Union ("ACLU") Foundation, the ACLU Foundation of the Idaho, and Lambda Legal Defense and Education Fund as their representatives. The attorneys who are appearing in this matter have extensive experience in complex civil rights litigation and class action litigation. They also have extensive experience representing transgender litigants advancing constitutional claims in federal court.

139. The requirements of Rule 23(b)(2) are met because Defendants have acted, or will act, on grounds generally applicable to the Class, and final injunctive and declaratory relief is appropriate for the Class as a whole. H.B. 752 (as applied to restrooms) applies to every member of the Class and causes the same injuries. The Idaho Attorney General is responsible for enforcing criminal laws like H.B. 752 through his assistance power and each county prosecutor defendant bears primary responsibility for enforcing H.B. 752 in their respective counties. Declaratory relief that H.B. 752 is unlawful and an injunction against its enforcement would benefit the entire Class in the same way and remedy the same injuries suffered by the entire Class.

140. All Class Members will be injured by Defendants' enforcement of H.B. 752, and will continue to be injured, if H.B. 752 goes into effect on July 1, 2026, in the absence of declaratory and injunctive relief preventing those injuries.

## CAUSES OF ACTION

### COUNT I
### Violation of Due Process Clause of the Fourteenth Amendment - Void for Vagueness
### (42 U.S.C. § 1983)

141. Plaintiffs reallege, reassert, and incorporate by reference each of the foregoing allegations above as though set forth fully herein.

142. The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, enforceable via 42 U.S.C. § 1983, provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

143. Defendants are all governmental actors acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

144. Under the Due Process Clause, if a statute fails to provide reasonable people with fair notice of the conduct it prohibits, it is "void-for-vagueness." That constitutional requirement for clarity is more exacting when a statute attaches criminal penalties.

145. H.B. 752's language is unconstitutionally vague as applied to restrooms because it does not provide clear notice of what conduct it prohibits and does not clearly specify when it exempts otherwise prohibited conduct.

146. H.B. 752 prohibits any person from:

[K]nowingly and willfully enter[ing] a restroom . . . in a government-owned building or a place of public accommodation…that is designated for use by the opposite biological sex of such person.

This prohibition is unconstitutionally vague because it does not provide sufficient notice to the public of what it means for a restroom to be "designated for the opposite biological sex." The statute does not define "designated" or "biological sex" creating confusion about how to identify whether a restroom is so designated or which restroom would be considered to be the "opposite biological sex" for a particular transgender individual.

147.    H.B. 752 section (e) creates an exception to criminal liability when an individual "use[s] a single-user facility designated for the opposite sex, if such single-user facility is the only facility reasonably available at the time of the person's use of the facility." This exception is unconstitutionally vague because it fails to specify what it means for a sex-designated single-use restroom to be the only one "reasonably available," such that a reasonable person would have fair notice of when the exception applies.

148.    H.B. 752 section (f) creates an exception to criminal liability when an individual uses a restroom designated for the opposite biological sex "when the person is in dire need of urinating or defecating and such facility is the only facility reasonably available at the time of the person's use." This exception is unconstitutionally vague because it fails to specify what it means for a prohibited restroom to be the only facility "reasonably available," such that a reasonable person would have fair notice of when the exception applies. This exception is unconstitutionally vague for the further reason that it fails to specify what it means for a person to be in "dire need of urinating or defecating," such that a reasonable person would have fair notice of when the exception applies. Law enforcement officials have made clear that H.B. 752 creates "an unenforceable standard" requiring officers to determine someone's "dire need" and noting that the elements of the offense must be more clearly defined.

36

**COUNT II**
**Violation of Equal Protection Clause of the Fourteenth Amendment**
**(42 U.S.C. § 1983)**

149.    Plaintiffs reallege, reassert, and incorporate by reference each of the foregoing allegations above as though set forth fully herein.

150.    The Fourteenth Amendment to the U.S. Constitution, enforceable via 42 U.S.C. § 1983, provides that no State shall "deny to any person within its jurisdiction the equal protection of laws." U.S.C. Const. Amend. XIV, § 1.

151.    Defendants are all governmental actors acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

152.    As applied to restrooms, H.B. 752 discriminates against Plaintiffs and putative Class Members based on sex and based on transgender status.

153.    **Sex-based discrimination:** Under the Equal Protection Clause of the Fourteenth Amendment, a sex-based classification like that in H.B. 752 is subject to heightened scrutiny, placing the burden on the government to show that its use of sex-based lines substantially advances an important governmental interest. *Roe v. Critchfield*, 137 F.4th 912, 922-23 (9th Cir. 2025). H.B. 752 contains a sex-based classification because it explicitly limits a transgender individual's access to restrooms in government-owned buildings and places of public accommodation based on their "biological sex" or sex-assigned at birth. A person whose assigned sex is female but whose gender identity is male cannot use the men's restroom because of his sex. A person whose assigned sex is male but whose gender identity is female cannot use the women's restroom because of her sex.

