Emily Croston (ISB No. 12389)
ecroston@acluidaho.org
Paul Southwick (ISB No. 12439)
psouthwick@acluidaho.org
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750

Barbara Schwabauer*
bschwabauer@aclu.org
Eleanor Matheson*
ematheson@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street N.W.
Washington, DC 20005

Chase Strangio*
cstrangio@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
111 N 1st Avenue, Suite 2I, PO Box 2975
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Pelecanos*†
pelecanos@lambdalegal.org
A.D. Sean Lewis*
alewis@lambdalegal.org
Charlie Ferguson*†
cferguson@lambdalegal.org
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600 (T) | (855) 535-2236 (F)

**Pro hac vice* admission forthcoming
*Attorneys for Plaintiffs (additional counsel identified on the following page)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

EMILIE JACKSON-EDNEY, *et al.*,

*Plaintiffs*,

v.

RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, *et al.*,

*Defendants*.

Case No. 1:26-cv-00261-AKB

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION [DKT. 3]**

Katherine M. Forster*
katherine.forster@mto.com
Kyle A. Groves*
kyle.groves@mto.com
Jannet Gomez*
jannet.gomez@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
Qian Zhe (Danny) Zhang*
danny.zhang@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

**Pro hac vice* admission forthcoming
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ..... 1
FACTUAL BACKGROUND ..... 2
I. H.B. 752 Criminalizes Transgender People's Use of Restrooms Aligned With Their Gender Identity, With Ambiguous Exceptions. ..... 2
II. Idaho Adduces No Evidence That H.B. 752 Substantiates Any State Interest As Applied to Transgender Plaintiffs. ..... 4
III. Plaintiffs Are Transgender Idahoans Who Have Long Used Public Restrooms Aligned With Their Gender Identity With No Issues. ..... 5
LEGAL STANDARD ..... 7
ARGUMENT ..... 8
I. Plaintiffs Are Likely to Succeed on Their Void-for-Vagueness Claim. ..... 8
A. H.B. 752 Fails to Adequately Define Its "Reasonableness" and "Dire Need" Exceptions. 8
B. H.B. 752 Fails to Adequately Define What It Means for a Restroom To Be "Designated for Use by the Opposite Biological Sex." ..... 11
II. Plaintiffs' Equal Protection Claim Is Likely To Succeed. ..... 13
A. H.B. 752 Triggers Heightened Scrutiny Because It Discriminates Against Transgender People Based on Sex and Transgender Status. ..... 13
B. Defendants Cannot Satisfy Their Heavy Burden Under Heightened Scrutiny. ..... 14
III. Plaintiffs Are Likely to Succeed on Their Privacy Claim. ..... 19
IV. The Remaining Factors Favor a Preliminary Injunction. ..... 21
A. Enforcing H.B. 752 Will Cause Irreparable Harm. ..... 21
B. The Balance of Hardships and Public Interest Favors an Injunction. ..... 23
V. The Court Should Issue Relief to a Provisionally Certified Class, Or, In the Alternative, Issue a Statewide Injunction. ..... 24
VI. The Court Should Grant Relief by June 15, 2026. ..... 25
VII. The Bond Should Be Waived. ..... 25
CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ....................10

*Alliance for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) ....................7, 8, 23

*Arroyo Gonzalez v. Rossello Nevares*,
305 F. Supp. 3d 327 (D.P.R. 2018)....................19

*Belle Maer Harbor v. Charter Township of Harrison*,
170 F.3d 553 (6th Cir. 1999) ....................9

*Chalk v. United States District Court Central District of California*,
840 F.2d 701 (9th Cir. 1988) ....................21

*City of Chicago v. Morales*,
527 U.S. 41 (1999)....................8, 11

*In re Crawford*,
194 F.3d 954 (9th Cir. 1999) ....................19

*Diaz v. Brewer*,
656 F.3d 1008 (9th Cir. 2011) ....................25

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ....................14

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ....................7, 23

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ....................25

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
92 F.3d 1486 (9th Cir. 1996) ....................24

*Evancho v. Pine-Richland School District*,
237 F. Supp. 3d 267 (W.D. Pa. 2017)....................10

*F.V. v. Barron*,
286 F. Supp. 3d 1131 (D. Idaho 2018) ....................16, 22

*Forbes v. Napolitano*,
236 F.3d 1009 (9th Cir. 2000) ....................8, 9, 13

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)....................8, 9, 11

*Grimm v. Gloucester County. School Board*,
972 F.3d 586 (4th Cir. 2020) ....................10, 14

*Humanitarian Law Project v. Reno*,
9 F. Supp. 2d 1205 (C.D. Cal. 1998) ....................8

*Idaho Organization of Resource Councils v. Labrador*,
780 F. Supp. 3d 1013 (D. Idaho 2025) ....................24

*International Franchise Association, Incorporated v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) ....................7

*Jones v. Critchfield*
803 F. Supp. 3d 1078 (9th Cir. 2025) ....................14, 15, 17, 18

*Kallstrom v. Columbus*,
136 F.3d 1055 (6th Cir. 1998) ....................19

*Koe v. Noggle*,
688 F. Supp. 3d 1321 (N.D. Ga. 2023)....................25

*Kolender v. Lawson*,
461 U.S. 352 (1983)....................9

*Latta v. Otter*,
19 F. Supp. 3d 1054 (D. Idaho 2014) ....................15

*Livsey v. Salt Lake County*,
275 F.3d 952 (10th Cir. 2001) ....................19

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015)....................19

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................21

*National Association of Wheat Growers v. Becerra*,
468 F. Supp. 3d 1247 (E.D. Cal. 2020), *aff'd sub nom. National Association of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023)....................23

*National Cable & Telecommunications Association v. Federal Communications Commission*,
555 F.3d 996 (D.C. Cir. 2009) .....21

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025) .....19

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) .....23

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) .....19, 22

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) .....20, 21

*Reporters Committee for Freedom of the Press v. Rokita*,
751 F. Supp. 3d 931 (S.D. Ind. 2024), *aff'd and remanded*, 147 F.4th 720 (7th Cir. 2025) .....23

*Robinson v. Labrador*,
747 F. Supp. 3d 1331 (D. Idaho 2024) .....8, 24

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) ..... *passim*

*Romer v. Evans*,
517 U.S. 620 (1996) .....18

*SAGA v. Critchfield*,
2025 WL 2256884 (D. Idaho Aug. 7, 2025) .....14, 15

*Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) .....14

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
251 F.3d 814 (9th Cir. 2001) .....21

*United States v. Kravetz*,
706 F.3d 47 (1st Cir. 2013) .....19

*United States v. Skrmetti*,
605 U.S. 495 (2025) .....14

*United States v. Virginia*,
518 U.S. 515 (1996) .....13, 16

*Washington v. Trump*,
768 F. Supp. 3d 1239 (W.D. Wash. 2025) .......... 18, 19

*Whalen v. Roe*,
429 U.S. 589 (1977) .......... 19

*Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*,
858 F.3d 1034 (7th Cir. 2017) .......... 17