154.    **Discrimination based on Transgender Status:** Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is subject to

37

heightenedd scrutiny, placing the burden on the government to show that its use of sex-based lines substantially advances an important governmental interest. *Roe v. Critchfield*, 137 F.4th 912, 922-23 (9th Cir. 2025). H.B. 752 discriminates against transgender people like Plaintiffs and putative Class Members based on their transgender status. H.B. 752 classifies based on transgender status by prohibiting transgender people from using restrooms in government-owned buildings and places of public accommodation consistent with their gender identity while allowing cisgender people using such restrooms to do so consistent with their gender identity. H.B. 752's limitation on restroom access disadvantages people based on whether their gender identity aligns with their "biological sex." In addition to facially classifying based on transgender status, the intent and effect of H.B. 752 was to prevent transgender people in Idaho from using restrooms that align with their gender identity and announcing the government's disapproval of the fact that transgender people have and live consistently with a gender identity different from their birth sex.

155.    H.B. 752's discrimination against transgender people including Plaintiffs and putative Class Members based on sex and transgender status fails every level of scrutiny.

156.    H.B. 752 is not substantially related to an important governmental interest. The law does not substantially advance safety, privacy, or any other legitimate interests. Instead, the law undermines the health, safety, and privacy of Plaintiffs and other putative Class Members by branding them as second-class citizens and subjects them to a variety of harms.

157.    H.B. 752 lacks a rational relationship to any governmental interest and is motivated by animus. It fails the rational basis test in part because its vast "breadth is so discontinuous with the reasons offered for it" such that it is "inexplicable by anything but animus" toward transgender people. *Romer v. Evans*, 517 U.S. 620, 634 (1996).

38

**COUNT III**
**Violation of Due Process Clause of the Fourteenth Amendment – Informational Privacy**
**(42 U.S.C. § 1983)**

158.    Plaintiffs reallege, reassert, and incorporate by reference each of the foregoing allegations above as though set forth fully herein.

159.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, enforceable via 42 U.S.C. § 1983, provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

160.    Defendants are all governmental actors acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

161.    The Due Process Clause provides a constitutional right to informational privacy, protecting information that is highly personal, which includes information that could lead to bodily harm upon disclosure.

162.    Government mandated or coerced disclosure of a person's transgender status violates that person's constitutional right to privacy. A person's transgender status is highly personal and sensitive information.

163.    Involuntary disclosure of a person's transgender status can lead to significant physical harm, threatening a person's safety and bodily integrity. This harm burdens and interferes with the ability of transgender persons to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary in accordance with evidence-based standard of care.

164.    As applied to restrooms, H.B. 752 violates the right to informational privacy for transgender individuals, including Plaintiffs and putative Class Members, by causing involuntary disclosure of their transgender status and by depriving them of significant control over the

39

circumstances around such disclosure. This is true even for Plaintiffs who are "out" as transgender to certain other individuals in their lives. For those Plaintiffs, their transgender status is not typically known or immediately knowable to strangers they encounter in public, including in public restrooms.

165. There are no adequate safeguards to prevent the harms of the involuntary disclosure of one's transgender status caused by H.B. 752.

166. Defendants have no legitimate interest, let alone a compelling or important one, in forcing the disclosure of a person's transgender status any time they need to use a restroom in a government-owned building or place of public accommodation because of H.B. 752. They also lack a legitimate interest in causing Plaintiffs and putative Class Members to disclose their transgender status to third parties under H.B. 752 when they would not otherwise do so. There is additionally no public policy interest that is served by causing such disclosure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

167. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

168. Appoint counsel for Plaintiffs as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

169. Issue a declaratory judgment that enforcement of Idaho H.B. 752, as applied to restrooms, is unconstitutional and unlawful;

170. Issue class-wide temporary, preliminary, and permanent injunctive relief enjoining Defendants, including their employees, agents, representatives, successors, and other

40

persons acting directly or indirectly in concern with them, from enforcing H.B. 752 (as applied to restrooms);[41]

171.    Waive the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

172.    Award Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws;

173.    Grant all other and further relief as is just and proper.


DATED: April 29, 2026                  Respectfully Submitted



Emily Croston
Paul Southwick
ACLU OF IDAHO FOUNDATION         By:      /s/ Samuel L. Linnet

Barbara Schwabauer                       Samuel L. Linnet
Eleanor Matheson                         ALTURAS LAW GROUP, PLLC
Chase Strangio
AMERICAN CIVIL LIBERTIES UNION           J. Max Rosen
FOUNDATION                               Katherine M. Forster
                                         Kyle A. Groves
Peter C. Renn                            Qian Zhe (Danny) Zhang
Kell L. Olson                            Jannet Gomez
Tara L. Borelli                          MUNGER TOLLES & OLSON LLP
Pelecanos
A.D. Sean Lewis
Charlie Ferguson
LAMBDA LEGAL DEFENSE & EDUCATION
FUND

---

[41] With this Complaint, Plaintiffs concurrently file a motion seeking class-wide, preliminary injunctive relief that is narrowed in scope.