**STATE STATUTES**

Idaho Code Ann. § 18-901 .......... 16

Idaho Code Ann. § 18-903 .......... 16

Idaho Code Ann. § 18-905 .......... 16

Idaho Code Ann. § 18-907 .......... 16

Idaho Code Ann. § 18-924 .......... 16

Idaho Code Ann. § 18-4116 .......... 16

Idaho Code Ann. § 18-4117 .......... 2, 3, 4, 9, 12

Idaho Code Ann. § 18-6409 .......... 16

Idaho Code Ann. § 18-7008 .......... 4, 16

Idaho Code Ann. § 33-6705 .......... 5, 10

Idaho Code Ann. § 67-5902(9) .......... 3

Idaho Code Ann. § 67-9802 .......... 5, 10

**FEDERAL RULES**

Federal Rule of Civil Procedure 65(c) .......... 25

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment XIV .......... 8, 13

**LEGISLATIVE MATERIALS**

Idaho House Bill 752 .......... 1, *passim*

**OTHER AUTHORITIES**

Black's Law Dictionary (12th ed. 2024)....................9

John Salmond, *Jurisprudence* 183 n. (u) (Glanville L. Williams ed., 10th ed. 1947) ....................9

Merriam-Webster....................11

## INTRODUCTION

Idaho House Bill 752 ("H.B. 752") is one of the most restrictive and punitive laws in the country restricting restroom use by transgender people. The law prohibits transgender people from using restrooms aligned with their gender identity in all government-owned buildings and places of public accommodation. Idaho already has two similar laws, but H.B. 752 goes further in three critical respects. First, its sweep reaches private Idaho businesses open to the public, restricting restroom access for transgender people virtually everywhere outside the home. Second, it makes no attempt to provide transgender people *any* accommodation, including access to single-user restrooms, as an alternative to using multi-user restrooms that do not align with their gender identity. Indeed, the law goes so far as to *exclude* transgender people from *single-user* restrooms "designated for use by the opposite biological sex." Third, H.B. 752 is a criminal statute, which authorizes longer sentences than those contemplated for some crimes that require actual injury to a person or pose an evidence-based threat to public safety, including assault, battery, and driving under the influence. These defining features of H.B. 752 will force transgender Idahoans to use restrooms inconsistent with their gender identity on a daily basis—putting them at an increased risk of harassment and violence, outing them as transgender to strangers, compromising their medical treatment, and subjecting them to the indignity of having their gender disavowed by the government. If they fail to comply, Idaho will put them in jail.

Plaintiffs are transgender Idahoans who use public restrooms that align with their gender identity. As this case proceeds, Plaintiffs will prove that excluding transgender people from restrooms aligned with their gender identity is unlawful, regardless of the purported availability of single-user alternatives.[1] But at this stage, Plaintiffs, on behalf of themselves and a putative

[1] Plaintiffs' Complaint does not challenge the application of H.B. 752 to changing rooms.

class of transgender people who seek to use restrooms in Idaho aligned with their gender identity, ask this Court to preliminarily enjoin H.B. 752's enforcement in only two narrow respects, where its application not only violates the Constitution but is also especially cruel and unprecedented:

***First***, Plaintiffs seek to enjoin H.B. 752's application to their use of sex-designated single-user restrooms. In this context, the application of H.B. 752 serves no possible purpose other than to restrict transgender people from access to restrooms and deny their gender identity. ***Second***, Plaintiffs seek to enjoin H.B. 752's application to their use of a restroom wherever a single-user restroom is not available. A single-user restroom is not available if, to the individual's knowledge after inspection or inquiry, (a) no single-user restroom exists on the same floor as the multi-user facilities; or (b) all single user restrooms on the same floor as the multi-user facilities are occupied or not in service. Applying H.B. 752 in such circumstances would force transgender people to either risk violence and profound invasions of privacy—or to forego restroom use entirely. Plaintiffs request that relief be granted as to a provisionally-certified class.

Plaintiffs request a decision by no later than June 15, 2026, to ensure that, should this court decline to issue the requested injunction, there is time to pursue any appropriate appeals.

## FACTUAL BACKGROUND

### I. H.B. 752 Criminalizes Transgender People's Use of Restrooms Aligned With Their Gender Identity, With Ambiguous Exceptions.

On March 31, 2026, Governor Brad Little signed H.B. 752 into law, despite bipartisan concerns over its severe penalties and strong law enforcement opposition. Declaration of Kyle A. Groves ("Groves Decl.") ¶ 3. H.B. 752 criminalizes the act of "knowingly and willfully enter[ing] a restroom or changing room in a government-owned building or a place of public accommodation . . . that is designated for use by the opposite biological sex." Idaho Code Ann §

18-4117(1).[2] That prohibition applies to both single and multi-occupancy sex-designated restrooms. The statute does not define "biological sex." At this stage only, Plaintiffs assume that the State intended the term to mean a person's sex assigned at birth. *See Roe v. Critchfield*, 137 F.4th 912, 920 n.2 (9th Cir. 2025) (making similar assumption as to the term "biological sex" under Idaho statute). For a transgender person, the law criminalizes the entry into any sex-designated restroom, whether multi- or single-occupancy, aligned with their gender identity. The first offense is a misdemeanor, punishable by up to one year imprisonment. *See* § 18-4117(1). The second offense is a felony punishable by up to *five years* of imprisonment. *Id.* A second offense includes pleading or being found guilty within five years of "a similar statute in another state, or any similar local ordinance." *Id.* H.B. 752 is placed under Idaho Code, Chapter 41, Title 18, for "crimes and punishments" for "indecency and obscenity." *See* Groves Decl., Ex. 1.

H.B. 752 applies to public accommodations "of any kind," § 67-5902(9), including restaurants, doctor offices, theaters, museums, banks, gas stations, churches, and stores. It also applies to all government-owned buildings, including state courthouses, city halls, local and state parks, and Idaho's Capitol Building. No transgender person could live, work, or travel in Idaho without encountering H.B. 752's prohibitions on a daily basis.

H.B. 752 includes ten separate exceptions, including for entry into a prohibited restroom for emergency aid and law enforcement and for non-emergency purposes like athletic coaching. *See* § 18-4117(2)(a)-(j). Two of H.B. 752's exceptions are notably ambiguous. H.B. 752 permits people to use a "single-user facility designated for the opposite sex" when it is the only one "reasonably available." § 18-4117(2)(e). H.B. 752 also permits people to use an otherwise prohibited sex-designated multi-user restroom when "the person is in dire need of urinating or

[2] All statutory code citations are to the Idaho Code Annotated, unless otherwise noted.

defecating" and the prohibited restroom is the only one "reasonably available at the time of the person's use." *Id.*, § 18-4117(2)(f). H.B. 752 does not define "reasonably available"; nor does it state what it means for a person to be in "dire need of urinating or defecating."

## II. Idaho Adduces No Evidence That H.B. 752 Substantiates Any State Interest As Applied to Transgender Plaintiffs.

H.B. 752 includes no legislative findings, but various lawmakers asserted that the purpose of the law was to "protect privacy, safety, and dignity, especially for women and girls."[3]

Evidence before the Legislature made clear that H.B. 752's restroom ban not only would not serve any safety or privacy interest—but would harm both objectives. Representatives for the Idaho Chiefs of Police Association testified that the bill "would place an unrealistic and absurd burden on Idaho law enforcement officers to somehow know, or be able to readily identify visually to [sic] biological sex of another human being." Groves Decl., ¶ 19 (Anthony Dahlinger). The Idaho Fraternal Order of Police concurred, stating that the process of enforcing this law "could be very invasive and intrusive" and that it is "not reasonable" to expect law enforcement to "make people undress and check" for a person's biological sex. Groves Decl., ¶ 19 (Bryan Lovell). Law enforcement representatives also opposed the bill on the basis that Idaho law already provides tools to address unwanted presence and protect safety in restrooms.[4]

Idaho likewise did not identify any evidence that privacy interests are served by H.B.

[3] Groves. Decl., ¶ 16 (Rep. Rasor (bill sponsor)); *see also Id.* ¶ 17 (Rep. Toews: the bill was intended to uphold the "reasonable expectation of privacy and security" in sex-separated bathrooms).

[4] *See* Groves Decl., ¶ 19 (Anthony Dahlinger: "[Idaho Chief of Police Association] finds that House Bill 752 would create unnecessary law… Idaho Code 18-7008 currently gives private citizens and Idaho law enforcement the means in which to address and remedy an individuals unwanted and disruptive presence on public or private property."); Ex. 4 (Idaho Fraternal Order of Police, Written Testimony: "Idaho law already provides tools to address inappropriate or disruptive behavior in restrooms or changing areas through existing statutes such as trespass or other criminal offenses.")

752. Single-user restrooms (to which the law applies) by definition do not have other occupants. Multi-user restrooms are structured to *protect* privacy via individual stalls available for anyone to use. And there is no evidence that the longstanding status quo—in which transgender people in Idaho have used restrooms aligned with their gender identity for decades—created any privacy problems justifying such a sweeping, criminal law.[5]

The legislative record included no persuasive justification for H.B. 752, but it did include evidence of legislators' belief that transgender people do not exist and their identities are invalid.[6] Opponents expressly called out the bill for targeting transgender people.[7] The attempted erasure of transgender people is evident in the law itself, which goes further than any previous Idaho law, imposing criminal consequences without regard to whether a facility offers single-user restrooms. *Compare* § 33-6705 (requiring reasonable accommodation in K-12 schools where law applied); § 67-9802 (same, in colleges).

## III. Plaintiffs Are Transgender Idahoans Who Have Long Used Public Restrooms Aligned With Their Gender Identity With No Issues.

Plaintiffs are six transgender Idahoans, all of whom have used restrooms aligned with their gender identity without incident for years.

***Emilie***. Emilie Jackson-Edney is a 77-year-old transgender woman. Jackson-Edney Decl. ¶¶ 2-3. For over three decades, she worked in engineering design and construction management

---

[5] Multiple lawmakers asserted, without producing evidence, that there are "bad actors" seeking to perpetrate harm by pretending to be transgender. *See* Groves. Decl., ¶ 18.

[6] *See* Groves Decl., ¶ 18 (Sen. Kohl: "Trans women aren't women. They're men. And they need to be treated as such."; Sen. Shippy: "[T]here is no oppressed community that we're dealing with here because there is only male and female"; Rep. Hill: referring to a transgender person as a "dude in a dress").

[7] *See* Groves Decl. ¶ 18 (Rep. Handy: "So, and if we're just trying to cast stones at transgender people, then I'm not going to be the first one to throw that stone."; Sen. Ruchti: "So, you know, if we're gonna do this, let's just do it, say why we're doing it. It's against trans people.")

for Ada County. *Id.* ¶ 6. Emilie is a lifelong Idahoan and has used women's restrooms for two decades with no issue. *Id.* ¶¶ 5, 10.

***Daniel***. Daniel Doe[8] is a 32-year-old transgender man. Doe Decl. ¶¶ 2-4. He has lived in Idaho for 30 years and has used men's restrooms with no issues. *Id.* ¶¶ 5, 8. He wears a medical device and often needs to use men's restrooms to adjust the device in private. *Id.* ¶ 17.

***Diego***. Diego Fable is a 37-year-old transgender man. Fable Decl. ¶¶ 2-4. He works for the Idaho Housing and Finance Association and has lived in Idaho for the past 10 years. *Id.* ¶¶ 5-6. Even though Diego loves his life in Boise and has used men's restrooms for four years with no issues, he is planning to move out of the state to avoid the impossible choice between his safety and the risk of criminal prosecution that H.B. 752 presents, despite significant disruption and consequences for his life and livelihood. *Id.* ¶¶ 9, 19-22, 24.

***Amelia***. Amelia Milette is a 50-year-old transgender woman. Milette Decl. ¶¶ 2-4. She is a lifelong Idahoan and a consultant who provides support to over 100 businesses. *Id.* ¶¶ 5-6. She has used women's restrooms for six years with no issues. *Id.* ¶ 9.

***Peter***. Peter Poe is a 33-year-old transgender man, who has lived in Idaho for over 25 years. Poe Decl. ¶¶ 2-5. He has used men's restrooms for over a decade with no issues. *Id.* ¶ 8.

***Zoey***. Zoey Wagner is a 30-year-old transgender woman. Wagner Decl. ¶¶ 2-4. She has lived in Idaho since she was two years old and has used women's restrooms for the past two years with no issues. *Id.* ¶¶ 5, 8. She has been searching for jobs after H.B. 752 passed and avoided job opportunities with offices that lacked gender-neutral restrooms. *Id.* ¶ 17.

All Plaintiffs express themselves and are perceived by others in line with their gender

[8] Two of the six plaintiffs are proceeding under pseudonym. Those plaintiffs have concurrently filed a Motion for Leave to Proceed Under Pseudonym. *See* Dkt. 5-1 (Pls.' Mem. ISO Daniel Doe and Peter Poe's Motion for Leave to Proceed Under Pseudonym).

identity. Jackson-Edney Decl. ¶ 14; Doe Decl. ¶ 4, 12; Fable Decl. ¶ 14; Milette Decl. ¶ 14; Poe Decl. ¶ 13; Wagner Decl. ¶ 13. They are frequently unable to locate gender-neutral restrooms in their day-to-day lives. Jackson-Edney Decl. ¶ 12; Doe Decl. ¶ 10; Fable Decl. ¶ 12; Milette Decl. ¶ 12; Poe Decl. ¶ 11; Wagner Decl. ¶ 11. Plaintiffs fear that if they are forced to use restrooms incongruent with their gender identities and outward appearances, they will likely experience violence, harassment, unwanted attention, and other harms. Jackson-Edney Decl. ¶ 15; Doe Decl. ¶ 13; Fable Decl. ¶ 15; Milette Decl. ¶ 15; Poe Decl. ¶ 14; Wagner Decl. ¶ 14. For example, Daniel Doe wears a beard, presents himself as a man, and is perceived by others as a man. Doe Decl. ¶ 12. He fears that if he uses a public restroom, including to adjust his medical device, he could be subjected to violence or harassment if strangers perceive him as a man entering a women's restroom. *Id.* ¶¶ 13, 15, 17. To reduce their need to use restrooms in government buildings and places of public accommodation, Plaintiffs plan to reduce their liquid and food consumption. Jackson-Edney Decl. ¶ 17; Fable Decl. ¶ 19; Milette Decl. ¶ 18. Plaintiffs also plan to spend less time outside of their homes, Fable Decl. ¶ 19; Wagner Decl. ¶ 16, or to avoid using public restrooms altogether. Fable Decl. ¶ 19; Poe Decl. ¶ 16.

## LEGAL STANDARD

A preliminary injunction is merited where a party shows that "(1) it is likely to succeed on the merits of its claim, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of hardships tips in its favor, and (4) a preliminary injunction is in the public interest." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A court may also grant a preliminary injunction when moving party shows "serious questions going to the merits," if the balance of hardships "tips sharply" in the moving party's favor. *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475,

490–91 (9th Cir. 2023); *see also Robinson v. Labrador,* 747 F. Supp. 3d 1331, 1340-42 (D. Idaho 2024) (granting preliminary injunction under the serious questions standard based on the medical necessity of gender-affirming care and on declarations showing that the loss of access to hormone therapy would likely cause irreparable harm to plaintiffs' mental health).

## ARGUMENT

Plaintiffs are likely to succeed on the merits as to multiple claims they assert in their Complaint—in particular, as applied in the narrow contexts for which they seek preliminary injunctive relief. And because they face irreparable harm without an injunction, a preliminary injunction is also warranted under the serious questions standard.

### I. Plaintiffs Are Likely to Succeed on Their Void-for-Vagueness Claim.

Plaintiffs are likely to succeed in showing that H.B. 752 is unconstitutionally vague. Under the Fourteenth Amendment's Due Process Clause, if a statute fails to provide reasonable people fair notice of what it prohibits, it is "void-for-vagueness." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). That requirement of clarity is "even more exacting" for criminal statutes. *See Forbes v. Napolitano*, 236 F.3d 1009, 1011–12 (9th Cir. 2000), *amended*, 247 F.3d 903 (9th Cir. 2000), *and amended*, 260 F.3d 1159 (9th Cir. 2001). The remedy for a void-for-vagueness law is to enjoin its application to conduct it does not clearly prohibit. *See Forbes*, 236 F.3d at 1011–12; *Humanitarian L. Project v. Reno*, 9 F. Supp. 2d 1205, 1213–14 (C.D. Cal. 1998), *aff'd,* 205 F.3d 1130 (9th Cir. 2000) (preliminarily enjoining criminal statute on vagueness grounds).

H.B. 752 is unconstitutionally vague in critical respects.

#### A. H.B. 752 Fails to Adequately Define Its "Reasonableness" and "Dire Need" Exceptions.

Two of H.B. 752's exceptions are unconstitutionally vague. H.B. 752 permits the use of a

single-user restroom "designated for the opposite sex" if such a facility "is the only facility reasonably available at the time" of use. § 18-4117(2)(e). It also permits the use of any sex-designated multi-occupancy restroom if a person "is in dire need of urinating or defecating and such facility is the only facility reasonably available." § 18-4117(2)(f). Crucial language in these exceptions is so vague as to fail to provide Plaintiffs fair notice of when these criminal provisions do and do not apply. *See Grayned*, 408 U.S. at 108; *Forbes*, 236 F.3d at 1011–12.

***"Reasonably Available."*** First, nothing in H.B. 752 defines what it means for a facility to be "reasonably available," even though that is a requirement for application of both exceptions. In particular, the criminal statute does not define "reasonable," nor contain any examples or other textual cues to provide guidance as to what the term means. *See Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 558 (6th Cir. 1999) (enjoining criminal law as void-for-vagueness and finding that there was no "commonly accepted meaning … for the term 'reasonable' which would provide [a police] officer with guidance … in executing his or her enforcement duties with any uniformity."). "[A] standard grounded on reasonableness … is susceptible to a myriad of interpretations conferring on the [police] 'a virtually unrestrained power to arrest and charge persons with a violation.'" *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 360 (1983)); *see also* REASONABLE, Black's Law Dictionary (12th ed. 2024) ("It is extremely difficult to state what lawyers mean when they speak of 'reasonableness.'" (quoting John Salmond, *Jurisprudence* 183 n.(u) (Glanville L. Williams ed., 10th ed. 1947)).

The lack of any definition of "reasonable" is particularly significant in this bill. In Plaintiffs' view, it is not remotely "reasonable" to be forced to use a sex-designated multi-occupancy restroom not aligned with their gender identity, at a minimum, when no gender-neutral single-user alternative is available. Nor is it reasonable to make Plaintiffs forgo restroom

use altogether. And that view—whether or not Idaho shares it—is inarguably a fair one. Multiple courts have held that it is *unconstitutional* to exclude transgender people from restrooms aligned with their gender identity—*even where* there are single-user restrooms available. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.* 972 F.3d 586, 613 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 773 (7th Cir. 2023); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 293-94 (W.D. Pa. 2017). These cases show, at minimum, that Plaintiffs (and police officers, prosecutors, and businesses) may fairly read the "reasonably available" standard to permit a transgender person to use a multi-occupancy restroom aligned with their gender identity when there is no single-user restroom otherwise available. Idaho may disagree with that reading—but if so, it should have specified as much in the statute itself. It cannot now direct its police officers to rely on an unstated, atextual definition of a critical term to put transgender people in jail.

Nor could Idaho credibly argue otherwise given its own prior legislation. Both S.B. 1100 (addressing restroom use in K-12 schools) and H.B. 264 (addressing restroom use at colleges) require schools to provide "reasonable" accommodations as a corollary to prohibiting transgender people from using sex-designated multi-occupancy restrooms aligned with their gender identity. Both laws expressly specify that a "reasonable" accommodation does "not include access to a restroom … that is designated for use by members of the opposite sex while persons of the opposite sex are present or could be present." § 33-6705(2); § 67-9802(6)(b). The absence of that same language in H.B. 752 is dispositive. If Idaho had to expressly define "reasonable" in two previous restroom laws to foreclose Plaintiffs' reading here, it cannot argue that "reasonable," with *no* definition, unambiguously precludes Plaintiffs' interpretation.

***"Dire Need***." H.B. 752 also fails to define what constitutes a "dire need" that would

allow a transgender person to use a sex-designated multi-occupancy restroom aligned with their gender identity. According to Merriam-Webster, "dire" is defined as "desperately urgent[;]"[9] and "need" is "a condition requiring supply or relief."[10] Plaintiffs reasonably believe that, at minimum, if there is no gender-neutral single-user restroom available to them, they have a "dire need" to use the sex-designated multi-occupancy restroom aligned with their gender identity. The evidence in the record makes that clear. *See* Doe Decl. ¶¶ 9–11; Fable Decl. ¶¶ 10–13; Milette Decl. ¶¶ 10–13. And again, the cases that have held that the Constitution guarantees Plaintiffs' equal access to restrooms aligned with their gender identity show that Plaintiffs' understanding is one shared by reasonable people—the critical standard for a void-for-vagueness claim. *See Grayned*, 408 U.S. at 108.

Idaho's own law enforcement groups agree. The Idaho Fraternal Order of Police, recognized that the wording in H.B. 752 created "an unenforceable standard that places officers in a difficult position" of having to determine someone's level of "dire need." Groves. Decl., Ex. 4. As that testimony shows, the lack of clarity in this term delegates unlimited authority to law enforcement officers in Idaho to determine what counts as a "dire need" and whether an individual has met that threshold—a responsibility the officers themselves do not know how to effectuate. *See Morales*, 527 U.S. at 71 (holding an ordinance unconstitutional because officers "enjoy[] too much discretion in *every* case").

### B. H.B. 752 Fails to Adequately Define What It Means for a Restroom To Be "Designated for Use by the Opposite Biological Sex."

Finally, it is not just H.B. 752's exceptions that are ambiguous. The law's central

---

[9] *Dire*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/dire (last visited April 16, 2026).

[10] *Need*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/need (last visited April 16, 2026).

prohibition is also unconstitutionally vague as to which restrooms it actually applies to. H.B. 752 purports to apply to covered restrooms that are "designated for use by the opposite biological sex." § 18-4117(1). But, even assuming "biological sex" were clear, the statute does not define what it means for a restroom to be "*designated*" for any particular biological sex. Restrooms are frequently marked only "men" or "women"—without more. Such a marker does not mean that a particular business intends those terms to designate "biological sex" rather than gender identity. Restrooms may also be marked by pictures, which often rely on traditional gender stereotypes about how men and women dress.[11] A picture of a person in a skirt or dress does not clearly convey that a restroom is intended for the "biological sex" of women—especially when many transgender women themselves frequently wear dresses or skirts.

These ambiguities underscore the provision's lack of guidance to Plaintiffs and the general public. First, many businesses, churches, and other establishments have opposed H.B. 752, and do not intend, and have never intended, to "designate" the restroom for use by a single "biological sex." Nothing in H.B. 752 *requires* that any business, church, or other place of public accommodation designate its restrooms by "biological sex"; only that, if the restroom *is* so designated, H.B. 752's restrictions apply. It is not clear how a transgender person is supposed to determine what a business or any government entity intends in any given circumstance.

Second, transgender people in Idaho have used the restrooms corresponding with their gender identity for years without prohibition or incident. *See* Jackson-Edney Decl. ¶ 10; Doe Decl. ¶ 8; Fable Decl. ¶ 9; Milette Decl. ¶ 9; Poe Decl. ¶ 8; Wagner Decl. ¶ 8. Presumably, many, if not most, establishments will keep the same signs after passage of H.B. 752. It is not

---

[11] One commonly used example is a simplified human figure depicting two people standing in a front-facing position. The female figure is differentiated typically by a triangular shape that flares at the waist, symbolizing the use of a skirt or dress. *See* Groves Decl., Ex. 12.

clear how Plaintiffs would know that a long-standing designation suddenly signifies the exclusive use of a restroom by one "biological sex." Such a guessing game—rooted in imprecise language—is exactly what the Due Process Clause prohibits with respect to criminal statutes.

The remedy for success on a void-for-vagueness claim is an injunction against enforcing a law. *See, e.g. Forbes*, 236 F.3d at 1010. Plaintiffs have shown a likelihood of success on this claim and are entitled to a preliminary injunction.

## II. Plaintiffs' Equal Protection Claim Is Likely To Succeed.

Plaintiffs are, independently, likely to succeed on their Equal Protection claim. Under the Fourteenth Amendment, "[n]o State shall…deny to any person within its jurisdiction the equal protection of the laws." When a law discriminates based on a person's sex or transgender status, courts must apply heightened scrutiny. *See Roe*, 137 F.4th at 922–23. To satisfy such scrutiny, the government must show "the discriminatory means employed are substantially related to the achievement" of "important governmental objectives, a burden that "is demanding" and "rests entirely on the state." *United States v. Virginia*, 518 U.S. 515, 533 (1996). At this preliminary juncture, the question is simply whether Idaho can meet that high bar to justify criminalizing transgender people's use of single-user restrooms designated for the opposite sex assigned at birth; and criminalizing them for using sex-designated multi-occupancy restrooms where no gender-neutral single-user restroom is reasonably available—that is, the scope of conduct for which Plaintiffs seek a preliminary injunction. The answer is no.[12]

### A. H.B. 752 Triggers Heightened Scrutiny Because It Discriminates Against

[12] If this Court agrees Plaintiffs are likely to show H.B. 752 unconstitutionally vague, it need go no further. If it does go further, Plaintiffs assume, *arguendo*, that H.B. 752 prohibits Plaintiffs from using single and multi-occupancy restrooms aligned with their gender identity—full stop—and analyzes the prohibition based on that assumption.

**<u>Transgender People Based on Sex and Transgender Status.</u>**

Controlling precedent dictates that H.B. 752 triggers heightened scrutiny. In *Roe v. Critchfield*, the Ninth Circuit held that S.B. 1100, an Idaho law prohibiting transgender people from using restrooms aligned with their gender identity in K-12 schools, triggered heightened scrutiny because it discriminated based on sex *and* transgender status. 137 F.4th at 922–23. *Roe*'s analysis applies here. Like S.B. 1100, H.B. 752 discriminates based on sex: it prohibits, *e.g.*, a transgender man from using the men's restroom solely because of his sex assigned at birth. *See* 137 F.4th at 922.[13] H.B. 752 also discriminates on the basis of transgender status. As in *Roe*, H.B. 752's prohibition on the use of restrooms designated for the opposite sex "does not prevent cisgender [people] from using restrooms . . . aligning with their gender identity; it only bars transgender [people] from using facilities that align with their gender identity." *See id.* at 922–23 (citing *Grimm*, 972 F.3d at 607).[14]

**B. <u>Defendants Cannot Satisfy Their Heavy Burden Under Heightened Scrutiny.</u>**

Idaho cannot meet its burden of showing that enforcing H.B. 752 in the narrow circumstances for which Plaintiffs seek emergency relief "directly advance[s] the State's legitimate objectives as applied to … Plaintiffs." *Doe v. Horne*, 115 F.4th 1083, 1110 (9th Cir. 2024). Nor can it show that any such State interests "overcome the injury and indignity inflicted"

---

[13] H.B. 752 also discriminates on the basis of sex because it seeks to reinforce the gender stereotype that individuals should act according to their sex assigned at birth. *See Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) ("Discrimination because one fails to act in the way expected of a man or woman is forbidden.").

[14] This Court has twice rejected Idaho's argument that *United States v. Skrmetti*, 605 U.S. 495 (2025) abrogated *Roe*'s holding in these respects. *See Jones v. Critchfield*, 803 F. Supp. 1078, 1090 (D. Idaho 2025); *SAGA v. Critchfield*, No. 1:23-CV-00315-DCN, 2025 WL 2256884, at *5–*6 (D. Idaho Aug. 7, 2025).

on the disfavored class. *Latta v. Otter*, 19 F. Supp. 3d 1054, 1077 (D. Idaho 2014).[15]

***Safety.*** First, the application of H.B. 752 to sex-designated single-user restrooms and multi-occupancy restrooms in facilities where single-user restrooms are not reasonably available does not advance any safety interest of the State. In fact, it does the opposite.

As an initial matter, the Ninth Circuit and this court have both rejected Idaho's previous attempts to justify transgender restroom bans on safety grounds. *See Roe*, 137 F.4th at 924 n.8 (finding "no evidence in the record supporting th[e] conclusion" that S.B. 1100's means are substantially related to the State's asserted safety interest); *Jones*, 803 F. Supp. at 1091 (finding arguments based on safety "minimally persuasive"). In *Jones*, this court observed that the State's evidence in defending H.B. 264 on safety grounds showed that attacks in women's restrooms "are, for the most part, perpetrated by cisgender men" and that "there is no indication" any attack by transgender people in a women's restroom "has ever happened in Idaho." *Jones*, 803 F. Supp. at 1091. No evidence in the legislative record makes H.B. 752 any different.

That conclusion is certainly clear as to the contexts for which Plaintiffs seek preliminary relief. To start, *single-user* restrooms are intended for use by a *single individual*, meaning that a transgender person's use of such a facility, even one "designated for the opposite biological sex," cannot possibly pose any safety concerns for any other person. As to sex-designated multi-occupancy restrooms where no single-user gender-neutral options are reasonably available, forcing transgender people to use such facilities that do not correspond with their gender identity

[15] This Court previously denied preliminary injunctions to Idaho civil laws that restricted restroom use in schools and colleges. *See Jones*, 803 F. Supp. 3d at 1095; *SAGA*, 2025 WL 2256884, at *8. Plaintiffs in both cases are challenging those rulings—but regardless, they do not apply here. Unlike those laws, H.B. 752 imposes criminal penalties, does not purport to require any accommodations for any transgender person unwilling or unable to use sex-designated restrooms not corresponding to their gender identity, sweeps far more broadly than schools, and covers even single-user facilities.

*undermines* safety. A "mismatch[]" between a transgender person's outward expression of gender identity and their sex assigned at birth can incite harassment or even assault. *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1137 (D. Idaho 2018); *see also* Ettner Decl., ¶¶ 56-57. When faced with such risk, transgender people often reduce their food and drink intake to avoid having to use the restroom at all, exposing them to a further risk of physical harm. *See* Ettner Decl., ¶¶ 50-51; Jackson-Edney Decl. ¶ 17; Fable Decl. ¶¶ 17, 19; Milette Decl. ¶ 18.

In any event, any actual safety concerns posed by a person entering a restroom "designated for the opposite biological sex" are addressed by Idaho's existing laws. *See, e.g.*, § 18-901 (assault); § 18-903 (battery); § 18-905 (aggravated assault); § 18-907 (aggravated battery); § 18-924 (sexual battery); § 18-6101 (rape); §18-7902 (malicious harassment); § 18-4116 (indecent exposure); § 18-7008 (criminal trespass); §18-6409 (disturbing the peace).

***Privacy.*** Idaho also cannot show that excluding Plaintiffs in the circumstances at issue in this Motion is "substantially related" to any privacy interests. *U.S. v. Virginia*, 518 U.S. at 533.

The State has *no* privacy justifications to enforce H.B. 752 against Plaintiffs in *any* single-user restroom in the State because these facilities are by their nature designed and intended for use by a single person. A transgender person's use of such facilities, no matter the restroom's sex designation, does not implicate the privacy interests of another person.

Nor does Idaho have a privacy interest in enforcing H.B. 752 to exclude transgender people from sex-designated multi-user restrooms aligned with their gender identity where no single-user alternative is reasonably available. As an initial matter, multi-occupancy restrooms (whether or not single-user restrooms are nearby) already protect users' privacy interests through structural mechanisms that do not require discrimination. As the Ninth Circuit has observed, "[c]ommon sense tells us that the communal restroom is a place where individuals act in a

discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall." *Roe*, 137 F.4th at 925 (quoting *Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1052 (7th Cir. 2017)).[16]

As a practical matter, enforcing H.B. 752 undermines the State's purported privacy interests in the contexts for which Plaintiffs seek relief. In *Jones*, this Court noted that, if transgender people use sex-designated multi-occupancy restrooms that do not correspond with their gender identity, it "could make [the transgender individual] and/or those in *that* restroom uncomfortable," which could itself "caus[e] privacy concerns." *Jones*, 803 F. Supp. 3d at 1091 n.13. In that case, the Court relied on its interpretation of H.B. 264 as providing the "accommodation" of a "single-occupancy restroom" to avoid that result. *Id.* But H.B. 752 has no such accommodation provision, and thus implicates the precise privacy concern the Court identified in *Jones* with no mechanism to avoid them. Moreover, many transgender people—including the Plaintiffs in this case—have a physical appearance consistent with their gender identity. *See* Ettner Decl., ¶¶ 33, 36; Jackson-Edney Decl. ¶ 14; Doe Decl. ¶ 12; Fable Decl. ¶ 14; Milette Decl. ¶ 14; Poe Decl. ¶ 13; Wagner Decl. ¶ 13; *cf. Jones*, 803 F. Supp. at 1086 (noting that both Plaintiffs used restrooms "consistent with [their] gender identity and physical appearance"). All of the Plaintiffs have used restrooms consistent with their gender identity without incident for years. Jackson-Edney Decl. ¶ 10; Doe Decl. ¶ 8; Fable Decl. ¶ 9; Milette Decl. ¶ 9; Poe Decl. ¶ 8; Wagner Decl. ¶ 8. Forcing Plaintiffs to use restrooms based on their sex

[16] In *Roe*, the Ninth Circuit affirmed the denial of a preliminary injunction based on a *facial* challenge against S.B. 1100's application to all covered facilities, including its application to locker rooms, overnight facilities, showers, and restrooms. *See* 137 F.4th at 925. The court stressed that it was not deciding that the law could validly be applied to all covered facilities—in particular restrooms. *Id.* at 942. To the contrary, it noted that "it is plain that the privacy interest in avoiding bodily exposure is most strongly implicated in locker rooms and communal shower rooms that lack curtains or stalls." *Id.* at 925.

assigned at birth (i.e. inconsistent with their gender identity and physical appearance) would make them and others uncomfortable by subverting—rather than conforming— societal expectations of bathroom use. And, for exactly that reason, it would out Plaintiffs as transgender, an egregious privacy violation that itself merits an injunction.

***Animus***. Finally, H.B. 752 fails for another reason: its vast criminal sweep, absence of any attempt to create discernable accommodations, and legislative history make clear that it was motivated by animus against and disapproval of transgender people—meaning it would not even survive rational basis review. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that when a law's "sheer breadth is so discontinuous with the reasons offered for it," a court may draw an inference of animus and strike down the law for lack of rational basis). H.B. 752 reaches beyond government and into private commercial establishments—where "an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society" take place. *Id.* at 631. H.B. 752 does not require "that individual restrooms be made available so transgender individuals need not use group bathrooms which do not align with their gender identity." *Jones*, 803 F. Supp. 3d at 1095. Nor does the law require a reasonable accommodations process for transgender people unwilling or unable to use restrooms "designated for the opposite sex." And indeed, the law even applies to single-user restrooms—making clear its purpose was not safety, or privacy, but to subject transgender people to the humiliation and degradation that comes with the state-mandated disavowal of their core identity. Statements by legislators confirm that the law was motivated not by evidence but by a belief that transgender people simply do not exist. *See supra*, Part II; *e.g.*, Groves Decl., ¶ 18 (Sen. Kohl: "Trans women aren't women. They're men. And they need to be treated as such."). Federal courts have held that government action that "denies the very existence of transgender people and instead seeks to erase them" evinces "[a]

bare desire to harm a politically unpopular group." *Washington v. Trump*, 768 F. Supp. 3d 1239, 1250 (W.D. Wash. 2025); *see PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025) (one "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist"). So it is here.

## III. Plaintiffs Are Likely to Succeed on Their Privacy Claim.

Plaintiffs are also likely to succeed in showing that H.B. 752 violates their right to informational privacy under the Due Process Clause, as applied to the contexts addressed in this Motion. *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). Compelled disclosure of sensitive personal matters implicates a right to privacy where the disclosure may: (1) invite stigma or embarrassment, *In re Crawford*, 194 F.3d at 960; (2) invite bodily harm, *Kallstrom v. Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998); or (3) reveal intimate personal details, such as information implicating one's sexual, medical, or mental health, including one's transgender status. *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (recognizing a privacy right in maintaining the confidentiality of one's transgender identity); *United States v. Kravetz*, 706 F.3d 47, 63 (1st Cir. 2013) (medical and mental health); *Livsey v. Salt Lake Cnty*., 275 F.3d 952, 956 (10th Cir. 2001) (sexual and medical health).

Disclosure of one's transgender status implicates all of these considerations. Many courts have held that policies requiring transgender individuals to disclose their transgender status infringes their right to informational privacy. *See, e.g.*, *Powell*, 175 F.3d at 111 (stating that the "private and intimate" nature of transgender status is "really beyond debate"); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (holding that the denial of sex marker changes on driver's licenses "forces [transgender people] to disclose their transgender status in violation of their constitutional right to informational privacy"); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (observing that the [denial of a license with an accurate sex

marker] creates a very real threat to Plaintiffs' personal security and bodily integrity" and implicates fundamental right to privacy (cleaned up)); *Ray v. McCloud*, 507 F. Supp. 3d 925, 931-32 (S.D. Ohio 2020) (observing that the "forced disclosure of an individual's transgender status could subject them to risk of bodily harm" and that this "highly personal" information is "protected by the due process clause's informational right to privacy").

H.B. 752 violates Plaintiffs' constitutionally-protected right to privacy. By forcing Plaintiffs to use restrooms misaligned with their gender identity, the law causes involuntary disclosure of their transgender status, including to strangers they encounter in public restrooms and government officials in state-owned buildings. *See* Ettner Decl., ¶¶ 55, 58; Jackson-Edney Decl. ¶ 15; Doe Decl. ¶ 13; Fable Decl. ¶ 15; Milette Decl. ¶ 15; Poe Decl. ¶ 14; Wagner Decl. ¶ 14. H.B. 752 also deprives Plaintiffs of significant control over the circumstances around such disclosure. *See* Ettner Decl., ¶¶ 55, 58; Jackson-Edney Decl. ¶¶ 14-15; Doe Decl. ¶¶ 12-13; Fable Decl. ¶¶ 14-15; Milette Decl. ¶¶ 14-15, 20-21; Poe Decl. ¶¶ 13-14; Wagner Decl. ¶¶ 13-14.

The risk of disclosure is particularly high in the circumstances where Plaintiffs seek preliminary relief: where Plaintiffs have no reasonable option other than to use a sex-designated single-user or multi-occupancy restroom. In those circumstances, the law relegates a transgender woman to the men's restroom—which would immediately out her as transgender because she lives, dresses, and expresses herself as a woman—and vice versa for transgender men. Being seen entering or leaving a sex-designated single-user restroom not aligned with a transgender person's gender identity has the same effect.[17] Even if Plaintiffs take great pains to avoid multi-

[17] *Roe*'s holding that plaintiffs in that case did not show that S.B. 1100 likely violated their right to informational privacy is inapposite. *Roe* suggested, on the limited record before it, that, because any student could request an accommodation, observing a student accessing a *unisex single-occupancy facility* would not "necessarily disclose that student's transgender status." *Roe*, 137 F.4th at 932. But *Roe* did not purport to address whether being compelled to use sex-

user restrooms and sex-designated single-user restrooms altogether, they will be unable to do so where no gender-neutral single-user restroom is available.[18]

Plaintiffs who are "out" in some aspects of their lives retain a privacy interest in whether, when, how, and to whom to disclose their transgender status. Individuals "do not lose their informational right to privacy by choosing to share the private information at certain times with certain people." *Ray*, 507 F. Supp. 3d at 934; *see Nat'l Cable & Telecomm. Ass'n v. FCC*, 555 F.3d 996, 1001 (D.C. Cir. 2009) ("It is widely accepted that privacy deals with determining for oneself when, how and to whom personal information will be disclosed to others."). Some Plaintiffs are known to be transgender by some people in their lives, but that information is not typically known or immediately knowable to strangers, such as others in a public restroom. *See* Jackson-Edney Decl. ¶¶ 14-15; Doe Decl. ¶¶ 12-13; Fable Decl. ¶¶ 14-15; Milette Decl. ¶¶ 14-15, 20-21; Poe Decl. ¶¶ 13-14; Wagner Decl. ¶¶ 13-14.

## IV. The Remaining Factors Favor a Preliminary Injunction.

### A. Enforcing H.B. 752 Will Cause Irreparable Harm.

H.B. 752 will irreparably harm Plaintiffs if not enjoined. To start, a violation of constitutionally-protected rights is *per se* irreparable harm. *See Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 827 (9th Cir. 2001). Irreparable harm can also be shown where, as here, a plaintiff is likely to experience "emotional stress, depression, and a reduced sense of well-being." *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988). If not enjoined, H.B. 752 will

---

designated single- or multi-occupancy restrooms inconsistent with one's gender identity "necessarily disclose[s]" the user's transgender status.

[18] Even successful efforts to avoid all restrooms other than gender-neutral single-user facilities are likely to out Plaintiffs as transgender. Because that circumstance is not within the scope of the preliminary relief requested in this Motion, Plaintiffs do not address it further here.

cause those harms to Plaintiffs. Forcing Plaintiffs to use sex-designated restrooms that do not align with their gender identity will increase their levels of gender dysphoria, harming their mental health. Ettner Decl., ¶¶ 49, 63; Jackson-Edney Decl. ¶ 13; Doe Decl. ¶ 11; Fable Decl. ¶ 13; Milette Decl. ¶¶ 13, 16; Poe Decl. ¶ 12; Wagner Decl. ¶ 12. And, when faced with the prospect of having to use restrooms inconsistent with their gender identity, transgender people often try to avoid using restrooms altogether through limiting food and drink intake, increasing the risk of discomfort, pain, and medical issues. Ettner Decl., ¶¶ 50-51; Jackson-Edney Decl. ¶ 17; Fable Decl. ¶¶ 17, 19; Milette Decl. ¶ 18. All of these harms are exacerbated by H.B. 752's prospect of criminal conviction and incarceration—which magnify the consequences of non-compliance; and which alone would amount to irreparable harm.

H.B. 752 will also force transgender people to continually out themselves to strangers in public, which will create further irreparable harm. The disclosure of one's transgender status, particularly where one would otherwise keep that information private, can provoke intense "hostility and intolerance from others," *Powell*, 175 F.3d at 111, including harassment and assault. *See F.V. v. Barron*, 286 F. Supp. 3d at 1137; Jackson-Edney Decl. ¶ 15; Doe Decl. ¶ 13; Fable Decl. ¶ 15; Milette Decl. ¶ 15; Poe Decl. ¶ 14; Wagner Decl. ¶ 14; Groves Decl. Exs. 21-30.[19] The fact that Plaintiffs' physical appearances do not match their sex assigned at birth puts Plaintiffs who attempt to comply with H.B. 752 at risk of false accusations of violating the law, with an accompanying risk of physical harm. *See* Jackson-Edney Decl. ¶ 15; Doe Decl. ¶¶ 13,15; Fable Decl. ¶ 15; Milette Decl. ¶ 15; Poe Decl. ¶ 14; Wagner Decl. ¶ 14.[20] Indeed, one legislator

---

[19] *See* Groves Decl. ¶ 20 (Testimony by Carolyn Blackherst: "[A] beloved transgender friend of more than 45 years was targeted outside the bathroom by a group of men. All my friend wanted to do was to pee, but this emboldened group of men stopped them, even at Meridian City Hall")

[20] *See* Groves Decl. ¶ 20 (Testimony by Scar Rulien: "I [a trans man] was six months into taking testosterone as part of my medical transition and thought that the women's restroom was the

supporting H.B. 752 implied that he would commit vigilante violence against someone he perceived to be violating the law. *See* Groves Decl., ¶ 18 (Rep. Hawkins: "If someone followed my daughter into a shower room, my family would have to come visit me somewhere. Because I wouldn't be waiting for police."). H.B. 752 would force transgender men to use the women's restroom—subjecting them to the very violence Rep. Hawkins cited in support of the law.

### B. <u>The Balance of Hardships and Public Interest Favors an Injunction.</u>

The balance of hardships here "tips sharply toward the plaintiff," supporting a preliminary injunction even under the serious questions standard. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 490–91 (9th Cir. 2023). "When the government is a party," the balance of hardships and public interest factors "merge." *Drakes Bay Oyster Co.,* 747 F.3d at 1092. If this Court does not grant the limited relief Plaintiffs seek, Plaintiffs will face inevitable and severe hardships in fulfilling a basic bodily function. *See supra*, Factual Background, IV.A. On the other hand, the State "has no legitimate interest in enforcing an unconstitutional law." *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1266 (E.D. Cal. 2020), *aff'd sub nom. Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023). And the public has an interest in preventing constitutional violations. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Enforcing the law is also unnecessary to further the State's purported interests, since—as law enforcement representatives testified—any harms the law purports to prevent are already addressed by existing criminal statutes. *See* Groves Decl. ¶ 19 (Testimony by Anthony Dahlinger, Bryan Lovell); *Reps. Comm. for Freedom of the Press v. Rokita,* 751 F. Supp. 3d 931, 948 (S.D. Ind. 2024)*, aff'd and remanded,* 147 F.4th 720 (7th Cir. 2025) (holding that balance of

---

safest restroom for me to use. I was immediately greeted by a woman asking, 'are you a man?' … This wasn't a safe situation for me. I felt uncomfortable. I felt afraid… I know she did too.").

hardships favored plaintiffs where "existing criminal statutes mitigate the potential harms that would result from enjoining the enforcement of" the challenged law.) A narrow preliminary injunction would do no more than maintain the existing status quo, under which the State has been unable to point to any incidents validating their purported safety concerns. *See Robinson,* 747 F. Supp. 3d at 1342 (maintaining pre-existing policy "would not impose any major burden on State Defendants").

## V. <u>The Court Should Issue Relief to a Provisionally Certified Class, Or, In the Alternative, Issue a Statewide Injunction.</u>

Plaintiffs ask this Court to issue a statewide injunction against enforcement of H.B. 752 in the circumstances the motion identifies. Statewide relief is merited on two independent bases.

First, Plaintiffs ask this Court to grant provisional class certification, for the reasons stated in their concurrently-filed Motion for Class Certification. *See* Dkt. 4-1 **(**Pls.' Mem. ISO Mot. Class Cert.); *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1046 (D. Idaho 2025) ("Courts routinely grant provisional class certification for purposes of entering injunctive relief."); *Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1351 (D. Idaho 2024) (provisionally certifying the class at the preliminary injunction stage).

Second, even if the Court does not provisionally certify the class, a statewide injunction should be issued because "the plaintiffs would not receive [] complete relief" without it. *Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1502 (9th Cir. 1996). In *Easyriders*, the Ninth Circuit held that a statewide injunction was necessary where plaintiffs challenged a statewide policy enforced by multiple law enforcement agencies and where a limited injunction would have required officers to determine plaintiff status during fast-moving interactions. *Id.* at 1501–02. So it is here. Plaintiffs in this case include six transgender individuals, two of whom seek to proceed under pseudonym. They live and travel across the state and face potential

enforcement from dozens of law enforcement agencies. *See supra*, III. A limited injunction would require officers to validate plaintiff status every time H.B. 752 is enforced and would be impossible to apply without compromising Plaintiffs' anonymity. *See Koe v. Noggle*, 688 F. Supp. 3d 1321, 1362 (N.D. Ga. 2023). Because such a limited injunction would likely result in erroneous arrest, detention, and parole consequences, a statewide injunction enjoining all county prosecutors in Idaho and the Attorney General is "necessary to provide complete relief to the plaintiffs." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021).

Even if the Court does not grant provisional class certification or order statewide relief, it should at minimum issue an injunction as to the named Plaintiffs in this case.

## VI. The Court Should Grant Relief by June 15, 2026.

H.B. 752 goes into effect on July 1, 2026. Groves Decl., ¶ 2. Plaintiffs therefore respectfully ask this Court to resolve this motion by June 15, 2026.

## VII. The Bond Should Be Waived.

Plaintiffs seek an injunction of unconstitutional conduct by a governmental entity. Because there is no risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined, Rule 65(c) bond is neither appropriate nor necessary and should be waived. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to preliminarily enjoin, as to a provisionally-certified class, the application of H.B. 752 to: (1) their use of sex-designated single-user restrooms; and (2) their use of a restroom wherever a single-user restroom is not available, defined as places where, to the individual's knowledge after inspection or inquiry, (a) no single-user restroom exists on the same floor as the multi-user facilities; or (b) all single-user restrooms on the same floor as the multi-user facilities are occupied or not in service.

DATED: April 29, 2026

Respectfully Submitted

By: */s/ Samuel L. Linnet*

Samuel L. Linnet
ALTURAS LAW GROUP, PLLC

J. Max Rosen
Katherine M. Forster
Kyle A. Groves
Qian Zhe (Danny) Zhang
Jannet Gomez
MUNGER TOLLES & OLSON LLP

Emily Croston
Paul Southwick
ACLU OF IDAHO FOUNDATION

Barbara Schwabauer
Eleanor Matheson
Chase Strangio
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Peter C. Renn
Kell L. Olson
Tara L. Borelli
Pelecanos
A.D. Sean Lewis
Charlie Ferguson
LAMBDA LEGAL DEFENSE & EDUCATION FUND