Emily Croston (ISB No. 12389)
ecroston@acluidaho.org
Paul Southwick (ISB No. 12439)
psouthwick@acluidaho.org
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750

Barbara Schwabauer*
bschwabauer@aclu.org
Eleanor Matheson*
ematheson@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street N.W.
Washington, DC 20005

Chase Strangio*
cstrangio@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
111 N 1st Avenue, Suite 2I, PO Box 2975
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Pelecanos*†
pelecanos@lambdalegal.org
A.D. Sean Lewis*
alewis@lambdalegal.org
Charlie Ferguson*†
cferguson@lambdalegal.org
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600 (T) | (855) 535-2236 (F)

**Pro hac vice* admission forthcoming
*Attorneys for Plaintiffs (additional counsel identified on the following page)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

EMILIE JACKSON-EDNEY, *et al.*,

*Plaintiffs*,

v.

RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, *et al.*,

*Defendants*.

Case No.

**DECLARATION OF KYLE A. GROVES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Katherine M. Forster*
katherine.forster@mto.com
Kyle A. Groves*
kyle.groves@mto.com
Jannet Gomez*
jannet.gomez@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
Qian Zhe (Danny) Zhang*
danny.zhang@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

*Pro hac vice* admission forthcoming
*Attorneys for Plaintiffs*

# DECLARATION OF KYLE A. GROVES

I, Kyle A. Groves, hereby declare:

1. I am an attorney at law duly admitted and licensed to practice law in the State of California and counsel for Plaintiffs Emilie Jackson-Edney, Daniel Doe, Diego Fable, Amelia Milette, Peter Poe, and Zoey Wagner in the above-captioned matter. I am concurrently filing my pro hac vice application to appear before this Court. I am an attorney at Munger, Tolles & Olson LLP in Los Angeles, California. I have personal knowledge of the facts contained herein or know of such facts by my review of the files maintained by Munger, Tolles & Olson LLP in the normal course of its business, and if called upon to do so, could and would competently testify thereto.

2. Attached hereto as Exhibit 1 is a copy of Idaho House Bill 752 ("H.B. 752"), codified at I.C. § 18-4117 et seq., downloaded on April 17, 2026, from https://legislature.idaho.gov/wp-content/uploads/sessioninfo/2026/legislation/H0752.pdf. The text of the bill provides that it will go into effect on July 1, 2026.

3. Attached hereto as Exhibit 2 is a copy of the status of H.B. 752, showing that it was signed into law on March 31, 2026. It was downloaded on April 21, 2026, from https://legislature.idaho.gov/sessioninfo/2026/legislation/H0752/.

4. Attached hereto as Exhibit 3 is a copy of the Statement of Purpose attached to H.B. 752, downloaded on April 17, 2026, from https://legislature.idaho.gov/wp-content/uploads/sessioninfo/2026/legislation/H0752SOP.pdf.

5. Attached hereto as Exhibit 4 is a copy of a letter provided by Bryan Lovell, President of the Idaho Fraternal Order of Police, to the Idaho House Judiciary, Rules and Administration Committee.

6. Attached hereto as Exhibit 5 is a copy of a letter provided by Andy Creech, the Payette County Sheriff and Legislative Chair of the Idaho Sheriffs Association, to the Idaho House Judiciary Rules & Administration Committee, dated March 11, 2026.

7. Attached hereto as Exhibit 6 is a copy of American Medical Ass'n, Issue Brief: Transgender Individuals' Access to Public Facilities (2025), https://www.ama-assn.org/system/files/transgender-public-facilities-issue-brief.pdf.

8. Attached hereto as Exhibit 7 is a copy of Scott McIntosh, *Family with transgender daughter plans to close business, leave Idaho,* The Idaho Statesman (Apr. 8, 2026), https://www.idahostatesman.com/opinion/from-the-opinion-editor/article315319866.html.

9. Attached hereto as Exhibit 8 is a copy of Pacific Research and Evaluation, LLC, U.S. Center for SafeSport, *2024 Culture & Climate Survey Report.*

10. Attached hereto as Exhibit 9 is a copy of Julie Luchetta, *For one woman, Idaho's latest anti-trans law leads to 'heart wrenching' decision,* Boise State Public Radio News (Apr. 7, 2026), https://www.boisestatepublicradio.org/news/2026-04-07/transgender-exodus-idaho-hb752-anti-trans-bathroom-bill-leaving.

11. Attached hereto as Exhibit 10 is a copy of Rebecca Boone & George Mulvihill, *Idaho bill aims to criminalize transgender bathroom use in private businesses,* PBS News (Mar. 26, 2026), https://www.pbs.org/newshour/politics/idaho-bill-aims-to-criminalize-transgender-bathroom-use-in-private-businesses.

12. Attached hereto as Exhibit 11 is a copy of Jody L. Herman, et al., UCLA School of Law Williams Institute, *Safety and Privacy in Public Restrooms and Other Gendered Facilities* (2025).

13. Attached hereto as Exhibit 12 is an excerpt from *Restroom Sign*, HOME DEPOT,

https://www.homedepot.com/b/Hardware-Signage-Stock-Signs-Restroom-Signs/N-5yc1vZ2fkp936.

14. Attached hereto as Exhibit 13 is a copy of Jody L. Herman, et al., UCLA School of Law Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* (2025).

15. Attached hereto as Exhibit 14 is a copy of Amira Hasenbush, et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms* (2018).

16. Below are excerpts from the legislative history of H.B. 752, by the House bill sponsor, Representative Cornel S. Rasor (R), District 1B:

a. Representative Rasor made the following statements in the February 6, 2026 House State Affairs Committee hearing. A full video of the hearing can be accessed at: https://insession.idaho.gov/IIS/2026/House/Committee/State%20Affairs/260206_hsta_0900AM-Meeting.mp4.

i. (00:00:23): "I commend to you this RS, which adds to Idaho Code 184117 to protect privacy, safety, and dignity, especially for women and girls, by prohibited knowing, willful entry into opposite sex designated government owned or public restrooms and changing rooms...It builds on SB 1100 in the schools, HB 264 in colleges and correction facilities and related 2025 measures. It extends biological, it extends proven biological sex protections to all public and government facilities for statewide consistency, which is important. … And finally, it prevents discomfort, voyeurism escalation, which is often a gateway to more serious crimes, and assaults while preserving single user options and narrow exceptions so no one is denied access or emergency aid."

ii. (00:03:49): [when asked how police would determine a person's biological sex] "DNA comes to mind. It should be very simple, using modern forensic techniques to determine the biological physiology of the perpetrator."

iii. (00:10:28): "In the course of an investigation or in the course of an arrest, if the sheriff or the police department makes it to the to the facility in time to effectuate that arrest, then the investigation proceeds from there. Identifications are made, if the person does not have identification on them, then law enforcement is tasked with finding out who that person is, and they can do that through various means. I guess I'm not, this is just going to follow a standard arrest procedure. This makes it illegal to do this. It provides a misdemeanor and a felony conviction. It gives law enforcement a clear process to follow, and which is, well actually it doesn't give them that, it points them to the clear process that they already follow in arresting procedures. I'm, having not been arrested, I'm unable to provide you with personal testimony about how this would proceed. But I know that when I've been stopped on the highway and asked for ID, I give them ID. So I don't know if that's an adequate answer."

iv. (00:13:09): "Essentially people of the biological sex that is not listed on the label of the restroom intentionally going in there for reasons other than what the restroom was designed for. That is quite clear that that's what it would actually be eventually dealing with. So for those folks who have mistakenly used the wrong restroom, that should come out very quickly. Most of this is very common sense."

b. Representative Rasor made the following statements in the March 11, 2026 House Judiciary Rules & Administration Committee hearing. A full video of the hearing can be accessed at

https://insession.idaho.gov/IIS/2026/House/Committee/Judiciary,%20Rules%20&%20Administration/260311_hjud_other_meet_time-Meeting.mp4.

i. (02:29:48): "My intention in this bill was to not put any more responsibility on businesses. It was to put the responsibility on the perpetrator."

ii. (02:30:30): "I was unaware that it was necessary for me to write an arrest procedure into every bill. I believe that we leave that to the discretion of our good sheriff's and police departments. That my prosecuting attorney told me that this covered it necessarily enough and that the, that the law enforcement personnel would be able to adjudicate what they needed to do in a given situation. There is nothing written in this bill regarding all of the, some of the allegations that have been made today. This is a simple bill about using the bathroom of your biology. That's all it addresses. There are 19 other states that have similar laws like this. And some of our laws have already been introduced and they have passed legal scrutiny. They have emulated laws which have worked their way through the courts."

c. Representative Rasor made the following statements in the March 16, 2026 House Floor Debate. A full video of the hearing can be accessed at https://insession.idaho.gov/IIS/2026/House/Chambers/HouseChambers03-16-2026.mp4.

i. (00:18:50): "It narrowly tailors exceptions for maintenance, medical aid, law enforcement, those exceptions can be seen through A through J. It's consistent with Idaho's recent policy direction. It builds on SB 1100 and HB 264 and related measures including SB 1209. It extends proven biological sex protections to all public school, public and government, private facilities for statewide consistency."

ii. (00:35:52): "Indecent exposure does happen all over, and this is to tighten up the indecent exposure laws where people intentionally take this opportunity to

perpetrate something on women's spaces that heretofore, for many years, was generally just a high school prank, and you never heard of people going to jail for that, or if you did, maybe you lived in a different community, I never did. So it's not about accidental incidents, I'll state it again. It's about intentional use. It's not about fear. It's about harm."

17. Below are excerpts from the legislative history of H.B. 752, by the Senate bill sponsor, Senator Ben Toews (R), District 4:

a. Senator Toews made the following statements in the March 23, 2026 Senate Judiciary & Rules Committee hearing. A full video of the hearing can be accessed at https://insession.idaho.gov/IIS/2026/Senate/Committee/Judiciary%20&%20Rules/260323_sj&r_0100PM-Meeting.mp4.

i. (00:22:32): "For you today is the privacy in women's, and it is regarding privacy in women's and sex separated spaces…Individuals in these vulnerable settings have a reasonable expectation of privacy and security. Protecting these spaces is not only about upholding expectations or preserving decency, it is empirically a matter of safety."

ii. (00:31:31): "There's a proliferation of single-use bathrooms, and I think that's very fortunate. More and more businesses, airports. You see them more and more often where they're single-use facilities. And so I'm happy to see that that's a movement in the right direction."

iii. (00:54:58): "There is no law currently that prohibits a biological man from entering a shower room with undressed women and children present. This bill addresses that situation. The bill would also allow preventative measures, even when no one is present, to stop someone from doing something like placing cameras, which unfortunately is a growing issue in our society."

b. Senator Toews made the following statements in the March 27, 2026 Senate Floor Debate. A full video of the debate can be accessed at https://insession.idaho.gov/IIS/2026/Senate/Chambers/SenateChambers03-27-2026.mp4.

i. (01:59:32): "You'll notice that the debate against this legislation centered almost 100% on bathrooms and not on changing rooms or dressing rooms or shower rooms. And there's a reason for that. Because a lot of what we're working to protect and a lot of what really needs to be done is protecting specifically women in those areas."

18. Below are other excerpts from legislators in the legislative history of H.B. 752:

a. Statements in the February 6, 2026 House State Affairs Committee hearing. A full video of the hearing can be accessed at https://insession.idaho.gov/IIS/2026/House/Committee/State%20Affairs/260206_hsta_0900AM-Meeting.mp4.

i. Statement by Representative Anne Henderson Haws (D), District 16 (00:05:19): "I'm concerned about the burden that we're placing on law enforcement and the potential costs that would be associated with, you know, DNA tests and things of that nature. I just, I'm having trouble seeing the mechanisms here."

ii. Statement by Representative Bruce D. Skaug (R), District 10 (00:08:25): "We were at SeaWorld many years ago, and I had my five or six kids with me at the time, and my 12-year-old girl walked out of the restroom at SeaWorld just pale and white and a little shaken. She has washed her hands in the sink in the restroom and there was a bearded man in a dress and high heels next to her in the women's restroom. We'd never seen or heard of anything like that before. And of course, different things crossed my mind, including violence, but he was a lot bigger than me. So as to the DNA, this is the situation we're looking at where it's

obviously a man in a woman's place. They're not, nobody's going to be checking as people walk in and out. But this is the obvious type of situation where what men used to be that were perverts were flashers. And now they're openly, instead of doing that, you don't see that happen anymore. They're going into women's restrooms and saying, hey, I'm a, I'm a woman. That's my opinion."

iii. Statements by Representative Monica C. Church (D), District 19 (00:09:59): "I mean how do we know an individual's name? You know, say you call the police and they come now it's you know an hour later. I, how do you know who the person is? Are you asking individuals to do a citizen's arrest? You know, how do we even have access to the human being that they've called about in the first place?"; (00:21:31): "The human in question has not done anything in this scenario except be in a room. They've not done anything. They have not assaulted. They have not peeping tomed. They have not done anything. They are just in a room. We, It's a slippery slope to make laws about people being in a room that's a crime."

iv. Statement by Representative Heather Scott (R), District 2 (00:18:08): "And I think this is good legislation. The way our society's going, I think there's a lot of moral decay, and I think there's nefarious people out there. And I don't want to see anybody cornered in a restroom for any reason. And, I don't know, I just think this is good legislation, and I appreciate it being brought forward for safety for girls."

b. Statements in the March 11, 2026 House Judiciary Rules & Administration Committee hearing. A full video of the hearing can be accessed at: https://insession.idaho.gov/IIS/2026/House/Committee/Judiciary,%20Rules%20&%20Administration/260311_hjud_other_meet_time-Meeting.mp4.

i. Statement by Representative Joe Alfieri (R), District 4 (02:51:54): "Idaho does have laws on indecent exposure. 18-4116. The problem is we don't prosecute it

anymore. We don't prosecute it anymore because it's certainly now, obviously, perfectly acceptable for a man to walk into a woman's private space. This bill underlines that there is indecent exposure. It is indecent to do that to a woman and that's why I think we need to pass this."

ii. Statement by Representative Chris Mathias (D), District 19 (02:42:56): "Well, what we're being told is that we need to protect women and girls. But we already have all of these laws on the book that do just that."

c. Statements in the March 16, 2026 House Floor Debate. A full video of the debate can be accessed at: https://insession.idaho.gov/IIS/2026/House/Chambers/HouseChambers03-16-2026.mp4.

i. Statement by Representative Clay Handy (R), District 27 (00:23:48): "Idaho's sexual assault is on the decline. We're one of the lowest states in the country. We would probably be a world leader if we could throw someone in jail, in prison for five years for being in the bathroom, being in the women's bathroom or the wrong bathroom two times in five years. That to me seems just a little bit over the edge. So, and if we're just trying to cast stones at transgender people, then I'm not going to be the first one to throw that stone."

ii. Statement by Representative Chris Mathias (D), District 19 (00:24:34): "The reason that people don't have to ask people to leave when that person is committing indecent exposure is because indecent exposure, which is something that men are arrested for all the time in Idaho, has some sort of criminal act involved. Exposure, things like that. When men are doing things to women, violating their privacy, violating them, currently in Idaho, they're being arrested for indecent exposure. They're being arrested for video voyeurism, assault, battery, and in some cases criminal trespass."

iii. Statement by Representative Edward H. "Ted" Hill (R), District 14 (00:31:33): “But this is the bottom line, when I come down to this, when you get into the ‘dude in a dress’ goes into the locker room or the shower with your 16 year old daughter, that's never okay. So that's the visual, that's what I've got. That's what I look at. That is the issue. It happens in the YMCAs, it happens everywhere. That's the big problem and I'm not gonna accept that.”

iv. Statement by Representative Dale R. Hawkins (R), District 2B (00:34:13): “If someone followed my daughter into a shower room, my family would have to come visit me somewhere. Because I wouldn't be waiting for police.”

d. Statements in the March 23, 2026 Senate Judiciary & Rules Committee Hearing. A full video of the hearing can be accessed at: https://insession.idaho.gov/IIS/2026/Senate/Committee/Judiciary%20&%20Rules/260323_sj&r_0100PM-Meeting.mp4.

i. Statements by Senator James D. Ruchti (D), District 29 (00:29:48): “I'm just wondering about why we need this statute and I guess another way of asking that is why aren't our already present criminal statutes, let me give you some examples here, assault, battery, indecent exposure, lewd and lascivious conduct, video voyeurism, why are those not sufficient?”; (00:30:16): “Assault, battery, indecent exposure, lewd and lascivious conduct, video voyeurism. Why are those not sufficient?”; (01:03:20): “I've heard a lot of discussion from committee members trying to refute what I consider to be the obvious that this bill really is about trans people. Everybody on the panel or people on the panel have been saying, no, it's just to keep men out of women's locker rooms, women out of men's locker rooms. But we've been, the problems that are complained of or used as examples have been taken care of under our current criminal statutes. The things that are used as examples by those same members of the committee

and by testifiers are ones that we've been dealing with for years and years, and we've never had this statute. So why suddenly do we need this statute? Well, because of some event up in North Idaho dealing with a trans person. And you can't take this out of the context that it's in. If we go back over the last few years, we have had a lot of legislation here dealing with trans people and with bathrooms also dealing with trans people. So, you know, if we're gonna do this, let's just do it, say why we're doing it. It's against trans people. We'd prefer that they have separate but equal bathrooms. I don't think that sounds very good though, does it?"

ii. Statement by Senator Melissa Wintrow (D), District 19 (00:56:28): "I think the purpose is really targeted at a specific group of folks … It's about a law against the presence of somebody just for being alive."

iii. Statement by Senator and Vice Chairman Brandon Shippy (R), District 9 (01:00:06): "As I just contemplated some of the opposition to the legislation, I think it reveals just kind of the truth of the matter that there is male and there's female. And there's no other community, as we've said. It's a myth. It isn't true. And you know, somebody will say that there's a certain group of people that's separated out, and that there are trans people. And the law, this bill doesn't address a third group of people. It just addresses male and female. And what I'm, I guess, trying to say is that I think it reveals that we all know that there's male or there's female. And that's why some feel like they're being prevented from using a bathroom that they prefer, because they want to use something that's other than what their biological sex is. It's not a sex assigned at birth. It was that way at their conception, not at birth. We are male or female. [...] I think we have to keep reminding ourselves that there is no oppressed community that we're dealing with here because there is only male and female. So I reject the premise entirely."

e. Statements in the March 27, 2026 Senate Floor Debate. A full video of the debate can be accessed at: https://insession.idaho.gov/IIS/2026/Senate/Chambers/SenateChambers03-27-2026.mp4.

i. Statement by Senator Jim Guthrie (R), District 28 (01:25:45): "So let's say, senators, for example, you have a woman that's transitioning to be a man, and they have the features of a man, facial hair, that type of thing. So if they go in the bathroom with their biological sex, they're going to upset a lot of people and freak people out. If they go in the bathroom that now is consistent with their looks, they are knowingly and willfully going in a bathroom that is breaking the law. And for that, they can get a sentence of one year for the first offense, five years for the next one. I don't express this as some kind of unrealistic example, these are real-life things. And these are people that you can argue whether or not you agree with the decisions, but that's a real thing. They go in the bathroom they're supposed to, they upset people. If they go in the one that they now look like, they're breaking the law, which could include pretty severe penalties. Down on line 35, it says they can use the restroom when the person is in dire need. What does that mean? We seem to be really focused on this space and ignoring the fact that there are people that are just like us. They're human beings just like us. What are they supposed to do? I think stuff like this is harmful."

ii. Statement by Senator James D. Ruchti (D), District 29 (01:29:03): "If you're trans, this creates a crime for who you are…this is the first one I can think of where we've set up a crime for who somebody is."

iii. Statement by Senator Joshua Kohl (R), District 25 (01:41:40): "This bill is about protecting Idaho's cultural decency. It's about protecting our children. And especially, in many cases, protecting the females in our state who feel threatened when certain

individuals, men, particularly walk into their changing room. That's not right. I was sent here by my voters to protect Idaho's children and to protect Idaho's cultural decency. We don't want to become like California or New York. We want to keep Idaho safe from so many of the cultural influences that are pressing down onto the different states. I'll just say it, you know, there's a lot of conversation about the trans population, not a lot of conversation about protecting our young children and making sure that they're safe in their spaces. Trans women aren't women. They're men. And they need to be treated as such."

iv. Statement by Senator Tammy Nichols (R), District 10 (01:44:23): "Because unfortunately, and this is probably part of it too, there are bad actors out there that are using things that are in society or different individuals that are in society, like in the trans community, and utilizing that title, that label to be able to do things that they shouldn't be doing in these spaces."

v. Statement by Senator Ron Taylor (D), District 26 (01:46:13): "I have constituents who have called me and said we are going to move from Idaho because if this bill passes, my son or my daughter who has transitioned and is known in our community, will be thrown in jail. Now, maybe that's what some of us want is to chase a population that's marginalized out of Idaho. But that's not Idaho. Idaho was founded by a population that was marginalized. I want you to go back and think about the roots of Idahoans. They were marginalized. They started back east in Palmyra, New York and were chased across the country. And they started Idaho after they started Utah. So let's look at this bill for what it is. It's discrimination flat out."

vi. Statement by Senator Melissa Wintrow (D), District 19 (01:55:17): "And I did an account, when I look back in these 11 years I've been here in the legislature, the

only bills we saw until 2020 were those that were trying to ensure that people who are gay or trans were not discriminated against. And in 2020, we start to see a lot of bills arrive. And since then, if what we pass today would make 30 bills against this community."

19. Below are excerpts of testimony in the legislative history of H.B. 752 by representatives of law enforcement organizations, in the March 11, 2026 House Judiciary Rules & Administration Committee Hearing. A full video of the hearing can be accessed at: https://insession.idaho.gov/IIS/2026/House/Committee/Judiciary,%20Rules%20&%20Administration/260311_hjud_other_meet_time-Meeting.mp4.

a. Statements by Anthony Dahlinger, of the Idaho Chiefs of Police Association (01:37:38): "The Idaho Chiefs Police Association stands in opposition of House Bill 752 as it is written and recommends it be held in committee or sent to amending orders. ICOPA finds that House Bill 752 would create unnecessary law and place Idaho law enforcement in impossible situations. Idaho code 18-7008 currently gives private citizens and Idaho law enforcement the means in which to address and remedy an individuals unwanted and disruptive presence on public or private property. House Bill 752 would create a situation where an individual's unwanted presence would be immediately a misdemeanor crime, which is an arrestable offense. Whereas Idaho Code 187008 dictates the same situation as likely only being an infraction penalty, and devoid of any other circumstance. Furthermore, House Bill 752 would place an unrealistic and absurd burden on Idaho law enforcement officers to somehow know, or be able to readily identify visually to biological sex of another human being. With the existence of a lawful remedy for law enforcement to address an individual's unwanted presence already established, House Bill 752 would create more problems rather than solutions"; (01:39:40): "I understand that representative Rasor pointed out, utilizing documentation and questioning as a

way in which to potentially find the answers to that question. However, that is unrealistic. Individuals in the state of Idaho are allowed and can currently under the law change their, what their driver's license or other documents say is what their biological sex is, or what their sex is on paper. And obviously, a law enforcement officers are only allowed to ask questions and not all people answer questions truthfully to the law enforcement."

b. Statements by Bryan Lovell, of the Idaho Fraternal Order of Police (02:12:21): "Our concern is with, you know, the ability to enforce this. I have to echo what Chief Dahlinger from Moscow said that, you know, going to the lengths to try and identify elements of this particular crime if it were enacted, it could be very invasive and intrusive. Not everyone through questioning will tell us the truth. Of course, not everyone through has identification on them. And have the right not to speak to us as well. And so we encountered that quite a bit. So, there are other laws in place, disturbing the peace, and then maybe a gap somewhere that doesn't cover every situation. But what we're seeing is too many bills that are being brought that are, that are putting expectations on law enforcement to solidify and prove these elements and make a crime out of it that's prosecutable for the prosecutors. And when we can't make that happen, law enforcement ends up being in the middle of people that are not pleased with that outcome. And we're limited by, on our abilities within the constraints of the law. So for those reasons, you know, while we appreciate the concerns and the potential for problems, and people have the right to be safe in their space, you know, the way this language is worded, the way this bill is, it makes it difficult for us to enforce."; (02:17:12): "Will we have the ability to get enough information to determine someone's gender right there and make a lawful arrest and be comfortable in meeting those elements? That's very, very difficult to do and puts us in a liability situation if we happen to get that wrong. Because we don't just, you know, make people undress and check for those

things. It's not reasonable in our world to do that under those conditions and especially for a misdemeanor or what could potentially just be a misdemeanor."

20. Below are excerpts of testimony in the legislative history of H.B. 752 by individuals discussing harms to transgender individuals, in the March 11, 2026 House Judiciary Rules & Administration Committee Hearing. A full video of the hearing can be accessed at: https://insession.idaho.gov/IIS/2026/House/Committee/Judiciary,%20Rules%20&%20Administration/260311_hjud_other_meet_time-Meeting.mp4.

a. Testimony by Nikson Mathews (00:50:51): "And I want to walk through what this looks like for me. Say one of the men here walks into the men's bathroom and you see me walk into a stall and you know I'm trans. And since you're all law-abiding citizens, you're going to call 911. You say 'hello 911, there's a trans person in the bathroom. They're peeing right now. I'm scared. Please come and arrest them.' And since this is the best use of police time, they're going to zip right over in record speed. So let's think about the situation they're walking into. I look like a man. Everyone in the restroom sees a bearded man using the men's bathroom. But the only reason I'm being investigated is because someone knows or thinks that I'm trans. And if that officer decides I violated this law, I could go to jail for up to a year for peeing, washing my hands, or even being in the bathroom to grab a tissue. OK. So let's talk about what this bill forces me to do. It forces me to use the women's bathroom. Say, I happened to walk behind a woman and her husband sees someone who looks like me, following his wife into the bathroom. What do you think happens next? Maybe the cops get called, but more likely that man is going to follow me into the bathroom, confront me, and even assault me. And it's worth noting that based on existing Idaho code, which I have here and will share, if I were assaulted, that person would face a lighter punishment than I would for using the men's bathroom. So every

single day when I'm out in public, I have to decide. Do I feel like going to jail today or do I feel like being attacked? Trans people make up .4% of Idaho's population. In the past five years, this body has passed 17 laws targeting trans rights, 5 this session."

b. Testimony by Carolyn Blackherst (01:04:38): "In 2018, while at Meridian City Hall for the non-discrimination ordinance hearing, a beloved transgender friend of more than 45 years was targeted outside the bathroom by a group of men. All my friend wanted to do was to pee, but this emboldened group of men stopped them, even at Meridian City Hall."

c. Testimony by Scar Rulien (01:24:59): "I'm here today testifying on how using public facilities that don't align with my gender identity threatens my privacy, safety, and dignity. I remember the first time I felt uncomfortable in a public restroom very clearly. I was at an In-N-Out. I was six months into taking testosterone as part of my medical transition and thought that the women's restroom was the safest restroom for me to use. I was immediately greeted by a woman asking, 'are you a man?' In this moment, I was scared because I knew the invasive questions that followed next. As a trans person, I'm fully aware that these situations often escalate to violence against trans individuals, so disregarding my gender identity, I said no. After all, I was doing what I've been told to do. I was assigned female at birth and using the women's restroom, but she didn't like my answer. She stared me down and said you aren't a woman. She began repeating it and pointing at me. 'You aren't a woman, you aren't a woman. Get out. You aren't a woman.' Was I supposed to show this woman my ID? Was law enforcement going to question me about my sex? Where was my right to privacy? I told this story last year when I was testifying against HB264. Afterwards, Skaug said, I want to remind those who testified, this bill is specifically prisons, corrections, higher education, and domestic violence centers, so this isn't the local Wendy's restaurant. Now that we're talking about the local

Wendy's restaurant, will you finally hear me, or will you continue to pass laws that criminalize my community's existence? This wasn't a safe situation for me. I felt uncomfortable. I felt afraid. I felt confused. I know she did too. I don't want to have to go through these experiences, but this bill will create an environment where this type of behavior is encouraged."

21. Attached hereto as Exhibit 15 is a copy of Longwoods International, *Travel USA Visitor Profile*, 2021 & Dean Runyan Associates, 2021 Idaho Economic Impact Report .

22. Attached hereto as Exhibit 16 is a copy of Jordan Grasso and Ilan Meyer, UCLA School of Law Williams Institute, *Violence and Harassment Against Transgender Adults in California* (2025).

23. Attached hereto as Exhibit 17 is a copy of Joshua Arrayales and Christy Mallory, UCLA School of Law Williams Institute, *Hate Crimes and Violence Against Transgender People in California and the U.S.: A Review of Existing Research* (2026).

24. Attached hereto as Exhibit 18 is a copy of the data published on the webpage The ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2026* (accessed April 29, 2026), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2026.

25. Attached hereto as Exhibit 19 is a copy of The HRC Foundation, *Map: Attacks on Gender Affirming Care by State* (accessed April 24, 2026), https://www.hrc.org/resources/attacks-on-gender-affirming-care-by-state-map.

26. Attached hereto as Exhibit 20 is a copy of Kyle Pfannenstiel, *For a Boise family of medical providers, Idaho criminal trans bathroom ban was the last straw*, Idaho Capital Sun (April 16, 2026), https://idahocapitalsun.com/2026/04/16/for-a-boise-family-of-medical-providers-idaho-criminal-trans-bathroom-ban-was-the-last-straw/.

27. Attached hereto as Exhibit 21 is a copy of Associated Press, *Oregon man sentenced for LGBTQ hate crimes in Idaho, including trying to hit people with car* (Nov. 3, 2023), https://www.nbcnews.com/nbc-out/out-news/oregon-man-sentenced-lgbtq-hate-crimes-idaho-trying-hit-people-car-rcna123521

28. Attached hereto as Exhibit 22 is a copy of Emma VandenEinde, *Deadly Club Q shooting reflects escalation in anti-LGBTQ hate around the Mountain West*, KUNC (Nov. 23, 2022), https://www.kunc.org/regional-news/2022-11-23/deadly-club-q-shooting-reflects-escalation-in-anti-lgbtq-hate-around-the-mountain-west.

29. Attached hereto as Exhibit 23 is a copy of Rebecca Boone, *Online right-wing extremists amp up anti-LGBTQ rhetoric during Pride Month*, Associated Press (Jun. 13, 2022), https://www.pbs.org/newshour/nation/online-right-wing-extremists-amp-up-anti-lgbtq-rhetoric-during-pride-month.

30. Attached hereto as Exhibit 24 is a copy of Shane Dixon Kavanaugh, *Idaho man found guilty of hate crime after beating transgender woman over bathroom use on Oregon coast*, THE OREGONIAN (Jan. 30, 2020), https://www.oregonlive.com/crime/2020/01/idaho-man-found-guilty-of-hate-crime-after-beating-transgender-woman-over-bathroom-use-on-oregon-coast.html.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 29th day of April, 2026 at Los Angeles, California

By: *Kyle Groves*

Kyle A. Groves

# Exhibit 1

LEGISLATURE OF THE STATE OF IDAHO

Sixty-eighth Legislature Second Regular Session - 2026

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 752

BY WAYS AND MEANS COMMITTEE

AN ACT

RELATING TO INDECENCY AND OBSCENITY; AMENDING CHAPTER 41, TITLE 18, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 18-4117, IDAHO CODE, TO PROHIBIT A PERSON FROM ENTERING A RESTROOM OR CHANGING ROOM OF THE OPPOSITE SEX, TO PROVIDE A PENALTY, TO PROVIDE EXCEPTIONS, AND TO DEFINE A TERM; AND DECLARING AN EMERGENCY AND PROVIDING AN EFFECTIVE DATE.

Be It Enacted by the Legislature of the State of Idaho:

SECTION 1. That Chapter 41, Title 18, Idaho Code, be, and the same is hereby amended by the addition thereto of a NEW SECTION, to be known and designated as Section 18-4117, Idaho Code, and to read as follows:

18-4117. ENTERING A RESTROOM OR CHANGING ROOM OF THE OPPOSITE SEX. (1) Any person who knowingly and willfully enters a restroom or changing room in a government-owned building or a place of public accommodation, as defined in section 67-5902, Idaho Code, that is designated for use by the opposite biological sex of such person shall be guilty of a misdemeanor and may be imprisoned in the county jail for a period not to exceed one (1) year. Any person who pleads guilty to or is found guilty of a violation of this section, a similar statute in another state, or any similar local ordinance for a second time within five (5) years of the first conviction, notwithstanding the form of judgment or withheld judgment, shall be guilty of a felony and may be imprisoned in the state prison for a period not to exceed five (5) years.

(2) The provisions of subsection (1) of this section shall not apply to an individual who enters a restroom or changing room designated for the opposite sex in any of the following circumstances:

(a) To perform custodial services or maintenance;

(b) To render medical assistance;

(c) To provide law enforcement assistance or to supervise any arrestee, detainee, or inmate in a custodial setting;

(d) To provide services or render aid during a natural disaster, during a declared emergency, or when necessary to prevent a serious threat to good order or safety;

(e) To use a single-user facility designated for the opposite sex, if such single-user facility is the only facility reasonably available at the time of the person's use of the facility;

(f) To use restroom facilities when the person is in dire need of urinating or defecating and such facility is the only facility reasonably available at the time of the person's use;

(g) To use restrooms, changing rooms, and sleeping quarters that have been temporarily designated for use by people of that person's biological sex;

(h) To provide coaching or athletic training during athletic events;

(i) To accompany and render assistance to a person who is in need of assistance when the person rendering assistance is:

(i) A family member or a legal guardian; or

(ii) The designee of the person in need of assistance and the designee is not a member of the designated sex for the single-sex restroom, changing facility, or sleeping quarters; or

(j) To a minor child who is in need of assistance and, for the purpose of receiving that assistance, is accompanied by a family member, a legal guardian, or the individual's designee who is a member of the designated sex for the single-sex restroom or changing facility.

(3) As used in this section, "changing room" means a facility in which a person may be in a state of undress in the presence of others, including a locker room, changing room, or shower room.

SECTION 2. An emergency existing therefor, which emergency is hereby declared to exist, this act shall be in full force and effect on and after July 1, 2026.

# Exhibit 2

# 2026 Legislation

## HOUSE BILL 752

The status of each bill, resolution, proclamation, and memorial is updated when the offices of the Secretary of the Senate and the Chief Clerk of the House publish the un-official daily journals and should not be deemed official. The official bill actions are located in the final journal, which are maintained by the offices of the Secretary of the Senate and the Chief Clerk of the House. **The daily journals are published at the end of each legislative day.**

Full Bill Information

**Individual Links:**

Bill Text
Statement of Purpose / Fiscal Note

H0752 ........................................ by WAYS AND MEANS COMMITTEE

INDECENCY AND OBSCENITY – Adds to existing law to prohibit a person from entering a restroom or changing room of the opposite sex, to provide a penalty, and to provide exceptions.

| | |
|---|---|
| 02/23 | Introduced, read first time, referred to JRA for Printing |
| 02/24 | Reported Printed and Referred to Judiciary, Rules & Administration |
| 03/12 | Reported out of Committee without Recommendation, Filed for Second Reading |
| 03/13 | Read second time; Filed for Third Reading |

| | |
|---|---|
| 03/16 | Read Third Time in Full – **PASSED - 54-15-1**<br>**AYES** – Alfieri, Barbieri, Beiswenger, Bingham, Boyle, Bruce, Burgoyne, Cannon, Cayler, Cheatum, Cornilles, Crane(12), Crane(13), Dygert, Ehardt, Ehlers, Furniss, Hall(Stone), Harris, Hawkins, Healey, Hill, Holtzclaw, Hostetler, Leavitt, Marmon, McCann, Mendive, Miller, Mitchell, Monks, Palmer, Petzke, Pickett, Pohanka, Price, Rasor, Raybould, Raymond, Redman, Sauter, Scott, Shepherd, Shirts, Skaug(Chadwick), Tanner(13), Tanner(14), Thompson, Vander Woude, Veile, Weber, Wheeler, Wisniewski, Mr. Speaker<br>**NAYS** – Berch, Church, Egbert, Erickson(Larsen), Fuhriman, Galaviz, Gannon, Garner, Green, Handy, Haws, Manwaring, Mathias, Nelsen, Rubel<br>**Absent** – Mickelsen<br>**Floor Sponsor - Rasor**<br>Title apvd - to Senate |
| 03/17 | Received from the House passed; filed for first reading |
| | Introduced, read first time; referred to: Judiciary & Rules |
| 03/24 | Reported out of Committee with Do Pass Recommendation; Filed for second reading |
| 03/25 | Read second time; filed for Third Reading |
| 03/27 | Read third time in full – **PASSED - 28-7-0**<br>**AYES** – Adams, Anthon, Bernt, Bjerke(Bjerke), Blaylock, Burtenshaw, Carlson, Cook, Den Hartog, Foreman, Galloway, Grow, Harris, Hart, Keyser, Kohl, Lakey, Lenney, Lent, Nichols, Okuniewicz, Ricks, Shippy, Toews, VanOrden, Woodward, Zito, Zuiderveld<br>**NAYS** – Guthrie, Rabe, Ruchti, Semmelroth, Taylor, Ward-Engelking, Wintrow<br>**Absent and excused** – None<br>**Floor Sponsor - Toews**<br>Title apvd - to House |
| | Returned from Senate Passed; to JRA for Enrolling |
| 03/30 | Reported Enrolled; Signed by Speaker; Transmitted to Senate |
| | Received from the House enrolled/signed by Speaker |
| | Signed by President; returned to House |
| | Returned Signed by the President; Ordered Transmitted to Governor |
| 03/31 | Delivered to Governor at 4:50 p.m. on March 30, 2026 |

04/01 Reported Signed by Governor on March 31, 2026

Session Law Chapter 263

Effective: 07/01/2026

# Exhibit 3

**REVISED**

## STATEMENT OF PURPOSE

### RS33366C1 / H0752

This bill adds Section 18-4117 to Title 18, Idaho Code, making it a misdemeanor for any person to knowingly and willfully enters a rest room, changing room, locker room, or shower room in a government-owned building or place of public accommodation designated for the opposite biological sex. A second or subsequent conviction within five years is a felony punishable by up to five years in state prison. Defined as a facility where undress occurs in the presence of others, the prohibition includes exceptions for custodial/maintenance, medical/law enforcement assistance, emergencies, single-user facilities (when no same-sex option exists), temporary re-designations, athletic coaching, and accompaniment of family, guardians, or designees in need (provided the designee is not of the designated sex.

## FISCAL NOTE

This legislation causes no increase or decrease in revenue, or additional expenditure of funds at the state or local level of government; therefore, this legislation has no fiscal impact.

**Contact:**
Representative Cornel S. Rasor
(208) 332-1000
Senator Ben Toews
(208) 332-1000

**DISCLAIMER: This statement of purpose and fiscal note are a mere attachment to this bill and prepared by a proponent of the bill. It is neither intended as an expression of legislative intent nor intended for any use outside of the legislative process, including judicial review (Joint Rule 18).**

# Exhibit 4

# IDAHO FRATERNAL ORDER OF POLICE

Bryan Lovell
President
BryanLFOP@Gmail.com
3360 E. Woodside Dr.
Idaho Falls, ID 83401

**House Judiciary, Rules and Administration Committee**
Idaho House of Representatives
State Capitol
Boise, Idaho

Re: **House Bill 752 – Opposition**

Chairman and Members of the Committee,

On behalf of the Idaho Fraternal Order of Police, we respectfully express concerns with House Bill 752.

While we understand the intent of the legislation, this proposal presents significant practical enforcement challenges for law enforcement officers in the field. Officers responding to a complaint would be placed in the difficult position of determining an individual's biological sex in order to enforce the statute. In many circumstances, there is no clear or reasonable way for officers to make that determination without engaging in questioning or investigative actions that could be viewed as invasive and inappropriate.

Additionally, the bill includes exceptions that would be extremely difficult for officers to evaluate in real time. For example, subsection (2)(f) allows a person to use a facility if they are in "dire need" of using the restroom. **It is unclear how an officer responding to a call would reasonably determine whether someone was truly in "dire need,"** creating an unenforceable standard that places officers in a difficult position.

Idaho law already provides tools to address inappropriate or disruptive behavior in restrooms or changing areas through existing statutes such as trespass or other criminal offenses. These laws allow officers to address situations where someone refuses to leave a facility or is creating a disturbance without requiring officers to make determinations about a person's gender or if they had a "dire need."

Creating a new criminal offense that hinges on determining biological sex and subjective conditions such as "dire need" will likely create confusion, place officers in uncomfortable and legally uncertain situations, and divert limited law enforcement resources from more pressing public safety priorities.

For these reasons, the Idaho Fraternal Order of Police respectfully urges the committee to reconsider House Bill 752.

Respectfully,

Bryan Lovell
President, Idaho Fraternal Order of Police

# Exhibit 5

Idaho Sheriffs' Association
3100 Vista Ave., Suite 203
Boise, ID 83705
208-287-0001
www.idahosheriffs.org

*March 11th, 2026*
House Judiciary & Rules Committee

Chairman Skaug and Members of the Committee,

The Idaho Sheriffs Association respectfully submits this letter for a suggested amendment to House Bill 752. As we have had little time to review House Bill 752, we would submit to the sponsor an amendment to Section (1):

*"Any person who knowingly and willfully enters a restroom or changing room in a government-owned building or a place of public accommodation, as defined in section 67-5902, Idaho Code, that is designated for use by the opposite biological sex of such person* ***and refuses to immediately depart when asked to do so*** *shall be guilty of a misdemeanor and may be imprisoned in the county jail for a period not to exceed one (1) year."*

An amendment to this language makes sense because it would provide clearer guidance to responding deputies regarding what specific conduct constitutes a violation. Similar to how trespass statutes operate, the amendment would establish a clear element of the offense once a person is asked to leave and refuses.

From a practical law enforcement perspective, when a deputy arrives on scene it is important that the elements of the offense are clearly defined. If a person has been directed to leave a restroom designated for the opposite sex and refuses, the deputy can take enforcement action based on the violation occurring in their presence (the individual continuing to refuse to leave), or based on a citizen's complaint in a manner similar to a trespass situation where a property owner has directed someone to leave and they refuse.

Thank you for your consideration.

Sincerely,

Andy Creech

Andy Creech
Payette County Sheriff
Legislative Chair, Idaho Sheriffs Association

E-mail: acreech@payettecounty.org
Phone: (208) 871-3885

# Exhibit 6

ISSUE BRIEF

# Transgender individuals' access to public facilities

## Background

Gender identity refers to an individual's concept of self as male, female, a blend of both or neither. Approximately 1.4 million adults and 150,000 youth ages 13 to 17 in the United States identify as transgender, meaning those individuals' gender identity and/or expression is different from cultural expectations based on the sex they were assigned at birth.[1] Individuals may also identify as gender expansive, meaning they identify with neither traditional binary gender role nor a single gender narrative or experience.[2] In this document, the term transgender is used inclusive of patients with transgender or gender expansive gender identities.

For many transgender individuals, social transition is a critically important part of medically necessary treatment. Social transition involves living one's life fully in accordance with one's gender identity and typically includes publicly identifying oneself as that gender, adopting a new name, using different pronouns, grooming and dressing in a manner typically associated with one's gender identity and using restrooms and other single-sex facilities consistent with that identity.[3]

Many but not all transgender people experience gender dysphoria, a medical condition defined by the American Psychiatric Association as a "conflict between a person's physical or assigned gender and the gender with which he/she/they identify." Treatment options for gender dysphoria may include counseling, gender-affirming hormone care, puberty suppression and/or gender confirmation surgeries.

## Transgender access to public facilities

### Nondiscrimination laws

Nineteen states and the District of Columbia have enacted legislation to prohibit discrimination against lesbian, gay, bisexual and transgender (LGBT) individuals in places of public accommodation: California, Colorado, Connecticut, District of Columbia, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont and Washington. These state laws vary in terms of scope; all cover places accessible to the public like restaurants, hotels and medical facilities, and some extend protection to additional categories of accommodation such as credit and education.[4] More than 200 municipalities have adopted similar nondiscrimination ordinances.[5] Often these nondiscrimination laws cover the right to access facilities within those spaces, such as restrooms, in accordance with gender identity.

1 Andrew Flores et al., Williams Inst., UCLA Sch. of Law, How Many Adults Identify as Transgender in the United States? (2016).

2 Joel Baum, et al., Human Rights Campaign & Gend. Spectrum, Supporting and Caring for our Gender Expansive Youth (2013).

3 Am. Psychological Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 840 (2015).

4 *See e.g.* Maine Human Rights Act of 2005 (codified in Me. Rev. Stat. tit. 5 § 337).

5 *Know Your Rights: Transgender People and the Law*, Am. Civil Liberties Union, https://www.aclu.org/know-your-rights/transgender-people-and-law.

AMA AMERICAN MEDICAL ASSOCIATION

GLMA Health Professionals Advancing LGBTQ Equality

© 2025 American Medical Association. All rights reserved. 25-1408414:9/25

No federal law explicitly protects against discrimination on the basis of gender identity; however, a growing number of federal courts have interpreted laws against discrimination based on sex to apply to discrimination based on gender identity. The U.S. Court of Appeals for the First, Sixth, Ninth and Eleventh Circuits, covering 20 states, have held that sex discrimination prohibited under Title VII includes discrimination based on gender identity, though the Seventh and Tenth Circuits have held that it does not. Title VII, among other things, prohibits discrimination in an employment context. The U.S. Court of Appeals for the Sixth and Seventh Circuits, covering seven states, have also held that sex discrimination prohibited under Title IX includes discrimination based on gender identity.[6]

Title IX, among other things, prohibits sex discrimination in schools that receive federal funding. On February 22, 2017, the U.S. Departments of Justice and Education rescinded guidance issued under the previous Administration that required schools accepting federal funding to protect transgender students' ability to use school restrooms corresponding to their gender identity.[7] In light of this action, the U.S. Supreme Court sent back to a lower court for further consideration a case involving a school's refusal to allow a student to use the bathroom corresponding to his gender identity. This case and several others addressing the scope of Title IX sex discrimination protections, including access to bathrooms corresponding to gender identity, are making their way through the federal and state court systems.

### Discriminatory laws

Several states have considered laws to restrict transgender individuals' right to access public restrooms according to their gender identity. Supporters of these laws claim sexual predators will take advantage of public accommodation laws to prey on women and children. No evidence exists to support these claims.

To date, only North Carolina has enacted – and repealed – such a law. The 2016 North Carolina Public Facilities Privacy & Security Act (commonly referred to as House Bill 2) restricted individuals to using only restrooms and locker rooms that correspond to the sex listed on their birth certificate, prohibiting transgender individuals from using the facilities that correspond with their gender identity. The law was repealed in 2017, but the legislature left in place a provision that preempts state agency and local government regulation of access to bathrooms, showers and changing facilities.[8] In 2017, legislation was introduced in sixteen other states to restrict public facility access for transgender individuals. None passed. Some states considered such bills in 2018 and, to date, none have been enacted.

## Health implications for transgender individuals

### Mental health

Transgender individuals in the U.S. are up to three times more likely than the general population to report or be diagnosed with mental health disorders, with as many as 41.5 percent reporting at least one diagnosis of a mental health or substance use disorder:

- Over a third of transgender individuals suffer a major depressive episode in their lifetimes;
- 20.2 percent have been diagnosed with suicidality in the past 30 days;
- 7.9 percent have been diagnosed with an anxiety disorder in the past six months;

6 The AMA and GLMA, along with 16 other medical and mental health organizations, submitted an amicus brief in support of a transgender student in *G.G. v. Gloucester County School Board*. The case was remanded for further consideration in light of guidance issued by the U.S. Departments of Justice and Education on February 22, 2017.

7 U.S. Dep't Justice Civil Rights Div. & U.S. Dep't Educ. Office Civil Rights, Dear Colleague letter on Transgender Students (Feb. 22, 2017).

8 N.C. Gen. Stat. § 143-760.



© 2025 American Medical Association. All rights reserved. 25-1408414:9/25

- 9.8 percent have been diagnosed with post-traumatic stress disorder in the past six months; and
- 15.2 percent have been diagnosed with a substance use disorder in the past year.[9]

Comparatively, 6.7 percent of all U.S. adults have experienced at least one major depressive episode in the past year.[10] The increased prevalence of these mental health conditions is widely thought to be a consequence of minority stress, the chronic stress from coping with societal stigma and discrimination because of one's gender identity and expression.[11] Discrimination in public facilities contributes to these existing mental health disparities.

Evidence confirms that policies excluding transgender individuals from facilities consistent with their gender identity have detrimental effects on the health, safety and well-being of those individuals.[12] These exclusionary policies undermine well-established treatment protocols for gender dysphoria, expose these individuals to stigma and discrimination as well as potential harassment and abuse and impair their social and emotional development, leading to poorer health outcomes throughout life.[13] Surveys have also shown transgender individuals face a greater risk of violence when using a public facility that does not correspond with their gender identity:

- 14 percent of transgender Americans reported being verbally harassed, physically assaulted, or sexually assaulted when accessing a restroom in the previous year; and
- 59 percent of transgender Americans have avoided using public restrooms for fear of confrontation, harassment and assault.[14]

## Physical health

Nine percent of transgender individuals reported that they were denied restroom access in the past year. In addition to psychological harm, denying access to facilities that correspond with an individual's gender identity can cause physical harm from prolonged avoidance of the restroom. Research has demonstrated that:

- Nearly one-third of transgender people report that they limited the amount they ate or drank at least once in the previous year so they did not need to use a public restroom;
- 54 percent of transgender individuals have reported physical problems from avoiding restrooms at work or in public, including dehydration and continence issues; and
- Eight percent of transgender individuals reported having a kidney or urinary tract infection, or another kidney-related medical issue because they avoided restrooms.[15]

9 Sari Reisner, et al., *Psychiatric Diagnoses and Comorbidities in a Diverse, Multicity Cohort of Young Transgender Women: Baseline Findings From Project LifeSkills*, 170 J. Am. Med. Ass'n Pediatrics 5, 481–86 (May 2016).

10 Cnt. Behavioral Health Statistics & Quality, Substance Abuse & Mental Health Serv. Admin., Key Substance Use and Mental Health Indicators in the United States: Results from the 2016 National Survey on Drug Use and Health, HHS Publication No. SMA 17-5044, NSDUH Series H-52 (Sep. 2017).

11 Stephen Russell & Jessica Fish, *Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth*, 12 Ann. Rev. Clinical Psychology 1, 465-87 (Mar. 2016).

12 E.g. Lance Weinhardt et al., *Transgender and Gender Nonconforming Youths' Public Facilities Use and Psychological Well-Being: A Mixed-Method Study*, 2 Transgender Health 1, 140-50 (Oct. 2017); Kristie Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 10, 1378-99 (Feb. 2016); Carolyn Port et al., "*Kicked out": LGBTQ youths' bathroom experiences and preferences*, 56 J. Adolescence 107-12 (Apr. 2017).

13 See e.g. Jody Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 1, 65-80 (2013); Am. Psychoanalytic Ass'n, Position Statement on Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression (2012).

14 Sandy James, Jody Herman, et al., Nat'l Ctr. Transgender Equality, The Report of the 2015 U.S. Transgender Survey (Dec. 2016).

15 *Id.*; Jody Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 1, 65-80 (2013).

AMA AMERICAN MEDICAL ASSOCIATION
GLMA Health Professionals Advancing LGBTQ Equality

© 2025 American Medical Association. All rights reserved. 25-1408414:9/25

## Medical society positions

The American Medical Association (AMA) and GLMA: Health Professionals Advancing LGBT Equality (GLMA) oppose policies preventing transgender individuals from accessing basic human services and public facilities consistent with gender identity, including the use of restrooms. Other medical societies, including the American Psychiatric Association, American Academy of Family Physicians and the American Academy of Pediatrics have policies or statements similarly opposing policies that discriminate against transgender individuals.[16] These medical associations, AMA, GLMA and others have joined amicus briefs supporting this position.[17]

### AMA policy

**Access to Basic Human Services for Transgender Individuals H-65.964**
Our AMA: (1) opposes policies preventing transgender individuals from accessing basic human services and public facilities in line with one's gender identity, including, but not limited to, the use of restrooms; and (2) will advocate for the creation of policies that promote social equality and safe access to basic human services and public facilities for transgender individuals according to one's gender identity. (Res. 010, A-17)

**Support of Human Rights and Freedom H-65.965**
Our AMA: (1) continues to support the dignity of the individual, human rights and the sanctity of human life, (2) reaffirms its long-standing policy that there is no basis for the denial to any human being of equal rights, privileges, and responsibilities commensurate with his or her individual capabilities and ethical character because of an individual's sex, sexual orientation, gender, gender identity, or transgender status, race, religion, disability, ethnic origin, national origin, or age; (3) opposes any discrimination based on an individual's sex, sexual orientation, gender identity, race, religion, disability, ethnic origin, national origin or age and any other such reprehensible policies; (4) recognizes that hate crimes pose a significant threat to the public health and social welfare of the citizens of the United States, urges expedient passage of appropriate hate crimes prevention legislation in accordance with our AMA's policy through letters to members of Congress; and registers support for hate crimes prevention legislation, via letter, to the President of the United States. (CCB/CLRPD Rep. 3, A-14; Reaffirmed in lieu of: Res. 001, I-16; Reaffirmation: A-17)

**Nondiscriminatory Policy for the Health Care Needs of LGBTQ Populations H-65.976**
Our AMA encourages physician practices, medical schools, hospitals, and clinics to broaden any nondiscriminatory statement made to patients, health care workers, or employees to include "sexual orientation, sex, or gender identity" in any nondiscrimination statement. (Res. 414, A-04; Modified: BOT Rep. 11, A-07; Modified: Res. 08, A-16; Modified: Res. 903, I-17)

**Health Care Needs of Lesbian, Gay, Bisexual and Transgender Populations H-160.991**
1. Our AMA: (a) believes that the physician's nonjudgmental recognition of patients' sexual orientations, sexual behaviors, and gender identities enhances the ability to render optimal patient care in health as well as in illness. In the case of lesbian, gay, bisexual, transgender, queer/questioning, and other (LGBTQ) patients, this recognition is especially important to address the specific health care needs of people who are or may be LGBTQ; (b) is committed to taking a leadership role in: (i) educating physicians on the current state of research in and knowledge of LGBTQ Health and the need to elicit relevant gender and sexuality information from our

16 See Am. Psychiatric Ass'n, Position Statement on Discrimination Against Transgender and Gender Variant Individuals (Jul. 2012); Am. Acad. Fam. Physicians, Patient discrimination (2015); Am. Acad. Pediatrics, AAP Statement on Protecting Transgender Youth (Feb. 23, 2017).
17 *See* Brief of Am. Acad. Pediatrics, et al., as Amici Curiae Supporting Appellant, *G.G. v. Gloucester County School Board*, No. 15-2056 (2017).

AMA AMERICAN MEDICAL ASSOCIATION
GLMA Health Professionals Advancing LGBTQ Equality
© 2025 American Medical Association. All rights reserved. 25-1408414:9/25

patients; these efforts should start in medical school, but must also be a part of continuing medical education; (ii) educating physicians to recognize the physical and psychological needs of LGBTQ patients; (iii) encouraging the development of educational programs in LGBTQ Health; (iv) encouraging physicians to seek out local or national experts in the health care needs of LGBTQ people so that all physicians will achieve a better understanding of the medical needs of these populations; and (v) working with LGBTQ communities to offer physicians the opportunity to better understand the medical needs of LGBTQ patients; and (c) opposes, the use of "reparative" or "conversion" therapy for sexual orientation or gender identity.

2. Our AMA will collaborate with our partner organizations to educate physicians regarding: (i) the need for sexual and gender minority individuals to undergo regular cancer and sexually transmitted infection screenings based on anatomy due to their comparable or elevated risk for these conditions; and (ii) the need for comprehensive screening for sexually transmitted diseases in men who have sex with men; (iii) appropriate safe sex techniques to avoid the risk for sexually transmitted diseases; and (iv) that individuals who identify as a sexual and/or gender minority (lesbian, gay, bisexual, transgender, queer/questioning individuals) experience intimate partner violence, and how sexual and gender minorities present with intimate partner violence differs from their cisgender, heterosexual peers and may have unique complicating factors.

3. Our AMA will continue to work alongside our partner organizations, including GLMA, to increase physician competency on LGBTQ health issues.

4. Our AMA will continue to explore opportunities to collaborate with other organizations, focusing on issues of mutual concern in order to provide the most comprehensive and up-to-date education and information to enable the provision of high quality and culturally competent care to LGBTQ people. (CSA Rep. C, I-81; Reaffirmed: CLRPD Rep. F, I-91; CSA Rep. 8 - I-94; Appended: Res. 506, A-00; Modified and Reaffirmed: Res. 501, A-07; Modified: CSAPH Rep. 9, A-08; Reaffirmation A-12; Modified: Res. 08, A-16; Modified: Res. 903, I-17; Modified: Res. 904, I-17)

## GLMA policy

**GLMA 070-95-108-18: Protection from Discrimination in Healthcare for Transgender People; Recommendation that Clinicians Follow the WPATH Standards of Care**
GLMA: Health Professionals Advancing LGBTQ Equality opposes discrimination in healthcare for transgender people, and recommends that clinicians follow the WPATH (World Professional Association for Transgender Health) standards of care and/or other evidence-based guidelines. (Approved 1995; Amended & Reaffirmed 2018)

**GLMA 073-95-111-18: Protection for LGBTQ People from Discrimination in Employment, and Inclusion of Transgender People as a Protected Group**
GLMA: Health Professionals Advancing LGBTQ Equality opposes discrimination of LGBTQ/SGM* people in employment and supports the inclusion of transgender people as a protected group. *SGM: Sexual and Gender Minority. (Approved 1995; Amended & Reaffirmed 2018)

For additional information or assistance with advocacy to protect transgender individuals' access public facilities, please visit the www.ama-assn.org/go/arc.

AMA AMERICAN MEDICAL ASSOCIATION GLMA Health Professionals Advancing LGBTQ Equality

© 2025 American Medical Association. All rights reserved. 25-1408414:9/25

# Exhibit 7

archive.today
webpage capture

Saved from https://www.idahostatesman.com/opinion/from-the-opinion-editor/article3153 search
history ←prior next→
Redirected from https://idahostatesman.com/opinion/from-the-opinion-editor/article31531986
no other snapshots from this url
All snapshots from host idahostatesman.com
from host www.idahostatesman.com

8 Apr 2026 14:51:05 UTC

Webpage Screenshot
share download .zip report bug or abuse Buy me a coffee



Opinion articles provide independent perspectives on key community issues, separate from our newsroom reporting.

THE IDAHO WAY

# *Family with transgender daughter plans to close business, leave Idaho | Opinion*

By **Scott McIntosh**

April 8, 2026 4:00 AM

Family with transgender daughter plans to leave Idaho

00:00 00:00

Michael Devitt, owner of Focus Physical Therapy in Boise, is closing his business in preparation of leaving Idaho over a new law that criminalizes transgender people for using a public bathroom By Scott McIntosh

**Listen to this article**

Eve Devitt recently came home to Boise from New York City to show her friend the beauty of Idaho.

They went to Bruneau Sand Dunes, Craters of the Moon, stopped at the Hemingway Memorial, went to Galena Lodge, and visited Stanley and McCall.

"She wanted to show her her state," Eve's father Michael Devitt told me in an interview. "And she's like, 'I can't do that now. We could not make that trip again,' which it's kind of heartbreaking, because she loves Idaho so much.

"She loves Idaho, but Idaho doesn't love her back."

Eve is a transgender woman and as of July 1, it will be illegal for Eve to use a woman's bathroom.

The Idaho Legislature passed and Gov. Brad Little signed House Bill 752, which makes it a crime for any person to knowingly and willfully enter a restroom, changing room, locker room or shower room in a government-owned building or place of public accommodation designated for the opposite biological sex.

The first offense is a misdemeanor with up to 1 year in jail, and a second offense within five years is a felony with up to five years in prison.

Little signed the bill on International Transgender Day of Visibility, which Michael said was just another slap in the face.

"For our family, the thing that was just really a kick in the teeth, was that when Gov. Little signed this bill, he did it during the Trans Day of Visibility ceremony," he said. "In case you ever wondered about the character of Brad Little — now we know… that was just cruel… reprehensible… that was intentional."

House Bill 752 was also "the last straw" for the Devitt family, which includes Michael, his wife, Dr. Angie Devitt, who is president of the Idaho Academy of Family Physicians, and their two daughters, Eve and Isabelle.

Michael, who has run Focus Physical Therapy for the last 28 years in Boise, will close the business by September for the purpose of preparing to move out of state.

"Obviously, this law is a disaster for families like ours," Michael wrote to his patients. "We can no longer take a road trip across our beloved state, or even enjoy a family night out at a restaurant, or a movie, without running the risk of Eve being charged and sent to prison merely for using the facilities."

I first interviewed Michael and Eve back in 2023, when the Legislature passed and Little signed a bill banning gender-affirming care for minors. That was when Eve was 17, and the law didn't go into effect until July 1, just a couple of months before Eve turned 18, so the Devitts were able to muddle through.

But over the past few years, the Idaho Legislature has continuously proposed and passed bills to place restrictions on transgender people, from banning them from sports to prohibiting trans people from changing the sex on their birth certificates and now telling them which bathrooms they're legally allowed to use.

“We love Idaho, but our lawmakers and governor have spent the past five legislative sessions attacking Idaho’s transgender community, and there is a point at which hard decisions must be made,” Michael wrote to his patients.

All for a community of people that represents less than 1% of the population, and for a supposed problem that has zero evidence of existing in Idaho. Transgender women aren’t going into the women’s bathroom to attack and sexually assault women. Transgender men aren’t going into the men’s room to attack other men.

A 2025 study by the Williams Institute at the UCLA School of Law looked at criminal reports of safety and privacy violations in localities with nondiscrimination laws that protected transgender access and localities that did not and found incidents of safety and privacy violations were rare, there was no significant difference in violations between the two types of localities and there was no evidence of an increase in violations from nondiscrimination laws.

The UCLA study also showed that transgender people get harassed or are denied use of a restroom – regardless of the gender-specific restroom they’re seeking to use. And in one study, 58% of respondents reported avoiding going out altogether due to a lack of access to a safe restroom.

With this new Idaho law, Eve will be forced to go to the men’s room, and people like Nikson Mathews, a transgender man, will be forced to use the women’s room. Monitoring and enforcement is going to get ugly and confusing.

The other thing this story illustrates is how everyone is affected by the state Legislature’s actions — whether you have a transgender family member or not.

Michael Devitt's patients will now have to find somewhere else to get physical therapy. And in a state with among the lowest number of doctors per capita, Idaho stands to lose another doctor in Angie Devitt, further exacerbating the problem and making it even harder for patients to find a doctor.

But for the Devitts, there's little choice.

"Angie and I have just kind of come to the conclusion that anybody with transgender family members in Idaho, we're basically in an abusive relationship with the state government," Michael said. "And it just has to come down to, how many times do you have to get hit to realize there's going to be another one coming, you know?"

*Scott McIntosh is the opinion editor of the Idaho Statesman. You can email him at smcintosh@idahostatesman.com or call him at 208-377-6202. Sign up for the free weekly email newsletter The Idaho Way.*

**Want to see more content like this?**

## Morning Update

A daily morning dispatch of local news, sports, business and opinion headlines.

SIGN UP

By submitting, I agree to the Privacy Policy and Terms of Service.

## Related Stories from Idaho Statesman

GUEST OPINIONS

GUEST OPINIONS

**Idaho law turns me into a criminal just for using the bathroom | Opinion**
March 26, 2026 11:51 AM

**Idaho shouldn't order my business how to organize bathrooms | Opinion**
April 1, 2026 4:00 AM



**Scott McIntosh** Opinion Contributor, *Idaho Statesman* 208-377-6202

Scott McIntosh is the Idaho Statesman opinion editor. A graduate of Syracuse University, he joined the Statesman in August 2019. He previously was editor of the Idaho Press and the Argus Observer and was the owner and editor of the Kuna Melba News. He has been honored for his editorials and columns as well as his education, business and local government watchdog reporting by the Idaho Press Club and the National Newspaper Association. Sign up for his weekly newsletter, The Idaho Way.
Support my work with a digital subscription

# Join the Conversation

FOLLOW

Anyone can read the comments, but you must be a subscriber or logged in with a registered account to contribute. If you do not have a registered account, you can sign up for one below (it's free).

LOG IN SIGN UP

Join the conversation

Conversations are opinions of our readers and are subject to the Community Guidelines.

ALL COMMENTS 9 NEWEST

**skidaddy** 19 MIN AGO

That's a shame. I can't blame them though. The legislature seems to be doing all they can to send the message that LGBT folks are not welcome in Idaho.

REPLY 1

LOAD MORE COMMENTS

ACTIVE CONVERSATIONS



Boise took its Pride flag down. But new art has popped up at City...

29



Risch talks a big game on public lands but sold them out in the en...

40

Powered by viafoura

McClatchy Media

Part of the McClatchy Media Network

## ABOUT

About Us

Site Map

Contact Us

Archives

Connect with us:

## SUBSCRIPTIONS

Customer Service

Start a Subscription

Cancel a Subscription

Make a Payment

## ADVERTISING

McClatchy Advertising

Place an Ad

Place a Classified Ad

Place an Ad - Celebrations

Place an Obituary

## EXPLORE

Read Today's Edition

Mobile Apps

Newsletters

Puzzles & Games

Staffing Solutions
Political | Advocacy Advertising

Horoscopes

COPYRIGHT
COMMENTING POLICY
PRIVACY POLICY
COOKIE PREFERENCES
YOUR PRIVACY CHOICES
TERMS OF SERVICE
MOBILE SMS TERMS OF SERVICE

# Exhibit 8

U.S. CENTER FOR SAFESPORT
CHAMPION RESPECT. END ABUSE.

# 2024 CULTURE & CLIMATE SURVEY REPORT

Prepared by: Pacific Research and Evaluation, LLC



# TABLE OF CONTENTS


**MESSAGE FROM THE CHIEF EXECUTIVE OFFICER** 3

**EXECUTIVE SUMMARY** 4

**INTRODUCTION** 8

**METHODS** 9

**FINDINGS** 10

- Survey Sample Description 11
- Athlete Satisfaction 17
- Athlete Disengagement 19
- Anti-Inclusive Experiences 21
- Discriminatory Experiences 25
- Emotional Harm & Neglect 32
- Physical Harm 37
- Stalking 43
- Sexual Harm Within Sport 44
- Sexual Harm Outside of Sport 60
- Athlete Mental Health 61
- Reporting Misconduct 63
- Trust & Knowledge 69
- Peer Norms 75
- Athlete Suggestions & Comments 77

**REPORT INSIGHTS & NEXT STEPS** 86

**REPORTING & RESOURCES** 88

**APPENDIX: KEY FINDINGS** 89

# MESSAGE FROM THE CHIEF EXECUTIVE OFFICER

Since we opened our doors in March 2017, the U.S. Center for SafeSport has been working to shift sport culture so that every athlete—from the practice fields in our neighborhoods to the podium in Paris—can feel safe, supported, and strengthened. As the first organization of its kind dedicated to ending abuse within the U.S. Olympic and Paralympic Movement (the Movement), the Center is forging a new and necessary path, and we are adapting along the way to best serve athletes and the entire sport community.

Crucial to this effort has been listening to stakeholders—especially athletes—to better understand the dynamics of emotional, physical, and sexual abuse in sport. Unfortunately, research in this area remains limited. With this in mind, the Center contracted with Pacific Research and Evaluation to launch our second Athlete Culture and Climate Survey to collect quantitative data on abuse and misconduct in sport. This survey builds on our 2020 research, and the results will guide our efforts to:

- Continue evaluating and improving our approach to investigations of abuse;
- Enhance our training, education, and engagement with athletes and survivors;
- Host information sessions for national governing bodies (NGBs) and athletes to further explore the data;
- Inform the broader abuse prevention landscape throughout the U.S. and abroad through our research, analysis, and evaluation of the athlete experience; and
- Prepare for a follow-up survey in 2027 to be released ahead of the 2028 Summer Olympic and Paralympic Games.

Although the Center's mandate is specific to the 11+ million individuals within the Movement, the 2024 survey went a step further to invite the participation of athletes from outside as well as within this community. We took this approach to better understand the experiences of athletes of all levels as well as the potential differences there might be between those participating within and outside of the Movement.

The social, emotional, and physical benefits of sport can and should last a lifetime. The 2024 Culture and Climate Survey found that a majority of those surveyed felt sport had a positive impact on their lives. That's what all athletes deserve, but it is not what many experience. The following outcomes highlight the need for culture change in sport and will guide our efforts to help athletes at every level thrive and fulfill their potential.

Sincerely,



**Ju'Riese Colón**
Chief Executive Officer
U.S. Center for SafeSport

# EXECUTIVE SUMMARY

In 2024, the U.S Center for SafeSport partnered with an independent research firm, Pacific Research and Evaluation, to conduct its second ever Athlete Culture and Climate Survey. The purpose of this survey is to gain a better understanding of the experiences of athletes, particularly when it comes to the scope and nature of emotional, physical, and sexual abuse in sports. This survey updates and expands on the previous survey (conducted in 2020) and provides insight into current trends in our nation's sport culture. The target audience for the survey was any person 18 years of age or older who had ever participated as an athlete in any sport at any level in the United States. This included both athletes who are affiliated with a National Governing Body (NGB) or the U.S. Olympic and Paralympic Committee (USOPC), as well those who are not.

4,980 individuals engaged with the survey and 3,762 athletes representing 67 different sports responded substantively to the survey between January 8 and February 4, 2024. More current athletes (71.8%) compared to former athletes (28.2%) took part in the survey. While shared broadly, participants were mostly white (79.5%), heterosexual (84.9%), female (57.6%) athletes, and athletes without disabilities (93.8%). Although some demographics are less represented than others, the methods and data presented in this report aim to shed light on the unique experiences that diverse athletes shared in this survey. Key findings from this report are summarized below.

## ATHLETE SATISFACTION & ATHLETE DISENGAGEMENT

- 72.1% of athletes expressed strong agreement that, overall, their athletic experience has had a positive impact on their life.
- In terms of frequency of equal treatment of athletes, 62.1% of athletes felt that equal treatment occurred either "Frequently" or "Very frequently" in their sport.
- However, nearly four out of five athletes (79.6%) shared that, at some point during their athletic involvement, they experienced feeling burned out by their sports participation.

## ANTI-INCLUSIVE EXPERIENCES

- 80.8% of athletes experienced anti-inclusive behaviors during their sports involvement.
- The most common anti-inclusive experience shared by athletes (54.5%) was feeling repeatedly excluded by other players from team or group activities.
- Black athletes were more likely to have experienced being hassled by security at an athletic event, compared to athletes with other racial identities.
- Former athletes were more likely than current athletes to have experienced anti-inclusive behaviors during their sports involvement including being called insulting names, having people assume that their injuries were less significant or painful than they actually were, and receiving inadequate support from athletic trainers or medical providers.

## DISCRIMINATORY EXPERIENCES

- One-third (33.0%) of athletes had experienced some form of discrimination during their sports involvement, with the most common form being ageism.
- Nearly half (48.0%) of athletes who identified as a gender other than man or woman experienced gender-based discrimination.
- More than one third (36.0%) of athletes who identified themselves as having a disability responded that they had experienced discrimination based on their disability.
- Black athletes were more likely to have experienced racial discrimination during their athletic involvement (36.9%), compared to athletes with other racial identities.
- More than one-third (36.0%) of athletes who identified themselves as having a disability experienced discrimination based on their disability. Athletes with disabilities were also more likely than athletes without disabilities to experience discrimination based on their gender and their sexual orientation.

## EMOTIONAL HARM & NEGLECT

- Nearly 4 in 5 athletes (78.4%) shared that they had experienced behaviors related to emotional harm and neglect during their sports involvement.
- Half (50.6%) of athletes had experienced being put down, embarrassed, or humiliated.
- Former athletes were more likely than current athletes to have experienced being put down, embarrassed, or humiliated, forced or expected to train or compete while injured, sick, or exhausted, and sworn/cursed at for not performing well.
- Athletes who identified as a gender other than man or woman were more likely to have felt that their athletic needs, or their mental or emotional health, were ignored.

## PHYSICAL HARM

- A little over one-third (35.3%) of athletes experienced behaviors related to physical harm/threat of harm during their sports involvement. The most commonly experienced behavior related to physical harm was being punished with excessive exercise.
- Black athletes were more likely than athletes in other racial groups to have experienced being hit or slapped (not including any hitting that occurs during combative sports).
- Athletes with disabilities were more likely than those without disabilities to have experienced being threatened with physical harm, as well as being forced or ordered by someone to get in or stay in a confined space (e.g., a locker or bathroom stall).
- Men and athletes who identified as a gender other than man or woman were more likely than women to have experienced being hit or kicked, punched, forced or knocked to the ground, as well as being threatened with physical harm.

## STALKING

- Approximately 17% of athletes (16.6%) experienced being spied on, watched, or followed by someone they didn't want to watch or follow them.
- Athletes with disabilities were more likely than those without disabilities to have experienced being spied on, watched, or followed.

## SEXUAL HARM WITHIN SPORTS

- Over one-third (36.3%) of athletes have received unwanted sexual comments or looks during their sports involvement.
- Athletes who identified as a gender other than man or woman were somewhat more likely than women, and much more likely than men, to have received unwanted sexual comments or looks.
- Nearly 11% (10.9%) of athletes indicated that they had experienced unwanted sexual contact or sexually explicit behaviors during their sports involvement. Coaches or assistant coaches were the most common perpetrators of non-consensual sexual touching, followed by athlete peers.
- More than 2 in 5 athletes (43.3%) who had unwanted sexual experiences reported at least one experience occurring when they were under 18.
- Athletes who identified themselves as a sexuality other than heterosexual/straight were more likely to have experienced being touched in sexual ways without their consent, compared to heterosexual/straight athletes.
- More than 3% (3.5%) of athletes indicated that, during their involvement in sports, someone had committed rape or attempted rape on them. Athlete peers were the most common perpetrators of rape and attempted rape experienced by athletes.
- Athletes with disabilities were more likely than athletes without disabilities to have been kissed against their will and had someone rape or attempt to rape them.
- Athletes who had ever participated on an NGB or a USOPC managed team were more likely to have been the subject of sexist comments or jokes, touched in non-consensual sexual ways, and asked to undress or assume a sexually explicit pose.

## ATHLETE MENTAL HEALTH

- Over half of surveyed athletes (53.1%) shared that during the time period of their sport participation they struggled with depression or anxiety.
- Between 2020 and 2024 there was an increase of nearly 8% of athletes surveyed engaging in an eating disorder, from 21.6% in 2020 compared to 30.2% in 2024.

## REPORTING MISCONDUCT

- Only 10.7% of athletes who experienced unwanted sexual behavior during their sports involvement submitted a formal complaint or report.
- Of athletes who did not report unwanted sexual behaviors that they experienced, over half shared that they had been concerned that if they reported the behaviors people would not take them seriously or were worried that nothing would be done.
- Nearly two-thirds (62.0%) of athletes who experienced unwanted sexual behaviors did not feel that they had a confidential, supportive place within their sport organization to talk about their experiences.

## ATHLETE TRUST & KNOWLEDGE

- Overall, only a little more than half (54.1%) of surveyed athletes had heard of the U.S. Center for SafeSport prior to taking the survey.
- Knowledge of the Center was somewhat better for athletes who had participated on NGB or USOPC managed teams: nearly 70% (69.3%) of athletes in that subgroup had heard of the Center previously.
- Approximately half (51.6%) of athletes who had heard of the Center previously believe that the Center is considered a trusted resource by athletes in their sport organization. A slightly lower proportion (44.8%) of athletes who have participated in NGBs believe that athletes trust the leadership at their NGB.
- Nearly one-third (31.5%) of athletes shared that they think that sexual, emotional, or physical abuse is a problem in their NGB.

# INTRODUCTION

The U.S. Center for SafeSport (the Center) is an independent nonprofit committed to building a sport community where athletes, coaches, and other community members can work and learn together free of emotional, physical, and sexual abuse and misconduct. The Center receives, investigates, and responds to reports of abuse and misconduct involving individuals who are affiliated with the U.S. Olympic and Paralympic Committee (USOPC) and its National Governing Bodies (NGBs). The Center also provides education and training to athletes, parents, coaches, volunteers, and organizations at all levels on best practices and principles for preventing abuse in sport settings, both inside and outside of the U.S. Olympic and Paralympic Movement. In doing so, the Center advances its mission of making athlete well-being the core of our nation's sports culture through abuse prevention, education, and accountability.

The Center contracted with Pacific Research and Evaluation (PRE) to update and administer the Athlete Culture and Climate survey in 2024. The purpose of this survey is to gain a better understanding of the experiences of athletes, particularly when it comes to the scope and nature of emotional, physical, and sexual abuse in sports. This is the second Athlete Culture and Climate survey launched by the Center; the first was administered in 2020 and remains one of the most in-depth studies to date exploring prevalence and factors related to abuse and misconduct among U.S. athletes. Results from the 2024 survey are shared in this report and serve to update and expand on the 2020 findings and provide insight into current trends in our nation's sport culture.

## ACKNOWLEDGMENTS

The data shared in this report goes beyond numbers and percentages, and represents individual athletes' personal experiences. This research would not be possible without athletes' willingness to share those personal experiences through their survey responses. We want to thank athletes for their participation. We also appreciate the guidance of the SafeSport Athlete Advisory Team (SAAT) for their constructive feedback that improved the survey instrument as well as our survey dissemination plan.

This report contains content related to physical, emotional, and sexual harm, as well as discrimination, mental health concerns, and other challenging topics. If you need crisis intervention, referrals, or emotional support at any time, contact **RAINN's 24-hour helpline**.

# METHODS

## SURVEY POPULATION

The target audience for the survey was any person 18 years of age or older who had ever participated as an athlete in any sport at any level in the United States. This included both athletes who are affiliated with a National Governing Body (NGB) or the U.S. Olympic and Paralympic Committee (USOPC), as well those who are not.

## SURVEY DEVELOPMENT

In September 2023, the research team and Center staff began reviewing and revising the survey instrument based on lessons learned from the **2020 Athlete Culture and Climate project**. The goal was to balance our redesign process by making improvements while retaining enough consistency to make comparisons in the data over time.

As relevant and applicable, comparisons between the 2020 and 2024 surveys have been included in the findings. While the 2024 survey population was expanded to include both athletes within and outside of the Movement, the findings related to topics that appeared on both the 2020 and 2024 surveys were generally consistent. There were three exceptions. First, athletes surveyed in 2024 reported higher rates of mental health concerns. This increase is consistent with findings from the American Psychological Association, which noted an increased demand for mental health services in the wake of the COVID-19 pandemic. Second, the survey found that the belief that the Center is a trusted resource by people in sport organizations increased between 2020 and 2024. Finally, a slightly larger portion of athletes surveyed in 2024 believe that sexual, emotional, or physical abuse is a problem in their sport organization compared to 2020. As we continue to gather additional data moving forward, we anticipate that more detailed comparisons will be possible.

The research team engaged with the SafeSport Athlete Advisory Team (SAAT) to coordinate a review of the survey instrument by athletes and to gather feedback, suggestions, and recommendations for revision. After the English version of the instrument was finalized, it was translated to Spanish. Both the English and the Spanish versions of the survey were programed into Qualtrics, a secure online survey platform. Finally, a second English version of the survey was created specifically to be accessible to anyone using a screen reader or other text-to-speech technology. The first and last page of the survey, as well as the beginning of the sexual harm section of the survey, included information and links to help athletes who may be in need of support resources or information about how to report abuse or misconduct.

## SURVEY ADMINISTRATION

The online, self-administered, anonymous survey was open from January 8 to February 12, 2024. An anonymous survey link and promotional tools to support consistency were shared by the Center with NGBs. The Center also conducted outreach to collegiate athletic partners, launched email campaigns to coaches and athletes, publicized the survey in its NGB Newsletter, and issued a press release. Additionally, social media posts were shared on Facebook/Instagram, TikTok and LinkedIn. To promote participation, athletes were offered a chance to win an Amazon gift card for filling out the survey. Two hundred $20 Amazon gift cards and four $100 Amazon gift cards were raffled off after the survey closed so that all athletes had an equal chance of receiving a gift card.

# FINDINGS

The findings sections that follow begin with descriptive information about the survey sample. Then, findings are organized into the key focus areas of the survey, listed below. This report concludes with a discussion of insights and next steps that are reflective of survey findings.


- Athlete Satisfaction
- Athlete Disengagement
- Anti-Inclusive Experiences
- Discriminatory Experiences
- Emotional Harm and Neglect
- Physical Harm
- Stalking
- Sexual Harm Within Sport
- Sexual Harm Outside of Sport
- Athlete Mental Health
- Reporting Misconduct
- Trust and Knowledge
- Peer Norms
- Athlete Suggestions and Comments


Several sections included findings related to group differences, when applicable. Analyses were considered statistically significant if their associated p-value was less than .05, and they were found to have at least a small effect size (an eta-squared of .02 or higher, or a Cramer's V of .10 or higher). Group differences are explored based on the factors listed below and are explained further in the survey sample description.

- **Gender Identity**
- **Race/Ethnicity**
- **Sexual Orientation**
- **Athletes with Disabilities vs. Athletes without Disabilities**
- **Current Athlete vs. Former Athlete status**
- **NGB/USOPC Athletes vs. non-NGB/USOPC Athletes**

The total number of athletes who substantively took part in this survey was 3,762 (including 3,724 in English and 38 in Spanish). Athletes were able to skip survey items at their discretion, and many athletes exited the survey before getting to the end. Therefore, the number of responses varies across survey items and are presented in parenthesis throughout the report's narrative.

# SURVEY SAMPLE DESCRIPTION

*Demographic and descriptive characteristics of surveyed athletes.*

Athletes were asked to select the one sport that they had been most involved in. This was the only required question on the survey (all others could be skipped). Throughout the survey, when asked to share their experiences during their sport involvement, athletes were asked to think about the sport that they selected on this first survey item. The category "Another sport" contains all sports that were selected by fewer than ten athletes. In all, surveyed athletes represent 67 different sports. As shown in Table 1, the largest proportion of responses came from Tennis athletes (31.8%).

*Table 1. Sport representation among surveyed athletes (N = 3,762)*

| SPORT | N (%) |
|---|---|
| Tennis | 1,196 (31.8%) |
| Soccer | 396 (10.5%) |
| Equestrian | 348 (9.3%) |
| Archery | 222 (5.9%) |
| Climbing | 130 (3.5%) |
| Volleyball | 127 (3.4%) |
| Track & Field | 96 (2.6%) |
| Basketball | 94 (2.5%) |
| Swimming | 89 (2.4%) |
| Softball | 83 (2.2%) |
| Hockey | 70 (1.9%) |
| Baseball | 64 (1.7%) |
| Gymnastics | 59 (1.6%) |
| Football (American Football) | 56 (1.5%) |
| Speedskating | 47 (1.2%) |
| Lacrosse | 45 (1.2%) |
| Triathlon | 38 (1.0%) |
| Rowing | 38 (1.0%) |
| Figure Skating | 33 (0.9%) |
| Cycling | 30 (0.8%) |

| SPORT | N (%) |
|---|---|
| Wrestling | 29 (0.8%) |
| Skiing (Alpine, Nordic, etc.) | 27 (0.7%) |
| Rugby | 23 (0.6%) |
| Bowling | 22 (0.6%) |
| Golf | 22 (0.6%) |
| Fencing | 20 (0.5%) |
| Curling | 20 (0.5%) |
| Cheer | 18 (0.5%) |
| Water Ski & Wake Sports | 17 (0.5%) |
| Diving | 17 (0.5%) |
| Roller Sports | 16 (0.4%) |
| Badminton | 15 (0.4%) |
| Field Hockey | 15 (0.4%) |
| Weightlifting | 13 (0.3%) |
| Dance | 13 (0.3%) |
| Artistic Swimming | 11 (0.3%) |
| Shooting (rifle, pistol, or shotgun) | 11 (0.3%) |
| Boxing | 10 (0.3%) |
| Kayak | 10 (0.3%) |
| Another sport | 173 (4.6%) |

Athletes had the option of indicating their racial identity using a 'select all that apply' approach. A large majority of athletes selected Caucasian/White (79.5%) to describe their race/ethnicity (see Table 2). Throughout the following findings sections of this report, analyses explore differences across racial groups. For the purposes of those comparisons, athletes who selected more than one of the options in Table 2 are combined into a multi-racial category. Also, for the purposes of analyses, athletes who identified as Hawaiian or Pacific Islander are combined with those who selected "Another race/ethnicity"; this is done to protect the anonymity of the small number of athletes who identified themselves as Hawaiian or Pacific Islander.

*Table 2. Athletes' racial/ethnic identities*

| RACE/ETHNICITY (2,443) | % |
|---|---|
| Caucasian/White | 79.5% |
| Hispanic or Latino/a/e | 6.4% |
| Asian or Asian American | 6.2% |
| Black or African American | 4.7% |
| Prefer not to say | 4.0% |
| Native American or Alaskan Native | 1.8% |
| Another race/ethnicity not listed here | 1.8% |
| Hawaiian or Pacific Islander | 0.5% |

Athletes included a mix of men and women (39.3% and 57.6%, respectively), with some respondents preferring not to share their gender identity (2.0%). A small proportion of athletes identified as non-binary (0.4%), gender non-conforming (0.3%), prefer to self-describe (0.2%) or are genderqueer (0.1%; see Table 3). For the purposes of subgroup analyses in findings sections throughout this report, three broad gender categories are compared: athletes who identify as women; athletes who identify as men; and athletes who identify as a gender other than man or woman.

*Table 3. Athletes' gender identities*

| GENDER IDENTITY (2,415) | % |
|---|---|
| Woman | 57.6% |
| Man | 39.3% |
| Prefer not to say | 2.0% |
| Non-binary | 0.4% |
| Gender non-conforming | 0.3% |
| A gender not listed, or prefer to self-describe | 0.2% |
| Genderqueer | 0.1% |

Athletes were asked if they consider themselves to be a member of the transgender community. Of the 2,347 athlete who responded to this item, less than 1% responded "Yes" (0.8%) or indicated that they were unsure or questioning (0.5%), while the large majority (97.3%) responded "No."

Surveyed athletes were asked to select all sexual identities that applied to them, with a majority identifying as heterosexual (84.9%; Table 4). For the purposes of subgroup analyses in findings sections throughout this report, two broad sexuality categories are compared: athletes who identified as only heterosexual/straight; and those who selected one or more sexual identity other than heterosexual/straight.

*Table 4. Athletes' sexual orientations*

| SEXUAL ORIENTATION (2,343) | % |
|---|---|
| Heterosexual/straight | 84.9% |
| Prefer not to say | 4.8% |
| Bisexual | 4.4% |
| Asexual | 3.4% |
| Lesbian | 2.4% |
| Gay | 1.7% |
| Queer | 1.3% |
| Unsure or questioning | 1.2% |
| Pansexual | 0.9% |
| Another sexuality not listed here or prefer to self-describe | 0.9% |
| Aromantic | 0.5% |

Around 5% (5.1%) of surveyed athletes identified themselves as an athlete with a disability (Table 5).

*Table 5. Athletes with and without disabilities, and those who prefer not to say*

| DISABILITY STATUS (3,737) | % |
|---|---|
| Athletes without disabilities | 93.8% |
| Athletes with disabilities | 5.1% |
| Prefer not to say | 1.1% |

Most athletes who responded indicated that they are currently actively involved as athletes in their sport (see Table 6). The age range for athletes who responded to this survey was 18 to 89 years old, with a median age of 43 years old, suggesting that the survey reached an active demographic of middle-aged adults.

*Table 6. Athletes' status as a current or former athletes*

| ACTIVE ATHLETE STATUS (3,752) | % |
|---|---|
| Former Athletes | 28.2% |
| Current Athletes | 71.8% |

When asked if they had ever participated as an athlete on an NGB or USOPC managed team, approximately half of athletes responded no (49.2%), while a third responded yes (33.4%). Over 15% (16.4%) of athletes expressed that they were unsure whether or not they had, and a small percentage indicated that they preferred not to say (see Table 7). Several findings in this report discuss variations between athletes who have participated on an NGB or USOPC managed team versus those who have not. When those comparisons are made, athletes who are unsure or did not specify are excluded from analysis.

*Table 7. Athlete responses regarding if they have ever participated on an NGB or USOPC*

| NGB/USOPC ATHLETE STATUS (3,761) | % |
|---|---|
| No | 49.2% |
| Yes | 33.4% |
| Unsure | 16.4% |
| Prefer not to say | 0.9% |

Athletes varied in terms of how long they had been involved as an athlete in their sport. The largest segment of responses came from individuals who had been involved in their sport for more than 10 years (see Table 8).

*Table 8. Range of years of athletes' involvement in their sport*

| YEARS OF INVOLVEMENT (3,710) | % |
|---|---|
| 0 to 4 years | 17.25% |
| 5 to 9 years | 18.41% |
| 10 to 20 years | 36.63% |
| 21 or more years | 27.71% |

A little less than 45% (44.6%) of athletes have participated on a college or university sports team. Further, surveyed athletes have performed many roles in addition to being an athlete. Nearly half have been a team captain (47.6%) at some point, and many have also been coaches, parents or guardians of athletes, and officials (see Table 9; athletes could select multiple additional roles).

*Table 9. Percent of athletes who performed additional roles in their sport*

| ADDITIONAL ROLES IN SPORT (2,413) | % |
|---|---|
| Team captain | 47.6% |
| Coach | 43.0% |
| Parent or guardian of athlete | 29.6% |
| Official | 21.2% |
| Other | 8.5% |
| NGB Athlete representative | 4.7% |
| USOPC Athlete council representative | 2.4% |

A small proportion (7.5%) of athletes (N=2,398) had participated on an Olympic or Paralympic team. Those who had included national team members, Paralympic and Olympic Medalists, and Paralympic and Olympic Junior team members (Table 10).

*Table 10. Olympic and Paralympic team athletes' highest level of competition achieved*

| OLYMPIC & PARALYMPIC TEAM MEMBERS (179) | N |
|---|---|
| Paralympic or Olympic National Team Member | 87 |
| Paralympic or Olympic Development or Junior Team Member | 50 |
| Other | 22 |
| Paralympic or Olympic Medalist | 20 |

# ATHLETE SATISFACTION

*Athletes shared their perceptions regarding aspects of their general sport experience.*

Athletes shared a high level of satisfaction with their sport experience in general. As shown in Figure 1, average ratings fell between somewhat agree (represented by a 5) and strongly agree (represented by a 6) for all items in this section.

*Figure 1. Athlete agreement with statements related to their satisfaction in sport*




Subgroup analyses were conducted to explore differences in athletes' responses to items related to their satisfaction in sport. Analyses revealed no differences that reached our criteria for statistical significance.[1]

Specific to the question "overall, my athletic experience has had a positive impact on my life," of the 3,748 responses, an additional breakdown is as follows:

- Strongly agree–72.1%
- Agree somewhat–15.0%
- Agree slightly–4.8%
- Disagree slightly–1.8%
- Disagree slightly–1.2%
- Strongly disagree–3.7%

1. ANOVAs revealed no differences that reached our criteria for significance in athletes' overall responses to survey items related to their satisfaction in sport when looking at demographic factors including gender, race, sexual orientation, disability, or NGB/USOPC affiliation. Criteria for significance was a p-value of .05 or less, and an eta-squared effect size of .02 or larger.

Surveyed athletes who identified themselves as having participated as athletes on an NGB or a USOPC managed team were asked whether they felt supported by those teams, and if they would recommend being a member of those teams to others. Overall, this subgroup of athletes agreed slightly (represented by a 4 on a 6-point agreement scale) that they felt supported by their NGB or USOPC managed team. These same athletes expressed stronger agreement that they would recommend being a member of their NGB or USOPC managed team to others, as shown in Figure 2.

*Figure 2. Athletes' agreement with statements related to their NGB or USOPC managed teams*




Most survey respondents expressed that they felt athletes are generally treated equally in their sport. Although 15% (15.0%) of athletes responded that they "Never" felt athletes were treated equally, the largest segment of athletes felt that equal treatment occurred either "Frequently" or "Very frequently" in their sport (62.1%) (see Figure 3).

*Figure 3. Frequency of equal treatment of athletes*



# ATHLETE DISENGAGEMENT

*Athletes reflected on experiences of disengagement and burnout.*

Most athletes indicated that, at some point during their athletic involvement, they felt burned out by their sports participation, uninterested in participating in their sport, and wished that they were somewhere else during a practice, game, or competition. Just under half of athletes had seriously considered quitting their sport entirely. Table 11 shows the percentage of athletes who had experiences related to athlete disengagement and burnout (either rarely, occasionally, frequently, or very frequently) compared to those who never had those experiences in the context of their sport.

*Table 11: Percent of athletes who experienced vs. never experienced indicators of disengagement and burnout*

| During your sport involvement, how frequently... | Rarely to Very Frequently | Never |
|---|---|---|
| Did you feel burned out by your sports participation? (3,749) | 79.6% | 20.4% |
| Did you feel uninterested in participating in your sport? (3,746) | 68.3% | 31.7% |
| Did you wish you were somewhere else during a practice, game, or competition? (3,742) | 63.1% | 36.9% |
| Did you seriously consider quitting your sport entirely? (3,740) | 48.1% | 51.9% |

For most athletes who had experienced disengagement or burnout during their athletic involvement, these were rare or occasional occurrences. Figure 4 displays the responses of athletes who had experienced disengagement or burnout in terms of how frequent those experiences were.

*Figure 4. Frequency of disengagement or burnout (not including athletes who selected "Never")*



## GROUP DIFFERENCES

To further explore variation in athletes' experiences, a composite score was calculated for each athlete representing the total number of indicators of disengagement and burnout (i.e., the four items in this section) that they endorsed having experienced. Composite scores ranged from 0 to 4, with 0 meaning that an athlete had never experienced any of the four indicators of disengagement and burnout, and a 4 meaning that an athlete had experienced all four of the indicators of disengagement and burnout.

Subgroup analyses revealed that athletes' experiences with disengagement and burnout were significantly associated with their **gender identity**. Specifically:

- Athletes who are men experienced significantly fewer indicators of disengagement and burnout compared to all other athletes.[2]
- While women tended to experience between two and three (with an average of 2.2) out of the four indicators of disengagement and burnout, most men experienced less than two (averaging 1.9) out of the four indicators.
- Athletes who identified as a gender other than man or woman (including genderqueer, gender non-conforming, non-binary, and a gender other than listed here)[3] experienced rates of disengagement and burnout that were similar to, yet slightly higher, than those experienced by women athletes (on average, having experienced 2.4 indicators of disengagement and burnout).

Gender differences regarding disengagement and burnout were most pronounced in responses to the question: "How frequently did you feel burned out by your sports participation?" Figure 5 displays the percentage of men, women, and athletes who identified as other genders who indicated that during their athletic involvement they felt burned out by their sports participation (i.e., selected anything other than "Never" for this survey item).

*Figure 5. Percent of athletes who felt burned out by their sport participation by gender*




2. ANOVA revealed statistically significant differences between men and women. While differences were not found for other genders, the small number of athletes who identified as a gender other than man or woman may have limited our statistical power to detect differences for that group.

3. For the purposes of comparing athletes' experiences throughout this report, athletes who identified themselves as a gender other than man or woman are grouped together. This was done due to the small number of athletes who identified themselves as genders other than man and woman in order to protect the anonymity of athletes' survey responses.

# ANTI-INCLUSIVE EXPERIENCES

*Athletes' experiences of being treated in anti-inclusive ways.*

Athletes were asked to consider a variety of statements related to anti-inclusive experiences (listed below in Table 12), and to indicate if they had any of those experiences during their athletic involvement. The experience most commonly noted was being "repeatedly excluded from team or group activities" (experienced by just over 45% of athletes). This was followed closely by experiences of being hassled by their peers or opponents during events, and people assuming their injuries weren't as significant or painful as they actually were. Of the athletes who responded to items in this section, over 80% (80.8%) endorsed at least one of the statements in Table 12. On average, athletes experienced between five and six (with a combined average of 5.2) out of the sixteen items in this section.

*Table 12. Percent of athletes who experienced vs. never experienced anti-inclusive behaviors*

| Frequency of experiences during sports involvement | Rarely to Very Frequently | Never |
|---|---|---|
| You felt other players repeatedly excluded you from team/group activities. (3,460) | 45.5% | 54.5% |
| You were hassled by peers or opponents during an event. (3,453) | 44.5% | 55.5% |
| People assumed that your injuries weren't as significant or painful as they actually were. (3,448) | 41.3% | 58.7% |
| Were you given a lower score or ranking than you earned? (3,457) | 40.2% | 59.8% |
| People expected less of you than they expected of other players on your team. (3,457) | 38.9% | 61.1% |
| You were called insulting names. (3,452) | 37.0% | 63.0% |
| You were disciplined or punished for something other players were regularly excused for. (3,464) | 36.2% | 63.8% |
| You received inadequate support from athletic trainers or medical providers. (3,444) | 35.4% | 64.6% |
| You were treated unfairly by an official at an event. (3,455) | 33.6% | 66.4% |
| People assumed your ability to communicate was poor. (3,455) | 33.3% | 66.7% |

| Frequency of experiences during sports involvement | Rarely to Very Frequently | Never |
|---|---|---|
| People acted as if they thought you were not smart. (3,448) | 31.3% | 68.7% |
| You were discouraged from taking on a leadership role. (3,456) | 29.7% | 70.3% |
| People acted as if they were afraid of you. (3,446) | 27.4% | 72.6% |
| You felt unsafe as a member of your sport organization. (3,442) | 22.9% | 77.1% |
| You were hassled by security at an athletics event. (3,456) | 15.3% | 84.7% |
| You were drug tested more than your athlete peers. (3,456) | 11.1% | 88.9% |

Athletes who had experienced anti-inclusive behaviors during their athletic involvement (i.e., those who selected anything other than "Never" as a response to items in this section) said this was a rare or occasional occurrence. Figure 6 displays the frequency at which athletes experienced the eight most common indicators of anti-inclusive behaviors.

*Figure 6. Frequency of anti-inclusive experiences (not including athletes who selected "Never")*



## GROUP DIFFERENCES

Generally, surveyed athletes experienced similar levels of anti-inclusive behaviors regardless of their demographic differences. One exception that stood out relates to the higher rate at which Black and African American athletes experienced being hassled by security at an athletic event, compared to athletes in other racial groups.[4] Further, Asian, multi-racial, and Hispanic athletes all had this anti-inclusive experience at higher rates than white athletes. Figure 7 displays the percentage of athletes across different racial groups who indicated that they have been hassled by security at an athletic event.

*Figure 7. Percent of athletes who were hassled by security at an athletic event by race*




Composite scores were calculated for each athlete representing the total number of anti-inclusive behaviors asked about in this section that they endorsed having experienced. Composite scores ranged from 0 to 16, with 0 meaning that an athlete had never experienced any of the 16 anti-inclusive behaviors, and a 16 meaning that an athlete had experienced all of the anti-inclusive behaviors discussed in this section. Analyses revealed that:

- Current athletes were slightly less likely to have experienced anti-inclusive behaviors compared to former athletes (i.e., those who said they were not currently active as athletes in their sport).[5] While current athletes, on average, experienced approximately five (averaging 4.8) of the 16 anti-inclusive behaviors described in this section, former athletes tended to have experienced more than six (averaging 6.2) of those behaviors.
- Three anti-inclusive behaviors in particular were experienced more by former athletes, including being called insulting names, having people assume that their injuries were not as painful or significant as they actually were, and receiving inadequate support from athletic trainers of medical providers.

4. ANOVA revealed that this racial group comparison was statistically significant, reaching a p-value of < .05. While the effect size for this item was smaller than our criteria of .02 eta-squared, it was approaching a small effect size (.014) and was the item with the largest effect size in this section according to our racial group comparison.

Figure 8 shows the rate at which current athletes compared to former athletes experienced these three anti-inclusive behaviors (i.e., selected anything other than "Never" in response to the associated item).

*Figure 8. Percent of current vs. former athletes who experienced specific anti-inclusive behaviors*[6]




## COMPARISON TO 2020

The majority of athletes who responded to the current survey (80.8%) indicated that they had experienced at least one anti-inclusive behavior during their athletic involvement, which is similar to the proportion who indicated this in the 2020 survey (72.4%). These results suggest that anti-inclusive behaviors in sports are commonly experienced by the majority of athletes.

5. ANOVA revealed that this variation between current vs. former athletes was statistically significant (p-value < .05), while the eta-squared effect size (measured at .019) was slightly smaller than our criteria of .02.
6. The number of current and former athletes who responded to the items displayed in this figure varies slightly due to athletes skipping survey items and/or exiting the survey before reaching the end. Similar variations in item response rates are noted in figures throughout this report.

# DISCRIMINATORY EXPERIENCES

*Athletes' experiences of being discriminated against during their athletic involvement.*

Athletes were asked whether, during their involvement in their sports, they were ever treated with disrespect or discriminated against because of aspects of their personal identities.[7] Overall, one-third (33.0%) of athletes who responded to items in this survey section (N=3,422) indicated that they had experienced some form of discrimination during their athletic involvement. According to survey results, ageism (toward both younger as well as older athletes) was the most pervasive form of discrimination experienced by the largest segment of athletes. Table 13 displays the percentage of athletes who had experienced different forms of discrimination during their athletic participation, compared to those who had not.

*Table 13. Percent of athletes who experienced vs. did not experience different types of discrimination*

| Experienced discrimination in sports due to... | Yes | No |
|---|---|---|
| Age being younger (3,414) | 13.2% | 86.8% |
| Age being older (3,413) | 13.1% | 86.9% |
| Gender identity (3,409) | 8.4% | 91.6% |
| Race or ethnicity (3,415) | 7.5% | 92.5% |
| Religious beliefs (3,408) | 6.1% | 93.9% |
| Sexual orientation (3,398) | 5.2% | 94.8% |
| National origin (3,412) | 5.2% | 94.8% |
| Another aspect of identity (2,206) | 5.4% | 94.6% |

Athletes who had experienced discrimination due to another aspect of their identity had the option of sharing in their own words the type of discrimination they experienced. Of the 125 athletes who specified another type of discrimination that they experienced, the highest proportion (12.8%) indicated that they had experienced discrimination due to their body shape (e.g., height, weight, or physique). Other aspects of athletes' identities that were the target of discrimination included their financial situation, political beliefs, skin tone, hairstyle or hair type, skill level, diet, and cultural identity.

7. Please note: While this section deals with questions explicitly focused on discrimination, analyses in various other sections of the report also shed light on athlete experiences concerning disrespect and discrimination.

Only athletes who identified themselves as having a disability were asked if they had experienced discrimination based on their disability. Of those athletes (N=172), more than one third (36.0%) responded they had experienced this type of discrimination.

Most athletes who experienced discrimination during their sports involvement indicated that they had these experiences occasionally. Figure 9 displays the frequency at which different types of discrimination occurred. As shown in Figure 9, discriminatory experiences happened more frequently when they were related to athletes' disability (N=58), or another aspect of their identity (N=118), compared to other forms of discrimination.

*Figure 9. Frequency of discrimination associated with various aspects of athletes' identities (only including athletes who experienced discrimination)*




Athletes shared whether they experienced discrimination at various timepoints (athletes were able to select more than one timeframe). Key insights from Table 14 include:

- Athletes most commonly report experiencing discrimination in sports more than four years ago.
- Athletes who experienced discrimination based on a disability were most likely to have experienced this within the past two years.
- Athletes who experienced discrimination based on their age being older or on their gender identity were most likely to have had these experiences within the past 12 months.
- Although many experiences of discriminatory behavior took place four or more years ago, all forms of discrimination were experienced by substantial segments of athletes more recently as well.

*Table 14. Timeframe of athletes' experiences of discrimination (only including athletes who experienced discrimination)*

| Timeframe of discrimination in sports due to... | Within the past 12 months | 1-2 years ago | 2-4 years ago | More than 4 years ago |
|---|---|---|---|---|
| Having a disability (59) | 47.5% | 49.2% | 33.9% | 28.8% |
| Age being older (438) | 35.6% | 30.1% | 21.2% | 29.2% |
| Gender identity (281) | 30.6% | 27.4% | 27.8% | 30.6% |
| Another aspect of identity (119) | 29.4% | 23.5% | 25.2% | 52.9% |
| National origin (249) | 28.5% | 24.5% | 20.5% | 47.0% |
| Religious beliefs (200) | 27.0% | 28.0% | 19.5% | 33.5% |
| Race or ethnicity (169) | 25.4% | 23.7% | 25.4% | 45.0% |
| Sexual orientation (170) | 25.3% | 24.7% | 25.9% | 38.2% |
| Age being younger (447) | 19.7% | 18.1% | 21.7% | 57.0% |

Athletes who experienced discrimination were asked to categorize the person or people who treated them in this way (using a 'select all that apply' approach). As shown in Figure 10, athletes were most likely to be discriminated against by their athlete peers, followed by their coaches or assistant coaches.

*Figure 10. Source of discriminatory behavior indicated by athlete who experienced discrimination (N = 1,106)*




## GROUP DIFFERENCES

Further statistical analysis shed more light on how athletes' experiences with discrimination related to their personal identities. As discussed below, significant differences[7] in discriminatory experiences were revealed relating to athletes' racial identities, gender identities, sexual orientation, and whether or not athletes identified as having a disability.

Athletes' experiences of racial discrimination varied significantly based on their racial identities.[8] As shown in Figure 11, well over one-third (36.9%) of athletes who identified themselves as being Black or African American had experienced racial discrimination during their athletic involvement; a rate which exceeds all other racial groups by more than ten percentage points.

*Figure 11. Percent of athletes with different racial identities who experienced racial discrimination*




8. Throughout this section, group differences are noted when Pearson chi-square significance tests were below our threshold of p-value equal to or less than .05, and when a Cramer's V effect size was observed at or above our threshold of .10 (indicative of a small effect size).

9. The effect size for this finding was calculated at a Cramer's V of .31 (a medium effect size). All other significant findings in this section were associated with small effect sizes (between .10 and .27).

Discrimination based on national origin also varied significantly by athletes' racial identities. As Figure 12 displays, Asian or Asian American athletes disproportionately experienced this type of discrimination, at a rate of approximately one in five (19.3%).

*Figure 12. Percent of athletes with different racial identities who experienced discrimination based on their national origin*




Athletes' gender identity was significantly associated with the rate at which they experienced both gender discrimination, and discrimination based on their sexual orientation (see Figure 13). Athletes who identified themselves as a gender other than man or woman (including genderqueer, gender non-conforming, non-binary, or another gender than listed here) experienced these types of discrimination at the highest rates. While women experienced more gender discrimination than men, both men and women experienced similar rates of discrimination based on sexual orientation.

*Figure 13. Percent of athletes with different gender identities who experienced discrimination based on their gender and their sexual orientation*



Athletes' sexual orientation was significantly associated with their experiences of discrimination related to both sexual orientation as well as gender. Athletes who identified themselves as having a sexual orientation other than heterosexual/straight (including asexual, aromantic, bisexual, gay, lesbian, queer, pansexual, unsure or questioning, or a sexual orientation not listed here)[9] were more likely to experience both of these types of discrimination, as shown in Figure 14.

*Figure 14. Percent of athletes with heterosexual vs. non-heterosexual identities who experienced discrimination based on their gender and their sexual orientation*




Athletes who identified as having a disability experienced significantly higher rates of discrimination that extended beyond ableism, or discrimination based on their disability status. Specifically, as shown in Figure 15, athletes with disabilities were more likely than athletes without disabilities to experience gender-based discrimination as well as discrimination related to their sexual orientation.

10. For the purposes of comparing athletes' experiences throughout this report, athletes who identified themselves as being a sexuality other than heterosexual/straight are grouped together. This was done due to the limited number of athletes who identified themselves in some of the smaller sexual orientation subgroups in order to protect anonymity.

*Figure 15. Percent of athletes with and without disabilities who experienced discrimination based on their gender and sexual orientation*




## COMPARISON TO 2020

A smaller proportion of athletes who responded to the current survey (33.0%) indicated that they had experienced at least one form of discriminatory behavior during their athletic involvement, compared to the athletes who responded to the 2020 survey (48%). However, findings from the current survey converge with findings from 2020 when it comes to noting the disproportionately higher rates of discrimination experienced by some athletes, including athletes in racial minority and gender minority groups. The current results build on the 2020 findings by clarifying the specific types of discrimination most often experienced by these various subgroups of athletes.

# EMOTIONAL HARM & NEGLECT

*Athletes' experiences of emotionally harmful or neglectful behavior.*

A series of 22 survey items was used to assess the potentially emotionally harmful and neglectful experiences that athletes had during their sports participation. A large majority of athletes (78.4%) shared that they had, at some point in their athletic involvement, experienced at least one of the 22 indicators of emotional harm and neglect (i.e., the items listed in Table 15). The average number of indicators of emotional harm and neglect that athletes endorsed having experienced fell between 6 and 7 (6.48) out of 22.

Table 15 shows the proportion of athletes that responded they had experienced versus never experienced each indicator of emotional harm or neglect within the context their sport. Just over half of athletes experienced being put down, embarrassed, or humiliated, and nearly as many experienced having people gossip or tell lies about them.

*Table 15. Percent of athletes who experienced vs. never experienced indicators of emotional harm and neglect*

| Frequency of experiences during sports involvement | Rarely to Very Frequently | Never |
|---|---|---|
| You were put down, embarrassed, or humiliated. (3,262) | 50.6% | 49.4% |
| People gossiped or told lies about you. (3,249) | 47.0% | 53.0% |
| You were shouted at in a frightening, threatening, or belittling manner. (3,261) | 43.3% | 56.7% |
| You were forced or expected to train or compete in unsafe conditions (e.g., extreme hot or cold weather, or other dangerous conditions). (3,116) | 41.9% | 58.1% |
| You were criticized as a person in response to your performance in training or competition. (3,256) | 41.2% | 58.8% |
| You felt your physical health was ignored. (3,119) | 40.3% | 59.7% |
| You felt your mental or emotional health was ignored. (3,116) | 39.6% | 60.4% |
| You felt your athletic needs were ignored. (3,116) | 39.0% | 61.0% |
| You were forced or expected to practice, train, or compete while you were injured, sick, or exhausted (3,105) | 37.5% | 62.5% |

| Frequency of experiences during sports involvement | Rarely to Very Frequently | Never |
|---|---|---|
| You were intentionally ignored in response to your performance in training or competition (3,252) | 36.2% | 63.8% |
| You were negatively criticized about your body weight, size, and/or shape. (3261) | 35.6% | 64.4% |
| You were pressured to try new skills before you felt ready. (3,118) | 32.0% | 68.0% |
| Someone threatened to harm or take away an animal that you cared about. (464)* | 30.6% | 69.4% |
| You have felt like your future wellbeing (beyond your athletic experience) was not cared for. (3,103) | 30.1% | 69.9% |
| You were sworn/cursed at for not performing well. (3,235) | 29.0% | 71.0% |
| You were encouraged to sacrifice your education or career for sport. (3,124) | 27.1% | 72.9% |
| You were not provided with adequate support for basic needs (e.g., food, sleep, shelter, bathroom use, opportunities for bathing/showering). (3,107) | 22.2% | 77.8% |
| You were harassed or criticized on social media, text message, or another online format. (3,264) | 20.4% | 79.6% |
| You were threatened with being thrown out of practice or kicked off the team. (3,241) | 17.9% | 82.1% |
| You were inappropriately left alone with no care. (3,111) | 14.5% | 85.5% |
| You were pressured to put off starting a family because of your sports involvement. (3,116) | 11.8% | 88.2% |
| | **One or more times** | **Never** |
| Someone harmed an animal that you cared about. (440)* | 30.2% | 69.8% |

**Only athletes who shared that they had a service or emotional support animal, or indicated being an equestrian athlete, were asked questions referencing animals.*

In terms of frequency, most athletes said they had experiences related to emotional harm and neglect rarely or occasionally. Figure 16 shows the frequency at which athletes experienced the eight most common forms of emotional harm and neglect.

*Figure 16. Frequency of athletes' experiences related to emotional harm and neglect (not including athletes who selected "Never")*




## GROUP DIFFERENCES

To explore group differences, composite scores related to emotional harm and neglect were calculated for each athlete based on the total number of items in this survey section that they indicated having experienced. Composite scores ranged from 0 to 22, with 0 meaning that an athlete had never experienced any of the behaviors asked about in this section, and a 22 meaning that an athlete had experienced all 22 indicators of emotional harm and neglect.

Analyses of variance in composite scores revealed that former athletes experienced a significantly higher number of emotional harm and neglect indicators when compared to current athletes.[10] The average number of emotional harm and neglect indicators experienced was eight (8.0) for former athletes and about six (5.9) for current athletes. The variation between current and former athletes' experiences with emotional harm and neglect was particularly pronounced for the three items displayed in Figure 17.

*Figure 17. Percent of current vs. former athletes who experienced three behaviors related to emotional harm and neglect*




Experiences with emotional harm and neglect also varied based on athletes' genders.[11] According to survey results, men experienced fewer indicators of emotional harm and neglect (averaging 5.9 out of 22 indicators), compared both to women (who averaged 7.7) and athletes who identified as a gender other than men and women (whose average was 10.5). Figure 18 shows the percent of men, women, and athletes who identify as another gender who experienced three types of emotional harm and neglect during their athletic involvement.

*Figure 18. Percent of athletes who experienced three behaviors related to emotional harm and neglect by gender identity*




11. ANOVA revealed that this variation between current vs. former athletes was statistically significant (p-value < .05), with an eta-squared effect size slightly higher than our criteria of .02 (measured at .023).

12. ANOVA revealed that this variation across gender groups was statistically significant (p-value < .05), with an eta-squared effect size slightly higher than our criteria of .02 (measured at .022). Post-hoc analysis revealed that all three gender comparison groups were significantly different from one another.

## COMPARISON TO 2020

Findings in the current survey converge with findings from 2020. Both suggest that approximately 80% of athletes have experienced some form of emotional harm or neglect (referred to as “Psychological harm” in the 2020 report) during their athletic involvement. Further, both sets of findings suggest that experiences of emotional harm and neglect are more common among women and other genders than they are among men.

# PHYSICAL HARM

*Athletes' experiences of physically harmful behavior, or threat of physical harm.*

Fourteen survey items asked athletes about the physically harmful or physically threatening experience they had during their sports participation. A little over one-third (35.3%) of athletes who responded to items in this section (N=3,023) experienced at least one of the 14 indicators of physical harm/threat of harm (i.e., the items listed in Table 16) during their athletic involvement. Table 16 shows the proportion of athletes who had experienced versus never experienced each indicator of physical harm (or threat of physical harm) in the context of their sport.

*Table 16. Percent of athletes who experienced vs. never experienced physical harm or threat of physical harm*

| Frequency of experiences during sports involvement | One or more Times | Never |
|---|---|---|
| You were punished with excessive exercise. (3,005) | 22.0% | 78.0% |
| Someone threw an object at you in an attempt to hit you (e.g., shoe, racket, hockey stick, water bottle). (3,011) | 14.9% | 85.1% |
| Someone threatened to physically harm you. (3,010) | 14.0% | 86.0% |
| You were denied water. (2,998) | 13.9% | 86.1% |
| Someone hit you with an object (e.g., shoe, racket, hockey stick, water bottle). (3,015) | 12.6% | 87.4% |
| Someone forced you to the ground/knocked you down without your consent (if not part of regular training and/or sport). (3,011) | 9.1% | 90.9% |
| Someone slapped/hit you with an open hand. (3,021) | 8.8% | 91.2% |
| Someone kicked or hit you with their foot or knee (if not part of regular training and/or sport). (3,013) | 8.7% | 91.3% |
| Someone punched/hit you with a fist (if not part of regular training and/or sport). (3,012) | 8.0% | 92.0% |
| Someone pulled your hair. (3,009) | 7.7% | 92.3% |
| Someone put their hands or another object on your neck and restricted your breathing. (3,009) | 5.5% | 94.5% |
| You were forced or ordered to get into and/or stay in a confined space (such as a locker or bathroom stall). (3,000) | 5.5% | 94.5% |
| Someone held you under water against your will. (3,011) | 5.1% | 94.9% |
| Someone shaved or cut your hair as punishment. (309) | 4.8% | 95.2% |

13. ANOVA revealed that this variation across gender groups was statistically significant ($p$-value < .05), with an eta-squared effect size slightly higher than our criteria of .02 (measured at .022). Post-hoc analysis revealed that all three gender comparison groups were significantly different from one another.

Figure 19 displays the frequency at which athletes experienced the eight most common indicators of physical harm or threat of physical harm.

*Figure 19. Frequency of athletes' experiences related to physical harm (not including athletes who selected "Never")*




Athletes who experienced indicators of physical harm or threat of physical harm were asked to categorize the person or people who treated them in harmful or threatening ways (using a 'select all that apply' approach). As shown in Figure 20, athletes were most likely to experience physical harm or physical threats from their coaches or assistant coaches, followed by their athlete peers.

*Figure 20. Source of physically harmful or physically threatening behavior according to athletes who experienced physical harm or threat (N = 1,059)*




## GROUP DIFFERENCES

For athletes whose primary sport was swimming, the experience of having been held under water against their will was far more common than it was for other athletes, as displayed in Figure 21.

*Figure 21. Percent of athletes in swim-focused sports vs. other sports who experienced being held under water against their will*



For athletes in swim-focused sports (i.e., swimming, artistic swimming, and water polo) who had ever experienced being held under water against their will (N=31), this was generally not confined to one or two occurrences (see Figure 22).

*Figure 22. Frequency of swim-focused athletes' experiences of being held under water (not including athletes who selected "Never")*




Composite scores were calculated for each athlete based on the total number of items related to physical harm or threat of physical harm that they indicated having experienced. Composite scores ranged from 0 to 14 (from never having experienced any of the behaviors asked about in this section, to having experienced all 14).

Analyses of variance in composite scores revealed no statistically significant differences in the number of indicators of physical harm (or threat of harm) that athletes had experienced across key demographic comparison groups.[12] However, at the item-level, several experiences related to physical harm stood out as being more prevalent within certain athlete sub-groups, as follows:

- Athletes' experiences of being hit or slapped with an open hand varied significantly based on their racial identities (Figure 23).[13] Black or African American athletes were the most likely to experience this behavior.
- Athletes' experiences of being threatened with physical harm, and of being forced or ordered to get into or stay in a confined space varied significantly based on whether or not they have a disability (Figure 24).[14] Athletes with disabilities were more likely to experience these behaviors.
- Athletes' experiences of being punched or hit with a fist, forced or knocked to the ground, kicked or hit with a foot or knee, and threatened with physical harm varied significantly based on athletes' gender identity (Figure 25).[15] Athletes who identified as men, or a gender other than man or woman were more likely than women to experience these behaviors.

14. ANOVAs revealed no variation in composite scores that reached our threshold of a p-value at or below .05 and an eta-squared effect size equal to or greater than .02.

15. The effect size for this finding was calculated at a Cramer's V of .11 (a small effect size).

16. The effect sizes for these findings were calculated at a Cramer's V of .10 (a small effect size).

17. The effect size for these findings was calculated at a Cramer's V of .13 (a small effect size).

*Figure 23. Variation across racial/ethnic groups in athletes' experiences of being hit or slapped*




*Figure 24. Variation in rate of experiences with two types of physical harm or threat or physical harm for athletes with and without disabilities*




*Figure 25. Variation across gender in athletes' rate of experiencing four forms of physical harm*



## COMPARISON TO 2020

The percentage of athletes who experienced at least one indicator of physically harmful or physically threatening behavior was found to be higher in the current survey participants (35.3%) than it was in 2020 (21.7%). Both reports shed light on the disproportionate physically harmful experiences of athletes of color, particularly Black or African American athletes. The current report expands on the findings shared in 2020 by identifying specific types of physically harmful or threatening behaviors that are more common for athletes with disabilities, as well as athletes who identify as men or another gender, compared to women.

# STALKING

*Athletes' experiences of being watched, tracked, or followed against their will.*

Athletes were asked how frequently they had experienced three types of behaviors related to stalking detailed in Table 17. As shown in the table, nearly seventeen percent of athletes (16.6%) had experienced being spied on, watched, or followed by someone they didn't want watching or following them, and 14.3% had experienced someone repeatedly showing up uninvited or waiting for them when they did not want them to.

*Table 17. Percent of athletes who experienced vs. never experienced indirect physical harm*

| Frequency of experiences during sports involvement | Rarely to Very Frequently | Never |
|---|---|---|
| You were spied on, watched, or followed by someone you didn't want watching or following you. (3,243) | 16.6% | 83.4% |
| Someone repeatedly showed up uninvited or waited for you when you did not want that person to be there. (3,244) | 14.3% | 85.7% |
| Someone tracked or monitored your activities or location using devices or software on your phone or computer. (3,238) | 9.1% | 90.9% |

Athletes who had experiences related to stalking (i.e., answering rarely, occasionally, frequently, or very frequently to the questions in this section) shared how frequent those experiences were for them. As shown in Figure 26, athletes' experiences of being tracked or monitored using devices or software tended to happen at higher frequencies, compared to experiences of in-person stalking behaviors.

*Figure 26. Frequency of stalking (not including athletes who selected "Never")*



## GROUP DIFFERENCES

Analyses revealed that most athletes' experiences related to the items in this section were relatively similar, regardless of athletes' demographic characteristics. Two exceptions relate to variation in athletes' experiences with being spied on, watched or followed by someone they didn't want to watch or follow them:

- Athletes with disabilities were more likely to experience this type of stalking behavior, compared to athletes without disabilities (Figure 27).[16]
- Athletes who had ever participated on an NGB or a USOPC managed team were more likely to experience this behavior, compared to athletes who had never participated on an NGB or USOPC managed team (Figure 28).[17]

*Figure 27. Percent of athletes with and without disabilities who experienced being spied on, watched or followed*




*Figure 28. Percent of NGB/USOPC athletes vs. non-NGB/USOPC athletes who experienced being spied on, watched or followed*



# SEXUAL HARM WITHIN SPORT

*Athletes' experiences of unwanted sexual behavior during their sports involvement.*

Athletes were asked questions regarding their experiences with different types of unwanted sexual behaviors that they may have been subjected to within the context of their sports involvement. These unwanted sexual behaviors are organized in this report in three general categories: (1) Unwanted sexual comments or looks; (2) Unwanted sexual contact or other sexually explicit behavior; and (3) Rape or attempted rape.

## UNWANTED SEXUAL COMMENTS OR LOOKS

Athletes' experiences with unwanted sexual comments or looks were explored using five survey items (detailed in Table 18). Over one third (36.3%) of athletes who responded (N=2,976) indicated that they had had at least one of the experiences listed in the table. As shown in Table 18, the most common experience shared by over a quarter of athletes (25.3%) was being the subject or target of sexist jokes/remarks.

*Table 18. Percent of athletes who experienced vs. never experienced unwanted sexual comments or looks*

| During your sports involvement, how frequently... | One or more Times | Never |
|---|---|---|
| Were you the subject or target of sexist jokes/remarks? (2,973) | 25.3% | 74.8% |
| Were you looked at with an intrusive sexual glance? (2,933) | 20.9% | 79.2% |
| Were parts of your body commented on in a manner that felt sexual? (2,925) | 19.5% | 80.6% |
| Has your clothing or uniform been commented on in a sexual manner? (2,926) | 17.2% | 82.8% |
| Did you receive (without your consent) calls, notes, emails, texts, photos, or videos that had a sexual connotation or were sexually explicit? (2,924) | 6.9% | 93.1% |

For many athletes who received unwanted sexual comments or looks from others during their sports involvement, these were repeated experiences (Figure 29).

*Figure 29. Frequency of athletes' experiences with unwanted sexual comments and looks (not including athletes who selected "Never")*




Athletes who experienced unwanted sexual comments or looks were asked to choose the category that best describes the person or people who were the source of those behaviors (using a 'select all that apply' approach). For all five items related to unwanted sexual comments or looks, "Athlete peer" was the most frequently selected category. Figure 30 displays sources of unwanted comments or looks for two of the items in this section.

18. The effect size for this finding was calculated at a Cramer's V of .12 (a small effect size).

19. The effect size for this finding was calculated at a Cramer's V of .10 (a small effect size).

*Figure 30. Sources of the unwanted sexual comments directed toward athletes*




## UNWANTED SEXUAL CONTACT OR SEXUALLY EXPLICIT BEHAVIORS

Four survey items (listed in Table 19) asked athletes about unwanted sexual contact or other unwanted sexually explicit behaviors that they may have experienced during their sport involvement. About 11% (10.9%) of athletes who responded (N=2,942) indicated that they had had at least one of these four unwanted experiences. As shown in Table 19, athletes' most commonly experienced behavior involved being touched in non-consensual and/or sexually inappropriate ways (against the athletes' will).

*Table 19. Percent of athletes who experienced vs. never experienced unwanted sexual contact of other within their sport*

| During your sports involvement, how frequently... | One or more Times | Never |
|---|---|---|
| Were you touched in non-consensual and/or sexually inappropriate ways against your will? (2,919) | 8.3% | 91.7% |
| Did someone expose their genitalia to you? (2,889) | 5.1% | 95.0% |
| Were you made to kiss someone against your will? (2,914) | 3.1% | 96.9% |
| Were you asked to undress, assume a sexually explicit pose, or perform sexual acts in the presence of someone or via social media? (2,906) | 2.9% | 97.1% |

Figure 31 shows how many times athletes who have experienced unwanted sexual contact or other unwanted sexually explicit behaviors in the context of sports were subjected to these actions.

*Figure 31. Frequency of athletes' experiences of unwanted sexual contact or other unwanted sexually explicit behavior (not including athletes who selected "Never")*




Athletes who experienced unwanted sexual contact or other unwanted sexually explicit behaviors were asked to choose the category that best describes the people who perpetrated these behaviors (using a 'select all that apply' approach). Figure 32 displays the sources of unwanted sexual contact or other unwanted sexually explicit behaviors for two of the items in this section (those that were experienced by the highest number of surveyed athletes).

*Figure 32. Perpetrators of unwanted sexual contact or unwanted sexually explicit behavior experienced by athletes*



## RAPE OR ATTEMPTED RAPE

Two survey items (listed in Table 20) asked athletes if they had ever experienced, within the context of their sport involvement, behaviors that could be categorized as rape or attempted rape. Over 3% (3.5%) of athletes who responded (N=2,894) indicated that, during their involvement in their sport, someone had committed rape or attempted rape on them. Table 20 shows the percent of athletes who experienced versus never experienced sexual harm in the form of rape or attempted rape.

*Table 20. Percent of athletes who experienced vs. never experienced rape or attempted rape within their sport*

| During your sports involvement, how frequently… | One or more Times | Never |
|---|---|---|
| Has someone tried to initiate genital-to-genital contact with you or tried to sexually penetrate you against your will? (2,878) | 3.1% | 96.9% |
| Has someone initiated genital-to-genital contact with you or sexually penetrated you against your will? (2,879) | 2.2% | 97.8% |

Figure 33 shows how many times athletes who had an experience that could be categorized as rape or attempted rape were subjected to those behaviors.

*Figure 33. Frequency of athletes' experiences of rape and attempted rape (not including athletes who selected "Never")*



Figure 34 displays the perpetrators that athletes indicated had raped or attempted to rape them. Athlete peers were the most common perpetrator of both acts, followed by coaches or assistant coaches.

*Figure 34. Perpetrators of rape and attempted rape against athletes*




## TIMEFRAME OF SEXUAL HARM

Athletes were asked to indicate during what timeframe(s) their unwanted sexual experiences took place (using a 'select all that apply' approach). As shown in Table 21, most experiences related to sexual harm against athletes took place four or more years ago.

*Table 21. Timeframe of athletes' experiences related to sexual harm (does not include athletes who responded "Never")*[18]

| Timeframe of... | Within the past 12 months | 1-2 years ago | 2-4 years ago | More than 4 years ago |
|---|---|---|---|---|
| You were the subject or target of sexist jokes/remarks. (750) | 21.1% | 24.8% | 25.6% | 58.9% |
| You were looked at with an intrusive sexual glance. (610) | 20.0% | 24.1% | 26.6% | 60.2% |
| Parts of your body were commented on in a manner that felt sexual. (568) | 22.7% | 23.4% | 26.2% | 58.3% |

20. Wording of items has been adjusted slightly to improve table readability.

| Timeframe of... | Within the past 12 months | 1-2 years ago | 2-4 years ago | More than 4 years ago |
|---|---|---|---|---|
| Your clothing or uniform was commented on in a sexual manner. (502) | 20.7% | 26.3% | 28.9% | 57.6% |
| You received calls, notes, emails, texts, photos, or videos that had a sexual connotation or were sexually explicit. (202) | 16.3% | 28.7% | 29.2% | 47.5% |
| You were touched in non-consensual and/or sexually inappropriate ways against your will. (241) | 12.0% | 16.6% | 23.7% | 56.4% |
| Did someone expose their genitalia to you? (144) | 17.4% | 23.6% | 23.6% | 54.9% |
| You were made to kiss someone against your will. (91) | 11.0% | 20.9% | 22.0% | 49.5% |
| You were asked to undress, assume a sexually explicit pose, or perform sexual acts in the presence of someone or via social media. (85) | 20.0% | 22.4% | 28.2% | 40.0% |
| Someone tried to initiate genital-to-genital contact with you or tried to sexually penetrate you against your will. (90) | 14.4% | 24.4% | 28.9% | 40.0% |
| Someone initiated genital-to-genital contact with you or sexually penetrated you against your will. (2,879) | 10.9% | 23.4% | 32.8% | 34.4% |

## GROUP DIFFERENCES

Subgroup analyses revealed important differences in the experiences of athletes when it comes to sexual harm.[19] Specifically, the rate at which athletes experienced several types of sexual harm varied significantly based on athletes' demographic characteristics as follows:

- Athletes with disabilities were more likely than athletes without disabilities to have been kissed against their will and had someone rape or attempt to rape them (Figure 35).
- Athletes who identify as women or as a gender other than man or woman were more likely than men to have been looked at with sexually intrusive glance, had parts of their body commented on in a sexual manner, and had their clothing or uniform commented on in a sexual manner (Figure 36).
- Athletes who identify as a sexuality other than heterosexual were more likely than heterosexual athletes to have been the subject of sexist comments or jokes, looked at with a sexually intrusive glance, had parts of their body commented on in a sexual manner, and been touched in non-consensual ways (Figure 37).
- Athletes who had ever participated on an NGB or a USOPC managed team were more likely to have been the subject of sexist comments or jokes, touched in non-consensual sexual ways, and asked to undress or assume a sexually explicit pose (Figure 38).

*Figure 35. Percent of athletes with and without disabilities who experienced unwanted sexual contact and rape*




21. The effect sizes for finding listed here range from Cramer's V of .13 to .19 (small effect sizes).

*Figure 36. Percent of athletes across different gender identities who experienced unwanted sexual comments or looks*




*Figure 37. Percent of athletes who identify as heterosexual/straight vs. non-heterosexual athletes who have experienced unwanted sexual behaviors*



*Figure 38. Percent of NGB/USOPC athletes vs. non-NGB/USOPC athletes who have experienced unwanted sexual behaviors*




## CIRCUMSTANCES AROUND SEXUAL HARM

Athletes who had been the subject or target for any of the unwanted sexual behaviors asked about in this survey section (i.e., any of the 11 items discussed above) were asked several follow-up questions, including one relating to athletes' age at the time of those experiences, and another relating to the location where those experiences occurred.

More than 40% of athletes who had unwanted sexual experiences in the context of their sport indicated that some or all of those experiences happened when they were less than 18 years old (Figure 39).

*Figure 39. Percent of athletes' unwanted sexual experiences that occurred when they were under 18 (N=1,064)*



Athletes were asked (using a 'select all that apply' approach) to select the types of location(s) where their unwanted sexual experiences had taken place (Figure 40). Athletes who selected "Another location used or controlled by my sport," or "Another sport facility not controlled by my sport" had the option of writing in a more specific type of location. The majority of athletes who used the write-in option specified locations used for training, practicing, and competing in specific sports.

*Figure 40. Percent of athletes' unwanted sexual experiences that occurred in a variety of locations (N=1,064)[20]*




Athletes were asked whether, following their unwanted sexual experience(s), they reached out to any of the types of people listed in Table 22 for support (athletes could select all that apply). More than 45% (46.0%) of athletes said that they did not reach out to anyone, but rather kept it to themselves. However, nearly one-third (31.8%) of athletes reached out to a teammate or friend within sports, while somewhat fewer indicated that they had reached out to a friend outside of sports for support. Many athletes selected more than one type of person who they went to for support (potentially, but not necessarily, in relation to more than one unwanted sexual experience).

22. Athletes were given the option to select "My personal vehicle" as a location where unwanted sexual experiences had occurred. This location is excluded from the figure because no athletes selected it.

*Table 22. Type of support person athletes reached out to vs. did not reach out to following unwanted sexual experiences*

| Did you reach out to anyone for? If so, who? | % Selected | % Not Selected |
|---|---|---|
| No one (I kept it to myself) | 46.0% | 54.0% |
| A teammate or friend within sports | 31.8% | 68.2% |
| A friend outside of sports | 20.3% | 79.7% |
| A parent or guardian | 17.3% | 82.7% |
| A counselor or other mental health professional | 12.4% | 87.6% |
| A coach | 8.6% | 91.4% |
| Another person not listed here | 5.0% | 95.0% |
| A sport administrator | 4.2% | 95.8% |
| Police or law enforcement | 3.4% | 96.6% |
| A teacher | 2.7% | 97.3% |
| A sexual violence advocate | 1.9% | 98.1% |

Athletes who had experienced sexual harm were asked how they prefer to describe themselves in the context of those harmful experiences (using a 'select all that apply' approach). Of athletes who responded to this item (N=556), the largest proportion indicated that they prefer not to use labels (51.6%), while fewer expressed that they describe themselves as survivors (33.8%), followed by victims (21.0%). Among athlete who indicated that they prefer another term not listed in Table 23, athletes shared that they describe themselves using terms including "thriver," "resilient," "a statistic," "unlucky," "affected", and "fighter."

*Table 23. How athletes who have experienced sexual harm prefer to describe themselves*

| Do you use any of the following terms to describe yourself? | % Selected | % Not Selected |
|---|---|---|
| I prefer to not use labels | 51.6% | 48.4% |
| Survivor | 33.8% | 66.2% |
| Victim | 21.0% | 79.0% |
| Another term not listed | 3.2% | 96.8% |

## IMPACT OF SEXUAL HARM ON ATHLETES

Athletes who indicated that they had experienced any unwanted sexual behaviors in the context of their sports involvement were asked follow-up questions regarding the impact that those experiences had on them. Most commonly, unwanted sexual experiences resulted in athletes' perceptions of themselves being negatively impacted, followed by adverse mental health outcomes (see Table 24).

*Table 24. Athletes who experienced vs. did not experience specific negative outcomes following unwanted sexual experiences*

| Did your experiences impact you in any of the following ways? | Yes, Experienced | No, Not Experienced |
|---|---|---|
| My perception of myself was negatively impacted. (984) | 41.3% | 58.7% |
| My mental health suffered. (980) | 37.4% | 62.6% |
| My eating habits were negatively impacted. (981) | 28.0% | 72.0% |
| My athletic performance was negatively impacted. (984) | 27.9% | 72.1% |
| My friendships or other important relationships were negatively impacted. (979) | 27.7% | 72.3% |
| My sleep habits were negatively impacted. (982) | 26.4% | 73.6% |
| I missed opportunities as a result (athletic, academic, personal, or work-related). (981) | 23.1% | 76.9% |
| My physical health suffered. (978) | 22.9% | 77.1% |
| I wished that I could participate in my sport without being a member of my NGB (or USOPC managed team). (397)* | 22.2% | 77.8% |
| I seriously considered quitting my sport. (986) | 21.5% | 78.5% |
| I wished that I could change clubs. (977) | 21.4% | 78.6% |
| My school or work suffered. (978) | 20.1% | 79.9% |
| I wanted to change coaches, but felt like I could not. (981) | 19.5% | 79.5% |
| I have lost time (in my athletic or non-athletic career) that I've needed to devote to healing. (974) | 18.5% | 81.5% |
| I changed coaches. (989) | 18.4% | 81.6% |
| I had to shorten my athletic career. (977) | 18.4% | 81.6% |
| I have incurred costs for paying for therapy. (985) | 18.0% | 82.0% |
| I experienced retaliation from others. (983) | 16.9% | 83.1% |
| I changed clubs. (982) | 15.9% | 84.1% |
| I began using drugs or alcohol more frequently. (983) | 12.9% | 87.1% |
| I have incurred costs in missed stipends/income. (980) | 10.9% | 89.1% |
| Other impact(s) not listed here. (503) | 8.9% | 91.1% |

*This item only presented to athletes who had participated on an NGB or USOPC managed team

## WITNESSING SEXUAL HARM

Athletes were asked whether they had ever witnessed or been informed about inappropriate or non-consensual sexual acts that were perpetrated against a teammate or another athlete within their sport. Nearly 15% (14.2%) of athletes who responded to this item (N=2,868) had witnessed or been informed of this occurring at least once. Those athletes (N=406) who witnessed or were informed about sexual harm against an athlete peer were asked follow-up questions regarding the perpetrator(s) of the behavior, the timeframe of the occurrence(s), and the age of the athlete who was harmed. Key findings from these follow-up questions are as follows:

- Athletes most often indicated that the perpetrators of these behaviors were coaches or assistant coaches (52.7%) and athlete peers (52.0%).
- Most athletes who witnessed or heard about these occurrences indicated that they had occurred more than four years ago (60.3%).
- More than two-thirds of athletes who had witnessed or heard about these occurrences said that at least some of them had been perpetrated against athletes who were under the age of 18 at the time.

## COACH/ATHLETE SEXUAL RELATIONSHIPS

About a quarter (26.7%) of athletes (N=2,815) indicated that they have known coaches who developed sexual relationships with adult athletes (e.g., teammate or other athlete in your sport).

- Of athletes who did know of this happening, about half (51.8%) responded "Yes" when asked if those relationships were inappropriate.
- Most athletes felt that those relationships negatively impacted both the coaching that they themselves received, as well as the coaching that other athletes received, at least slightly and up to a great extent, as shown in Figure 41.

*Figure 41. The impact of sexual coach/ athlete relationships on the coaching that athletes received*



## COMPARISON TO 2020

Findings shared in the current report, in many ways, lend support to findings shared in 2020. The rate at which athletes were found to have experienced different types of unwanted sexual behavior according to the current survey are strikingly similar to the rates reported in 2020, as the following results demonstrate.

- In 2020, 34.0% of surveyed athletes had experienced unwanted sexual comments or looks (compared to 36.3% of athletes surveyed in 2024).
- Non-consensual sexual contact and other sexually explicit behaviors had been experienced by 9.0% of athletes surveyed in 2020 (compared to 10.9% of athletes surveyed in 2024).
- In 2020, 3.2% of athletes indicated that someone had attempted to rape or committed rape on them (while 3.1% of athletes surveyed in 2024 had experience attempted rape, and 2.2% had been raped).

Both sets of findings also shed light on the disproportionate frequency of unwanted sexual experiences endured by athletes with disabilities, those in gender minorities, and those who identify as having a non-heterosexual sexual orientation. Additionally, converging results from 2020 and 2024 suggest that sexually harmful behaviors against athletes are perpetrated most often by athlete peers and coaches or assistant coaches.

# SEXUAL HARM OUTSIDE OF SPORT

*Athletes' experiences of unwanted sexual behavior outside of their sports involvement.*

This survey section asked athletes about their experiences outside of the sports context, including eleven items related to unwanted sexual experiences that they may have had, and one item related to learning about sexual harm perpetrated against someone else (e.g., a close friend or family member). Table 25 shows the percentage of athletes who had each of these experiences at least once, compared to those who never had these experiences. Looking at the frequencies in the table below compared to those shared in the previous section reveals that athletes are much more likely to have experienced sexual harm outside of the context of their sport, than within it.

*Table 25. Percent of athletes who experienced vs. never experienced sexual harm outside of their sport*

| Frequency of experiences outside of sports involvement | One or more Times | Never |
|---|---|---|
| You were the subject or target of sexist jokes/remarks. (2,710) | 42.3% | 57.7% |
| You were you looked at with an intrusive sexual glance. (2,706) | 42.1% | 57.9% |
| Parts of your body commented on in a sexual manner. (2,702) | 40.8% | 59.3% |
| You learned that someone close to you (e.g., a friend, family member, etc.) has experienced sexual harm. (2,689) | 40.3% | 59.6% |
| Your clothing or what you were wearing was commented on in a sexual manner. (2,699) | 36.9% | 63.1% |
| You were touched in non-consensual and/or sexually inappropriate ways against your will. (2,702) | 29.3% | 70.8% |
| You received (without your consent) calls, notes, emails, texts, photos, or videos (possibly on your cell phone or the internet) that had a sexual connotation or were sexually explicit. (2,701) | 22.0% | 77.9% |
| Someone exposed their genitalia to you (in your presence, via social media, text, or private message). (2,697) | 19.4% | 80.6% |
| Someone tried to initiate genital-to-genital contact with you, or tried to sexually penetrate you (orally, vaginally, or anally) against your will. (2,698) | 15.4% | 84.6% |
| You were made to kiss someone against your will. (2,699) | 12.4% | 87.6% |
| Someone initiated genital-to-genital contact with you, or sexually penetrated you (orally, vaginally, or anally) against your will? (2,693) | 12.0% | 88.0% |
| You were asked to undress, assume a sexually explicit pose, or perform sexual acts in the presence of someone (with or without a camera) or via social media. (2,699) | 9.9% | 90.1% |

Findings in the table above align with statistics reported by **RAINN** as well as the **Center for Disease Control**, which suggest that over half of women and almost one in three men have experienced sexual violence involving physical contact, and approximately one in six women have experienced rape. The importance of abuse-free sport environments is even more apparent when considering that, for many athletes, they present a much-needed haven and a place to find support.

# ATHLETE MENTAL HEALTH

*Athletes' experiences of adverse mental health during their sports involvement.*

Athletes were asked questions pertaining to their mental health during their sports involvement, found in Table 26. Over half of surveyed athletes (53.1%) shared that during their time as an athlete they have struggled with depression or anxiety, and approximately 30% have engaged in disordered eating behaviors or struggled with another mental health concern not listed here.

*Table 26. Percent of athletes who experienced vs. never experienced adverse mental health in their sports*

| How frequently did you... | Rarely to Very Frequently | Never |
|---|---|---|
| Struggle with depression or anxiety? (2,698) | 53.1% | 46.8% |
| Struggle with another mental health concern not listed here? (2,689) | 32.4% | 67.7% |
| Engage in disordered eating behaviors (e.g., restrain, binging, purging)? (2,699) | 30.2% | 69.8% |
| Have suicidal thoughts? (2,695) | 21.9% | 78.1% |
| Engage in self-harming behaviors (e.g., cutting, self-hitting, burning)? (2,697) | 13.2% | 86.8% |

Among the group of athletes who experienced any of these mental health struggles, over half struggled with their challenges at least occasionally (see Figure 41).

*Figure 42. Frequency of adverse mental health experiences (not including athletes who selected "Never")*



## COMPARISON TO 2020

Athletes surveyed in 2024 appear to have experienced higher rates of mental health concerns during their athletic involvement compared to those who responded to the 2020 survey, as the findings below demonstrate.

- In 2020, 49.1% of athletes responded that they had struggled with depression or anxiety (compared to 53.1% of athletes surveyed in 2024).
- 21.6% of athletes surveyed in 2020 had engaged in disordered eating (compared to 30.2% of athletes surveyed in 2024).
- Of athletes surveyed in 2020, 16.0% had suicidal thoughts (compared to 21.9% of athletes surveyed in 2024).
- 5.9% of athletes surveyed in 2020 had engaged in self-harming behaviors (while 13.2% of those surveyed in 2024 had done so).

This increase in mental health concerns is consistent with findings from the **American Psychological Association**, which noted an increased demand for mental health services in the wake of the COVID-19 pandemic.

Case 1:26-cv-00261-AKB Document 3-3 Filed 04/29/26 Page 114 of 368



Athletes were asked if they had heard of the U.S. Center for SafeSport prior to taking the survey. A little more than half (54.1%) of athletes (N=2,693) responded that they had, while nearly as many (45.9%) expressed that they had not. This finding suggests a substantial need for greater awareness of this important reporting and educational resource. Knowledge of the Center was somewhat better for athletes who had participated on NGB or USOPC managed teams: nearly 70% (69.3%) of athletes in that subgroup (1,016) had heard of the Center previously.

## PERCEPTIONS OF HOW SPORT ORGANIZATIONS WOULD RESPOND TO REPORTING

Current athletes, and athletes who indicated that they have participated in their sport within the past three years were asked a series of questions regarding how they thought their sport organization would react to someone reporting an instance of harm on a 6-point likelihood scale ranging from very unlikely to very likely. As shown in Figure 43, a large majority of athletes believe their organization would likely (slightly, moderately, or extremely) handle the report fairly, support and maintain the privacy of the person making the report, and take the report seriously.

*Figure 43. Athletes' perceptions of how their sport organization would likely respond to reported misconduct*



Nearly 30% of these same athletes expressed feeling that there was some likelihood that the person who made the report would be punished by their sport organization for doing so. (Figure 44).

*Figure 44. Athletes' perceptions of how likely their sport organization would be to punish or retaliate against a person who made a report*




## PERCEPTIONS OF HOW THE CENTER WOULD RESPOND TO REPORTING

Athletes who had participated in their sport in the past three years and who had heard of the Center prior to taking this survey were asked how they thought the Center would likely respond to a report of misconduct. Over 90% of athletes thought that the Center would take a report of misconduct seriously and maintain the privacy of the person making the report. (Figure 45).

*Figure 45. Athletes' perceptions of how the Center would likely respond to reported misconduct*



Figure 46 shows that over 20% of athletes thought it was likely that the Center would punish the person who made a report and nearly 15% thought it was likely that they would retaliate against anyone that reports or participates in an investigation.

*Figure 46. Athletes' perceptions of how likely the Center would be to punish or retaliate against a person who made a report*




## PERCEPTIONS OF THE CENTER'S RESPONSE TO REPORTS IN THE PAST 3 YEARS

Athletes who had participated in their sport in the past three years and who had heard of the Center prior to taking this survey were asked if, to their knowledge, anyone in their sport had been reported to the Center for a code of conduct violation in the past three years (36 months). 19.4% of athletes (N=1,973) indicated that they knew of someone from their sport being reported to the Center in that timeframe, while 69.6% did not, and 11% expressed that they were unsure. Of athletes who did know of someone from their sport being reported to the Center, most indicated that (to their knowledge) the reported person was both investigated by the Center (72.8%) and sanctioned (62.4%; see Figure 47).

*Figure 47. Athletes' awareness of others being investigated or sanctioned in their sport in the past 36 months*



Those same athletes (i.e., those who were aware of someone from their sport being reported to the Center in the past 3 years) were asked to share their perceptions of the Center's response to those reports. As shown in Figure 48, athletes most commonly did not know whether the Center's response was appropriate and timely, whether the investigation process was fair and thorough, or whether the outcome or determination of the investigation was appropriate and fair. However, as displayed in Figure 49, a large majority of these same athletes (80.3%) expressed feeling that their sport community is better off (either "Slightly," "Moderately," or "To a great extent") now because of the Center's response to the reported misconduct.

*Figure 48. Athletes' perceptions of the Center's response to reports made in their sport in the past 36 months*




*Figure 49. Athletes' perceptions of how the Center's response to reported misconduct impacted their sport community*



## REPORTING BY ATHLETES WHO HAVE EXPERIENCED SEXUAL HARM

Figure 50 shows that only 10.7% of athletes who indicated that they had experienced unwanted sexual behavior during their athletic involvement submitted a formal complaint about the matter. Further, 62% felt that they did not have a place within their sport organization to talk about their experience.

*Figure 50. Athletes' response to experiencing sexual harm*




Among the athletes who experienced sexual harm while participating in their sport and did not submit a formal report/complaint, there were varied reasons that they shared for not doing so (see Figure 51). The most common reasons for not making a formal report or complaint of sexual harm included feelings that it was a private matter and wanting to deal with it on their own, followed by thinking it was not serious enough to talk about. Over 50% of athletes who responded to these items shared that they did not think people would take them seriously, or they worried that that nothing would be done.

*Figure 51. Athletes' top 8 reasons for not reporting a formal complaint of sexual harm*



Figure 52 shows the types of entities where athletes who have participated on NGB/USOPC managed teams did make formal reports/complaints following an incident of sexual harm. Most of these surveyed athletes made their reports to the U.S. Center for SafeSport, and just under half reported to their NGB or the USOPC.

*Figure 52. To whom NGB/ USOPC athletes submitted a formal complaint of sexual harm*




Figure 53 shows where athletes who have not participated on NGB/USOPC managed teams made formal reports/complaints following an incident of sexual harm. Athletes in this group also made most of their reports of sexual harm to the Center, followed by their sport organization (Figure 50).

*Figure 53. To whom athletes not affiliated with the NGB/ USOPC submitted a formal complaint of sexual harm*



# TRUST & KNOWLEDGE

*Athletes' trust in their sport organizations, and in the Center, and athletes' knowledge related to reporting misconduct and accessing support.*

Athletes who had heard of the Center prior to taking this survey were asked whether they felt the Center was a trusted resource by athletes in their sport. Responses were mixed, with just over half of athletes (51.6%) seeing the Center as a trusted resource by people in their sport, about 15% expressing disagreement, and over one-third being unsure. Similarly, athletes who have participated in NGBs thought that about 45% (44.8%) of athletes trust in the leadership at their NGB. About one third of athletes (including both those affiliated with NGBs and those not affiliated with NGBs) think that sexual, emotional, or physical misconduct is a problem in their sport organization (Figure 50).

*Figure 54. Athletes' trust in the Center and their NGB leadership, and their perception of the problem of misconduct in their sport organization*[21]




## COMPARISON TO 2020

Findings in 2024 show that a higher percentage of athletes (51.6%) believe that the Center is considered a trusted resource by people in their sport organization, compared to athletes surveyed in 2020 (at which time 45.0% expressed this belief). Approximately the same percentage of athletes surveyed in 2020 and 2024 believed that athletes trust the leadership at their NGB. A slightly larger proportion of athletes surveyed in 2024 believe that sexual, emotional, or physical abuse is a problem in their sport organization (31.5%) compared to those who held this belief in 2020 (28.0%).

## REPORTING SEXUAL MISCONDUCT

Athletes responded to a series of questions regarding their general knowledge of reporting sexual misconduct and what they would do if they or another athlete experienced sexual misconduct. Figure 55 shows these responses for athletes that are (or have been) part of an NGB and Figure 56 shows responses for those that are not (and have not been) part of an NGB.

23. Only athletes who indicated that they had previously heard of the U.S. Center for SafeSport were asked questions referring directly to the Center. This applied to all figures in this section (Figures 50 to 56)

Among athletes who have participated in NGBs, the majority feel generally knowledgeable in relation to sexual misconduct with over 85% expressing that they know what behaviors are considered sexual misconduct under the SafeSport Code. Although nearly 73% of NGB athletes know what happens when an athlete reports a claim of sexual misconduct to the Center, less than 60% know what happens when they report that claim to their NGB.

*Figure 55. Knowledge of sexual misconduct reporting for NGB athletes*




For athletes not part of a NGB, Figure 56 shows that nearly 89% know what behaviors are considered sexual misconduct by their sports organization. While 63.4% of non-NGB athletes understand what happens when an athlete reports a claim of sexual misconduct to their sports organization, slightly higher than those athletes in an NGB.

*Figure 56. Knowledge of sexual misconduct for non-NGB athletes*




## REPORTING EMOTIONAL MISCONDUCT

Athletes responded to a series of questions regarding their general knowledge of reporting emotional misconduct and what they would do if they or another athlete experienced emotional misconduct. Figure 57 shows these responses for athletes that are part of an NGB and Figure 58 shows responses for those that are not part of an NGB.

As illustrated by Figure 57, three quarters of athletes in a NGB know what behaviors are considered emotional misconduct under the SafeSport Code. Athletes were split on their understanding of what happens when an athlete reports a claim of emotional misconduct to their governing body of sport, but over 69% understand what happens when an athlete reports a claim of emotional misconduct to the Center.

*Figure 57. Knowledge of emotional misconduct for NBG athletes*




Among non-NGB athletes, 75.6% know what behaviors are considered emotional misconduct by their sport organization. Nearly 60% of non-NGB athletes understand what happens when an athlete reports emotional misconduct to their sports organization.

*Figure 58. Knowledge of emotional misconduct for non-NGB athletes*



## REPORTING PHYSICAL MISCONDUCT

Athletes responded to a series of questions regarding their general knowledge of reporting physical misconduct under the SafeSport Code and what they would do if they or another athlete experienced physical misconduct. Figures 59 shows these responses for athletes that are part of an NGB and Figure 60 shows responses for those that are not part of an NGB.

Of athletes that are part of a NGB, Figure 59 shows that 82% know what behaviors are considered physical misconduct under the SafeSport Code. Over 75% of athletes know where to get support from The Center for physical misconduct, but only 65% know where to get support from their NGB.

*Figure 59. Knowledge of physical misconduct for NGB athletes*




For non-NGB athletes, Figure 60 shows that nearly 86% know what behaviors are considered physical misconduct by their sport organization. Over 84% of athletes know where to get support from the Center when they experience physical misconduct and nearly 74% know where to get support from their sports organizations.

*Figure 60. Knowledge of physical misconduct for non-NGB Athletes*



# PEER NORMS

*Athletes' perceptions related to what types of behaviors are considered acceptable in their athlete peer groups.*

Athletes were asked their perceptions of what they think their athlete peers would approve of in terms of derogatory remarks or behavior, seen in Figure 61. All items received low levels of agreement from athletes, which suggests that most athletes perceive derogatory behaviors to be outside of the norm in their sports. The item with the most athletes' agreement (21.9%) in this section related to athletes' belief that their peers would approve of insulting or spreading rumors about teammates behind their backs.

*Figure 61. Athletes' perception of peer approval of derogatory remarks or behavior*




Athletes in general disagreed even more strongly that their peers would approve of coercion or intimidation of others. Figure 62 shows that only 7% of athletes thought that their peers would approve of lying to someone to have sex with them and 4% thought their peers would approve of physically forcing someone to have sex with them.

*Figure 62. Athletes' perception of peer approval of coercion or intimidation*



# ATHLETE SUGGESTIONS & COMMENTS

*Athletes shared their suggestions and final comments for the U.S. Center for SafeSport.*

Athletes who responded to the survey were asked two open-ended questions. The first one requested their recommendations to assist the U.S. Center for SafeSport in preventing abuse, protecting athletes, and resolving reports of misconduct against athletes. Over eight hundred athletes (N = 826) responded, providing a mix of suggestions and comments. In the second open-ended survey question, athletes were asked whether there was anything else they would like to share or make known to the researchers conducting this survey. Over six hundred athletes (N = 622) responded to the second question. Tables 27 and 28 below display the primary themes that emerged from all responses (many of which were the same for both survey questions), and the narrative that follows elaborates on key themes and provides quotations from the athlete survey participants.

*Table 27. Response themes and frequencies for the open-ended survey question: What recommendations do you have to assist the U.S. Center for SafeSport in preventing abuse, protecting athletes, and resolving reports of misconduct against athletes? (N = 826)*

| Response Themes | n | % |
|---|---|---|
| Theme: Athlete Suggestions* | 465 | 56.3% |
| *Many athletes made more than one suggestion. | | |
| Subthemes: | | |
| Provide education & training | 194 | 23.5% |
| Spread awareness | 175 | 21.2% |
| Protect young athletes & involve parents/caregivers | 102 | 12.3% |
| Improve & publicize reporting methods | 94 | 11.4% |
| Take swift action on investigations | 68 | 8.2% |
| Follow through to ensure fair resolutions | 59 | 7.1% |
| Better protect athletes, prevent abuse and misconduct | 57 | 6.9% |
| Refine, clarify, and publicize the Center's policy and guidelines | 54 | 6.5% |
| Provide support resources for survivors | 36 | 4.4% |
| Protect accused against false claims; utilize due process | 31 | 3.8% |
| Prevent whistleblower retaliation; change victim shaming norms | 27 | 3.3% |
| Learn from and partner with other entities | 25 | 3.0% |
| Theme: Critical Feedback | 164 | 19.3% |
| Subthemes: | | |
| Feedback about The U.S. Center for SafeSport | 109 | 13.2% |
| Feedback about another entity (e.g., an NGB) | 55 | 6.1% |

| Response Themes | n | % |
|---|---|---|
| Theme: Other Types of Comments (i.e., of a personal or unique nature) | 148 | 17.9% |
| Theme: None, Don't Know, or N/A | 132 | 16.0% |
| Theme: Endorsements of The U.S. Center for SafeSport | 39 | 4.7% |

*Table 28. Response themes and frequencies for the open-ended question: Is there anything else you would like to share or make known to the researchers conducting this survey? (N = 622)*

| Response Themes | n | % |
|---|---|---|
| Theme: No, N/A | 241 | 38.7% |
| Theme: Athlete Suggestions | 175 | 28.1% |
| Subthemes: | | |
| Survey & research suggestions | 68 | 10.9% |
| Other recommendations (i.e., many distinct recommendations) | 36 | 5.8% |
| Improve reporting, investigation, and resolution processes | 35 | 5.6% |
| Better protect athletes, prevent abuse and misconduct | 21 | 3.4% |
| Prevent whistleblower retaliation, victim shaming | 15 | 2.4% |
| Theme: Critical Feedback | 111 | 17.8% |
| Subthemes: | | |
| Feedback about The U.S. Center for SafeSport | 104 | 16.7% |
| Feedback about the Athlete Culture & Climate Survey | 31 | 5.0% |
| Feedback about another entity (e.g., an NGB) | 7 | 1.1% |
| Theme: Positive Feedback | 106 | 17.0% |
| Subthemes: | | |
| Endorsements of The U.S. Center for SafeSport | 68 | 10.9% |
| Endorsements of Athlete Culture & Climate Survey | 38 | 6.1% |
| Theme: Other Types of Comments (i.e., many distinct responses) | 77 | 12.4% |
| Subtheme: | | |
| Opinions on transgender athlete participation | 21 | 3.4% |
| Theme: Descriptions of Personal Experiences of Abuse or Misconduct in Sport | 69 | 11.1% |

## ATHLETE SUGGESTIONS

As presented in Tables 27 and 28 above, surveyed athletes' suggestions covered a broad range of topics which most commonly included: providing education and training, spreading awareness, protecting young athletes and involving their parents or caregivers, and improving and publicizing reporting methods. Each of these topic areas is expanded upon below.

## PROVIDE EDUCATION & TRAINING

Athletes (N=194) commonly recommended that the Center continue to develop, provide, and expand upon the education and formal training opportunities. Some recommended that SafeSport training be made mandatory and provided more regularly for coaching staff and parents. Athletes also suggested the Center expand its training on emotional and verbal abuse as these are the most prevalent forms of athlete maltreatment. Other athlete suggestions included making the SafeSport training sport-specific and role-specific, such as tailoring content to parents. Finally, a few athletes recommended more in-person training opportunities to prevent participants from quickly going through the material without engaging deeply enough to learn and retain crucial information. Selected quotes from athletes on this topic are presented in Table 29, below.

*Table 29. Selected quotes from athletes about providing education and training*

| Selected Quotes |
|---|
| "Provide regular training sessions for coaches, staff, and volunteers on appropriate conduct, recognizing signs of abuse, and the importance of maintaining a safe and respectful environment." |
| "Require all coaches and athletes to meet a yearly education quota."<br><br>"Prioritize emotional abuse... There is a whole culture of [athletes] who think that being good at absorbing your trainer's abusive harmful behavior makes you a better, more valuable [athlete]. Silence is encouraged and rewarded." |
| "Please develop more materials and content on emotional abuse."<br><br>"Adjust the rules and training so they apply to each sport." |
| "Coaches should be required to do the online SafeSport training in an in-person seminar... Online classes can be guessed on, or someone can just mentally check out because they are given or just know the answers." |

## SPREADING AWARENESS

The second most common suggestion from athletes was to further spread awareness about the content available through the Center. As seen in Table 27 above, 21.2% of athletes stressed the importance of making the Center's resources widely known and accessible to everyone involved in sport, including athletes, coaches, staff, and parents. They recommended that the Center increase its efforts to spread

the word about what constitutes abuse and misconduct, where to seek help, and how to access reporting channels. Further, these athletes suggested various outreach strategies such as creating awareness campaigns, sending out regular emails, posting flyers, providing information at event sign-ups, and communicating through NGBs or directly to athletes. Selected athlete quotes related to this topic are presented in Table 30, below.

*Table 30. Selected quotes from athletes about spreading awareness.*

| Selected Quotes |
|---|
| *"I believe it is important to keep pushing the message and information out to the athletes, parents, coaches, and all adults involved in the sport the information about what is and isn't acceptable behavior as well as the reporting procedures."* |
| *"Being more known to athletes. I had no idea this existed and could have greatly benefitted from this when I was an athlete to deal with conflict between myself and my coach."*<br><br>*"Give information to parents. In an individual sport that selects for high achieving student/athletes, parents don't always understand that intense attention from a coach or staff is not always a good thing."* |
| *"More awareness of [SafeSport] and how you came to be. Better recognition of you as a national body not owned or operated by any sport entity."*<br><br>*"Send out emails or hand out flyers at the start of every season reminding people of the Safe Sport organization, its mission, and its contact numbers."* |
| *"Work with the media to promote a climate of public opinion that focuses on athletes' rights."* |

## PROTECT YOUNG ATHLETES & INVOLVE PARENTS/CAREGIVERS

Approximately 12% (12.3%) of athletes emphasized that the Center should prioritize promoting its SafeSport courses for parents, guardians, and children involved in sport (see Table 27 above). According to these athletes, parents should be required to take SafeSport classes to help them identify and report potential misconduct, and there should be a modified version of SafeSport training mandatory for minors. Further, these athletes emphasized the importance of teaching children how to communicate with trusted adults about any misconduct or potential harm they may experience. Table 31 below displays a selection of athlete quotes related to this issue.

*Table 31. Selected quotes from athletes about protecting young athletes and involving their parents or caregivers*

| Selected Quotes |
|---|
| "I think it would be beneficial to require a player's parent or guardian to take a safe sport class if their child is signed up for youth sports so that they know what to look for and are informed of all outlets available to them and their child." |
| "Keep working to get SafeSport training to be a requirement of parents for their children to participate in sports." |
| "I think a modified version of SafeSport training should be mandatory for minors, so they know what behaviors to look out for and how/when to ask for help." |
| "Teach children athletes how to properly communicate with trusted adults about misconduct issues and potential harm to them." |

## IMPROVE & PUBLICIZE REPORTING METHODS

Approximately 11% (11.4%) of athletes recommended that the Center improve and publicize methods for reporting abuse or misconduct in sport. These athletes emphasized the importance of publicizing how to report abuse or misconduct in sport, for example, through email campaigns, newsletters, or within workshops. They suggested reporting methods such as links to online report templates on NGB websites and sport-specific hotlines. Some athletes recommended that the Center better understand and apply best practices for creating reporting channels, for example, making reporting anonymous. They also urged the Center to prioritize the protection of both accusers and the accused during the reporting and investigation processes and before any resolutions are made. Finally, athletes recommended that the Center lead cultural change by helping to normalize "speaking up and speaking out" about abuse and misconduct in sport. Table 32 below displays a selection of related athlete quotes.

*Table 32. Selected quotes from athletes about improving and publicizing reporting methods*

| Selected Quotes |
|---|
| *"I think you folks are doing a great job. You need to continue encouraging all athletes, coaches, and parents to report any attempts at misconduct."* |

| Selected Quotes |
| --- |
| *"Putting a simple hotline, email address, online report template, DM, or some other straightforward item on its communications. No one needs to know the process or understand too much. Anyone who has experienced abuse needs a place to start."* |
| *"Implement a confidential and independent reporting mechanism where athletes can report any concerns or incidents without fear of retaliation."* |
| *"There must be 100% anonymous ways to report without giving your name, phone number, etc. Also, it is not fair for the accused to be suspended and have their life ruined over a simple accusation. If you can prevent this from happening there will be more people reporting incidents."* |
| *"Use the right channel Ensure that the right channel is chosen for the report, which may be the sports center's complaints channel, a sports organization, a local law enforcement agency, or a suitable independent body."* |
| *"Creating spaces that make it seem normalized to speak up and speak out."* |

The types of suggestions that athletes provided unique to the second open-ended survey question were about improving this survey and research topics for the Center to explore. As presented in Table 28 above, approximately 10.9% of athletes made such suggestions.

## SURVEY & RESEARCH SUGGESTIONS

Athletes proposed a variety of research topics for the Center to consider investigating, such as causes and risk factors for abuse and misconduct in sport, effects of abuse on athletes, and the effectiveness of abuse prevention measures. Regarding suggestions for improving this survey, some athletes commented that it is too lengthy and recommended that it be shortened. A few others recommended allowing survey respondents to answer questions based on multiple sports they had played, rather than only one. A few others suggested including "N/A" or "I don't know" as response options. For example, this could allow those who participated in sport before the widespread use of social media a chance to indicate that these questions did not apply to them. Table 33 displays a selection of related athlete quotes.

*Table 33. Selected quotes from athletes containing suggestions for this survey or potential research topics*

| Selected Quotations |
|---|
| "Examine the power structures and dynamics within sport organizations to understand the possible root causes of misconduct." |
| "Examine the role of social media in exacerbating or preventing abuse." |
| "Investigate the impact of abuse on athletes' performance and motivation." |
| "Evaluate the impact of an anonymous reporting system on rates of misconduct disclosure and resolution." |
| "Collect suggestions and comments from participants to improve the efficiency and fairness of the whistleblowing process." |
| "Evaluate the effectiveness of preventive education programs to understand their impact on athlete awareness and behavior." |

## CRITICAL FEEDBACK

Some athletes used the open-ended survey questions to provide critical feedback about the Center or other entities, e.g., NGBs. Specifically, 19.3% of athletes provided critical responses to the first question (Table 27) and 17.8% to the second question (Table 28). In both survey questions, athletes' critical responses that were about their NGB or other entities were mostly of a personal or unique nature and did not fall into clear response themes. Feedback specific to the Center included:

- The Center is slow to respond to or does not act on reports of abuse or misconduct in sport.
- The Center exaggerates the problem of abuse or misconduct in sport. For example, some articulated that certain instances of coaching behavior deemed as verbal or emotional abuse by some could be considered valid approaches to coaching by others.
- A few athletes expressed mistrust in the Center or the need for the organization to repair its reputation.
- A few stated that SafeSport training was too lengthy or ineffective.
- The Center does not adequately protect the accused or those who may be accused from false claims of abuse or misconduct.
- The survey was too long, and the survey questions were not applicable.

Table 34 below displays a selection of athletes' critical feedback specific to the Center

*Table 34. Selected quotes from athletes providing critical feedback.*

| Selected Quotations |
| --- |
| *"Follow-through needs to be done more quickly. Cases take far too long for The Center to be seen as trustworthy or helpful."* |
| *"Considerable frustration exists around the time it takes for SafeSport to address a claim and to complete the investigation... Taking more than 3 months to reach a verdict and receive any guidance, while accused persons are still participating, makes families and organizations feel unsupported and vulnerable at a time when they need to opposite - support and reassurance. Please address this as it is eroding the faith in SafeSport and the process."* |
| *"This new organization seems to be looking to create problems where they don't exist."* |
| *"In my sport, many of us adult competitors have nothing to do with junior athletes, and the long, repetitive section of SafeSport training that covers things like "why sport is good for children's mental health" and "how to be the responsible adult at an overnight away game" is completely irrelevant to us."* |
| *"Maybe you lose people with how [SafeSport classes] are taught and people stop paying attention."* |
| *"I would prefer the reporting system to be better about doing due diligence in making sure that reports are true... I think we need to stress that MOST of us are just trying to do our job and love what we do and are aware of and adhering to the rules."* |
| *"Be very careful to not automatically assume that a potential perpetrator is guilty without due process."* |
| *"Retaliation should be punished. Bullying and sexual harassment include spreading rumors, lying, and making up stories of sexual assault and need to be investigated and punished with the same fervor as a sexual assault complaint. The reporting party should not be hinted at or divulged to any claimant, respondent, or witness."* |
| *"I'm old enough that anything I experienced or could have experienced predated social media. Thus, the questions that related to that content don't apply."* |

## ATHLETE ENDORSEMENTS OF THE U.S. CENTER FOR SAFESPORT

Athletes also used both open-ended survey questions as opportunities to provide endorsements of the Center. Specifically, 4.7% of athletes provided positive responses to the first open-ended question (Table 27) and 17.0% to the second (Table 28). These athletes affirmed the importance and urgency of the Center's mission and encouraged the organization to "keep up the good work." Athletes also provided positive feedback about the SafeSport training. The feedback from athletes that was unique to the second open-ended survey question affirmed the value of this survey. Table 35 below displays selected athlete quotes.

*Table 35. Selected quotes from athletes endorsing the U.S. Center for SafeSport*

| Selected Quotations |
|---|
| *"I think it's important to continue educating and raising awareness of the various ways abuse/misconduct can happen, with emphasis on some of the normalized ways it can be embedded in sports teams and culture."* |
| *"I think SafeSport is an incredible institution - I think our national sport organizations protect people in power, including abusers, and culture is slow to change. But it is changing."* |
| *"Keep up good work, continue focus, and move forward."* |
| *Their program is comprehensive and to the extent they practice what they teach, it should be effective. I was very impressed with how thorough their program is. I am a criminal investigator, so I have seen many kinds of abuse to children and adults, and this program is the best and most comprehensive child safety training program I have ever taken.* |
| *"I appreciate taking Safe Sport each year to remind myself of behaviors to watch for and knowing all adults on my team have the same knowledge and training to support youth athletes."* |
| *"Thank you for conducting this survey to learn more about making sports safe for all! I'm interested in learning more."* |

# REPORT INSIGHTS & NEXT STEPS

- Sports are an important and valued aspect of athletes' lives. According to this survey, most athletes feel strongly that their athletic experiences have positively impacted their life. Nevertheless, findings from this report shed light on the ongoing issues of emotional, physical, and sexual harm in sports. Therefore, there is both great need and great potential when it comes to creating safer and more supportive athletic environments where all athletes can thrive.
- Findings in this report suggest that emotional harm and neglect in sports is highly prevalent and has been experienced by a large majority of athletes (nearly 80%). While physical harm and sexual harm are less prevalent, they are still present in sports environments across the county. It is therefore critical for coaches, officials, and other individuals who are involved in sports to know what to look out for when it comes to signs of abuse and misconduct, how to report concerns, and how to apply strategies and best practices to prevent all forms of abuse and misconduct from occurring.
- Athletes experienced varying rates of harmful or potentially harmful behaviors depending on a number of personal characteristics. This report points to some of the specific behaviors that certain groups of athletes are more likely to experience than others. For example: Black athletes disproportionately experience being hassled by security at athletic events; Asian athletes experience high rates of discrimination based on their national origin; Athletes with disabilities experience being forced to get in or stay in confined spaces more than athletes without disabilities. These and other sub-group differences highlighted throughout this report may have important implications for the prevention of abuse in sports.
- The Center is a resource for athletes when it comes to preventing and reporting abuse and misconduct in sports; however, nearly half of athletes who responded to this survey had not heard of the Center prior to taking the survey. Among those who had heard of the Center, only a little over half expressed the belief that athletes in their sport organization consider the Center a trusted resource. Together, these findings suggest a need for outreach efforts and tangible next steps by the Center to both raise awareness and earn the trust of athletes across the nation.
- Many athletes shared suggestions and criticisms of the survey instrument itself. In particular, many athletes expressed that the survey should be shorter, a criticism that was shared by the SafeSport Athlete Advisory Team (SAAT) who provided guidance and support in the survey's development. The Center and its research partners will strive to determine and apply strategies to shorten the length of surveys launched in the future. Potential strategies may include conducting multiple surveys focused on different topic areas, as well as creating culture and climate surveys that target specific audiences (e.g., coaches, parents, or officials, in addition to athletes).

# REPORT INSIGHTS & NEXT STEPS

The results of the 2024 Athlete Culture and Climate Survey will guide the U.S. Center for SafeSport's efforts to:

- Continue evaluating and improving our approach to investigations of abuse and misconduct;
- Enhance our training, educational content, and ongoing engagement with athletes and survivors;
- Host information sessions for national governing bodies (NGBs) and athletes to further explore the data;
- Inform the broader abuse prevention landscape throughout the United States and abroad through our research, analysis, and evaluation of the athlete experience; and
- Prepare for a follow-up survey in 2027 to be released ahead of the 2028 Summer Olympic and Paralympic Games.

# REPORTING & RESOURCES

## REPORTING

**Report here** to the U.S. Center for SafeSport if you have experienced abuse or misconduct—or if you have reasonable suspicion of abuse or misconduct—inflicted by someone in the U.S. Olympic and Paralympic Movement. You can also call the Center at: 833-587-7233.

## RESOURCES

**RAINN's 24/7 online hotline** is available for crisis intervention, referrals, or emotional support at any time. You can also call RAINN at: 800-656-HOPE (4673).

The **Suicide Prevention Lifeline** provides 24/7 free and confidential support at 988lifeline.org or by calling 988.

# APPENDIX: KEY FINDINGS

**72%**

of athletes strongly agreed that that their athletic experience has had a positive impact on their life.

**62%**

of athletes felt that equal treatment occurred frequently or very frequently in their sport.

The social, emotional, and physical benefits of sport can and should last a lifetime. The 2024 Culture and Climate Survey findings show that a majority of those surveyed felt sport had a positive impact on their lives. That's what all athletes deserve, but it is not what many experience. The following outcomes highlight the need for a shift in sport culture so that all athletes can feel safe, supported, and strengthened throughout their sport experience.

**49%**

of athletes who experienced mental health struggles during their participation in sports reported having suicidal thoughts.

**78%**

of athletes shared that they had experienced behaviors related to emotional harm and neglect during their sports involvement.

REPORT

**89%**

of athletes who experienced unwanted sexual behavior during their sports involvement **did not submit** a formal complaint or report.

**11%**

of athletes indicated that they had experienced unwanted sexual contact or sexually explicit behaviors during their sports involvement.

**43%** of athletes who experienced unwanted sexual behavior indicated that at least one instance occurred before they were 18.

Survey findings shed light on the disproportionate frequency of unwanted sexual experiences endured by athletes with disabilities, those in gender minorities, and those who identify as having a non-heterosexual sexual orientation.

# Exhibit 9

archive.today
webpage capture
Saved from https://www.boisestatepublicradio.org/news/2026-04-07/transgender-exodus
search
no other snapshots from this url
All snapshots from host www.boisestatepublicradio.org
28 Apr 2026 22:38:20 UTC
Webpage Screenshot
share download .zip report bug or abuse Buy me a coffee



News

# For one woman, Idaho's latest anti-trans law leads to 'heart wrenching' decision

## The Latest From Boise State Public Radio



Idaho abortion ballot initiative exceeds signature requirements for November election

19 hours ago

LISTEN • 1:38



USS Idaho, the U.S. Navy's newest and most advanced nuclear sub, commissioned into service

Boise State Public Radio News | By Julie Luchetta
Published April 7, 2026 at 4:57 AM MDT

▶ LISTEN • 2:50



Lexci Menhart / Personal Picture

Lexci Menhart visiting Seattle ahead of her permanent move there,

On Trans Visibility Day in March, Gov. Brad Little signed into law a bill that criminalizes trans people for using public restrooms not aligned with their birth sex. For some, that means living in Idaho is simply not tenable anymore.

April 27, 2026

▶ LISTEN • 7:00




2026 Idaho legislative primary primer: key races to watch

April 27, 2026

▶ LISTEN • 1:26




**Love the outdoors? We want to hear from you**

We're looking at new ways to tell stories about the outdoors, and we want to make sure it actually

For Lexci Menhart, a 29-year-old barista and music administrator at Cathedral of the Rockies in downtown Boise, the state's latest anti-trans legislation is a turning point: she has decided to move out of Idaho.

"The idea of leaving has just been heart wrenching. It's been so difficult," she said.

She will be leaving the state she's called home for close to 20 years in July, when her lease ends and just as the new law goes into effect.

"I am making this decision now so that it doesn't feel like I'm fleeing in the future. I don't want to live somewhere where laws are being created to criminalize who I am," Menhart added, saying she anticipates things will continue to get worse for trans people in Idaho.

Under HB 752, a first time offense can lead to a misdemeanor. A second one to felony charges and up to five years in prison.

"It makes me have to choose between risking a criminal penalty to use the restroom or risking my own personal safety. As soon as I go into a men's room, I'm outing myself, and putting myself in an extremely dangerous situation," Menhart said.

While she's found support and community in Boise, she said being trans in Idaho can be scary.

"To be harassed and to be ridiculed for simply having to go to the bathroom and existing as a trans person, that's just not a reality that I want to live in," Menhart said.

delivers what YOU care about.

Take our quick survey (it only takes a few minutes), and help us build something worth reading every week.

Take The Survey




The Connector: Idaho Daily News

New episodes every Monday through Friday.

Menhart already has to be cautious in public: she's experienced people following her into stores and strangers asking about her genitalia.

"There are some people that feel like they have the right to antagonize you just for who you are," she said. "So I'm looking forward to maybe not dealing with so much of that anxiety in Washington."

Menhart wishes people understood she lives a very normal life: she goes to church, she goes to work, she's a student with friends, family and aspirations.

"It's hard for me to understand and for me to wrap my head around why it is so divisive and why it is so controversial that I live such a normal life," Menhart said.

"My identity as a woman is the only identity that I've ever known. And, I can only explain that with the lens that I was created this way by God, just as we were all created to be who we are," she added.

A recent UCLA school of law analysis found fewer than 1% of U.S. adults are transgender but are four times more likely to be victims of a violent crime than cisgender people.

Tags News Transgender

Listen Here





## Julie Luchetta

I joined Boise State Public Radio in 2022 as the Canyon County reporter through Report for America, to report on the growing Latino community in Idaho. I am very invested in listening to people's different perspectives and I am very grateful to those who are willing to share their stories with me. It's a privilege and I do not take it for granted.

See stories by Julie Luchetta

**You make stories like this possible.**

The biggest portion of Boise State Public Radio's funding comes from readers like you who value fact-based journalism and trustworthy information.

**Your donation today** helps make our local reporting free for our entire community.

Donate

Radio Frequencies &
Coverage Maps

A Community Service of
Boise State University

© 2026 Boise State Public Radio

# Exhibit 10

# Idaho bill aims to criminalize transgender bathroom use in private businesses

Politics Mar 26, 2026 8:32 PM EDT

BOISE, Idaho (AP) — Idaho lawmakers are considering a bill that would make it a crime for transgender people to use the bathroom that matches their gender identity — even inside privately owned businesses.

At least 19 states, including Idaho, already have laws barring transgender people from using bathrooms and changing rooms that align with their gender in schools and, in some cases, other public places. The LGBTQ+ advocacy organization Movement Advancement Project's tracking of the laws shows that three other states — Florida, Kansas and Utah — have made it a criminal offense in some circumstances to violate the bathroom laws.

**READ MORE:** Ohio Gov. DeWine signs bill restricting transgender students' use of bathrooms

But none of the others apply as broadly to private businesses as the Idaho bill, which covers any "place of public accommodation," meaning any business or facility that serves the public. The state's Republican supermajority Senate is expected to vote on the bill this week, deciding whether to send it to Gov. Brad Little's desk.

## Felony bathroom use?

If the law is passed, anyone who enters a public facility like a bathroom or locker room designated for the opposite sex could be sentenced to a year in jail for a misdemeanor first offense, or up to five years in prison for a felony second offense. That's a longer sentence than Idaho imposes for a first drunken driving conviction or for displaying offensive sexual material in public.

Protecting those spaces is a "matter of safety" and "decency," said Republican Sen. Ben Toews told a Senate committee last week.

"Private spaces such as restrooms, changing areas and showers are sex-separated for a reason," Toews said. "Individuals in these vulnerable settings have a reasonable expectation of privacy and security."

The bill does carve out several exceptions. Athletic coaches, people responding to emergencies, people supervising inmates, custodians, and people helping children who need bathroom assistance get a pass. So does someone who is "in dire need" of a bathroom, if the bathroom they use is the only one that is reasonably available at the time.

## Law enforcement groups say it's a bad bill

Law enforcement groups including the Idaho Fraternal Order of Police and the Idaho Chiefs of Police Association oppose the bill, which they say would place officers in impossible positions, tasking them with visually determining someone's biological sex or their level of "dire need." The Idaho Sheriff's Association asked lawmakers to require that people first ask any suspected violator to leave the bathroom before calling authorities, but lawmakers refused.

Heron Greenesmith, deputy policy director at Transgender Law Center, said the "dire need" exception could be especially hard to assert — and that the idea that a person can use a public restroom only in an emergency is dehumanizing.

"How does one prove that one was going to poop on the floor?" they asked.

## Opponents fear vigilantism

John Bueno, a transgender student at the University of Idaho and a member of the student group Queer Inclusion Society, said the school has lots of single-use restrooms, which helps mitigate the logistical impacts of the bill. But the legislation would likely lead to more unwanted "profiling" of people, whether they are transgender or not, she said.

"It's this cultural attitude of getting other Americans to habitually be narcing on one other and doing this sort of 'transvestigating' — that is what these kinds of bills promote," Bueno said.

It all comes down to an effort to disenfranchise transgender people, Bueno said.

"This will increasingly deter queer individuals from Idaho universities and the state as a whole," she said. "Which to be fair, is probably the primary purpose."

## Bill could impact employment opportunities

Nikson Matthews, a transgender man with a beard, told a panel of lawmakers last week that the bill would force him into the women's restroom, where his masculine appearance puts him at risk of aggression from people who think he's intruding.

"It creates a crime — but that is not based on conduct or harm," Matthews said. "It is based on presence, and to justify that you have to accept that someone's presence alone is traumatizing and harmful enough to criminalize."

It could also make it difficult for transgender people to work, said Boise resident Laura Volgert.

"People might be able to hold it for an hour if they're at a restaurant for lunch or at a grocery store," she told lawmakers during a committee hearing. "They can't be expected to hold it for a full eight-hour shift."

That's the point of these types of laws, said Greenesmith, to "make it untenable to go to the movies, to go to the doctor, to go to the bank."

Proponents say that isn't the case.

## Proponents say safety and privacy is key

Suzanne Tabert, a Sandpoint resident, said the bill is about "maintaining, clear, enforceable boundaries" so that women and children can feel safe.

"If we lose the ability to protect based on biological sex, we lose our most effective tool for preventing harassment, voyeurism and other sex crimes before they occur," she said.

She later continued, "This legislation is not about how an individual identifies, nor does it seek to target or malign the transgender community. Rather it upholds a universal standard of privacy."

Bathrooms are not the only place where lawmakers have been placing restrictions on transgender people in the name of protecting women and girls. At least 25 states bar transgender women and girls from some women's and girl's sports competitions. And at least 27 states have laws restricting or banning gender-affirming care for minors.

Expanding all of these policies are priorities for President Donald Trump, too.

The only widely reported arrest of someone on charges of violating transgender bathroom restrictions was part of a protest in Florida last year.

*Mulvihill reported from Haddonfield, New Jersey.*


# A free press is a cornerstone of a healthy democracy.

Support trusted journalism and civil dialogue.

**Donate now →**


*By* — **Rebecca Boone, Associated Press**

*By* — **Geoff Mulvihill, Associated Press**

# Exhibit 11

UCLA School of Law Williams Institute

# SAFETY AND PRIVACY IN PUBLIC RESTROOMS

## and Other Gendered Facilities

**BRIEF /** FEBRUARY 2025

Jody L. Herman, Andrew R. Flores, Elana Redfield

President Trump has made access to public restrooms and other gendered facilities an early focal point of his administration. For example, on January 20, 2025, the president issued an executive order entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which defines sex as only male and female, determined "at conception," and unchangeable, for the purposes of federal programs, services, and spaces.[1] Another executive order prohibits federally funded educational institutions from allowing minors to use restrooms that align with their gender identity if it differs from their anatomical sex.[2] The president subsequently issued an executive order seeking to prevent the participation of transgender girls and women in federally funded girl's and women's sports and their use of women's locker rooms.[3]

In recent years, an increasing number of state legislatures have passed laws to require transgender people to use restrooms and other facilities in public buildings, such as schools and government buildings, according to their sex assigned at birth.[4] Restroom access for transgender people has been the subject of policymaking in the U.S. House

[1] Donald J. Trump, Exec. Order (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-genderideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

[2] This executive order specifically directs agencies administering educational grants to K-12 institutions to prohibit the support of "social transition," which is defined to include "use of intimate facilities and accommodations such as bathrooms or locker rooms specifically designated for persons of the opposite sex." Donald J. Trump, Exec. Order (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/. Notably, on January 28, 2025, the U.S. Department of Education began an investigation into whether Denver Public Schools District has violated Title IX because they created a bathroom that was all-gender and not separated by anatomical sex. In a letter notifying the District of the investigation, the Department of Education stated the investigation "will examine whether the District discriminates against students on the basis of sex by installing multi-stall all gender restrooms in District school facilities, in violation of Title IX and its implementing regulations." *See* Solomon, M. (2025). *U.S. Department of Education launches investigation into DPS for all-gender restroom conversion.* 9NEWS.com. https://www.9news.com/article/news/education/us-department-education-investigation-dps-all-gender-restroom/73-4a73b4a7-5a52-405a-afb1-ec71490a64b0 (DOE letter posted in article); Seaman, J. (2025). *Trump Administration to Investigate DPS for Converting Girls Restroom to All-gender Bathroom.* The Denver Post. https://www.denverpost.com/2025/01/28/trump-investigation-dps-all-gender-restroom-discrimination/.

[3] Donald J. Trump, Exec. Order (Feb. 5, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/.

[4] Movement Advancement Project. (2025). Equality Maps: Bans on Transgender People's Use of Public Bathrooms & Facilities According to Their

of Representatives regarding the use of U.S. House facilities.[5] In November and December 2024, U.S. Rep. Nancy Mace filed two bills that would prohibit transgender people from using restrooms according to their gender identity on federal property (H.R. 10186, "Protecting Women's Private Spaces Act") and prohibit receipt of federal funds by any entity that allows transgender people to use restrooms and other gendered facilities according to their gender identity (H.R. 10290, "Stop the Invasion of Women's Spaces Act").[6]

Those engaging in these efforts allege that new protections are needed for women's safety and privacy in restrooms and other gendered facilities.[7] For instance, the "Stop the Invasion of Women's Spaces Act" and the transgender sports participation executive order ("Keeping Men Out of Women's Sports") are framed around the idea that the inclusion of transgender women in women's spaces is inappropriate, unsafe, or violates privacy. The January 20 executive order specifically asserts that transgender women are a risk to "women's safety" in "intimate single-sex spaces" and therefore, separation by anatomical sex in such spaces is necessary.[8] In this brief, we review studies conducted by Williams Institute scholars that examine whether women's restrooms and other gendered facilities pose added risk to occupants when transgender people are allowed to use those facilities according to their gender identity. We also review research on the experiences that transgender people report when using restrooms and the impact on transgender people's lives when they cannot safely access restrooms.

## RESEARCH ON OVERALL SAFETY AND PRIVACY IN PUBLIC RESTROOMS AND OTHER GENDERED FACILITIES

Williams Institute scholars conducted studies in Massachusetts and nationally that assessed empirical evidence of impacts on safety and privacy in restrooms as a result of the enactment of nondiscrimination laws that protect transgender people's ability to use restrooms according to their gender identity.

### Study of Localities in Massachusetts

This study utilized data from criminal incident reports on safety and privacy violations related to assault, sex crimes, and voyeurism in public restrooms, locker rooms, and dressing rooms.[9] Massachusetts localities with nondiscrimination laws that protect transgender people's access to these facilities based on their gender identity were matched with localities without these protections. The matched pairs were compared over a period of time before and after the passage of the nondiscrimination laws.[10] We found that:

---

Gender Identity. https://www.lgbtmap.org/equality-maps/nondiscrimination/bathroom_bans. Accessed January 17, 2025; Redfield, E., Conron K.J., & Mallory, C. (2024). *The Impact of 2024 Anti-Transgender Legislation on Youth*. Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/publications/2024-anti-trans-legislation/.

[5] 171 Cong. Rec. H26 (daily ed. Jan. 3, 2025).

[6] Protecting Women's Private Spaces Act, H.R. 10186, 118th Cong., (2024), https://www.congress.gov/bill/118th-congress/house-bill/10186/text?s=6&r=12&q=%7B%22search%22%3A%22restrooms%22%7D; Stop the Invasion of Women's Spaces Act, H.R. 10290, 118th Cong., (2024), https://www.congress.gov/bill/118th-congress/house-bill/10290/text?s=6&r=10&q=%7B%22search%22%3A%22restrooms%22%7D.

[7] Herman, J.L. (2011). "Bathroom Panic" and Antidiscrimination Laws: The role of activists in securing gender identity protections in gendered public spaces in Washington, DC. *LGBTQ Policy Journal at the Harvard Kennedy School*, *2*, 25-34; Hasenbush, A., Flores, A.R., & Herman, J.L. (2019). Gender Identity Nondiscrimination Laws in Public Accommodations: a review of evidence regarding safety and privacy in public restrooms, locker rooms, and changing rooms. *Sexuality Research and Social Policy*, 16, 70-83. https://doi.org/10.1007/s13178-018-0335-z

[8] Donald J. Trump, Exec. Order (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/

[9] Hasenbush, A., et al. (2019).

[10] A statewide law prohibiting other types of discrimination, but not places of public accommodation, was in place during the time period covered in this study. *See* Hasenbush, A., et al. (2019).

- Incidents of safety and privacy violations in these spaces were rare.
- There was no significant change in privacy and safety violations across matched localities during the time period surrounding the enactment of nondiscrimination laws.
- There was no evidence that privacy and safety in restrooms changed as a result of transgender people having, by law, access to restrooms and other facilities in accordance with their gender identity.

### Study of States and Counties across the United States

Building on the Massachusetts study, this study utilized data from the National Crime Victimization Survey to estimate the impact of gender identity nondiscrimination laws for public accommodations on the prevalence of violent victimization perpetrated by strangers.[11] Violent victimization perpetrated by strangers is the type of crime that is purported to increase when transgender people may use restrooms and other gendered facilities according to their gender identity. We found that:

- When comparing states with and without these nondiscrimination laws, statewide implementation of these laws did not increase victimization rates perpetrated by strangers.
- When comparing counties with and without these nondiscrimination laws, neither statewide nor countywide implementation of these nondiscrimination laws resulted in increased victimization rates perpetrated by strangers.
- There was no evidence that violent victimization by strangers increased as a result of transgender people having, by law, access to restrooms that accord with their gender identity.

## RESEARCH ON SAFETY OF TRANSGENDER PEOPLE WHEN USING RESTROOMS AND OTHER GENDERED FACILITIES

While we have found no evidence of increased harms to people who are not transgender when transgender people are allowed to use restrooms and other gendered facilities according to their gender identity, it is a consistent finding across studies and over time that transgender people report being denied access to these spaces and experiencing verbal harassment and physical assault from others in these spaces.

- In a 2008 survey of transgender people in Washington, DC, 18% reported being denied access to a public restroom at least once in D.C. Sixty-eight percent (68%) reported ever being verbally harassed and 9% reported ever being physically assaulted in a D.C. public restroom.[12]

---

[11] Flores, A.R. & Herman, J.H. (n.d.) Including Gender Identity as a Protected Class in Public Accommodations Laws Does Not Increase Victimization Rates: A statewide, countywide, and municipal assessment. Unpublished manuscript. We utilized a generalized synthetic control method with time-varying covariates to compare states and counties with and without gender identity nondiscrimination laws in public accommodations on measures of violent victimization perpetrated by strangers. Presence of and enactment dates of public accommodations nondiscrimination laws at the state and sub-state levels were identified through publicly available resources created by the Movement Advancement Project and Human Rights Campaign, in addition to our own assessments with the assistance of legal analysts. National Crime Victimization Survey subnational estimates of variation in victimization rates came from: Fay, R. E., & Diallo, M. (2015). *Developmental estimates of subnational crime rates based on the National Crime Victimization Survey*. U.S. Bureau of Justice Statistics.

[12] Herman, J.L. (2013). Gendered Restrooms and Minority Stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management & Social Policy*, *19*(1), 65-80.

- In the 2015 U.S. Transgender Survey, 9% of respondents reported being denied access to a restroom in the last year. Twelve percent (12%) reported being verbally harassed, physically attacked, or sexually assaulted when using a restroom in the last year.[13]
- In the 2022 U.S. Transgender Survey, 4% of respondents reported being denied access to a restroom in a public place, at work, or at school in the last year. Six percent (6%) of respondents reported being verbally harassed, physically attacked, or experiencing unwanted sexual contact when accessing or using a restroom in the last year.[14]

Analysis of data from the 2022 U.S. Transgender Survey suggests that negative incidents, such as being denied access when trying to use a restroom or verbal harassment when using a restroom, are more likely to occur when transgender people who are living their day-to-day lives according to their gender identity use the restroom of their sex assigned at birth. Transgender respondents who are living all the time according to their gender identity were significantly more likely to experience being denied access to a restroom or verbally harassed in a restroom when they used restrooms that matched their sex assigned at birth (See Table 1).[15] For instance, nearly 11% of transgender men living all the time according to their gender identity and who used women's restrooms in the last year were verbally harassed in a restroom in the past year, compared to 7% of transgender men who used men's restrooms in the last year.[16]

**Table 1. Experiences of denied access and verbal harassment in restrooms in the last 12 months for transgender men and women who are living all the time according to their gender identity, by which restroom they used in the last 12 months[17]**

| EXPERIENCE | TRANSGENDER MEN | | | | TRANSGENDER WOMEN | | | |
|---|---|---|---|---|---|---|---|---|
| | MEN'S RESTROOM | | WOMEN'S RESTROOM | | MEN'S RESTROOM | | WOMEN'S RESTROOM | |
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| Denied Access in the last 12 months | 5.2% | [4.8, 5.6] | 10.4% | [9.6, 11.3] | 7.0% | [6.0, 7.9] | 4.6% | [4.2, 5.0] |
| Verbally Harassed in the last 12 months | 7.3% | [6.9, 7.7] | 10.8% | [9.9, 11.7] | 8.9% | [7.8, 10.0] | 7.2% | [6.8, 7.7] |

[13] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. National Center for Transgender Equality. https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

[14] James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). Early Insights: A Report of the 2022 U.S. Transgender Survey. National Center for Transgender Equality. https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf.

[15] James, S.E., et al. (2024). Additional analyzes of 2022 USTS data completed by the author.

[16] Transgender men are defined here as men who were assigned female at birth, and transgender women are women who were assigned male at birth. In this analysis, we do not include those who identify as nonbinary or are intersex. The impact on people who are nonbinary and/or intersex of laws requiring the use of restrooms and other facilities according to sex assigned at birth should be centered in future research.

[17] James, S.E., et al. (2024). Additional analyzes of 2022 USTS data completed by the author.

## RESEARCH ON NEGATIVE IMPACTS ON TRANSGENDER PEOPLE DUE TO UNSAFE RESTROOMS

In order to avoid negative experiences in restrooms, transgender people report avoiding going to the bathroom when needed, not going to specific public places because of a lack of safe bathrooms, and avoiding going out in public at all.[18] Not going to the bathroom when needed can negatively impact health.[19] There are also potential negative impacts on education, employment, and participation in public life from a lack of safe restroom options.[20]

- According to the 2015 U.S. Transgender Survey, 55% of respondents reported not using the restroom when they needed to go. Thirty-two percent (32%) of respondents avoided eating or drinking so they would not have to use the restroom. Eight percent (8%) reported a urinary tract infection or a kidney-related health problem due to avoiding using restrooms in the last year.[21]
- The 2008 survey of transgender people in Washington, D.C., found that problems using restrooms can further impact employment, education, and participation in public life.[22]
    - Thirteen percent (13%) of those who worked in Washington, D.C., and had problems using restrooms at work (denied access or verbal harassment) said it affected their employment in some way. This included having to change jobs or quitting their jobs, poor job performance, and excessive absences or tardiness.
    - Ten percent (10%) of respondents who attended school in Washington, D.C., reported that problems accessing restrooms at school affected their education in some way. Respondents reported excessive absences, poor performance, changing schools, and dropping out of school.
    - Fifty-eight percent (58%) of respondents reported having ever avoided going out in public due to a lack of access to safe bathrooms. Thirty-eight percent (38%) reported avoiding particular places in public because of a lack of safe bathroom options.

## CONCLUSION

Current policy debates regarding transgender people's access to restrooms and other gendered facilities are predicated on narratives about protecting the safety and privacy of women's spaces. These narratives lack evidence showing any negative impacts on safety and privacy in women's restrooms or other facilities when transgender people can use restrooms according to their gender identity. However, transgender people consistently report having negative experiences in restrooms perpetrated by others, including denial of access, verbal harassment, and physical assault. Evidence suggests that transgender people are put at added risk if required by law to use restrooms in accordance with their sex assigned at birth.

[18] Herman, J.L. (2013); James, S.E., et al. (2016).

[19] Herman, J.L. (2013); James, S.E., et al. (2016).

[20] Herman, J.L. (2013); James, S.E., et al. (2016).

[21] James, S.E., et al. (2016).

[22] Herman, J.L. (2013).

## AUTHORS

**Jody L. Herman, Ph.D.**, is the Reid Rasmussen Senior Scholar of Public Policy at the Williams Institute.

**Andrew R. Flores, Ph.D.**, is a Distinguished Visiting Scholar at the Williams Institute and an Associate Professor of Government at American University.

**Elana Redfield, J.D.**, is the Arnold D. Kassoy Scholar of Law and Federal Policy Director at the Williams Institute.

## ACKNOWLEDGEMENTS

The authors thank Christy Mallory, Rachel Dowd, and Laurel Sprague for their thoughtful reviews and Kris Bicknell for the design of this report. The authors acknowledge the tremendous contribution of Amira Hasenbush in leading our study of localities in Massachusetts. The authors also thank the Advocates for Trans Equality Education Fund (formerly the National Center for Transgender Equality) for use of the 2022 U.S. Transgender Survey dataset.

# Exhibit 12

SPRING DEALS TO TACKLE OUTDOOR PROJECTS. While Supplies Last. Shop Now.

Huntington Park 10PM 90255 What can we help you find today? Huntington Park 10PM 90255 Shop All Services DIY Log In

Sign in for the best exp
Sign In
Don't have an account? Creat

... / Hardware / Signage / Stock Signs / Restroom Signs

SPRING DEALS HAPPENING NOW + FAST FREE DELIVERY*
*Subject to Availability
Shop Now

Feedback

# RESTROOM SIGNS



Mens Restroom Sign



Black


Self-adhesive



Aluminum



Plastic



Everbilt

45 results

All Filters | Sign Material | Brand | Price | Hardware Color Family | One-Sided/Two-Sided | Bundle/Single | Review Rating

In Stock at Store Today | Next-Day Delivery

Sort by Top Sellers

Feedback



12 in. x 12 in. Blue Circle California A.D.A. Plastic Women's Restroom Sign

★★★★☆ (4 / 3)

Model# 844605

$13.47

Pickup: 2 in stock at Huntington Park

Delivery: Free | Tomorrow

Add to Cart




Blue Plastic Triangle California A.D.A. Men Sign

★★★★★ (5 / 3)

Model# 844606

$13.47

Pickup: 7 in stock at Huntington Park

Delivery: Free | Tomorrow

Add to Cart

Feedback



Restroom Blue Triangle on Circle California A.D.A. Signs

(4.4 / 11)

$13.47

Pickup: 2 in stock at Huntington Park

Delivery: Free | Tomorrow

Add to Cart




3 in. x 9 in. Men's Restroom Sign

(5 / 1)

Best Seller

$6.27

Pickup: 10 in stock at Huntington Park

Delivery: Free | Tomorrow

Add to Cart

Feedback




6 in. x 9 in. Men with Handicap Accessible Symbol Acrylic Restroom Sign with Braille
(3.7 / 3)
Top Rated
$13.98

Pickup: 4 in stock at Huntington Park
Delivery: Free | Tomorrow

Add to Cart




Everbilt 9 in. x 6.5 in. Unisex Restroom ADA Braille Sign
(4.8 / 72)
$13.97

Ship to Store: Free | Pickup
Delivery: Free | Sat, May 2

Add to Cart

Feedback







+more options

**Everbilt** 6 in. x 9 in. Men Handicap Accessible ADA Restroom Sign with Braille
(4.3 / 57)

## Loading Recommendations

$12.75

Ship to Store: Free | Pickup
Delivery: Free | Sat, May 2

Add to Cart

**Everbilt** 6 in. x 9 in. Men and Women Acrylic Restroom Signs with Handicap Symbol and Braille
(4.3 / 57)

$25.50

View Package

Feedback

Exclusive




**Everbilt** 3 in. x 9 in. Plastic Employee Must Wash Hand Sign

(4.5 / 30)

Model# 31444

$6.27

Exclusive




**Everbilt** 3 in. x 9 in. Plastic Restroom Sign

(4.8 / 55)

Model# 31445

$6.27

# Exhibit 13

UCLA School of Law Williams Institute

RESEARCH THAT MATTERS

# HOW MANY ADULTS AND YOUTH IDENTIFY AS TRANSGENDER IN THE UNITED STATES?

August 2025

Jody L. Herman
Andrew R. Flores

# CONTENTS

EXECUTIVE SUMMARY ........ 2
INTRODUCTION ........ 4
FINDINGS ........ 6
NATIONAL POPULATION ESTIMATES BY GENDER IDENTITY, AGE, AND RACE/ETHNICITY ........ 6
REGIONAL AND STATE POPULATION ESTIMATES, BY GENDER IDENTITY, AGE, AND RACE/ETHNICITY ........ 10
CONCLUSION ........ 21
METHODS ........ 22
AUTHORS ........ 27
ACKNOWLEDGEMENTS ........ 27
SUGGESTED CITATION ........ 27
APPENDIX ........ 28

# EXECUTIVE SUMMARY

In this report, we use the best available data to provide new estimates of the size and characteristics of the U.S. population, aged 13 and older, who identify as transgender. Data come from the 2021-2023 Behavior Risk Factor Surveillance System (BRFSS) and the 2021 and 2023 Youth Risk Behavior Survey (YRBS).

## KEY FINDINGS

- Over 2.8 million adults (aged 18 and older) and youth (aged 13 to 17) identify as transgender in the United States, or 1.0% of those aged 13 and older.
- Among U.S. adults, 0.8% (over 2.1 million people) identify as transgender. Among youth aged 13 to 17 in the U.S., 3.3% (about 724,000 youth) identify as transgender.
- Of the 2.1 million adults who identify as transgender, 32.7% (698,500) are transgender women, 34.2% (730,500) are transgender men, and 33.1% (707,100) are transgender nonbinary adults.
- We confirm trends based on age found in our prior estimates and other prior research that people who identify as transgender are younger on average than the U.S. population.
  - Youth aged 13 to 17 comprise 25.3% of those who identify as transgender (aged 13 and older) compared to 7.7% of the U.S. population.
  - Young adults aged 18 to 24 comprise 28.9% of those who identify as transgender (aged 13 and older) compared to 10.7% of the U.S. population.
  - Young adults aged 18 to 24 are significantly more likely to identify as transgender (2.72%) than those aged 35 to 64 (0.42%) and those aged 65 and older (0.26%).
- The race and ethnicity distribution of adults and youth who identify as transgender appears similar to the U.S. population. Race/ethnicity estimates for adults in this report reflect trends from prior research that found Latinx people, American Indian or Alaska Native, and biracial and multiracial groups appear more likely to identify as transgender than White people. Our youth estimates do not reflect that trend for White and Latinx youth. However, differences based on race/ethnicity among youth and adults are not statistically significant.
- At the regional and state levels, regional percentages of adults aged 18 and older who identify as transgender are similar across regions and range from 0.7% in the South to 0.9% in the Northeast. State percentages range from 0.4% in New Mexico to 1.2% in Minnesota.
- Regional percentages of youth aged 13 to 17 who identify as transgender are similar across regions and range from 3.2% in the South to 3.4% in the Midwest. State percentages range from 2.5% in Delaware to 3.6% in Hawaii.

Since 2011, Williams Institute scholars have published a series of reports describing estimates of the population size and characteristics of individuals who identify as transgender in the United States. During this time, substantial advancements have been made in the quality and availability of data about transgender people from population-based surveys. Overall, our estimates for adults have remained relatively steady over time, but there are notable changes in our new estimates. In prior estimates, there have been no statistically significant differences between age groups for adults in the

percentage of those who identify as transgender. Our current estimates confirm prior trends and show that the youngest adult age groups are now significantly more likely to identify as transgender than older age groups. Our current data source for our new national youth estimate (2023 YRBS) represents the best data we have ever utilized to estimate the number of youth (aged 13 to 17) who identify as transgender nationally (just over 724,000). The data sources and analytic methods for our youth estimates have changed over time. Comparisons over time should not be made given these changes.

**Regional estimates of individuals who identify as transgender in the US by age (13+)**



# INTRODUCTION

Since 2011, Williams Institute scholars have published a series of reports describing estimates of the population size and characteristics of individuals who identify as transgender in the United States.[1] During this time, substantial advancements have been made in the quality and availability of data about transgender people from population-based surveys.[2] Whereas our first report relied on two state-level population-based surveys, subsequent reports relied on data from a larger number of states through the Centers for Disease Control and Prevention (CDC). Beginning in 2014, the CDC offered states the option to ask adult respondents to the Behavior Risk Factor Surveillance System (BRFSS) if they consider themselves to be transgender.[3] Nineteen states opted to ask that question in their surveys in 2014. As of the 2023 BRFSS, 41 states have opted to ask that question in at least one of the years from 2021 through 2023. The BRFSS has offered a consistent data source over time for us to base our estimates of the adult U.S. population who identify as transgender.[4] The percentage and number of adults who identify as transgender remained fairly consistent in our estimates based on the 2014 BRFSS (0.6% or 1.4 million adults) and the 2017-2020 BRFSS (0.5% or 1.3 million adults). In this report, we describe new estimates utilizing data from the 2021-2023 BRFSS, finding that 0.8% of adults (or 2.1 million) identify as transgender. Our latest estimate does not significantly differ from our prior estimates for adults. We also provide estimates for adults regarding gender, age, and race/ethnicity at the national, regional, and state levels.

Population-based data sources regarding transgender youth remain scarce. The CDC's Youth Risk Behavior Survey (YRBS) currently provides the best available data for our estimates of the size and characteristics of youth who identify as transgender in the U.S. Beginning in 2017, the CDC's Youth Risk Behavior Survey, a biennial national and state-level survey of high school students, provided states with an optional question to identify transgender youth.[5] Ten states and nine urban school

---

[1] Gates, G.J. (2011). *How many people are lesbian, gay, bisexual, and transgender?* The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-People-LGBT-Apr-2011.pdf; Flores, A.R., Herman, J.L., Gates, G.J., & Brown, T.N.T. (2016). *How Many Adults Identify as Transgender in the United States?* The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Adults-US-Aug-2016.pdf; Flores, A.R., Herman, J.L., & Brown, T.N.T. (2016). *Race and Ethnicity of Adults Who Identify as Transgender in the United States.* The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Race-Ethnicity-Trans-Adults-US-Oct-2016.pdf; Herman, J.L., Flores, A.R., Brown, T.N.T., Wilson, B.D.M., & Conron, K.J. (2017). *Age of Individuals who Identify as Transgender in the United States.* The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf; Herman, J.L., Flores A.R., & O'Neill, K.K. (2022). *How Many Adults and Youth Identify as Transgender in the United States?* The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

[2] Population-based surveys allow findings to be generalized to the population from which the sample is drawn.

[3] The wording of this question has remained the same since 2014, as follows: "Do you consider yourself to be transgender?" If a respondent answers yes, they are asked the following: "Do you consider yourself to be 1. male-to-female, 2. female-to-male, or 3. gender nonconforming?"

[4] See Herman et al. (2022) for a description of other potential data sources from population-based surveys, such as the U.S. Census Household Pulse Survey and the National Crime Victimization Survey, and a discussion of the limitations of each. The BRFSS remains the best available data for generating our estimates of adults who identify as transgender.

[5] The wording of the question has remained the same since 2017, as follows: "Some people describe themselves as transgender when their sex at birth does not match the way they think or feel about their gender. Are you transgender?" Response options

districts administered the optional question in their 2017 YRBS.[6] In 2019, 14 states and at least 16 states in 2021 asked the optional question.[7] In 2023, the CDC added the question to identify transgender youth as a required question in the national survey of high school students, which provides the best available data thus far to estimate the number of youth who identify as transgender nationally.[8] Our prior estimates utilizing data from 2017 and 2019 YRBS found that 1.4% of youth aged 13 to 17 (or 300,000 youth) identify as transgender. In this report, we utilize state-level data from six states for 2021-2023 YRBS and national data from 2023 YRBS to provide new estimates of the percentage and number of youth aged 13 to 17 who identify as transgender at the national, regional, and state levels, including descriptions of race and ethnicity.[9] We now estimate that 3.3%, or 724,000 youth, identify as transgender in the U.S., derived from the national 2023 YRBS. The data sources and analytic methods for our youth estimates have changed over time. Comparisons over time should not be made given these changes. A detailed description of our methods, along with an appendix that provides 95% confidence intervals for each figure and table, is included at the end of this report.

---

are as follows: "No, I am not transgender;" "Yes, I am transgender;" "I am not sure if I am transgender;" "I do not know what this question is asking."

[6] Johns, M.M., Lowry, R., Andrzejewski, J., et al. (2019). Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students–19 States and Large Urban School Districts, 2017. *MMWR Morb Mortal Wkly Rep*, *68*(3), 67-71. http://dx.doi.org/10.15585/mmwr.mm6803a3.

[7] Miller-Jacobs, C., Operario, D. & Hughto, J.M.W. (2023). State-Level Policies and Health Outcomes in U.S. Transgender Adolescents: Findings from the 2019 Youth Risk Behavior Survey. *LGBT Health*, *10*(6), 447-455. https://doi.org/10.1089/lgbt.2022.0247; The count of participating states for 2021 was conducted by the Williams Institute.

[8] Centers for Disease Control and Prevention. (2024, September 24). 2023 Youth Risk Behavior Survey Results: New Information in the 2023 YRBS. Youth Risk Behavior Surveillance System (YRBSS). https://www.cdc.gov/yrbs/results/2023-yrbs-results.html#:~:text=For%20the%20first%20time%2C%20the,questioning%20(LGBTQ%2B)%20youth%20data

[9] The CDC did not include the gender identify variable in its publicly available national combined dataset for YRBS 2021. We obtained these data for YRBS 2021-2023 through records requests with state health agencies and were able to acquire data from 6 states. New Mexico was also collected; however, the SOGI questions were only asked of individuals 18 years or older, which we exclude from this analysis.

# FINDINGS

## NATIONAL POPULATION ESTIMATES BY GENDER IDENTITY, AGE, AND RACE/ETHNICITY

We estimate that 1.0% of individuals (2.8 million) aged 13 or older identify as transgender in the United States. Among adults, 0.8% (over 2.1 million) identify as transgender. Among youth ages 13 to 17, 3.3% (about 724,000 youth) identify as transgender. In this section, we describe national estimates for the gender distribution of transgender adults, the percentage and number of those who identify as transgender by age for those aged 13 and older, and the percentage and number of those who identify as transgender by race/ethnicity for adults and youth separately.

### Gender

The BRFSS asks those who identify as transgender a follow-up question to provide more information about their gender identity.[10] Based on this question, we estimate that, of adults who identify as transgender, 32.7% (698,500) are transgender women, 34.2% (730,500) are transgender men, and 33.1% (707,100) are transgender nonbinary adults. The YRBS does not collect further gender identity information from youth who identify as transgender. Therefore, we cannot provide more detailed information on gender identity for youth.

**Figure 1. Gender identity of adults who identify as transgender in the US (aged 18+)**




[10] See Note #3. Here we categorize those who selected "male-to-female" as transgender women, "female-to-male" as transgender men, and "gender nonconforming" as transgender nonbinary adults. "Gender nonconforming" is often used as a term to describe one's gender expression. However, evidence suggests that about a third of transgender individuals identify as nonbinary. See, for instance, Wilson, B.D.M & Meyer, I.H. (2021). *Nonbinary LGBTQ Adults in the United States*. The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Nonbinary-LGBTQ-Adults-Jun-2021.pdf, and James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). *Early Insights: A Report of the 2022 U.S. Transgender Survey*. National Center for Transgender Equality. https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf. We find here that 33.1% of respondents who identified as transgender selected "gender nonconforming" as their gender identity. Furthermore, if respondents to the BRFSS ask the definition of gender nonconforming, they are given the following definition: "Some people think of themselves as gender nonconforming when they do not identify only as a man or only as a woman." Therefore, we categorize this group as "transgender nonbinary adults."

## Age

We present the age of individuals who identify as transgender in two ways: the percentage of each age group that identifies as transgender and the age distribution of the transgender-identified population compared to the age distribution of the U.S. population. As shown in Table 1, younger age groups are more likely than older age groups to identify as transgender. For instance, 2.7% of young adults aged 18 to 24 identify as transgender compared to 0.3% of those aged 65 and older, a statistically significant difference. (See Appendix Table A2.) We have found a similar trend for age in our prior estimates, and it is also consistent with other studies utilizing population-based data about transgender people.[11]

**Table 1. Percent and number in each age group that identifies as transgender in the US (aged 13+)**

| AGE GROUP | PERCENT | NUMBER |
|---|---|---|
| 13 to 17 | 3.3% | 723,700 |
| 18 to 24 | 2.7% | 827,200 |
| 25 to 34 | 1.4% | 622,600 |
| 35 to 64 | 0.4% | 531,500 |
| 65 and older | 0.3% | 154,800 |
| **13 and older** | **1.0%** | **2,859,800** |

The age distribution of individuals who identify as transgender also shows a skew towards younger age groups compared to the U.S. population. As shown in Figure 2, 25.3% of those who identify as transgender are aged 13 to 17 compared to 7.7% of the U.S. population (of those aged 13 and older). Conversely, 5.4% of those who identify as transgender are aged 65 and older compared to 20.8% of the U.S. population (of those aged 13 and older). This age trend is consistent with prior research utilizing population-based surveys that found transgender individuals have a lower mean age than cisgender individuals.[12]

**Figure 2. Age distribution of those who identify as transgender and the US population (aged 13+)**




[11] Jones, J. M. (2025). LGBTQ+ Identification in U.S. Rises to 9.3%. Gallup. https://news.gallup.com/poll/656708/lgbtq-identification-rises.aspx; Feldman, J.L., Luhur, W.E., Herman, J.L., Poteat, T., Meyer, I.H. (2021). Health and health care access in the US transgender population health (TransPop) survey. *Andrology*, *9*, 1707– 1718. https://doi.org/10.1111/andr.13052; Flores, A.R., Meyer, I.H., Langton, L., & Herman, J.L. (2021). Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018. *American Journal of Public Health*, *111*(4), 726-729. https://doi.org/10.2105/AJPH.2020.306099.
[12] Feldman et al. (2021); Flores et al. (2021).

## Race and Ethnicity

Similar to age, we examine the race and ethnicity of individuals who identify as transgender in two ways: the percentage of each racial and ethnic group that identifies as transgender, and the racial and ethnic distribution of the transgender-identified population compared to the racial and ethnic distribution of the U.S. population. We present these findings separately for youth and adults. Due to sample size constraints, we must combine all those reporting two or more races or a race/ethnicity other than White, Black, Asian American or Pacific Islander (AAPI), American Indian or Alaska Native (AIAN), or Latino/a/x/e or Hispanic (Latinx) into one heterogeneous category. The categories of White, Black, AAPI, AIAN, as well as biracial, multiracial, or another race/ethnicity, are non-Hispanic. The Latinx category includes people of any race.

Tables 2 and 3 provide the percentage and number of each race/ethnicity group that identifies as transgender. Prior research with population-based samples has found that Latinx people, American Indian or Alaska Native, and biracial and multiracial groups appear more likely than White people to identify as transgender.[13] While we find no significant differences based on race/ethnicity, this trend is reflected among adults in Table 2. This trend is not reflected in estimates for White or Latinx youth in Table 3.

**Table 2. Percent and number of each racial/ethnic group that identifies as transgender in the US, among adults (aged 18+)**

| RACIAL/ETHNIC GROUP | PERCENT | NUMBER |
|---|---|---|
| White | 0.8% | 1,200,100 |
| Black | 0.6% | 187,400 |
| AAPI | 0.8% | 126,000 |
| AIAN | 0.9% | 12,000 |
| Latinx | 1.0% | 469,100 |
| Biracial, multiracial, or another race/ethnicity | 1.3% | 141,500 |

Note: White, Black, Asian American or Pacific Islander (AAPI), American Indian or Alaska Native (AIAN), and Biracial, Multiracial, or Another Race/Ethnicity are all non-Hispanic. Latino/a/x/e or Hispanic (Latinx) includes people of any race.

**Table 3. Percent and number of each racial/ethnic group that identifies as transgender in the US, among youth (aged 13 to 17)**

| RACIAL/ETHNIC GROUP | PERCENT | NUMBER |
|---|---|---|
| White | 3.6% | 376,500 |
| Black | 2.2% | 62,200 |
| AAPI | 3.4% | 37,700 |
| AIAN | 4.2% | 5,200 |
| Latinx | 2.9% | 171,100 |
| Biracial, multiracial, or another race/ethnicity | 4.3% | 71,000 |

Note: White, Black, Asian American or Pacific Islander (AAPI), American Indian or Alaska Native (AIAN), and Biracial, Multiracial, or Another Race/Ethnicity are all non-Hispanic. Latino/a/x/e or Hispanic (Latinx) includes people of any race.

[13] Feldman et al. (2021); Miller-Jacobs et al. (2023).

Compared to the U.S. population, the racial/ethnic distribution of youth and adults who identify as transgender seems generally similar. Youth and adults who identify as transgender may be more likely to report being AIAN and biracial, multiracial, or another race/ethnicity, which would be in keeping with prior research.[14] Adults who identify as transgender may be more likely to report being Latinx, in keeping with prior research, but youth do not appear more likely to report being Latinx.

**Figure 3. Race/ethnicity of adults who identify as transgender and of the US population (aged 18+)**




**Figure 4. Race/ethnicity of youth who identify as transgender and of the US population (aged 13 to 17)**




[14] Feldman et al. (2021); Miller-Jacobs et al. (2023).

## REGIONAL AND STATE POPULATION ESTIMATES, BY GENDER IDENTITY, AGE, AND RACE/ETHNICITY

Adults and youth who identify as transgender in the U.S. reside in all 50 states and the District of Columbia. In this section, we present regional and state estimates for the gender distribution of transgender adults, as well as the percentage and number of those who identify as transgender by age for individuals aged 13 and older. Additionally, we provide the percentage and number of transgender individuals by race/ethnicity for both adults and youth. Percentages reflect our precise estimates, rounded to one or two decimal places. Our estimated numbers are rounded to the nearest hundred. Table 4 presents the gender identity distribution of adults who identify as transgender, along with the population estimate for each gender identity in the four U.S. regions and each state within those regions. The gender identity distribution of adults who identify as transgender appears quite similar across regions and states, with roughly a third identifying as transgender women, a third identifying as transgender men, and a third identifying as transgender nonbinary adults.

**Table 4. Gender identity of adults who identify as transgender, by region and state (aged 18+)**

| | TRANSGENDER WOMEN | | TRANSGENDER MEN | | TRANSGENDER NONBINARY ADULTS | |
|---|---|---|---|---|---|---|
| STATE/REGION | % | # | % | # | % | # |
| United States | 32.7% | 698,500 | 34.2% | 730,500 | 33.1% | 707,100 |
| **West** | **32.7%** | **178,900** | **34.8%** | **190,000** | **32.5%** | **177,400** |
| Alaska | 33.8% | 1,700 | 32.5% | 1,700 | 33.7% | 1,700 |
| Arizona | 38.4% | 21,200 | 32.6% | 18,200 | 29.0% | 16,000 |
| California | 33.3% | 87,700 | 35.8% | 94,500 | 30.9% | 81,500 |
| Colorado | 31.7% | 13,600 | 32.5% | 14,000 | 35.7% | 15,400 |
| Hawaii | 28.8% | 2,300 | 39.2% | 3,100 | 32.0% | 2,600 |
| Idaho | 31.7% | 3,100 | 31.8% | 3,000 | 36.5% | 3,500 |
| Montana | 32.7% | 2,100 | 31.8% | 1,900 | 35.5% | 2,300 |
| Nevada | 34.7% | 6,700 | 35.8% | 6,900 | 29.5% | 5,700 |
| New Mexico | 35.5% | 2,400 | 36.9% | 2,600 | 27.6% | 1,900 |
| Oregon | 32.2% | 10,700 | 34.0% | 11,200 | 33.8% | 11300 |
| Utah | 34.3% | 8,600 | 29.7% | 7,500 | 36.0% | 9,000 |
| Washington | 26.3% | 17,400 | 36.0% | 24,000 | 37.6% | 24,900 |
| Wyoming | 33.1% | 1,400 | 30.7% | 1,400 | 36.2% | 1,600 |
| **Midwest** | **32.4%** | **147,900** | **33.9%** | **154,700** | **33.6%** | **153,200** |
| Illinois | 30.3% | 19,800 | 36.2% | 23,700 | 33.5% | 21,900 |
| Indiana | 32.7% | 12,200 | 32.3% | 12,100 | 35.0% | 13,000 |
| Iowa | 31.6% | 5,100 | 33.6% | 5,600 | 34.9% | 5,700 |
| Kansas | 33.6% | 7,500 | 32.2% | 7,300 | 34.1% | 7,600 |
| Michigan | 29.0% | 22,600 | 36.0% | 28,200 | 35.0% | 27,300 |
| Minnesota | 34.4% | 18,400 | 31.4% | 16,900 | 34.2% | 18,300 |
| Missouri | 36.6% | 13,300 | 30.4% | 11,100 | 33.0% | 12,000 |
| Nebraska | 32.4% | 5,100 | 33.6% | 5,300 | 34.0% | 5,300 |

| | TRANSGENDER WOMEN | | TRANSGENDER MEN | | TRANSGENDER NONBINARY ADULTS | |
|---|---|---|---|---|---|---|
| STATE/REGION | % | # | % | # | % | # |
| North Dakota | 31.1% | 1,000 | 34.2% | 1,200 | 34.8% | 1,100 |
| Ohio | 34.6% | 29,200 | 33.4% | 28,100 | 32.0% | 27,000 |
| South Dakota | 32.7% | 2,300 | 34.1% | 2,400 | 33.2% | 2,400 |
| Wisconsin | 32.0% | 11,400 | 35.4% | 12,800 | 32.6% | 11,600 |
| **South** | **33.4%** | **241,200** | **33.6%** | **242,900** | **33.0%** | **238,700** |
| Alabama | 32.6% | 8,100 | 33.9% | 8,600 | 33.5% | 8,400 |
| Arkansas | 34.0% | 3,500 | 32.7% | 3,500 | 33.4% | 3,500 |
| Delaware | 39.7% | 3,600 | 30.4% | 2,700 | 29.9% | 2,800 |
| District of Columbia | 30.6% | 1,600 | 30.8% | 1,600 | 38.6% | 2,100 |
| Florida | 33.5% | 54,400 | 33.7% | 54,900 | 32.9% | 53,500 |
| Georgia | 34.1% | 16,100 | 34.0% | 16,200 | 31.9% | 15,100 |
| Kentucky | 37.9% | 8,300 | 30.2% | 6,600 | 31.9% | 7,000 |
| Louisiana | 29.2% | 6,300 | 36.3% | 7,900 | 34.6% | 7,400 |
| Maryland | 35.8% | 12,400 | 32.8% | 11,300 | 31.4% | 10,900 |
| Mississippi | 36.1% | 5,800 | 33.3% | 5,400 | 30.6% | 4,900 |
| North Carolina | 33.2% | 12,800 | 33.3% | 12,900 | 33.5% | 12,900 |
| Oklahoma | 42.9% | 7,700 | 27.9% | 5,100 | 29.2% | 5,200 |
| South Carolina | 32.8% | 12,900 | 34.1% | 13,400 | 33.1% | 13,100 |
| Tennessee | 32.8% | 18,400 | 34.1% | 19,100 | 33.1% | 18,600 |
| Texas | 31.5% | 50,800 | 34.5% | 55,700 | 34.0% | 54,800 |
| Virginia | 33.2% | 14,600 | 32.9% | 14,600 | 33.9% | 14,900 |
| West Virginia | 36.0% | 3,900 | 31.2% | 3,400 | 32.8% | 3,600 |
| **Northeast** | **31.7%** | **130,500** | **34.8%** | **142,900** | **33.5%** | **137,800** |
| Connecticut | 33.4% | 8,500 | 35.4% | 9,000 | 31.2% | 8,000 |
| Maine | 33.2% | 3,600 | 34.5% | 3,900 | 32.4% | 3,500 |
| Massachusetts | 28.9% | 18,000 | 35.2% | 22,000 | 36.0% | 22,400 |
| New Hampshire | 33.1% | 3,500 | 34.3% | 3,700 | 32.7% | 3,500 |
| New Jersey | 26.9% | 17,400 | 38.9% | 25,100 | 34.2% | 22,200 |
| New York | 32.9% | 49,000 | 33.4% | 49,700 | 33.7% | 50,100 |
| Pennsylvania | 34.7% | 25,700 | 33.4% | 24,700 | 32.0% | 23,700 |
| Rhode Island | 37.3% | 3,000 | 34.3% | 2,700 | 28.4% | 2,300 |
| Vermont | 29.0% | 1,800 | 36.9% | 2,100 | 34.1% | 2,100 |

Figure 5 shows the percentage of each age group that identifies as transgender, along with the population estimate for each group in the four U.S. regions. Table 5 expands on this to include the percentage and population estimate for each state within those regions. Overall, for youth ages 13 to 17, we find that 3.3% identify as transgender, which is about 724,000 youth. Our estimates of youth ages 13 to 17 who identify as transgender are similar across U.S. regions, ranging from 3.2% in the South to 3.4% in the Midwest. At the state level, our estimates are also similar across states and range from 2.5% of youth ages 13 to 17 identifying as transgender in Delaware to 3.6% in Hawaii.[15] Among all adults, we find that 0.8%, or over 2.1 million, identify as transgender. Our estimates of adults in U.S. regions who identify as transgender range from 0.7% in the South to 0.9% in the Northeast. At the state level, our estimates range from 0.4% of adults identifying as transgender in New Mexico to 1.2% in Minnesota.

**Figure 5. National and regional estimates of individuals who identify as transgender in the US by age (aged 13+)**




[15] Appendix Table A9 describes 95% confidence intervals for our national, regional, and state level estimates for youth and adults by age group. This table can serve as a reference to help determine if estimates across regions and states appear to be statistically significantly different from each other (i.e., the confidence intervals do not overlap).

Table 5. Regional and state-level estimates of those who identify as transgender in the US population by age group (aged 13+)

| | 13-17 | | 18-24 | | 25-34 | | 35-64 | | 65+ | | ALL ADULTS 18+ | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE/REGION | % | # | % | # | % | # | % | # | % | # | % | # |
| United States | 3.28% | 723,700 | 2.72% | 827,200 | 1.37% | 622,600 | 0.42% | 531,500 | 0.26% | 154,800 | 0.81% | 2,136,100 |
| West | 3.32% | 174,700 | 2.90% | 207,900 | 1.46% | 166,900 | 0.45% | 135,700 | 0.27% | 35,800 | 0.88% | 546,300 |
| Alaska | 3.47% | 1,700 | 3.09% | 1,900 | 1.50% | 1,700 | 0.44% | 1,200 | 0.27% | 300 | 0.91% | 5,100 |
| Arizona | 3.15% | 15,700 | 3.13% | 21,900 | 1.59% | 16,400 | 0.49% | 13,100 | 0.28% | 4,000 | 0.95% | 55,400 |
| California | 3.15% | 84,600 | 2.80% | 99,600 | 1.41% | 80,000 | 0.45% | 67,200 | 0.27% | 16,900 | 0.86% | 263,700 |
| Colorado | 3.40% | 13,100 | 3.04% | 16,100 | 1.51% | 14,000 | 0.46% | 10,400 | 0.27% | 2,500 | 0.92% | 43,000 |
| Hawaii | 3.57% | 3,100 | 2.60% | 3,100 | 1.26% | 2,300 | 0.38% | 2,000 | 0.21% | 600 | 0.71% | 8,000 |
| Idaho | 3.48% | 5,300 | 2.16% | 4,200 | 1.03% | 2,600 | 0.31% | 2,200 | 0.19% | 600 | 0.64% | 9,600 |
| Montana | 3.50% | 2,500 | 2.56% | 2,500 | 1.26% | 1,800 | 0.37% | 1,500 | 0.21% | 500 | 0.71% | 6,300 |
| Nevada | 3.18% | 6,800 | 2.68% | 6,800 | 1.34% | 6,100 | 0.41% | 5,100 | 0.24% | 1,300 | 0.77% | 19,300 |
| New Mexico | 3.22% | 4,800 | 1.43% | 2,700 | 0.72% | 2,000 | 0.21% | 1,700 | 0.13% | 500 | 0.41% | 6,900 |
| Oregon | 3.32% | 9,000 | 3.39% | 12,000 | 1.73% | 10,100 | 0.52% | 8,500 | 0.32% | 2,600 | 0.98% | 33,200 |
| Utah | 3.43% | 9,800 | 2.91% | 11,600 | 1.44% | 7,300 | 0.44% | 5,100 | 0.26% | 1,100 | 1.01% | 25,100 |
| Washington | 3.39% | 16,900 | 3.64% | 23,800 | 1.80% | 21,300 | 0.56% | 16,600 | 0.34% | 4,600 | 1.07% | 66,300 |
| Wyoming | 3.22% | 1,400 | 3.31% | 1,700 | 1.69% | 1,300 | 0.50% | 1,100 | 0.28% | 300 | 0.96% | 4,400 |
| Midwest | 3.41% | 155,500 | 2.86% | 181,800 | 1.44% | 129,400 | 0.43% | 111,100 | 0.27% | 33,500 | 0.85% | 455,800 |
| Illinois | 3.18% | 27,500 | 2.26% | 25,800 | 1.12% | 18,700 | 0.34% | 16,300 | 0.21% | 4,600 | 0.66% | 65,400 |
| Indiana | 3.29% | 15,900 | 2.30% | 15,300 | 1.19% | 10,700 | 0.35% | 8,900 | 0.21% | 2,400 | 0.71% | 37,300 |
| Iowa | 3.42% | 7,700 | 2.28% | 7,100 | 1.07% | 4,200 | 0.33% | 3,900 | 0.20% | 1,200 | 0.66% | 16,400 |
| Kansas | 3.44% | 7,300 | 3.22% | 9,400 | 1.69% | 6,500 | 0.47% | 5,000 | 0.28% | 1,500 | 0.99% | 22,400 |
| Michigan | 3.45% | 22,100 | 3.38% | 30,900 | 1.70% | 22,500 | 0.50% | 18,700 | 0.31% | 6,000 | 0.98% | 78,100 |
| Minnesota | 3.43% | 13,400 | 4.20% | 21,000 | 2.00% | 14,900 | 0.63% | 13,800 | 0.38% | 3,900 | 1.21% | 53,600 |
| Missouri | 3.42% | 14,200 | 2.60% | 14,700 | 1.26% | 10,200 | 0.38% | 8,800 | 0.24% | 2,700 | 0.76% | 36,400 |
| Nebraska | 3.26% | 4,800 | 3.36% | 6,500 | 1.70% | 4,400 | 0.53% | 3,700 | 0.31% | 1,100 | 1.04% | 15,700 |
| North Dakota | 2.83% | 1,400 | 1.71% | 1,500 | 0.78% | 900 | 0.25% | 700 | 0.15% | 200 | 0.53% | 3,300 |
| Ohio | 3.32% | 26,100 | 3.10% | 32,300 | 1.58% | 24,700 | 0.47% | 20,600 | 0.30% | 6,700 | 0.92% | 84,300 |
| South Dakota | 3.37% | 2,400 | 3.34% | 2,800 | 1.76% | 2,000 | 0.54% | 1,800 | 0.32% | 500 | 1.02% | 7,100 |

| | 13-17 | | 18-24 | | 25-34 | | 35-64 | | 65+ | | ALL ADULTS 18+ | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE/REGION | % | # | % | # | % | # | % | # | % | # | % | # |
| Wisconsin | 3.30% | 12,700 | 2.62% | 14,500 | 1.32% | 9,700 | 0.39% | 8,900 | 0.24% | 2,700 | 0.77% | 35,800 |
| South | 3.19% | 279,200 | 2.37% | 280,400 | 1.20% | 209,000 | 0.37% | 180,800 | 0.23% | 52,600 | 0.71% | 722,800 |
| Alabama | 3.09% | 10,800 | 2.15% | 10,400 | 1.07% | 6,800 | 0.31% | 6,100 | 0.19% | 1,800 | 0.63% | 25,100 |
| Arkansas | 3.27% | 7,200 | 1.48% | 4,300 | 0.73% | 2,900 | 0.22% | 2,500 | 0.14% | 800 | 0.44% | 10,500 |
| Delaware | 2.40% | 1,600 | 4.02% | 3,600 | 1.97% | 2,400 | 0.60% | 2,300 | 0.38% | 800 | 1.12% | 9,100 |
| District of Columbia | 2.76% | 900 | 2.90% | 2,000 | 1.39% | 2,000 | 0.43% | 1,100 | 0.26% | 200 | 0.97% | 5,300 |
| Florida | 3.16% | 42,800 | 3.17% | 57,500 | 1.65% | 46,500 | 0.50% | 43,400 | 0.31% | 15,400 | 0.89% | 162,800 |
| Georgia | 3.04% | 24,600 | 1.84% | 19,300 | 0.89% | 13,500 | 0.27% | 11,600 | 0.17% | 3,000 | 0.56% | 47,400 |
| Kentucky | 3.54% | 10,600 | 2.11% | 8,700 | 1.06% | 6,300 | 0.32% | 5,400 | 0.19% | 1,500 | 0.62% | 21,900 |
| Louisiana | 2.97% | 9,600 | 2.07% | 8,400 | 1.04% | 6,200 | 0.32% | 5,400 | 0.20% | 1,600 | 0.61% | 21,600 |
| Maryland | 3.12% | 12,900 | 2.50% | 13,000 | 1.26% | 10,000 | 0.38% | 9,200 | 0.23% | 2,400 | 0.72% | 34,600 |
| Mississippi | 2.94% | 6,400 | 2.42% | 6,900 | 1.19% | 4,200 | 0.35% | 3,900 | 0.22% | 1,100 | 0.71% | 16,100 |
| North Carolina | 3.03% | 21,800 | 1.52% | 15,500 | 0.77% | 11,100 | 0.23% | 9,300 | 0.14% | 2,700 | 0.45% | 38,600 |
| Oklahoma | 3.36% | 9,900 | 1.92% | 7,700 | 0.95% | 5,100 | 0.28% | 4,100 | 0.16% | 1,100 | 0.58% | 18,000 |
| South Carolina | 3.17% | 11,300 | 3.12% | 15,100 | 1.64% | 11,100 | 0.49% | 9,900 | 0.31% | 3,300 | 0.93% | 39,400 |
| Tennessee | 3.26% | 15,600 | 3.26% | 20,500 | 1.73% | 16,900 | 0.54% | 14,600 | 0.33% | 4,100 | 1.01% | 56,100 |
| Texas | 3.07% | 71,200 | 2.23% | 65,500 | 1.11% | 48,500 | 0.34% | 38,500 | 0.21% | 8,800 | 0.70% | 161,300 |
| Virginia | 3.14% | 18,200 | 2.18% | 17,600 | 1.09% | 12,700 | 0.32% | 10,800 | 0.20% | 3,000 | 0.64% | 44,100 |
| West Virginia | 3.48% | 3,800 | 2.81% | 4,400 | 1.38% | 2,800 | 0.40% | 2,700 | 0.25% | 1,000 | 0.77% | 10,900 |
| Northeast | 3.30% | 114,300 | 3.08% | 157,100 | 1.55% | 117,300 | 0.47% | 103,900 | 0.30% | 32,900 | 0.90% | 411,200 |
| Connecticut | 3.23% | 7,500 | 3.06% | 10,200 | 1.53% | 6,900 | 0.46% | 6,500 | 0.28% | 1,900 | 0.88% | 25,500 |
| Maine | 3.55% | 2,900 | 3.51% | 4,000 | 1.78% | 3,000 | 0.53% | 2,900 | 0.33% | 1,100 | 0.95% | 11,000 |
| Massachusetts | 3.29% | 13,900 | 3.62% | 24,900 | 1.75% | 16,800 | 0.58% | 15,800 | 0.38% | 4,900 | 1.10% | 62,400 |
| New Hampshire | 3.50% | 2,800 | 3.27% | 4,000 | 1.67% | 2,900 | 0.52% | 2,900 | 0.31% | 900 | 0.94% | 10,700 |
| New Jersey | 3.21% | 19,900 | 3.13% | 24,100 | 1.58% | 18,600 | 0.47% | 17,200 | 0.29% | 4,800 | 0.89% | 64,700 |
| New York | 3.13% | 37,400 | 3.19% | 55,300 | 1.62% | 44,400 | 0.49% | 37,100 | 0.33% | 12,000 | 0.95% | 148,800 |
| Pennsylvania | 3.26% | 26,600 | 2.49% | 29,000 | 1.27% | 20,900 | 0.36% | 18,000 | 0.24% | 6,200 | 0.72% | 74,100 |
| Rhode Island | 3.23% | 2,000 | 2.95% | 3,100 | 1.48% | 2,300 | 0.47% | 2,000 | 0.29% | 600 | 0.90% | 8,000 |
| Vermont | 3.47% | 1,300 | 4.01% | 2,500 | 2.00% | 1,500 | 0.61% | 1,500 | 0.38% | 500 | 1.14% | 6,000 |

Table 6 for adults and Table 7 for youth describe the percentage and the population estimate of each race/ethnicity group that identifies as transgender in the four U.S. regions and each state within those regions. Due to an insufficient sample size, we are unable to report some estimates for youth, which are marked with an asterisk.

**Table 6. Regional and state-level estimates of adults who identify as transgender in the US population by race/ethnicity (aged 18+)**

| | WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, MULTIRACIAL, ANOTHER RACE/ ETHNICITY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE | % | # | % | # | % | # | % | # | % | # | % | # |
| United States | 0.76% | 1,200,100 | 0.62% | 187,400 | 0.76% | 126,000 | 0.92% | 12,000 | 1.02% | 469,100 | 1.31% | 141,500 |
| **West** | **0.78%** | **240,200** | **0.64%** | **17,300** | **0.75%** | **54,500** | **0.99%** | **6,300** | **1.08%** | **187,800** | **1.33%** | **40,200** |
| Alaska | 0.78% | 2,700 | 0.61% | 100 | 0.91% | 400 | 1.18% | 800 | 1.11% | 400 | 1.38% | 700 |
| Arizona | 0.78% | 25,800 | 0.73% | 1,900 | 0.88% | 2,000 | 1.23% | 2,100 | 1.21% | 19,900 | 1.50% | 3,700 |
| California | 0.71% | 78,300 | 0.60% | 9,800 | 0.71% | 36,200 | 0.96% | 800 | 1.07% | 122,100 | 1.28% | 16,500 |
| Colorado | 0.83% | 26,200 | 0.71% | 1,200 | 0.90% | 1,500 | 1.10% | 200 | 1.19% | 11,200 | 1.32% | 2,700 |
| Hawaii | 0.63% | 1,600 | 0.58% | 100 | 0.55% | 2,900 | 1.37% | <100 | 0.95% | 900 | 1.06% | 2,500 |
| Idaho | 0.60% | 7,100 | 0.73% | 100 | 0.63% | 200 | 0.73% | 100 | 0.82% | 1,500 | 0.88% | 600 |
| Montana | 0.68% | 5,200 | 0.86% | <100 | 0.50% | <100 | 0.95% | 400 | 0.96% | 300 | 0.98% | 400 |
| Nevada | 0.64% | 7,700 | 0.57% | 1,200 | 0.68% | 1,800 | 0.94% | 100 | 1.02% | 6,800 | 1.26% | 1,700 |
| New Mexico | 0.32% | 2,100 | 0.31% | 100 | 0.38% | 100 | 0.50% | 700 | 0.47% | 3,600 | 0.54% | 300 |
| Oregon | 0.89% | 22,300 | 0.90% | 600 | 0.92% | 1,600 | 1.10% | 200 | 1.33% | 5,700 | 1.43% | 2,800 |
| Utah | 0.97% | 18,400 | 0.87% | 200 | 0.96% | 900 | 1.20% | 200 | 1.11% | 4,000 | 1.56% | 1,400 |
| Washington | 0.97% | 39,300 | 0.86% | 2,000 | 1.01% | 6,900 | 1.23% | 600 | 1.46% | 10,900 | 1.64% | 6,600 |
| Wyoming | 0.90% | 3,500 | 0.96% | <100 | 1.20% | <100 | 1.22% | 100 | 1.23% | 500 | 1.36% | 300 |
| **Midwest** | **0.82%** | **328,800** | **0.67%** | **34,000** | **0.87%** | **16,700** | **1.05%** | **2,100** | **1.09%** | **46,400** | **1.41%** | **27,800** |
| Illinois | 0.62% | 36,900 | 0.51% | 6,500 | 0.60% | 3,700 | 0.67% | 100 | 0.87% | 14,800 | 1.10% | 3,400 |
| Indiana | 0.67% | 27,700 | 0.56% | 2,500 | 0.79% | 1,100 | 0.77% | <100 | 0.93% | 3,700 | 1.18% | 2,300 |
| Iowa | 0.63% | 13,400 | 0.55% | 400 | 0.68% | 400 | 0.70% | <100 | 0.89% | 1,300 | 1.20% | 900 |
| Kansas | 0.92% | 15,500 | 0.74% | 900 | 1.01% | 700 | 1.02% | 100 | 1.37% | 3,700 | 1.56% | 1,500 |
| Michigan | 0.96% | 56,600 | 0.79% | 7,900 | 1.04% | 2,800 | 1.17% | 300 | 1.37% | 5,600 | 1.60% | 4,900 |
| Minnesota | 1.13% | 39,800 | 1.05% | 2,800 | 1.34% | 2,900 | 1.59% | 500 | 1.72% | 4,100 | 2.01% | 3,500 |
| Missouri | 0.73% | 27,600 | 0.59% | 3,000 | 0.80% | 900 | 0.87% | 100 | 1.06% | 2,300 | 1.26% | 2,500 |

| | WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, MULTIRACIAL, ANOTHER RACE/ ETHNICITY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE | % | # | % | # | % | # | % | # | % | # | % | # |
| Nebraska | 0.97% | 11,400 | 0.85% | 500 | 1.17% | 500 | 1.39% | 100 | 1.41% | 2,300 | 1.71% | 900 |
| North Dakota | 0.50% | 2,600 | 0.45% | 100 | 0.64% | 100 | 0.57% | 100 | 0.90% | 200 | 0.84% | 200 |
| Ohio | 0.89% | 64,100 | 0.73% | 7,600 | 0.98% | 2,300 | 0.78% | 100 | 1.24% | 4,600 | 1.54% | 5,600 |
| South Dakota | 0.95% | 5,600 | 0.88% | 100 | 1.00% | 100 | 1.31% | 500 | 1.55% | 400 | 1.55% | 400 |
| Wisconsin | 0.72% | 27,600 | 0.69% | 1,700 | 0.92% | 1,200 | 0.85% | 200 | 1.09% | 3,400 | 1.18% | 1,700 |
| **South** | **0.67%** | **383,700** | **0.57%** | **102,600** | **0.66%** | **26,500** | **0.74%** | **3,100** | **0.90%** | **161,100** | **1.16%** | **45,800** |
| Alabama | 0.64% | 16,600 | 0.51% | 5,100 | 0.61% | 400 | 0.63% | 100 | 0.91% | 1,600 | 1.03% | 1,300 |
| Arkansas | 0.41% | 6,800 | 0.36% | 1,200 | 0.46% | 200 | 0.51% | 100 | 0.61% | 1,100 | 0.73% | 1,100 |
| Delaware | 1.05% | 5,300 | 0.95% | 1,600 | 1.17% | 400 | 1.06% | <100 | 1.62% | 1,200 | 1.93% | 600 |
| District of Columbia | 1.04% | 2,300 | 0.75% | 1,600 | 1.21% | 300 | 1.15% | <100 | 1.15% | 700 | 1.45% | 400 |
| Florida | 0.81% | 78,200 | 0.80% | 19,800 | 0.86% | 4,800 | 0.94% | 200 | 1.02% | 48,800 | 1.48% | 11,000 |
| Georgia | 0.55% | 24,100 | 0.45% | 11,600 | 0.55% | 2,200 | 0.63% | 100 | 0.75% | 6,100 | 0.96% | 3,300 |
| Kentucky | 0.60% | 17,700 | 0.50% | 1,300 | 0.66% | 300 | 0.62% | <100 | 0.90% | 1,300 | 1.01% | 1,300 |
| Louisiana | 0.62% | 12,700 | 0.52% | 5,400 | 0.64% | 400 | 0.73% | 100 | 0.75% | 1,700 | 0.99% | 1,300 |
| Maryland | 0.71% | 16,600 | 0.56% | 7,900 | 0.70% | 2,300 | 0.96% | 100 | 0.97% | 5,100 | 1.25% | 2,600 |
| Mississippi | 0.73% | 9,500 | 0.60% | 4,700 | 0.79% | 200 | 0.89% | 100 | 1.02% | 700 | 1.22% | 900 |
| North Carolina | 0.44% | 23,300 | 0.36% | 6,100 | 0.45% | 1,300 | 0.55% | 400 | 0.63% | 5,000 | 0.81% | 2,500 |
| Oklahoma | 0.51% | 10,400 | 0.43% | 900 | 0.64% | 500 | 0.68% | 1,300 | 0.79% | 2,600 | 0.90% | 2,300 |
| South Carolina | 0.91% | 24,900 | 0.77% | 7,600 | 0.97% | 800 | 1.27% | 100 | 1.30% | 3,400 | 1.68% | 2,600 |
| Tennessee | 0.99% | 40,500 | 0.80% | 6,600 | 0.99% | 1,100 | 0.96% | 100 | 1.35% | 4,600 | 1.65% | 3,200 |
| Texas | 0.62% | 59,500 | 0.53% | 14,600 | 0.61% | 8,300 | 0.75% | 300 | 0.84% | 71,200 | 1.03% | 7,400 |
| Virginia | 0.62% | 25,700 | 0.51% | 6,300 | 0.60% | 2,900 | 0.61% | 100 | 0.85% | 5,700 | 1.12% | 3,400 |
| West Virginia | 0.76% | 9,600 | 0.57% | 300 | 0.80% | 100 | 0.80% | <100 | 0.98% | 300 | 1.23% | 600 |
| **Northeast** | **0.85%** | **247,400** | **0.71%** | **33,500** | **0.87%** | **28,300** | **0.88%** | **500** | **1.13%** | **73,800** | **1.51%** | **27,700** |
| Connecticut | 0.80% | 15,000 | 0.75% | 2,200 | 0.87% | 1,200 | 0.89% | <100 | 1.15% | 5,400 | 1.45% | 1,700 |
| Maine | 0.92% | 9,700 | 0.95% | 200 | 1.05% | 200 | 1.15% | <100 | 1.31% | 300 | 1.45% | 600 |
| Massachusetts | 1.00% | 39,200 | 0.89% | 3,200 | 1.11% | 4,700 | 1.35% | 100 | 1.42% | 9,400 | 1.92% | 5,800 |
| New Hampshire | 0.90% | 9,000 | 0.96% | 100 | 0.85% | 300 | 0.74% | <100 | 1.28% | 600 | 1.35% | 700 |

| | WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, MULTIRACIAL, ANOTHER RACE/ ETHNICITY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE | % | # | % | # | % | # | % | # | % | # | % | # |
| New Jersey | 0.84% | 32,400 | 0.70% | 6,200 | 0.79% | 5,900 | 0.77% | <100 | 1.08% | 16,300 | 1.51% | 3,900 |
| New York | 0.91% | 78,000 | 0.74% | 15,300 | 0.89% | 12,800 | 1.19% | 400 | 1.14% | 32,700 | 1.50% | 9,600 |
| Pennsylvania | 0.69% | 53,600 | 0.59% | 5,900 | 0.68% | 2,800 | 0.72% | <100 | 0.96% | 7,400 | 1.27% | 4,400 |
| Rhode Island | 0.82% | 5,300 | 0.78% | 300 | 0.87% | 300 | 1.17% | <100 | 1.13% | 1,500 | 1.41% | 600 |
| Vermont | 1.12% | 5,200 | 0.69% | 100 | 1.39% | 100 | 1.54% | <100 | 1.45% | 200 | 1.50% | 400 |

Note: White, Black, Asian American or Pacific Islander (AAPI), American Indian or Alaska Native (AIAN), and Biracial, Multiracial, or Another Race/Ethnicity are all non-Hispanic. Latino/a/x/e or Hispanic (Latinx) includes people of any race.

Figure 6. Regional estimates of adults who identify as transgender in the US by race/ethnicity (aged 18+)



**Table 7. Regional and state-level estimates of youth who identify as transgender in the US population by race/ethnicity (aged 13 to 17)**

| | WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, MULTIRACIAL, ANOTHER RACE/ ETHNICITY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE | % | # | % | # | % | # | % | # | % | # | % | # |
| United States | 3.60% | 376,500 | 2.20% | 62,200 | 3.38% | 37,700 | 4.21% | 5,200 | 2.92% | 171,100 | 4.28% | 71,000 |
| **West** | **3.59%** | **68,000** | **2.18%** | **4,600** | **3.37%** | **14,900** | **4.48%** | **2,800** | **2.97%** | **65,600** | **4.21%** | **18,800** |
| Alaska | 3.44% | 600 | 2.05% | <100 | 3.26% | 100 | 4.30% | 400 | 2.41% | 200 | 4.13% | 400 |
| Arizona | 3.50% | 6,400 | 2.29% | 600 | 3.28% | 500 | 4.26% | 800 | 2.87% | 6,100 | 4.01% | 1,300 |
| California | 3.57% | 21,100 | 2.20% | 2,600 | 3.35% | 10,700 | 3.97% | 200 | 2.97% | 41,500 | 4.31% | 8,500 |
| Colorado | 3.70% | 7,200 | 2.31% | 300 | 3.65% | 400 | 5.03% | 100 | 3.04% | 3,900 | 4.43% | 1,200 |
| Hawaii | 3.36% | 300 | 2.29% | <100 | 3.43% | 1,000 | 4.35% | <100 | 2.95% | 400 | 4.23% | 1,400 |
| Idaho | 3.65% | 3,800 | 2.48% | <100 | 3.76% | 100 | 3.77% | 100 | 3.03% | 900 | 4.24% | 400 |
| Montana | 3.55% | 1,900 | 1.96% | <100 | 4.07% | <100 | 4.21% | 200 | 3.00% | 200 | 4.25% | 200 |
| Nevada | 3.61% | 2,400 | 2.22% | 400 | 3.59% | 500 | 4.13% | 100 | 2.97% | 2,600 | 4.02% | 800 |
| New Mexico | 3.69% | 1,200 | 2.02% | <100 | 3.18% | 100 | 3.99% | 500 | 3.04% | 2,700 | 3.92% | 300 |
| Oregon | 3.46% | 5,300 | 2.48% | 200 | 3.39% | 200 | 4.60% | 100 | 2.96% | 2,000 | 4.36% | 1,200 |
| Utah | 3.60% | 7,200 | 2.58% | 100 | 3.58% | 100 | 4.29% | 100 | 2.94% | 1,600 | 4.27% | 700 |
| Washington | 3.74% | 9,500 | 2.22% | 400 | 3.28% | 1,200 | 3.99% | 200 | 2.88% | 3,300 | 4.00% | 2,300 |
| Wyoming | 3.40% | 1,100 | 3.21% | <100 | * | * | 4.74% | <100 | 2.70% | 200 | 3.08% | 100 |
| **Midwest** | **3.62%** | **105,700** | **2.26%** | **11,400** | **3.36%** | **5,500** | **3.23%** | **700** | **2.88%** | **17,600** | **4.30%** | **14,600** |
| Illinois | 3.60% | 14,800 | 2.27% | 2,600 | 3.23% | 1,400 | 3.45% | <100 | 2.87% | 6,400 | 4.41% | 2,300 |
| Indiana | 3.56% | 11,200 | 2.16% | 1,000 | 3.35% | 400 | 5.22% | <100 | 2.82% | 1,800 | 4.22% | 1,500 |
| Iowa | 3.58% | 5,800 | 2.36% | 200 | 3.03% | 100 | 4.37% | <100 | 3.02% | 900 | 4.41% | 700 |
| Kansas | 3.69% | 5,100 | 1.94% | 200 | 3.36% | 200 | 3.35% | <100 | 2.90% | 1,100 | 4.30% | 700 |
| Michigan | 3.81% | 15,600 | 2.23% | 2,000 | 3.27% | 800 | 4.39% | 100 | 2.94% | 1,600 | 4.30% | 2,000 |
| Minnesota | 3.63% | 9,200 | 2.26% | 700 | 3.66% | 1,000 | 4.53% | 100 | 2.95% | 1,000 | 4.13% | 1,400 |
| Missouri | 3.65% | 10,300 | 2.30% | 1,100 | 3.30% | 300 | 3.87% | <100 | 2.95% | 1,000 | 4.61% | 1,500 |
| Nebraska | 3.49% | 3,400 | 2.10% | 200 | 3.42% | 100 | 3.58% | <100 | 2.73% | 700 | 4.32% | 400 |
| North Dakota | 2.88% | 1,000 | 2.30% | 100 | 2.61% | <100 | 3.45% | 100 | 2.96% | 100 | 3.15% | 100 |
| Ohio | 3.56% | 18,600 | 2.27% | 2,500 | 3.26% | 600 | 3.02% | <100 | 2.77% | 1,500 | 4.53% | 2,900 |

| | WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, MULTIRACIAL, ANOTHER RACE/ ETHNICITY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE** | % | # | % | # | % | # | % | # | % | # | % | # |
| South Dakota | 3.44% | 1,700 | 2.49% | 100 | 4.28% | 100 | 4.23% | 300 | 2.82% | 100 | 3.49% | 100 |
| Wisconsin | 3.51% | 9,000 | 2.24% | 700 | 3.57% | 500 | 4.88% | 100 | 2.93% | 1,400 | 4.17% | 1,000 |
| **South** | **3.62%** | **138,200** | **2.20%** | **37,400** | **3.39%** | **10,000** | **3.86%** | **1,600** | **2.90%** | **66,000** | **4.27%** | **26,000** |
| Alabama | 3.56% | 6,900 | 2.17% | 2,000 | 3.18% | 200 | 4.86% | <100 | 3.00% | 1,000 | 4.12% | 700 |
| Arkansas | 3.68% | 4,500 | 2.13% | 800 | 4.04% | 200 | 3.43% | <100 | 2.86% | 900 | 4.24% | 800 |
| Delaware | 2.72% | 700 | 1.67% | 300 | 2.58% | 100 | * | * | 2.30% | 300 | 3.50% | 200 |
| District of Columbia | 4.02% | 200 | 2.17% | 400 | 4.08% | <100 | * | * | 3.01% | 200 | 4.28% | 100 |
| Florida | 3.68% | 19,300 | 2.30% | 5,400 | 3.42% | 1,200 | 4.54% | <100 | 2.90% | 12,300 | 4.34% | 4,600 |
| Georgia | 3.73% | 12,000 | 2.13% | 5,400 | 3.42% | 1,000 | 3.12% | <100 | 2.90% | 3,800 | 4.31% | 2,400 |
| Kentucky | 3.77% | 8,300 | 2.20% | 500 | 3.23% | 100 | 4.04% | <100 | 2.72% | 700 | 4.65% | 1,000 |
| Louisiana | 3.51% | 5,200 | 2.13% | 2,300 | 3.52% | 100 | 5.44% | 100 | 2.73% | 900 | 4.61% | 1,000 |
| Maryland | 3.62% | 5,500 | 2.20% | 2,500 | 3.52% | 900 | 2.77% | <100 | 3.22% | 2,400 | 4.20% | 1,600 |
| Mississippi | 3.60% | 3,700 | 2.12% | 1,800 | 3.29% | <100 | 4.26% | <100 | 2.74% | 300 | 4.16% | 600 |
| North Carolina | 3.44% | 11,500 | 2.25% | 3,400 | 3.24% | 700 | 3.93% | 200 | 2.73% | 3,700 | 4.02% | 2,300 |
| Oklahoma | 3.40% | 4,900 | 2.19% | 400 | 3.57% | 200 | 4.39% | 1,200 | 3.05% | 1,600 | 4.11% | 1,600 |
| South Carolina | 3.70% | 6,700 | 2.21% | 2,100 | 3.21% | 200 | 3.87% | <100 | 3.05% | 1,300 | 4.19% | 1,000 |
| Tennessee | 3.65% | 10,900 | 2.19% | 1,700 | 3.15% | 200 | 4.70% | <100 | 2.78% | 1,600 | 4.30% | 1,200 |
| Texas | 3.67% | 24,500 | 2.18% | 6,100 | 3.57% | 3,700 | 4.16% | 100 | 2.91% | 32,400 | 4.40% | 4,400 |
| Virginia | 3.49% | 10,000 | 2.24% | 2,300 | 3.44% | 1,200 | 4.43% | <100 | 2.75% | 2,500 | 4.31% | 2,200 |
| West Virginia | 3.60% | 3,400 | 1.56% | <100 | 3.53% | <100 | * | * | 2.88% | 100 | 4.34% | 300 |
| **Northeast** | **3.55%** | **64,600** | **2.20%** | **8,800** | **3.25%** | **7,300** | **3.17%** | **100** | **2.94%** | **21,900** | **4.29%** | **11,600** |
| Connecticut | 3.65% | 4,100 | 2.16% | 500 | 3.45% | 400 | 2.72% | <100 | 2.80% | 1,700 | 4.13% | 800 |
| Maine | 3.63% | 2,400 | 2.13% | 100 | 3.40% | <100 | 3.89% | <100 | 3.04% | 100 | 4.40% | 300 |
| Massachusetts | 3.61% | 8,300 | 2.07% | 700 | 3.21% | 900 | 6.48% | <100 | 2.88% | 2,400 | 4.28% | 1,600 |
| New Hampshire | 3.63% | 2,200 | 2.38% | <100 | 3.78% | 100 | * | * | 2.81% | 200 | 3.92% | 300 |

| | WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, MULTIRACIAL, ANOTHER RACE/ ETHNICITY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE | % | # | % | # | % | # | % | # | % | # | % | # |
| New Jersey | 3.57% | 9,100 | 2.21% | 1,700 | 3.44% | 2,000 | 5.04% | <100 | 3.01% | 5,200 | 4.36% | 1,900 |
| New York | 3.48% | 18,700 | 2.21% | 3,600 | 3.14% | 2,800 | 4.35% | 100 | 2.97% | 8,700 | 4.20% | 3,500 |
| Pennsylvania | 3.54% | 17,500 | 2.18% | 2,100 | 3.42% | 1,100 | 4.83% | <100 | 2.82% | 3,100 | 4.36% | 2,800 |
| Rhode Island | 3.57% | 1,200 | 2.08% | 100 | 3.54% | <100 | 5.15% | <100 | 2.70% | 500 | 4.17% | 200 |
| Vermont | 3.44% | 1,100 | 2.49% | <100 | 3.11% | <100 | 2.27% | <100 | 2.10% | <100 | 4.64% | 200 |

Note: White, Black, Asian American or Pacific Islander (AAPI), American Indian or Alaska Native (AIAN), and Biracial, Multiracial, or Another Race/Ethnicity are all non-Hispanic. Latino/a/x/e or Hispanic (Latinx) includes people of any race. * = Insufficient data to report.

Figure 7. Regional estimates of youth who identify as transgender in the US by race/ethnicity (aged 13 to 17)



# CONCLUSION

Compared to our prior estimates, our current estimates for adults have remained relatively steady regarding the percentage who identify as transgender. While we find no statistically significant differences across years for our adult estimates, there are a couple of notable changes. In prior estimates, we observed the trend where younger adult age groups appear more likely to identify as transgender than older age groups. Still, we did not find statistically significant differences between age groups. (See Appendix Table 12.) Our current estimates show young adults aged 18 to 24 are now significantly more likely to identify as transgender (2.72%) than those aged 35 to 64 (0.42%) and those aged 65 and older (0.26%). Our current estimates provide new findings for adults aged 25 to 34, who are significantly more likely to identify as transgender (1.37%) than those aged 65 and older (0.26%). Those aged 18 to 24 now comprise 28.9% of those who identify as transgender (aged 13 and older), up from 24.4% in our prior estimates. Those aged 18 to 34 comprise just over half (50.7%) of those who identify as transgender (aged 13 and older). Our current estimates confirm age trends found in our prior estimates and in other prior research that younger age groups are more likely to identify as transgender than older age groups. Trends among adults, based on gender and race/ethnicity, are consistent with our prior estimates and other prior research.

Our data sources and methodology for estimates of those aged 13 to 17 have changed over time, due to the availability and structure of data about this population. The 2023 YRBS provides the best data yet for estimating the number of youth who identify as transgender nationally. We estimate that 3.3% of youth aged 13 to 17 (or nearly 724,000) identify as transgender. Youth aged 13 to 17 now comprise 25.3% of the population who identify as transgender (aged 13 and older), up from 18.3% in our prior estimates. Three-quarters (76.0%) of those aged 13 and older who identify as transgender are under the age of 35. Though differences among youth who identify as transgender are not statistically significantly different between race and ethnicity groups (see Appendix Table 5), it is notable that trends regarding race and ethnicity are not reflected in our estimates for White and Latinx youth. Our prior estimates and prior research suggest that people who identify as transgender are less likely to be White and more likely to be Latinx than the general population. Our findings for youth race and ethnicity do not reflect that trend.

It is unclear what data sources will be available to us in the future to update our estimates regarding those who identify as transgender in the U.S.[16] It is also unclear whether individuals' willingness to disclose on surveys that they identify as transgender will remain unchanged in the years to come. However, it is already clear from our estimates and other research about the transgender population in the U.S. that younger generations are more likely to identify as transgender. We expect that trend to continue. This has implications for institutions in our society, including educational institutions, the U.S. Armed Forces, civilian workplaces, health care settings, and other areas, regarding how to meet the needs of and provide opportunities for current youth and future generations.

---

[16] See, for instance, Centers for Disease Control and Prevention/National Center for Chronic Disease Prevention and Health Promotion. (2025, April 7). Non-substantive Change Request: OMB Control Number 0920-0493: 2025 and 2027 National Youth Risk Behavior Survey. https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202504-0920-006.; Centers for Disease Control and Prevention. (2025, April 15). Attachment 3: BRFSS Core Questionnaire Sections by Topic and Year of Administration. https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202411-0920-013. PRA ICR Documents

# METHODS

The BRFSS collects demographic and health information from probability-based samples of individuals representative of each state and territory that participates. In addition to a core questionnaire provided by the Centers for Disease Control and Prevention that coordinates the BRFSS, states can add optional modules that ask unique sets of questions. One module asks about sexual orientation and transgender status (referred to as the "SOGI" module), which allows for the classification of respondents as LGBT or not. The YRBS, in addition to having a nationally representative sample of youth, makes a similar module available to states.

Sexual orientation is measured with one question in the BRFSS module, "Which of the following best represents how you think of yourself?" with response options, "Gay or lesbian; Straight, that is, not gay; Bisexual; Something else; I don't know the answer" or respondents could refuse to answer. To assess transgender and cisgender status, the BRFSS module asks, "Do you consider yourself to be transgender?" with response options, "Yes; No; Don't Know/not sure," or respondents could refuse to answer. If a respondent expresses confusion, then interviewers provide definitions of transgender and/or gender nonconforming. If respondents affirmatively answer the question, they are then asked if they consider themselves to be male-to-female, female-to-male, or gender nonconforming.

In the YRBS module, sexual orientation is assessed with one question, "Which of the following best describes you?" with response options, "Heterosexual (straight); Gay or lesbian; Bisexual, or Not sure." To assess transgender and cisgender status, the YRBS module asks, "Some people describe themselves as transgender when their sex at birth does not match the way they think or feel about their gender. Are you transgender?" with response options, "No; Yes, I am transgender; Not sure if I am transgender, Don't know what the question is asking."

We pool the 2021-2023 BRFSS surveys; 41 states used the SOGI module one or more times in this timeframe ($n$ = 802,721). We use both the national 2023 YRBS ($n$ = 20,103) and pool the 2021 and 2023 state YRBS, where we obtained data from 6 states that used the module at least once during this time period ($n$ = 118,207).[17] We analyze adults and youth separately, considering that the data come from different sources. All respondents who were asked about their sexual orientation were coded as 1 if they identify as LGB and zero if they did not, which includes not sure, don't know, and missing responses. All respondents who were asked whether they identify as transgender are coded as 1 if they did or zero if they did not, which includes don't know responses, not sure responses, and refusals to answer. A respondent who was LGB and/or transgender was classified as LGBT (1), all others were classified as not LGBT (0).

[17] The CDC did not include the gender identify variable in its publicly available national combined dataset for YRBS 2021. We obtained these data for YRBS 2021-2023 through records requests with state health agencies and were able to acquire data from 6 states (Colorado, Delaware, Florida, Maine, Maryland, and North Dakota). New Mexico was also collected; however, the SOGI questions were only asked of individuals 18 years or older, which we exclude from this analysis. Data for Delaware come from the Delaware Department of Health and Social Services, Division of Public Health. The Florida Youth Survey data used in this report were collected by the Florida Department of Health (DOH). The findings, conclusions, and views expressed herein are solely those of the authors and do not necessarily reflect those of the Florida DOH. Data for Maryland come from the Maryland Department of Health, Maryland Youth Risk Behavior Survey/Youth Tobacco Survey (YRBS/YTS); analyses conducted by the authors.

We directly analyze and present the results from any state that implemented the sexual orientation and gender identity module for adults. For example, the prevalence estimates for the 41 states in the BRFSS are the same as the weighted results one would obtain from direct analyses of available 2021-2023 BRFSS data for that state.[18] The pooled estimates do not account for various years, meaning that we average across the years as opposed to treating each year as fixed. For youth, we relied on the national YRBS for national population estimates, which established population totals for our state estimates.

For adults, the strategy we employ for states where LGBT identification is not observed, because the SOGI module was not used, combines small area estimation strategies common in demographic research with poststratification techniques common in survey research.[19] For youth, we use the same strategy by using the pooled state YRBS data. This strategy is called multilevel regression and poststratification (MRP). We fit multilevel models relying on demographics and state of residence. The general model can be summarized in two stages. The first stage performs a multilevel regression to data. The following is the specification for the BRFSS:

$$y_i = g\Big(b_0 + b_1 \cdot \text{cell_int} + b_2 \cdot \text{sex} + \alpha^j_{\text{race}_i} + \alpha^k_{\text{age}_i} + \alpha^l_{\text{educ}_i} + \alpha^s_{\text{state}_i}\Big)$$

where $g(.)$ is a link function, and $\alpha$'s represent random coefficients for demographic and geographic predictors. All demographic random effects are distributed normally, $\alpha \sim N(0, \sigma^2)$. In the model for transgender identification, sex is not used. Education is not used in the youth analyses.

In building our estimation models, we include covariates that are correlated with the percentage of LGBT people within a state and where there are population estimates from the United States Census Bureau. Individual-level and contextual covariates are related to identification, disclosure, and may be associated with migration to a state. Evaluations of models employing this estimation strategy for statewide estimates show that even using a single demographic predictor, such as race, in addition to geographic predictors, produce estimates that outperform disaggregated analysis.[20] Studies document that LGBT populations tend to be younger,[21] more racially and ethnically diverse,[22] and have levels of educational attainment that differ from non-LGBT populations.[23] Further, varying social contexts may create environments that are either more welcoming to LGBT people, encouraging greater identity uptake or migration.[24] Thus, the models rely on basic demographics and state-level contextual characteristics that may covary with LGBT identification.

---

[18] This is true for all overall population estimates. However, for age and race/ethnicity we rely on the model described in this note and then generalize those model results to the estimated population total of people who identify as transgender. We do this because of small cell sizes and unstable direct estimates.

[19] Park, D.K., Gelman, A., & Bafumi, J. (2004). Bayesian multilevel estimation with poststratification: State-level estimates from national polls. *Political Analysis, 12*(4), 375-385. https://doi.org/10.1093/pan/mph024

[20] Lax, J.R., and Phillips, J.H. (2009). How should we estimate public opinion in the states? *American Journal of Political Science, 53*(1), 107-121. https://doi.org/10.1111/j.1540-5907.2008.00360.x

[21] Flores, A. R., Langton, L., Meyer, I. H., and Romero, A. P. (2020). Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey, 2017. *Science Advances, 6*: eaba6910.

[22] Flores et al. (2020).

[23] Flores et al. (2020); Badgett, M.V.L., Choi, S.K., & Wilson, B.D.M., (2019, October). *LGBT poverty in the United States: A study of differences between sexual orientation and gender identity groups*. Los Angeles, CA: The Williams Institute. https://williamsinstitute.law.ucla.edu/wp-content/uploads/National-LGBT-Poverty-Oct-2019.pdf

[24] Esposito, E., Calanchini, J. (2022). Examining selective migration as attitudinal fit versus gay migration. *Journal of Experimental Social Psychology, 101*, 104307. https://doi.org/10.1016/j.jesp.2022.104307

We use seven racial-ethnic categories. We also use ten age categories ranging from 18 to over 65 years old in the BRFSS. The YRBS considers two age groups: 13-14 years old and 15-17 years old. Educational attainment is comprised of four categories (i.e., less than a high school diploma or equivalent, a high school diploma or equivalent, some college education, and those with a college degree or more education) in the BRFSS; whereas, education is not considered in the YRBS. At times, the BRFSS module may or may not be used in a cell phone interview, depending on a person's residency,[25] so it is used as a covariate to account for a systematic missing data pattern. This is not done for the YRBS. The geographic-level coefficients are given group-level covariates:

$$\alpha_s \sim N\left(\alpha^r_{\text{region}_s} + G^s U, \sigma^2_{\text{state}}\right)$$

where $G^s$ is a matrix of $(s \times j)$matrix of $j$ group-level variables, and $U$ is a vector of length $j$ regression coefficients. We include statewide contextual variables such as racial-ethnic composition of the state, the percentage of same-sex couple households in the state, statewide measures of public opinion on LGBT rights, and median income in a state. These variables supply contextual information about how states differ from one another, which helps in gathering estimates for locations that did not measure LGBT identification. In total, the percentage of same-sex couple households in the state was among the strongest predictors in the current model. We further add a third level to the model for regional groupings of the states.

The YRBS was analyzed with the same approach, except there were only two age groups (13-14 and 15-17), and we do not use educational attainment. We do not account for cell phone interviews as they are not applicable to the YRBS data. All models are fit in R, relying on maximum likelihood estimation.[26]

To arrive at the transgender population estimates, we fit the above model twice. We first estimate whether someone identified as LGBT. We then estimate whether someone identified as transgender given that they identified as LGBT. We use this two-step process because we want to harmonize these estimates for consistency. This way, our estimates for cisgender-LGB, transgender, and LGBT people will sum up to our total population estimates.

The second step of MRP is to use the fitted regression and generalize it over known population distributions. For example, if $g(\cdot)$ were a logistic regression, then the probabilities an individual identifies with a group can be predicted for each demographic and geographic characteristic $(\theta_c)$, where max$(c) = j{*}k{*}l{*}s$. Every fitted value can then be weighted by the size of the population, $N_c$, and these weighted values summed by state for population size and further divided by the state's population for a population proportion:

$$\text{Population size}_s = \sum\nolimits_{c \in s} \theta_c * N_c ; \text{Population Proportion}_s = \frac{\sum_{c \in s} \theta_c * N_c}{\sum_{c \in s} N_c}.$$

[25] Jesdale, B.M. (2021). Sources of missing sexual orientation and gender identity data in the Behavioral Risk Factor Surveillance System. *American Journal of Preventative Medicine, 61*(2), 281-290. 10.1016/j.amepre.2021.02.027

[26] Bates, D., Máchler, M., Bolker, B., and Walker, S. (2015). Fitting linear mixed-effects models using lme4. *Journal of Statistical Software, 67*, 1-48. 10.18637/jss.v067.i01

We use the 2023 estimates from the American Community Survey for our poststratification dataset, which we retrieved through IPUMS. For the states where data are observed, we multiply the 2023 estimates to the proportion of people identifying as LGBT, providing us with a population estimate. For the states where data are not observed, model-based estimates of proportion LGBT are used, and we incorporate model uncertainty in predictions when providing confidence intervals of our estimates.[27] We similarly estimate the transgender population using the same process.

Since our estimation strategy produces two sets of estimates for states where data are observed (i.e., direct estimates and model-based estimates), we compared these two sets of estimates. Overall, they tended to strongly correlate with one another (e.g., correlation above 0.80), suggesting that the model-based estimates perform similarly to direct estimation.

Figures 8 and 9 compare model-based estimates to direct estimates at the state level. We see very few differences, which all fall within the margin of error.

**Figure 8. Model-based estimates and direct estimates from BRFSS**




[27] There is no consensus about the best method for uncertainty estimation for multilevel models. We use the predictInterval function from the merTools package in R for uncertainty estimation. Ideally, a fully Bayesian model would be preferred, but we were limited by computing power.

**Figure 9. Model-based estimates and direct estimates from YRBS**




To generate estimates of the proportion of transgender people in the U.S., and for each region, given the use of both direct and model-based estimates, we sum transgender count estimates for each state and then divide by total population estimates for the U.S. and each region. To obtain 95% confidence intervals for the U.S. and each region, we rely on statistical simulations. We log-transform the population estimates and their bounds; we then draw samples for the states within the grouping (e.g., West) from the multivariate normal distribution to propagate uncertainty in our estimates. We then rely on this uncertainty to generate intervals for the regional and national levels.

To create subgroup transgender count estimates, model-based estimates of the proportion of transgender people within each level (e.g., 13-14; 15-17) of each subgroup (e.g., age, race-ethnicity) were generated for each geospatial unit (e.g., state, region, national) and then multiplied by the population estimate of the number of people in that level of each subgroup per geospatial unit. Using model-based estimates, versus a combination of direct and model-based estimates, ensured that subgroup count totals within states and across regions, and the U.S. as a whole, summed to state, regional, and national totals—give or take very small differences due to rounding.

All count estimates were rounded to the nearest 100.

# AUTHORS

**Jody L. Herman, Ph.D.,** is the Reid Rasmussen Senior Scholar of Public Policy at the Williams Institute.

**Andrew R. Flores, Ph.D.,** is a Distinguished Visiting Scholar at the Williams Institute and an Associate Professor of Government at American University.

## ACKNOWLEDGEMENTS

The authors would like to thank Raksha Kopparam, Christy Mallory, and Laurel Sprague for thoughtful reviews and other contributions to this report. We also thank Kris Bicknell and Rachel Dowd for their design and creation of the data interactive that accompanies this report. Finally, the authors thank Gary J. Gates for his foundational research that launched this series of reports.

## SUGGESTED CITATION

Herman, J.L. and Flores, A.R. (2025). *How Many Adults and Youth Identify as Transgender in the United States?* The Williams Institute, UCLA School of Law.

### ABOUT THE WILLIAMS INSTITUTE

The Williams Institute is dedicated to conducting rigorous, independent research on sexual orientation and gender identity law and public policy. A think tank at UCLA Law, the Williams Institute produces high-quality research with real-world relevance and disseminates it to judges, legislators, policymakers, media, and the public. These studies can be accessed at the Williams Institute website.

#### FOR MORE INFORMATION

The Williams Institute, UCLA School of Law
(310) 267-4382
williamsinstitute@law.ucla.edu
williamsinstitute.law.ucla.edu

RESEARCH THAT MATTERS

# APPENDIX

**Table A1. 95% confidence intervals for gender identity of adults who identify as transgender in the U.S. (aged 18+)**

| GENDER IDENTITY | PERCENT | NUMBER |
|---|---|---|
| | LB, UB | LB, UB |
| Transgender women | 29.43%, 36.95% | 653,300, 784,000 |
| Transgender men | 30.83%, 38.95% | 675,200, 823,500 |
| Transgender nonbinary adults | 28.37%, 43.85% | 644,100, 935,600 |

**Table A2. 95% confidence intervals for percent and number in each age group that identifies as transgender in the U.S. (aged 13+)**

| AGE GROUP | PERCENT | NUMBER |
|---|---|---|
| | LB, UB | LB, UB |
| 13 to 17 | 2.88%, 3.74% | 634,500, 824,400 |
| 18 to 24 | 1.44%, 4.05% | 438,300, 1,233,700 |
| 25 to 34 | 0.76%, 2.62% | 682,300, 2,340,100 |
| 35 to 64 | 0.24%, 0.86% | 307,800, 1,088,000 |
| 65 and older | 0.15%, 0.58% | 89,100, 343,600 |
| 13 and older | 0.73%, 1.24% | 2,078,900, 3,530,200 |

**Table A3. 95% confidence intervals for age distribution among those who identify as transgender (aged 13+)**

| AGE GROUP | PERCENT OF TRANSGENDER IDENTIFIED INDIVIDUALS (AGED 13+) |
|---|---|
| | LB, UB |
| 13 to 17 | 11.54%, 35.71% |
| 18 to 24 | 12.75%, 47.72% |
| 25 to 34 | 9.58%, 38.73% |
| 35 to 64 | 8.65%, 37.09% |
| 65 and older | 2.49%, 10.59% |

**Table A4. 95% confidence intervals for percent and number of each racial/ethnic group that identifies as transgender in the U.S., among adults (aged 18+)**

| RACIAL/ETHNIC GROUP | PERCENT | NUMBER |
|---|---|---|
| | LB, UB | LB, UB |
| White | 0.45%, 1.34% | 709,500, 2,102,600 |
| Black | 0.34%, 1.23% | 102,400, 372,700 |
| AAPI | 0.37%, 1.68% | 60,400, 276,800 |
| AIAN | 0.46%, 1.80% | 6,000, 23,600 |
| Latinx | 0.44%, 2.29% | 204,200, 1,055,800 |
| Biracial, multiracial, or another race/ethnicity | 0.72%, 2.22% | 77,700, 239,100 |

**Table A5. 95% confidence intervals for percent and number of each racial/ethnic group that identifies as transgender in the U.S., among youth (aged 13 to 17)**

| RACIAL/ETHNIC GROUP | PERCENT | NUMBER |
|---|---|---|
| | LB, UB | LB, UB |
| White | 1.87%, 4.84% | 195,400, 506,400 |
| Black | 1.11%, 3.28% | 31,200, 92,400 |
| AAPI | 1.54%, 5.82% | 17,300, 65,500 |
| AIAN | 1.89%, 6.48% | 2,400, 8,300 |
| Latinx | 1.27%, 5.36% | 74,500, 313,100 |
| Biracial, multiracial, or another race/ethnicity | 2.26%, 5.77% | 37,700, 96,200 |

**Table A6. 95% confidence intervals for race/ethnicity of adults who identify as transgender (aged 18+)**

| RACIAL/ETHNIC GROUP | PERCENT OF TRANSGENDER IDENTIFIED INDIVIDUALS (AGED 18+) |
|---|---|
| | LB, UB |
| White | 27.61%, 98.64% |
| Black | 4.02%, 16.52% |
| AAPI | 2.30%, 13.62% |
| AIAN | 0.23%, 1.05% |
| Latinx | 7.66%, 51.34% |
| Biracial, multiracial, or another race/ethnicity | 3.07%, 11.74% |

**Table A7. 95% confidence intervals for race/ethnicity of youth who identify as transgender (aged 13 to 17)**

| RACIAL/ETHNIC GROUP | PERCENT OF TRANSGENDER IDENTIFIED INDIVIDUALS (AGED 13-17) |
|---|---|
| | LB, UB |
| White | 23.15%, 66.10% |
| Black | 3.56%, 13.43% |
| AAPI | 1.87%, 8.35% |
| AIAN | 0.25%, 1.24% |
| Latinx | 8.27%, 45.40% |
| Biracial, multiracial, or another race/ethnicity | 4.45%, 13.75% |

Note: In Tables A4, A5, A6, and A7, White, Black, Asian American or Pacific Islander (AAPI), American Indian or Alaska Native (AIAN), and Biracial, Multiracial, or Another Race/Ethnicity are all non-Hispanic. Latino/a/x/e or Hispanic (Latinx) includes people of any race.

**Table A8. 95% confidence intervals for gender identity distribution of adults who identify as transgender, by region and state (aged 18+)**

| STATE/REGION | TRANSGENDER WOMEN | | TRANSGENDER MEN | | TRANSGENDER NONBINARY ADULTS | |
|---|---|---|---|---|---|---|
| | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER |
| | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| United States | 29.43%, 36.95% | 653,300, 784,000 | 30.83%, 38.95% | 675,200, 823,500 | 28.37%, 43.85% | 644,100, 935,600 |
| **West** | **24.28%, 42.60%** | **146,400, 233,700** | **25.48%, 44.24%** | **153,700, 246,800** | **21.20%, 54.85%** | **124,400, 303,400** |
| Alaska | 17.94%, 44.37% | 900, 2,300 | 17.21%, 43.76% | 900, 2,200 | 11.87%, 64.85% | 600, 3,300 |
| Arizona | 21.99%, 48.28% | 12,200, 26,700 | 18.50%, 41.88% | 10,200, 23,200 | 9.84%, 59.52% | 5,400, 32,900 |
| California | 18.32%, 43.70% | 48,300, 115,200 | 19.61%, 45.69% | 51,700, 120,500 | 10.62%, 62.08% | 28,000, 163,700 |
| Colorado | 16.33%, 42.11% | 7,000, 18,100 | 16.67%, 44.90% | 7,200, 19,300 | 12.99%, 67.00% | 5,600, 28,800 |
| Hawaii | 15.40%, 37.68% | 1,200, 3,000 | 21.21%, 51.21% | 1,700, 4,100 | 11.11%, 63.39% | 900, 5,100 |
| Idaho | 16.05%, 42.45% | 1,500, 4,100 | 16.30%, 44.24% | 1,600, 4,300 | 13.32%, 67.65% | 1,300, 6,500 |
| Montana | 16.73%, 43.72% | 1,100, 2,800 | 16.33%, 43.57% | 1,000, 2,800 | 12.71%, 66.94% | 800, 4,300 |
| Nevada | 19.28%, 44.51% | 3,700, 8,600 | 19.93%, 45.52% | 3,900, 8,800 | 9.96%, 60.79% | 1,900, 11,800 |
| New Mexico | 19.96%, 45.43% | 1,400, 3,100 | 21.22%, 45.47% | 1,500, 3,100 | 9.11%, 58.82% | 600, 4,100 |
| Oregon | 17.07%, 43.45% | 5,700, 14,500 | 17.88%, 44.63% | 6,000, 14,900 | 11.93%, 65.05% | 4,000, 21,700 |
| Utah | 17.48%, 45.74% | 4,400, 11,500 | 15.32%, 41.07% | 3,800, 10,300 | 13.19%, 67.20% | 3,300, 16,900 |
| Washington | 13.27%, 36.43% | 8,800, 24,100 | 18.01%, 49.57% | 11,900, 32,800 | 14.01%, 68.72% | 9,300, 45,500 |
| Wyoming | 16.51%, 45.25% | 700, 2,000 | 15.49%, 41.59% | 700, 1,800 | 13.16%, 68.00% | 600, 3,000 |
| **Midwest** | **26.74%, 38.86%** | **129,300, 178,300** | **28.18%, 40.56%** | **133,900, 187,100** | **25.26%, 49.01%** | **126,500, 222,200** |
| Illinois | 15.78%, 40.03% | 10,300, 26,200 | 19.29%, 47.98% | 12,600, 31,400 | 11.99%, 64.94% | 7,800, 42,500 |
| Indiana | 17.05%, 43.66% | 6,400, 16,300 | 17.21%, 43.76% | 6,400, 16,300 | 12.58%, 65.74% | 4,700, 24,500 |
| Iowa | 16.33%, 41.56% | 2,700, 6,800 | 17.87%, 45.82% | 2,900, 7,500 | 12.62%, 65.80% | 2,100, 10,800 |
| Kansas | 17.80%, 45.04% | 4,000, 10,100 | 16.99%, 42.58% | 3,800, 9,500 | 12.38%, 65.21% | 2,800, 14,600 |
| Michigan | 15.19%, 38.69% | 11,900, 30,200 | 18.77%, 48.48% | 14,700, 37,900 | 12.83%, 66.04% | 10,000, 51,600 |
| Minnesota | 18.28%, 45.57% | 9,800, 24,400 | 16.91%, 42.00% | 9,100, 22,500 | 12.43%, 64.81% | 6,700, 34,800 |
| Missouri | 19.54%, 48.06% | 7,100, 17,500 | 16.43%, 40.35% | 6,000, 14,700 | 11.59%, 64.02% | 4,200, 23,400 |
| Nebraska | 17.30%, 43.29% | 2,700, 6,800 | 17.58%, 44.45% | 2,800, 7,000 | 12.26%, 65.12% | 1,900, 10,200 |
| North Dakota | 16.27%, 42.74% | 500, 1,400 | 17.50%, 44.72% | 600, 1,400 | 12.55%, 66.22% | 400, 2,100 |
| Ohio | 18.47%, 45.08% | 15,600, 38,000 | 18.13%, 43.59% | 15,300, 36,800 | 11.33%, 63.41% | 9,600, 53,500 |
| South Dakota | 17.43%, 43.16% | 1,200, 3,100 | 18.04%, 45.15% | 1,300, 3,200 | 11.69%, 64.52% | 800, 4,600 |
| Wisconsin | 17.00%, 41.83% | 6,100, 15,000 | 19.06%, 46.67% | 6,800, 16,700 | 11.50%, 63.94% | 4,100, 22,900 |

| STATE/REGION | TRANSGENDER WOMEN | | TRANSGENDER MEN | | TRANSGENDER NONBINARY ADULTS | |
|---|---|---|---|---|---|---|
| | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER |
| | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| **South** | **27.95%, 40.70%** | **210,100, 291,400** | **27.22%, 40.47%** | **211,000, 290,300** | **24.82%, 49.18%** | **187,100, 362,600** |
| Alabama | 17.09%, 43.55% | 4,300, 10,900 | 17.86%, 44.63% | 4,500, 11,200 | 11.82%, 65.05% | 3,000, 16,300 |
| Arkansas | 18.18%, 45.43% | 1,900, 4,700 | 17.19%, 42.71% | 1,800, 4,400 | 11.86%, 64.64% | 1,200, 6,700 |
| Delaware | 22.05%, 51.40% | 2,000, 4,700 | 16.71%, 38.51% | 1,500, 3,500 | 10.09%, 61.24% | 900, 5,600 |
| District of Columbia | 15.32%, 42.56% | 800, 2,300 | 15.16%, 43.10% | 800, 2,300 | 14.33%, 69.52% | 800, 3,700 |
| Florida | 17.75%, 44.56% | 28,900, 72,500 | 18.23%, 43.88% | 29,700, 71,400 | 11.56%, 64.02% | 18,800, 104,200 |
| Georgia | 18.68%, 45.12% | 8,800, 21,400 | 18.43%, 43.87% | 8,700, 20,800 | 11.01%, 62.88% | 5,200, 29,800 |
| Kentucky | 20.45%, 49.61% | 4,500, 10,900 | 16.43%, 39.24% | 3,600, 8,600 | 11.16%, 63.12% | 2,400, 13,800 |
| Louisiana | 15.17%, 38.53% | 3,300, 8,300 | 18.88%, 48.95% | 4,100, 10,600 | 12.52%, 65.95% | 2,700, 14,200 |
| Maryland | 19.59%, 46.14% | 6,800, 16,000 | 17.94%, 42.91% | 6,200, 14,900 | 10.95%, 62.47% | 3,800, 21,700 |
| Mississippi | 19.78%, 47.29% | 3,200, 7,600 | 18.13%, 42.26% | 2,900, 6,800 | 10.45%, 62.08% | 1,700, 10,000 |
| North Carolina | 17.66%, 43.43% | 6,800, 16,800 | 17.50%, 44.68% | 6,800, 17,300 | 11.89%, 64.85% | 4,600, 25,100 |
| Oklahoma | 23.84%, 54.13% | 4,300, 9,700 | 15.70%, 35.96% | 2,800, 6,500 | 9.91%, 60.46% | 1,800, 10,900 |
| South Carolina | 17.80%, 43.36% | 7,000, 17,100 | 18.12%, 44.84% | 7,100, 17,700 | 11.80%, 64.08% | 4,700, 25,300 |
| Tennessee | 17.43%, 43.08% | 9,800, 24,200 | 18.37%, 44.99% | 10,300, 25,300 | 11.93%, 64.20% | 6,700, 36,100 |
| Texas | 16.61%, 42.16% | 26,800, 68,000 | 18.07%, 45.68% | 29,200, 73,700 | 12.16%, 65.32% | 19,600, 105,400 |
| Virginia | 17.41%, 44.02% | 7,700, 19,400 | 17.24%, 43.97% | 7,600, 19,300 | 12.01%, 65.35% | 5,300, 28,800 |
| West Virginia | 18.69%, 48.02% | 2,000, 5,300 | 16.70%, 40.38% | 1,800, 4,400 | 11.60%, 64.62% | 1,300, 7,100 |
| **Northeast** | **24.08%, 40.33%** | **109,000, 166,300** | **25.93%, 43.74%** | **120,200, 182,700** | **20.85%, 54.74%** | **101,300, 221,700** |
| Connecticut | 18.08%, 42.81% | 4,600, 11,000 | 19.60%, 46.26% | 5,000, 11,800 | 10.93%, 62.32% | 2,800, 15,900 |
| Maine | 18.17%, 42.94% | 2,000, 4,700 | 18.19%, 45.60% | 2,000, 5,000 | 11.46%, 63.64% | 1,300, 6,900 |
| Massachusetts | 14.72%, 39.05% | 9,200, 24,400 | 18.02%, 47.83% | 11,200, 29,900 | 13.12%, 67.26% | 8,200, 42,000 |
| New Hampshire | 17.72%, 43.42% | 1,900, 4,700 | 18.40%, 45.16% | 2,000, 4,900 | 11.42%, 63.87% | 1,200, 6,900 |
| New Jersey | 14.11%, 35.78% | 9,100, 23,200 | 20.43%, 51.90% | 13,200, 33,600 | 12.33%, 65.47% | 8,000, 42,400 |
| New York | 17.69%, 43.02% | 26,300, 64,100 | 17.75%, 44.75% | 26,400, 66,600 | 12.22%, 64.56% | 18,200, 96,100 |
| Pennsylvania | 18.55%, 44.86% | 13,700, 33,200 | 18.37%, 43.90% | 13,600, 32,500 | 11.24%, 63.08% | 8,300, 46,700 |
| Rhode Island | 21.12%, 46.98% | 1,700, 3,800 | 19.72%, 43.47% | 1,600, 3,500 | 9.54%, 59.16% | 800, 4,700 |
| Vermont | 15.33%, 38.79% | 900, 2,400 | 19.23%, 49.35% | 1,200, 3,000 | 11.86%, 65.45% | 700, 4,000 |

Case 1:26-cv-00261-AKB Document 3-3 Filed 04/29/26 Page 199 of 368

fidence intervals for regional and state-level estimates of those who identify as transgender in the US population by age group (aged 13+)

| 13-17 | | 18-24 | | 25-34 | | 35-64 | | 65+ | | ALL A |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| 2.88%, 3.74% | 634,500, 824,400 | 1.44%, 4.05% | 438,300, 1,233,700 | 0.76%, 2.62% | 682,300, 2,340,100 | 0.24%, 0.86% | 307,800, 1,088,000 | 0.15%, 0.58% | 89,100, 343,600 | 0.73%, 1.64% |
| **0.99%, 8.11%** | **52,000, 427,200** | **1.75%, 13.18%** | **125,200, 944,100** | **0.88%, 9.09%** | **99,800, 1,035,900** | **0.13%, 1.60%** | **39,200, 477,200** | **0.15%, 1.85%** | **20,300, 247,400** | **0.75%, 1.34%** |
| 0.38%, 19.69% | 200, 9,300 | 0.29%, 19.41% | 200, 11,800 | 0.13%, 11.73% | 200, 13,400 | 0.04%, 5.02% | 100, 7,700 | 0.02%, 2.46% | 0, 2,500 | 0.70%, 1.18% |
| 0.34%, 18.82% | 1,700, 91,800 | 0.30%, 21.07% | 2,100, 147,400 | 0.14%, 12.61% | 1,400, 129,700 | 0.05%, 5.47% | 700, 74,900 | 0.02%, 2.78% | 300, 39,900 | 0.66%, 1.34% |
| 0.33%, 18.10% | 8,700, 475,500 | 0.27%, 17.36% | 9,800, 617,800 | 0.12%, 10.61% | 7,000, 600,700 | 0.05%, 4.97% | 3,600, 391,600 | 0.02%, 2.65% | 1,400, 167,600 | 0.63%, 1.18% |
| 0.38%, 19.26% | 1,400, 72,400 | 0.29%, 18.81% | 1,500, 99,400 | 0.13%, 11.50% | 1,200, 106,600 | 0.05%, 5.21% | 600, 64,200 | 0.02%, 2.72% | 200, 25,700 | 0.69%, 1.22% |
| 0.39%, 20.49% | 300, 17,500 | 0.25%, 15.87% | 300, 18,700 | 0.11%, 9.54% | 200, 17,700 | 0.04%, 4.37% | 100, 12,000 | 0.02%, 2.08% | 100, 6,300 | 0.56%, 0.89% |
| 0.38%, 20.56% | 600, 30,400 | 0.19%, 14.89% | 400, 29,000 | 0.09%, 8.61% | 200, 21,900 | 0.03%, 3.73% | 100, 14,000 | 0.01%, 1.83% | 100, 6,300 | 0.46%, 0.89% |
| 0.39%, 20.05% | 300, 13,800 | 0.22%, 17.74% | 200, 17,500 | 0.10%, 10.28% | 200, 15,100 | 0.04%, 4.39% | 100, 9,500 | 0.02%, 2.19% | 0, 5,100 | 0.54%, 0.94% |
| 0.32%, 18.87% | 700, 39,300 | 0.25%, 16.96% | 600, 43,400 | 0.12%, 10.28% | 500, 46,700 | 0.04%, 4.68% | 300, 30,200 | 0.02%, 2.55% | 100, 14,100 | 0.54%, 1.11% |
| 0.34%, 19.36% | 500, 28,400 | 0.13%, 10.11% | 200, 19,200 | 0.06%, 6.33% | 200, 17,500 | 0.02%, 2.69% | 100, 10,700 | 0.01%, 1.37% | 0, 5,800 | 0.28%, 0.61% |
| 0.38%, 19.72% | 1,000, 52,500 | 0.31%, 19.75% | 1,100, 70,200 | 0.15%, 12.67% | 900, 74,100 | 0.05%, 5.94% | 400, 51,600 | 0.03%, 3.14% | 200, 26,100 | 0.08%, 7.75% |
| 0.37%, 19.93% | 1,000, 55,500 | 0.28%, 18.61% | 1,100, 74,300 | 0.12%, 11.30% | 600, 57,300 | 0.04%, 4.97% | 300, 33,800 | 0.02%, 2.47% | 100, 10,300 | 0.85%, 1.20% |
| 0.38%, 19.39% | 1,800, 94,000 | 0.34%, 21.21% | 2,300, 138,700 | 0.15%, 12.95% | 1,800, 152,700 | 0.05%, 6.01% | 900, 96,900 | 0.03%, 3.34% | 400, 44,700 | 0.95%, 1.21% |
| 0.35%, 18.76% | 100, 8,000 | 0.33%, 21.11% | 200, 10,600 | 0.15%, 13.07% | 100, 9,900 | 0.05%, 5.83% | 100, 6,600 | 0.02%, 2.86% | 0, 3,200 | 0.55%, 1.65% |
| **1.24%, 5.91%** | **56,400, 269,800** | **2.10%, 11.36%** | **133,200, 721,700** | **1.09%, 6.84%** | **98,100, 615,200** | **0.15%, 1.25%** | **37,900, 323,800** | **0.20%, 1.47%** | **25,400, 185,600** | **0.78%, 1.10%** |
| 0.35%, 18.47% | 2,900, 155,500 | 0.21%, 15.43% | 2,400, 176,100 | 0.09%, 8.89% | 1,600, 148,400 | 0.03%, 4.06% | 800, 99,700 | 0.02%, 2.07% | 400, 45,800 | 0.45%, 0.97% |
| 0.35%, 19.46% | 1,700, 91,700 | 0.21%, 14.94% | 1,400, 99,600 | 0.10%, 9.28% | 900, 83,000 | 0.03%, 4.04% | 400, 51,700 | 0.02%, 2.05% | 200, 24,200 | 0.58%, 0.86% |
| 0.38%, 20.08% | 800, 44,100 | 0.20%, 15.70% | 600, 49,000 | 0.09%, 8.98% | 400, 35,100 | 0.03%, 4.01% | 200, 23,800 | 0.02%, 2.06% | 100, 12,300 | 0.53%, 0.82% |
| 0.37%, 19.64% | 800, 40,700 | 0.32%, 21.29% | 900, 62,400 | 0.15%, 13.09% | 600, 50,100 | 0.04%, 5.65% | 200, 31,000 | 0.02%, 2.76% | 100, 14,300 | 0.82%, 1.21% |
| 0.39%, 19.46% | 2,400, 122,000 | 0.31%, 22.19% | 2,800, 203,100 | 0.15%, 13.41% | 1,900, 177,500 | 0.05%, 6.10% | 900, 109,900 | 0.02%, 3.17% | 500, 61,300 | 0.77%, 1.25% |
| 0.36%, 19.89% | 1,400, 76,200 | 0.41%, 23.35% | 2,100, 116,900 | 0.18%, 14.64% | 1,400, 109,000 | 0.06%, 6.71% | 700, 75,100 | 0.03%, 3.48% | 300, 35,600 | 1.04%, 1.40% |
| 0.35%, 19.56% | 1,400, 79,600 | 0.23%, 17.54% | 1,300, 99,500 | 0.11%, 10.35% | 900, 83,700 | 0.04%, 4.51% | 400, 52,300 | 0.02%, 2.46% | 200, 28,100 | 0.59%, 0.96% |

| 13-17 | | 18-24 | | 25-34 | | 35-64 | | 65+ | | ALL A |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| 0.35%, 19.47% | 500, 28,100 | 0.34%, 19.38% | 600, 37,400 | 0.16%, 12.07% | 400, 31,100 | 0.05%, 5.86% | 200, 21,800 | 0.03%, 3.09% | 100, 10,600 | 0.09%, 7.99% |
| 0.31%, 17.43% | 200, 8,500 | 0.16%, 11.64% | 100, 9,900 | 0.07%, 6.75% | 100, 7,700 | 0.02%, 2.89% | 0, 4,300 | 0.01%, 1.48% | 0, 2,000 | 0.35%, 0.81% |
| 0.36%, 19.05% | 2,800, 146,600 | 0.30%, 19.90% | 3,100, 207,100 | 0.13%, 12.53% | 2,100, 196,000 | 0.05%, 5.68% | 1,100, 122,300 | 0.02%, 2.83% | 500, 62,700 | 0.75%, 1.11% |
| 0.36%, 19.68% | 200, 13,600 | 0.31%, 19.29% | 300, 16,000 | 0.15%, 13.03% | 200, 15,000 | 0.05%, 6.21% | 100, 10,700 | 0.02%, 3.11% | 0, 5,300 | 0.09%, 7.94% |
| 0.38%, 19.85% | 1,400, 74,300 | 0.24%, 16.46% | 1,300, 91,000 | 0.11%, 10.11% | 800, 74,200 | 0.04%, 4.65% | 400, 51,000 | 0.02%, 2.33% | 200, 26,300 | 0.61%, 0.96% |
| **1.19%, 5.41%** | **103,800, 473,100** | **1.84%, 9.87%** | **218,300, 1,169,500** | **0.92%, 5.41%** | **159,900, 939,500** | **0.14%, 1.05%** | **70,100, 518,800** | **0.20%, 1.44%** | **43,600, 325,100** | **0.56%, 2.32%** |
| 0.33%, 18.22% | 1,100, 62,100 | 0.19%, 14.72% | 900, 71,100 | 0.09%, 9.17% | 600, 58,800 | 0.03%, 3.85% | 300, 36,600 | 0.02%, 1.91% | 100, 17,800 | 0.38%, 1.04% |
| 0.34%, 18.77% | 700, 40,200 | 0.14%, 10.22% | 400, 29,500 | 0.06%, 6.14% | 200, 24,200 | 0.02%, 2.65% | 100, 15,300 | 0.01%, 1.37% | 100, 7,500 | 0.23%, 0.85% |
| 0.25%, 15.59% | 200, 10,300 | 0.38%, 25.68% | 300, 23,000 | 0.17%, 15.60% | 200, 19,100 | 0.06%, 7.32% | 100, 13,500 | 0.03%, 3.78% | 100, 8,400 | 0.76%, 1.66% |
| 0.28%, 17.16% | 100, 5,200 | 0.27%, 17.49% | 200, 12,300 | 0.12%, 10.40% | 200, 15,000 | 0.04%, 5.05% | 100, 7,700 | 0.02%, 2.66% | 0, 2,400 | 0.08%, 7.69% |
| 0.34%, 18.66% | 4,400, 247,000 | 0.32%, 19.34% | 5,700, 350,100 | 0.14%, 12.28% | 3,900, 345,400 | 0.05%, 5.75% | 2,200, 243,900 | 0.02%, 2.98% | 1,200, 146,500 | 0.08%, 7.12% |
| 0.32%, 18.36% | 2,500, 145,200 | 0.17%, 13.13% | 1,800, 137,500 | 0.08%, 7.50% | 1,200, 113,700 | 0.03%, 3.28% | 600, 71,400 | 0.01%, 1.84% | 200, 31,200 | 0.42%, 0.74% |
| 0.39%, 19.77% | 1,100, 57,900 | 0.20%, 14.49% | 800, 59,400 | 0.09%, 8.90% | 500, 53,000 | 0.03%, 3.88% | 300, 32,600 | 0.02%, 1.92% | 100, 15,400 | 0.36%, 1.09% |
| 0.32%, 17.69% | 1,000, 55,700 | 0.19%, 14.21% | 800, 57,900 | 0.09%, 8.75% | 500, 51,800 | 0.03%, 3.83% | 300, 33,700 | 0.02%, 1.95% | 100, 15,500 | 0.42%, 0.89% |
| 0.34%, 18.32% | 1,400, 74,300 | 0.23%, 16.56% | 1,200, 86,500 | 0.11%, 10.26% | 800, 81,500 | 0.04%, 4.37% | 500, 53,700 | 0.02%, 2.31% | 200, 24,700 | 0.55%, 0.93% |
| 0.32%, 17.49% | 700, 37,200 | 0.21%, 18.89% | 600, 53,500 | 0.10%, 10.96% | 300, 38,500 | 0.03%, 4.47% | 200, 25,500 | 0.02%, 2.24% | 100, 11,600 | 0.38%, 1.33% |
| 0.33%, 18.17% | 2,300, 128,100 | 0.14%, 10.66% | 1,400, 109,300 | 0.07%, 6.42% | 900, 92,600 | 0.02%, 2.80% | 500, 57,800 | 0.01%, 1.43% | 200, 27,400 | 0.33%, 0.62% |
| 0.37%, 19.58% | 1,100, 56,500 | 0.17%, 12.62% | 700, 50,500 | 0.08%, 7.62% | 400, 41,300 | 0.03%, 3.37% | 200, 26,000 | 0.01%, 1.61% | 100, 10,900 | 0.38%, 0.90% |
| 0.34%, 18.59% | 1,200, 64,500 | 0.30%, 19.48% | 1,500, 94,400 | 0.14%, 12.03% | 1,000, 81,600 | 0.05%, 5.56% | 500, 55,600 | 0.02%, 3.04% | 300, 31,500 | 0.08%, 7.41% |
| 0.34%, 19.30% | 1,600, 90,300 | 0.32%, 19.10% | 2,000, 120,200 | 0.15%, 12.77% | 1,500, 125,000 | 0.05%, 5.76% | 700, 78,600 | 0.03%, 3.26% | 300, 40,700 | 0.09%, 7.81% |
| 0.31%, 17.62% | 7,000, 399,800 | 0.21%, 15.05% | 6,200, 441,400 | 0.10%, 8.90% | 4,200, 389,800 | 0.03%, 3.98% | 2,100, 249,300 | 0.02%, 2.09% | 700, 87,500 | 0.54%, 0.91% |
| 0.33%, 19.34% | 1,900, 109,400 | 0.20%, 14.20% | 1,600, 114,500 | 0.09%, 8.36% | 1,000, 97,300 | 0.03%, 3.88% | 500, 67,300 | 0.02%, 2.06% | 200, 30,900 | 0.47%, 0.88% |
| 0.39%, 20.41% | 400, 22,000 | 0.28%, 17.76% | 400, 28,000 | 0.12%, 10.91% | 200, 22,400 | 0.04%, 4.83% | 100, 15,600 | 0.02%, 2.36% | 100, 9,000 | 0.60%, 1.00% |

Case 1:26-cv-00261-AKB Document 3-3 Filed 04/29/26 Page 201 of 368

| 13-17 | | 18-24 | | 25-34 | | 35-64 | | 65+ | | ALL A |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| **0.96%, 7.19%** | **33,200, 249,300** | **1.67%, 14.76%** | **85,000, 752,100** | **0.89%, 9.62%** | **67,300, 726,200** | **0.13%, 1.56%** | **29,500, 345,100** | **0.17%, 1.89%** | **18,800, 205,300** | **0.61%, 4.[illegible]3%** |
| 0.35%, 19.22% | 800, 43,600 | 0.28%, 19.40% | 900, 64,800 | 0.14%, 12.03% | 600, 54,300 | 0.05%, 5.52% | 300, 37,500 | 0.02%, 2.84% | 200, 19,600 | 0.71%, 1.[illegible]0% |
| 0.38%, 20.50% | 300, 16,300 | 0.33%, 20.64% | 400, 23,300 | 0.16%, 13.29% | 300, 22,100 | 0.05%, 6.27% | 100, 16,000 | 0.03%, 3.26% | 100, 10,400 | 0.64%, 1.[illegible]% |
| 0.36%, 19.24% | 1,500, 79,500 | 0.37%, 20.77% | 2,500, 143,200 | 0.16%, 12.76% | 1,500, 122,700 | 0.06%, 6.25% | 800, 83,300 | 0.03%, 3.42% | 400, 44,200 | 0.94%, 1.[illegible]9% |
| 0.37%, 19.51% | 300, 15,300 | 0.32%, 19.88% | 400, 24,300 | 0.15%, 12.04% | 300, 21,100 | 0.05%, 5.69% | 100, 14,700 | 0.03%, 3.03% | 100, 8,800 | 0.08%, 7.[illegible]4% |
| 0.35%, 19.08% | 2,100, 116,000 | 0.30%, 20.16% | 2,300, 155,400 | 0.13%, 12.04% | 1,600, 141,900 | 0.05%, 5.57% | 900, 101,800 | 0.02%, 2.95% | 400, 48,700 | 0.67%, 1.18% |
| 0.34%, 18.41% | 3,900, 215,000 | 0.29%, 19.10% | 5,100, 331,100 | 0.15%, 11.50% | 4,100, 314,500 | 0.05%, 5.65% | 1,900, 209,400 | 0.03%, 2.95% | 900, 107,500 | 0.08%, 7.[illegible]4% |
| 0.36%, 18.97% | 2,900, 151,000 | 0.24%, 16.72% | 2,700, 194,800 | 0.11%, 10.47% | 1,800, 172,700 | 0.04%, 4.42% | 900, 105,600 | 0.02%, 2.32% | 500, 60,300 | 0.48%, 1.0[illegible]% |
| 0.38%, 19.02% | 200, 11,400 | 0.29%, 18.76% | 300, 19,800 | 0.13%, 11.63% | 200, 17,900 | 0.05%, 5.27% | 100, 10,700 | 0.02%, 2.93% | 0, 6,200 | 0.66%, 1.[illegible]1% |
| 0.40%, 19.65% | 100, 7,000 | 0.38%, 24.25% | 200, 15,000 | 0.17%, 14.98% | 100, 11,500 | 0.06%, 6.91% | 100, 8,000 | 0.03%, 3.86% | 0, 5,500 | 0.91%, 1.[illegible]3% |

nfidence intervals for regional and state-level estimates of adults who identify as transgender in the US population by race/ethnicity (aged 18+)

| WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL ANOTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| 0.45%, 1.34% | 709,500, 2,102,600 | 0.34%, 1.23% | 102,400, 372,700 | 0.37%, 1.68% | 60,400, 276,800 | 0.46%, 1.80% | 6,000, 23,600 | 0.44%, 2.29% | 204,200, 1,055,800 | 0.72%, 2.22% |
| **0.26%, 2.05%** | **80,400, 630,900** | **0.16%, 2.13%** | **4,300, 57,200** | **0.17%, 3.02%** | **12,400, 220,500** | **0.33%, 2.66%** | **2,100, 17,000** | **0.26%, 4.12%** | **44,300, 713,300** | **0.44%, 4.12%** |
| 0.07%, 6.54% | 200, 22,400 | 0.05%, 5.35% | 0, 900 | 0.08%, 7.23% | 0, 3,000 | 0.10%, 9.07% | 100, 6,300 | 0.09%, 8.70% | 0, 3,300 | 0.12%, 10.50 |
| 0.07%, 6.77% | 2,200, 223,300 | 0.06%, 6.33% | 200, 16,100 | 0.07%, 7.39% | 200, 16,700 | 0.11%, 9.81% | 200, 17,100 | 0.11%, 9.41% | 1,800, 155,400 | 0.13%, [illegible]1.05 |
| 0.06%, 5.84% | 6,900, 646,000 | 0.05%, 5.15% | 800, 84,100 | 0.06%, 5.95% | 3,100, 302,200 | 0.09%, 7.36% | 100, 6,000 | 0.09%, 8.04% | 10,800, 914,500 | 0.12%, [illegible].33 |
| 0.07%, 6.88% | 2,200, 218,100 | 0.06%, 6.06% | 100, 10,500 | 0.08%, 7.52% | 100, 12,400 | 0.10%, 8.55% | 0, 1,400 | 0.10%, 9.19% | 1,000, 86,100 | 0.11%, [illegible]0.14 |
| 0.05%, 5.30% | 100, 13,900 | 0.05%, 4.88% | 0, 1,000 | 0.05%, 4.59% | 200, 24,600 | 0.13%, 9.99% | 0, 100 | 0.08%, 7.43% | 100, 6,800 | 0.09%, 7.90 |
| 0.05%, 5.22% | 600, 63,100 | 0.06%, 6.59% | 0, 700 | 0.05%, 5.42% | 0, 1,300 | 0.06%, 6.11% | 0, 700 | 0.07%, 6.76% | 100, 12,000 | 0.08%, 7.17 |
| 0.06%, 5.89% | 400, 45,300 | 0.07%, 7.32% | 0, 300 | 0.04%, 4.49% | 0, 400 | 0.08%, 7.78% | 0, 3,300 | 0.08%, 7.82% | 0, 2,700 | 0.08%, 7.99 |

Case 1:26-cv-00261-AKB Document 3-3 Filed 04/29/26 Page 202 of 368

| WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL ANOTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| 0.05%, 5.51% | 700, 66,900 | 0.05%, 5.16% | 100, 11,100 | 0.06%, 5.71% | 100, 14,800 | 0.08%, 7.56% | 0, 1,100 | 0.09%, 7.93% | 600, 53,300 | 0.11%, [illegible].08% |
| 0.03%, 3.05% | 200, 20,100 | 0.03%, 3.01% | 0, 900 | 0.03%, 3.41% | 0, 1,100 | 0.04%, 4.46% | 100, 5,900 | 0.04%, 4.24% | 300, 32,000 | 0.05%, [illegible].63% |
| 0.08%, 7.21% | 1,900, 181,500 | 0.08%, 7.13% | 0, 4,500 | 0.08%, 7.35% | 100, 12,600 | 0.10%, 8.34% | 0, 1,800 | 0.11%, 9.82% | 500, 42,300 | 0.13%, [illegible].30% |
| 0.08%, 7.77% | 1,600, 147,800 | 0.07%, 7.17% | 0, 1,800 | 0.08%, 7.80% | 100, 7,000 | 0.11%, 9.21% | 0, 1,700 | 0.10%, 8.72% | 300, 31,100 | 0.14%, [illegible].50% |
| 0.08%, 7.68% | 3,300, 311,700 | 0.07%, 7.14% | 200, 16,500 | 0.09%, 8.03% | 600, 54,300 | 0.11%, 9.37% | 100, 4,500 | 0.13%, 10.71% | 1,000, 80,300 | 0.15%, [illegible].94% |
| 0.08%, 7.59% | 300, 28,800 | 0.08%, 8.20% | 0, 200 | 0.10%, 9.20% | 0, 300 | 0.11%, 9.67% | 0, 700 | 0.11%, 9.73% | 0, 4,000 | 0.12%, 10.38% |
| **0.31%, 1.87%** | **123,000, 755,700** | **0.22%, 1.87%** | **11,400, 94,900** | **0.29%, 2.23%** | **5,700, 42,800** | **0.38%, 2.41%** | **800, 4,800** | **0.37%, 2.64%** | **16,000, 112,800** | **0.52%, [illegible].35%** |
| 0.05%, 5.33% | 3,100, 317,100 | 0.04%, 4.71% | 500, 60,000 | 0.05%, 5.20% | 300, 31,800 | 0.06%, 5.88% | 0, 600 | 0.08%, 7.01% | 1,300, 118,900 | 0.10%, [illegible].53% |
| 0.06%, 5.63% | 2,400, 230,900 | 0.05%, 4.83% | 200, 21,600 | 0.07%, 6.59% | 100, 9,400 | 0.06%, 6.23% | 0, 300 | 0.08%, 7.41% | 300, 29,400 | 0.10%, [illegible].75% |
| 0.05%, 5.43% | 1,100, 114,500 | 0.04%, 4.89% | 0, 4,000 | 0.06%, 5.85% | 0, 3,800 | 0.06%, 5.84% | 0, 300 | 0.08%, 7.24% | 100, 10,900 | 0.11%, [illegible].18% |
| 0.08%, 7.75% | 1,300, 131,400 | 0.06%, 6.66% | 100, 8,000 | 0.09%, 8.38% | 100, 5,400 | 0.09%, 8.51% | 0, 1,000 | 0.12%, 10.52% | 300, 28,000 | 0.14%, 12.39% |
| 0.08%, 8.01% | 4,900, 474,100 | 0.07%, 6.85% | 700, 68,200 | 0.09%, 8.68% | 200, 23,700 | 0.10%, 9.63% | 0, 2,400 | 0.12%, 10.84% | 500, 44,300 | 0.14%, [illegible]2.10% |
| 0.10%, 8.65% | 3,500, 303,900 | 0.09%, 8.43% | 200, 22,700 | 0.12%, 10.24% | 300, 22,600 | 0.14%, 11.82% | 0, 3,400 | 0.16%, 12.36% | 400, 29,500 | 0.18%, [illegible].77% |
| 0.06%, 6.28% | 2,300, 238,400 | 0.05%, 5.40% | 200, 27,100 | 0.06%, 6.70% | 100, 7,400 | 0.08%, 7.33% | 0, 700 | 0.09%, 8.57% | 200, 18,500 | 0.11%, [illegible].56% |
| 0.09%, 7.49% | 1,000, 88,200 | 0.07%, 7.02% | 0, 4,400 | 0.10%, 8.79% | 0, 3,500 | 0.13%, 10.25% | 0, 800 | 0.13%, 10.35% | 200, 16,600 | 0.15%, [illegible].77% |
| 0.04%, 4.23% | 200, 21,400 | 0.04%, 4.14% | 0, 600 | 0.05%, 5.48% | 0, 500 | 0.05%, 4.82% | 0, 1,100 | 0.08%, 7.10% | 0, 1,800 | 0.07%, 6.50% |
| 0.08%, 7.41% | 5,500, 532,300 | 0.06%, 6.39% | 600, 66,800 | 0.08%, 8.13% | 200, 19,600 | 0.06%, 6.71% | 0, 500 | 0.11%, 9.56% | 400, 35,800 | 0.14%, [illegible].67% |
| 0.08%, 7.50% | 500, 43,400 | 0.07%, 7.00% | 0, 900 | 0.09%, 8.15% | 0, 1,000 | 0.13%, 9.75% | 100, 4,100 | 0.14%, 11.26% | 0, 3,300 | 0.14%, 11.08% |
| 0.06%, 5.89% | 2,300, 224,100 | 0.06%, 6.12% | 100, 15,100 | 0.08%, 7.54% | 100, 10,100 | 0.07%, 6.72% | 0, 1,600 | 0.09%, 8.34% | 300, 26,100 | 0.11%, [illegible].90% |
| **0.27%, 1.59%** | **152,600, 901,700** | **0.23%, 1.40%** | **40,600, 252,100** | **0.25%, 1.84%** | **9,800, 74,000** | **0.23%, 1.81%** | **1,000, 7,600** | **0.25%, 2.98%** | **45,300, 535,300** | **0.45%, [illegible].81%** |
| 0.05%, 5.49% | 1,300, 143,200 | 0.04%, 4.63% | 400, 45,900 | 0.05%, 5.53% | 0, 3,500 | 0.05%, 5.52% | 0, 700 | 0.08%, 7.37% | 100, 13,400 | 0.09%, [illegible].27% |
| 0.03%, 3.58% | 600, 59,200 | 0.03%, 3.22% | 100, 10,500 | 0.04%, 3.85% | 0, 1,900 | 0.04%, 4.20% | 0, 400 | 0.05%, 4.97% | 100, 9,100 | 0.07%, 5.65% |
| 0.09%, 8.83% | 500, 44,600 | 0.08%, 8.10% | 100, 13,800 | 0.10%, 9.59% | 0, 3,500 | 0.09%, 8.75% | 0, 100 | 0.14%, 12.53% | 100, 9,400 | 0.18%, 14.29% |
| 0.09%, 8.36% | 200, 18,700 | 0.06%, 6.19% | 100, 13,300 | 0.10%, 9.27% | 0, 2,400 | 0.10%, 8.88% | 0, 100 | 0.10%, 8.93% | 100, 5,300 | 0.13%, 10.49% |

| WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL ANOTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| 0.07%, 6.54% | 6,700, 632,400 | 0.07%, 6.68% | 1,700, 165,000 | 0.07%, 7.00% | 400, 38,900 | 0.08%, 7.54% | 0, 1,500 | 0.09%, 7.98% | 4,300, 381,700 | 0.14%, 10.58% |
| 0.05%, 4.76% | 2,000, 207,200 | 0.04%, 4.12% | 1,000, 105,800 | 0.04%, 4.77% | 200, 19,000 | 0.05%, 5.57% | 0, 700 | 0.07%, 6.29% | 500, 51,400 | 0.08%, 6.57% |
| 0.05%, 5.21% | 1,500, 153,000 | 0.04%, 4.57% | 100, 11,500 | 0.06%, 5.78% | 0, 3,000 | 0.05%, 5.33% | 0, 300 | 0.08%, 7.10% | 100, 10,100 | 0.09%, 7.94% |
| 0.05%, 5.25% | 1,100, 107,100 | 0.04%, 4.72% | 400, 48,600 | 0.06%, 5.60% | 0, 3,800 | 0.06%, 6.42% | 0, 1,200 | 0.06%, 6.18% | 100, 13,700 | 0.09%, 7.89% |
| 0.06%, 6.01% | 1,400, 141,700 | 0.05%, 5.13% | 700, 71,800 | 0.06%, 5.98% | 200, 19,800 | 0.08%, 7.59% | 0, 400 | 0.08%, 7.73% | 400, 40,200 | 0.11%, 9.67% |
| 0.06%, 6.71% | 800, 86,800 | 0.05%, 5.75% | 400, 45,400 | 0.06%, 7.11% | 0, 1,700 | 0.07%, 8.12% | 0, 800 | 0.08%, 8.76% | 100, 6,400 | 0.10%, 10.46% |
| 0.04%, 3.80% | 2,000, 203,400 | 0.03%, 3.29% | 500, 55,400 | 0.04%, 4.14% | 100, 11,800 | 0.05%, 4.58% | 0, 3,200 | 0.05%, 5.16% | 400, 41,300 | 0.07%, 6.44% |
| 0.04%, 4.48% | 900, 91,000 | 0.04%, 3.86% | 100, 7,900 | 0.06%, 5.37% | 0, 4,100 | 0.06%, 5.70% | 100, 11,000 | 0.07%, 5.99% | 200, 19,600 | 0.08%, 6.82% |
| 0.08%, 7.29% | 2,200, 198,900 | 0.06%, 6.42% | 600, 63,800 | 0.08%, 7.71% | 100, 6,200 | 0.11%, 9.31% | 0, 700 | 0.12%, 9.40% | 300, 24,800 | 0.16%, 11.55% |
| 0.09%, 7.70% | 3,600, 315,600 | 0.07%, 6.62% | 600, 54,500 | 0.08%, 7.53% | 100, 8,100 | 0.08%, 7.47% | 0, 400 | 0.12%, 9.87% | 400, 33,500 | 0.15%, 11.34% |
| 0.05%, 5.33% | 5,100, 511,700 | 0.04%, 4.71% | 1,200, 129,900 | 0.05%, 5.38% | 700, 73,200 | 0.06%, 6.30% | 0, 2,500 | 0.07%, 6.91% | 6,200, 586,200 | 0.09%, 8.26% |
| 0.05%, 5.29% | 2,100, 218,900 | 0.04%, 4.43% | 500, 54,900 | 0.05%, 5.20% | 200, 25,400 | 0.05%, 5.17% | 0, 500 | 0.07%, 6.67% | 500, 44,700 | 0.10%, 8.26% |
| 0.06%, 6.25% | 800, 80,400 | 0.05%, 5.02% | 0, 2,200 | 0.07%, 6.77% | 0, 800 | 0.07%, 6.74% | 0, 100 | 0.08%, 7.99% | 0, 2,100 | 0.11%, 9.14% |
| **0.25%, 2.15%** | **72,900, 628,000** | **0.18%, 2.02%** | **8,500, 94,900** | **0.21%, 2.77%** | **6,700, 90,100** | **0.28%, 3.40%** | **200, 1,900** | **0.29%, 3.27%** | **19,200, 212,500** | **0.44%, 4.36%** |
| 0.07%, 6.79% | 1,300, 127,300 | 0.07%, 6.47% | 200, 18,600 | 0.07%, 7.14% | 100, 10,000 | 0.08%, 7.59% | 0, 200 | 0.10%, 9.13% | 500, 43,000 | 0.13%, 11.79% |
| 0.08%, 7.39% | 800, 77,300 | 0.08%, 7.49% | 0, 1,400 | 0.09%, 8.24% | 0, 1,200 | 0.10%, 8.90% | 0, 400 | 0.12%, 10.02% | 0, 2,400 | 0.13%, 10.45% |
| 0.09%, 7.66% | 3,500, 300,100 | 0.08%, 7.07% | 300, 25,100 | 0.10%, 8.43% | 400, 35,600 | 0.12%, 9.66% | 0, 400 | 0.13%, 10.21% | 800, 67,700 | 0.18%, 12.69% |
| 0.08%, 7.11% | 800, 71,900 | 0.08%, 7.62% | 0, 1,000 | 0.07%, 6.97% | 0, 2,200 | 0.06%, 6.52% | 0, 100 | 0.12%, 9.65% | 100, 4,400 | 0.13%, 10.06% |
| 0.07%, 7.03% | 2,700, 272,500 | 0.06%, 6.25% | 500, 55,000 | 0.07%, 6.63% | 500, 49,700 | 0.06%, 6.72% | 0, 400 | 0.10%, 8.80% | 1,400, 132,800 | 0.13%, 11.10% |
| 0.08%, 7.00% | 6,700, 598,100 | 0.06%, 6.05% | 1,300, 126,300 | 0.08%, 7.02% | 1,100, 101,700 | 0.11%, 8.95% | 0, 2,600 | 0.10%, 8.67% | 2,900, 249,100 | 0.14%, 10.93% |
| 0.06%, 5.77% | 4,600, 450,300 | 0.05%, 5.15% | 500, 52,100 | 0.06%, 5.92% | 200, 23,800 | 0.06%, 6.08% | 0, 400 | 0.08%, 7.77% | 600, 59,900 | 0.12%, 9.72% |
| 0.07%, 6.81% | 400, 43,400 | 0.06%, 6.49% | 0, 2,800 | 0.07%, 7.28% | 0, 2,200 | 0.11%, 9.23% | 0, 100 | 0.10%, 8.86% | 100, 12,100 | 0.13%, 10.37% |
| 0.09%, 8.94% | 500, 43,000 | 0.06%, 6.03% | 0, 400 | 0.12%, 11.18% | 0, 900 | 0.14%, 11.53% | 0, 100 | 0.13%, 11.17% | 0, 1,400 | 0.13%, 11.33% |

confidence intervals for regional and state-level estimates of youth who identify as transgender in the US population by race/ethnicity (aged 13 to 17)

| WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, M ANOTHER RAC |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| 1.87%, 4.84% | 195,400, 506,400 | 1.11%, 3.28% | 31,200, 92,400 | 1.54%, 5.82% | 17,300, 65,500 | 1.89%, 6.48% | 2,400, 8,300 | 1.27%, 5.36% | 74,500, 313,100 | 2.26%, 5.77% |
| **1.24%, 7.66%** | **23,400, 145,000** | **0.62%, 6.44%** | **1,300, 13,600** | **0.75%, 9.93%** | **3,300, 43,900** | **1.44%, 7.79%** | **900, 4,900** | **0.73%, 7.59%** | **16,000, 168,000** | **1.32%, 9.33%** |
| 0.38%, 19.24% | 100, 4,100 | 0.21%, 13.08% | 0, 100 | 0.34%, 19.67% | 0, 300 | 0.45%, 22.86% | 0, 1,900 | 0.24%, 15.22% | 0, 1,000 | 0.44%, 21.84% |
| 0.36%, 20.34% | 700, 37,300 | 0.22%, 15.44% | 100, 3,800 | 0.36%, 19.31% | 100, 3,000 | 0.48%, 22.69% | 100, 4,200 | 0.30%, 16.94% | 600, 36,100 | 0.44%, 22.37% |
| 0.41%, 19.46% | 2,400, 114,400 | 0.21%, 14.42% | 300, 17,000 | 0.35%, 18.55% | 1,100, 59,100 | 0.46%, 21.86% | 0, 1,300 | 0.29%, 16.90% | 4,000, 236,400 | 0.46%, 22.80% |
| 0.42%, 19.57% | 800, 38,400 | 0.24%, 15.74% | 0, 2,100 | 0.39%, 20.28% | 0, 2,100 | 0.51%, 25.84% | 0, 300 | 0.30%, 18.05% | 400, 23,000 | 0.46%, 23.15% |
| 0.36%, 19.11% | 0, 2,000 | 0.21%, 14.60% | 0, 100 | 0.36%, 19.96% | 100, 5,600 | 0.50%, 22.73% | 0, 0 | 0.29%, 17.40% | 0, 2,100 | 0.46%, 22.64% |
| 0.40%, 21.19% | 400, 22,700 | 0.24%, 16.29% | 0, 100 | 0.38%, 21.13% | 0, 300 | 0.39%, 21.49% | 0, 300 | 0.30%, 17.52% | 100, 4,900 | 0.46%, 22.70% |
| 0.39%, 19.80% | 200, 10,400 | 0.18%, 13.18% | 0, 100 | 0.44%, 21.96% | 0, 100 | 0.47%, 22.93% | 0, 1,000 | 0.28%, 17.88% | 0, 900 | 0.44%, 22.81% |
| 0.37%, 20.08% | 200, 13,100 | 0.21%, 13.89% | 0, 2,600 | 0.34%, 20.24% | 100, 3,000 | 0.43%, 21.68% | 0, 300 | 0.28%, 18.03% | 200, 15,900 | 0.41%, 21.47% |
| 0.38%, 20.59% | 100, 6,500 | 0.20%, 13.23% | 0, 300 | 0.34%, 18.98% | 0, 500 | 0.42%, 20.98% | 100, 2,800 | 0.31%, 18.62% | 300, 16,700 | 0.42%, 21.25% |
| 0.39%, 19.76% | 600, 30,600 | 0.27%, 15.51% | 0, 1,200 | 0.37%, 20.25% | 0, 1,400 | 0.50%, 23.40% | 0, 300 | 0.31%, 18.15% | 200, 12,300 | 0.48%, 23.60% |
| 0.38%, 20.19% | 800, 40,300 | 0.27%, 15.90% | 0, 400 | 0.38%, 19.58% | 0, 800 | 0.48%, 23.93% | 0, 300 | 0.29%, 17.94% | 200, 9,600 | 0.48%, 22.41% |
| 0.41%, 19.90% | 1,000, 50,100 | 0.22%, 14.68% | 0, 2,900 | 0.33%, 19.46% | 100, 7,300 | 0.43%, 21.62% | 0, 800 | 0.30%, 17.03% | 300, 19,600 | 0.47%, 22.81% |
| 0.36%, 18.75% | 100, 5,800 | 0.35%, 20.89% | 0, 200 | * | * | 0.55%, 24.05% | 0, 200 | 0.29%, 16.50% | 0, 1,100 | 0.34%, 19.66% |
| **1.39%, 6.09%** | **40,700, 178,000** | **0.7%, 4.9%** | **3,700, 25,600** | **1.13%, 6.42%** | **1,900, 10,500** | **1.25%, 8.35%** | **300, 1,800** | **0.99%, 5.66%** | **6,000, 34,600** | **1.58%, 7.55%** |
| 0.40%, 19.65% | 1,600, 79,600 | 0.22%, 14.82% | 300, 17,100 | 0.34%, 19.05% | 100, 8,500 | 0.35%, 18.72% | 0, 200 | 0.30%, 16.68% | 700, 37,200 | 0.49%, 23.22% |
| 0.38%, 20.49% | 1,200, 64,400 | 0.23%, 13.60% | 100, 6,000 | 0.35%, 19.52% | 0, 2,400 | 0.57%, 27.32% | 0, 100 | 0.29%, 16.53% | 200, 10,500 | 0.44%, 22.25% |
| 0.39%, 20.51% | 600, 32,400 | 0.24%, 15.36% | 0, 1,500 | 0.31%, 17.85% | 0, 800 | 0.49%, 24.59% | 0, 100 | 0.33%, 17.78% | 100, 5,300 | 0.49%, 23.83% |
| 0.38%, 20.11% | 500, 28,100 | 0.19%, 13.64% | 0, 1,100 | 0.34%, 19.74% | 0, 900 | 0.37%, 18.88% | 0, 100 | 0.30%, 17.71% | 100, 6,700 | 0.45%, 22.82% |
| 0.44%, 20.37% | 1,800, 83,900 | 0.21%, 14.14% | 200, 12,600 | 0.35%, 19.06% | 100, 4,500 | 0.49%, 23.88% | 0, 500 | 0.30%, 17.07% | 200, 9,100 | 0.49%, 23.29% |
| 0.38%, 20.39% | 900, 50,700 | 0.23%, 14.60% | 100, 4,800 | 0.41%, 21.13% | 100, 6,100 | 0.48%, 22.94% | 0, 700 | 0.30%, 17.07% | 100, 6,000 | 0.41%, 23.42% |

| WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, M ANOTHER RAC |
|---|---|---|---|---|---|---|---|---|---|---|
| PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| 0.36%, 19.92% | 1,000, 56,300 | 0.23%, 15.71% | 100, 7,700 | 0.32%, 19.00% | 0, 1,700 | 0.40%, 20.95% | 0, 100 | 0.32%, 17.99% | 100, 6,000 | 0.53%, 23.81% |
| 0.37%, 20.24% | 400, 19,400 | 0.21%, 13.49% | 0, 1,000 | 0.36%, 19.63% | 0, 800 | 0.38%, 19.94% | 0, 200 | 0.26%, 16.74% | 100, 4,400 | 0.47%, 22.98% |
| 0.31%, 17.26% | 100, 6,400 | 0.23%, 15.05% | 0, 400 | 0.25%, 18.16% | 0, 0 | 0.39%, 18.73% | 0, 600 | 0.30%, 19.11% | 0, 600 | 0.33%, 18.65% |
| 0.38%, 19.65% | 2,000, 102,900 | 0.22%, 14.67% | 200, 15,900 | 0.34%, 19.11% | 100, 3,500 | 0.32%, 18.67% | 0, 0 | 0.28%, 16.22% | 200, 9,000 | 0.54%, 22.89% |
| 0.37%, 19.73% | 200, 9,600 | 0.24%, 15.32% | 0, 700 | 0.45%, 22.83% | 0, 300 | 0.44%, 22.04% | 0, 1,700 | 0.30%, 16.70% | 0, 600 | 0.37%, 20.24% |
| 0.40%, 20.53% | 1,000, 52,800 | 0.22%, 14.59% | 100, 4,600 | 0.37%, 20.94% | 0, 2,700 | 0.49%, 24.21% | 0, 500 | 0.31%, 17.61% | 100, 8,300 | 0.46%, 22.75% |
| **1.50%, 6.00%** | **57,400, 229,200** | **0.88%, 4.34%** | **14,900, 74,000** | **1.17%, 7.58%** | **3,400, 22,400** | **1.04%, 11.08%** | **400, 4,600** | **0.82%, 7.06%** | **18,800, 160,700** | **1.73%, 7.33%** |
| 0.37%, 20.02% | 700, 38,400 | 0.21%, 13.85% | 200, 12,500 | 0.33%, 18.19% | 0, 1,100 | 0.53%, 25.43% | 0, 100 | 0.32%, 17.28% | 100, 5,800 | 0.43%, 22.14% |
| 0.38%, 19.65% | 500, 23,800 | 0.21%, 13.77% | 100, 5,100 | 0.42%, 22.11% | 0, 1,000 | 0.35%, 18.84% | 0, 100 | 0.26%, 17.42% | 100, 5,500 | 0.48%, 23.63% |
| 0.29%, 16.77% | 100, 4,700 | 0.17%, 11.55% | 0, 1,900 | 0.27%, 16.06% | 0, 400 | * | * | 0.23%, 15.06% | 0, 1,800 | 0.35%, 21.12% |
| 0.39%, 20.81% | 0, 1,300 | 0.21%, 14.52% | 0, 2,500 | 0.51%, 21.88% | 0, 100 | * | * | 0.33%, 18.57% | 0, 1,000 | 0.47%, 22.73% |
| 0.40%, 20.63% | 2,100, 107,400 | 0.23%, 14.45% | 500, 33,800 | 0.34%, 19.83% | 100, 7,200 | 0.50%, 23.17% | 0, 200 | 0.29%, 17.23% | 1,200, 73,200 | 0.46%, 22.97% |
| 0.36%, 20.93% | 1,100, 66,500 | 0.23%, 13.88% | 600, 35,200 | 0.35%, 20.08% | 100, 5,900 | 0.30%, 18.27% | 0, 200 | 0.30%, 18.02% | 400, 23,800 | 0.48%, 22.13% |
| 0.41%, 20.10% | 900, 44,800 | 0.22%, 14.36% | 0, 3,100 | 0.35%, 19.39% | 0, 700 | 0.41%, 23.90% | 0, 0 | 0.28%, 17.12% | 100, 4,200 | 0.49%, 24.18% |
| 0.37%, 18.95% | 600, 28,500 | 0.22%, 14.34% | 200, 15,500 | 0.38%, 20.61% | 0, 800 | 0.60%, 27.31% | 0, 300 | 0.28%, 17.31% | 100, 5,400 | 0.54%, 22.75% |
| 0.40%, 20.01% | 600, 31,000 | 0.22%, 14.05% | 300, 16,100 | 0.37%, 19.36% | 100, 4,800 | 0.26%, 17.04% | 0, 100 | 0.32%, 18.25% | 200, 13,300 | 0.49%, 23.46% |
| 0.39%, 19.41% | 400, 19,600 | 0.21%, 14.01% | 200, 11,700 | 0.34%, 19.82% | 0, 300 | 0.46%, 21.47% | 0, 200 | 0.30%, 16.95% | 0, 1,900 | 0.46%, 22.55% |
| 0.37%, 19.26% | 1,200, 65,000 | 0.23%, 14.48% | 300, 21,500 | 0.36%, 19.75% | 100, 4,200 | 0.42%, 20.17% | 0, 1,100 | 0.28%, 17.30% | 400, 23,300 | 0.42%, 22.60% |
| 0.37%, 19.96% | 500, 28,500 | 0.21%, 14.01% | 0, 2,700 | 0.38%, 20.13% | 0, 1,400 | 0.51%, 21.98% | 100, 5,900 | 0.30%, 16.71% | 200, 9,000 | 0.45%, 22.89% |
| 0.40%, 20.26% | 700, 36,400 | 0.21%, 14.47% | 200, 13,800 | 0.31%, 18.72% | 0, 900 | 0.42%, 22.33% | 0, 100 | 0.33%, 17.84% | 100, 7,500 | 0.44%, 22.85% |
| 0.37%, 20.87% | 1,100, 62,300 | 0.22%, 14.11% | 200, 10,900 | 0.33%, 18.09% | 0, 1,400 | 0.52%, 23.94% | 0, 100 | 0.29%, 16.78% | 200, 9,500 | 0.50%, 21.59% |
| 0.36%, 19.94% | 2,400, 132,800 | 0.20%, 15.02% | 600, 41,800 | 0.38%, 19.61% | 400, 20,600 | 0.43%, 22.76% | 0, 500 | 0.28%, 15.99% | 3,100, 178,500 | 0.47%, 24.66% |
| 0.36%, 21.19% | 1,000, 60,300 | 0.22%, 14.71% | 200, 15,400 | 0.33%, 20.28% | 100, 7,400 | 0.51%, 23.23% | 0, 100 | 0.29%, 16.47% | 300, 14,800 | 0.49%, 23.05% |
| 0.39%, 20.57% | 400, 19,200 | 0.16%, 11.45% | 0, 300 | 0.36%, 21.41% | 0, 100 | * | * | 0.30%, 16.39% | 0, 600 | 0.46%, 22.31% |

| | WHITE | | BLACK | | AAPI | | AIAN | | LATINX | | BIRACIAL, M ANOTHER RAC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB | LB, UB |
| | **1.08%, 7.70%** | **19,600, 140,300** | **0.53%, 5.55%** | **2,100, 22,200** | **0.86%, 7.26%** | **1,900, 16,300** | **1.07%, 10.14%** | **0, 300** | **0.78%, 7.47%** | **5,800, 55,700** | **1.26%, 8.31%** |
| | 0.39%, 21.15% | 400, 24,000 | 0.21%, 14.31% | 100, 3,400 | 0.36%, 19.69% | 0, 2,100 | 0.27%, 16.68% | 0, 0 | 0.29%, 16.64% | 200, 9,900 | 0.40%, 21.41% |
| | 0.38%, 20.47% | 300, 13,800 | 0.21%, 14.20% | 0, 400 | 0.35%, 19.34% | 0, 0 | 0.42%, 21.00% | 0, 100 | 0.30%, 18.96% | 0, 400 | 0.47%, 22.98% |
| | 0.42%, 20.05% | 900, 45,700 | 0.20%, 14.07% | 100, 4,900 | 0.34%, 18.57% | 100, 5,400 | 0.75%, 30.87% | 0, 0 | 0.28%, 17.06% | 200, 14,300 | 0.43%, 23.13% |
| e | 0.38%, 19.46% | 200, 12,400 | 0.24%, 15.20% | 0, 100 | 0.38%, 21.44% | 0, 400 | 0.56%, 26.72% | 0, 100 | 0.28%, 16.84% | 0, 900 | 0.44%, 21.90% |
| | 0.38%, 19.66% | 1,000, 50,300 | 0.23%, 14.67% | 200, 11,200 | 0.35%, 19.48% | 200, 11,300 | * | * | 0.32%, 18.66% | 600, 32,500 | 0.48%, 23.43% |
| | 0.39%, 19.60% | 2,100, 105,300 | 0.21%, 13.67% | 300, 22,300 | 0.33%, 18.29% | 300, 16,500 | 0.45%, 22.77% | 0, 400 | 0.29%, 17.52% | 900, 51,300 | 0.47%, 22.86% |
| | 0.40%, 19.42% | 2,000, 95,900 | 0.23%, 14.73% | 200, 14,000 | 0.36%, 19.08% | 100, 6,200 | 0.44%, 25.01% | 0, 100 | 0.29%, 17.04% | 300, 18,900 | 0.44%, 24.32% |
| | 0.42%, 19.93% | 100, 6,900 | 0.20%, 14.07% | 0, 400 | 0.37%, 20.91% | 0, 200 | 0.52%, 24.80% | 0, 0 | 0.30%, 16.65% | 100, 2,800 | 0.46%, 21.88% |
| | 0.40%, 19.28% | 100, 5,600 | 0.26%, 16.21% | 0, 100 | 0.31%, 19.25% | 0, 200 | 0.21%, 15.67% | 0, 0 | 0.20%, 13.50% | 0, 100 | 0.47%, 23.56% |

Asian American or Pacific Islander (AAPI), American Indian or Alaska Native (AIAN), and Biracial, Multiracial, or Another Race/Ethnicity are all non-Hispanic. Latino/a/x/e or Hispanic (Latinx) includes people of any race. Co
ntain zeroes due to rounding. * = Insufficient data to report.

**ent and 95% confidence intervals for current and prior Williams Institute estimates of percent identifying as transgender by age group (aged 13+)**

| | 2016/17 | | 2022 | | 2025 | |
|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI |
| | | LB, UB | | LB, UB | | LB, UB |
| | 0.73% | 0.54%, 1.00% | 1.43% | 0.61%, 4.02% | 3.28% | 2.88%, 3.74% |
| | 0.66% | 0.39%, 1.13% | 1.31% | 0.43%, 2.43% | 2.72% | 1.44%, 4.05% |
| | 0.58% | 0.34%, 1.00% | 0.45% | 0.23%, 0.74% | - | - |
| | - | - | - | - | 1.37% | 0.76%, 2.62% |
| | - | - | - | - | 0.42% | 0.24%, 0.86% |
| | 0.50% | 0.31%, 0.84% | 0.32% | 0.12%, 0.57% | 0.26% | 0.15%, 0.58% |
| | 0.58% | 0.36%, 0.95% | 0.52% | 0.32%, 0.77% | 0.81% | 0.73%, 1.64% |

# Exhibit 14

# UCLA

## Other Recent Work

### Title


Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms


### Permalink

https://escholarship.org/uc/item/4rs4n6h0



### Authors

Hasenbush, Amira
Flores, Andrew R
Herman, Jody L



### Publication Date

2018-07-23

### DOI

10.1007/s13178-018-0335-z



### Data Availability

The data associated with this publication are not available for this reason: Licensing Restrictions

Peer reviewed

eScholarship.org Powered by the California Digital Library
University of California

# Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms

Amira Hasenbush[1] & Andrew R. Flores[1,2] & Jody L. Herman[1]

## Introduction

North Carolina's Public Facilities Privacy & Security Act, also known as H.B. 2, introduced much of the United States to a debate regarding the use of public restrooms that had previously largely gone unnoticed. In an emergency session, the North Carolina legislature passed H.B. 2 in one day, legally requiring sex-segregated restrooms and changing facilities to be limited to use based on the sex on a person's birth certificate (Philipps, 2016). While this law would have no legal impact on restroom use among cisgender (i.e., nontransgender) people, it meant that transgender people who had transitioned from their sex assigned at birth to a different gender would be required to use the restroom of their sex assigned at birth unless they had legally changed their birth certificate. The new law also opened up the possibility of increased harassment and policing, both social and actual, of gender nonconforming people in public restrooms, whether they were transgender or not. H.B. 2 was passed as a direct reaction to a local nondiscrimination ordinance that the City of Charlotte passed that included gender identity as one of the protected classifications in public accommodations, legally codifying the rights of individuals to use the public restroom that corresponded to their gender identity, even if that did not match their sex assigned at birth (Philipps, 2016). The primary argument levied against the passage of public accommodations nondiscrimination policies that protect trans- gender people is that the policy creates a loophole for sexual predators to access women's public restrooms and locker rooms, thus decreasing women's and girls' safety and privacy in such spaces. For example, at a floor hearing on H.B. 2, Senator E. S. "Buck" Newton stated:

> [T]he City Council of Charlotte lost their mind, and decided to embark upon a very radical course … of radical political correctness. And in so doing, created a real public safety risk … would allow men into the locker rooms and the bathrooms of females – of our daughters, of our wives … And that common sense tells us that men don't belong in the ladies' bathroom. It's a matter of public safety. Under this ordinance that they've put forward, anyone, quite frankly, with – with that intent, could use this Charlotte ordinance as an excuse to be somewhere that we all know they don't belong." (House Bill 2: Senate Floor Session, 2016).

On the other hand, there were those who argued that such nondiscrimination laws had already been enacted in localities across the United States with no noticeable change in criminal activity in public accommodations. For example, Representative Rodney Moore stated in the H.B. 2 House floor debate:

> [W]hat you have here is – you have fear-stoking. The LGB – I've done the research. This ordinance is in over 200 cities, as it was referenced before, and there has not, to my knowledge, been any catastrophic incident of as- saults, of rapes in these bathrooms or anything, and so the argument that this is such a grave challenge or a grave issue of public safety, just doesn't – just doesn't mesh; doesn't – doesn't pan out based upon the data." (House Bill 2: House Floor Debate, 2016).

While H.B. 2 was partially repealed in 2017, the debates, legislation, and litigation about restroom access and safety continue. For example, the Commonwealth of Massachusetts is now facing a ballot measure in the 2018 elections asking its citizens to decide whether to repeal a recently passed statewide public accommodations nondiscrimination law that is inclusive of gender identity. It is important to evaluate the empirical validity of the underlying claims to assess whether nondiscrimination laws are actually related to privacy and safety in restrooms, evidence of which has yet to be provided. We sought to empirically assess such claims through the analysis of police records of safety and privacy crimes in public restrooms, locker rooms, and changing rooms.

[1] UCLA School of Law, The Williams Institute, Box 951476, Los Angeles, CA 90095-1476, USA

[2] Department of Public Policy & Political Science, Mills College, Oakland, CA, USA

## Legal Background

State and local employment and public accommodations non- discrimination statutes and ordinances have included gender identity for over 20 years. In 1993, Minnesota passed the first statewide nondiscrimination law that included gender identity (Minn. Stat., 1993). Currently, 20 states and over 200 towns, cities, boroughs, and counties have nondiscrimination laws and ordinances that are inclusive of gender identity (Movement Advancement Project, 2017; Human Rights Campaign, 2016). In theory, employment nondiscrimination laws that include gen- der identity would apply to restroom use in the workplace, and public accommodations nondiscrimination laws that include gender identity would apply to public restrooms; however, the specific language, interpretation, and implementation of such laws and ordinances have varied throughout the country.

There is no federal law that prohibits discrimination in employment or public accommodations based on gender identity. However, some federal agencies and courts[3] have interpreted laws that prohibit discrimination based on sex to include gender identity. For example, the Equal Employment Opportunity Commission held that Title VII's prohibition on sex discrimination in employment also prohibits discrimination based on gender identity in employment, including by requiring that employers allow employees to use restrooms in the workplace that are consistent with their gender identity (Lusardi v. Dep't of the Army, 2015). The Department of Housing and Urban Development has issued regulations to ensure equal access to shelter housing and restrooms without discrimination based on gender identity (Department of Housing and Urban Development, 2016),[4] and the Occupational Safety and Health Administration has issued guidance instructing employers to allow employees to have access to restrooms based on their gender identity (Occupational Safety and Health Administration, 2015). In 2016, the Civil Rights Divisions of the Department of Education and the Department of Justice issued guidance that students should have access to restrooms that correspond to students' self-identified gender identity (U.S. Department of Justice & U.S. Department of Education, 2016). That guidance was repealed less than a year later (U.S. Department of Justice & U.S. Department of Education, 2017). In June of 2017, an instructional letter was sent to Department of Education Civil Rights Office regional directors stating that sex discrimination complaints from transgender stu- dents should be evaluated based on Title IX and its implementing regulations, as interpreted in decisions of federal courts and other Office for Civil Rights guidance documents, but specifically excluding the repealed guidance (Jackson, 2017). By February of 2018, a Department of Education spokesperson asserted that the department would no longer accept discrimination complaints from transgender students who are blocked access to restrooms in accordance with their gender identity (Holden, 2018).

The 2015–2016 state legislative sessions across the country saw increases in proposed legislation seeking to prohibit access to public restrooms based on gender identity (Kralik, 2017). Some of these policies sought to roll back protections granted by municipal governments (Fausset, 2017; Kralik, 2017). In addition, some localities such as Anchorage, Alaska and Houston, Texas sought repeal of protective policies through public ballot measures (Fernandez & Smith, 2015; Kelly, 2016). Additionally, some states that did not have any statewide laws related to public accommodations access, such as North Carolina, sought to pro- actively prohibit any future enactment of gender identity nondiscrimination laws at the state or local level that would allow transgender people to access restrooms that correspond with their gender identity (Kralik, 2017).

At the same time, litigation across the country has sought to determine the extent of state, local, and federal powers to either prohibit or mandate restroom access based on gender identity. For example, after the Departments of Education and Justice issued the initial federal school bathroom guidance in 2016, states and representatives from Texas and 12 other states filed a lawsuit against the federal government. The District Court granted a preliminary injunction against implementation of the guidance in 2016, and in 2017, the federal government withdrew its initial appeal (Texas v. U.S., 2016, 2017). At the same time, a transgender student has been engaged in litigation against his local school board for access to school restrooms in accordance with his gender identity. That case had been accepted to be heard by the Supreme Court but was remanded to the Fourth Circuit Court for reevaluation in response to the repeal of the federal school restroom guidance (G. G. v. Gloucester County School Board, 2017). After the student graduated from high school with- out having a final court decision, he amended his complaint to request a declaration that the school board violated his rights under Title IX and the Equal Protection Clause and to allow him to use male restrooms when he returned to school grounds for alumni activities (American Civil Liberties Union, 2017). Nebraska and nine other states filed a case similar to the Texas case that was stayed pending a ruling in the G.G. case and later was voluntarily dismissed by the plaintiffs without prejudice, in other words, with the right to reinstate the case later (Nebraska v. U.S., 2016, 2017). Several other lawsuits specific to transgender student restroom access are currently winding their way through state and federal courts. Concerns about restroom privacy and/or safety have been considered in all of these cases (G.G. v. Gloucester County School Board, 2015; Nebraska v. U.S. First Amended Complaint, 2016; Texas v. U.S., 2016).

---

[3] See, e.g., EEOC v. Harris Funeral Homes, 2018, which affirmed the Sixth Circuit's previous holdings that discrimination against a transgender individual is illegal sex discrimination under Title VII. In that case, a funeral home director was fired after she told her employer that she was transgender and planned to transition and begin wearing women's work clothing on the job. The court also stated that religious beliefs and the Religious Freedom Restoration Act do not overrule the nondiscrimination requirements of Title VII. The last paragraph in this section discusses court cases that directly address sex discrimination as it applies to transgender individuals in the context of restroom access.

[4] The Department of Housing and Urban Development has slowed support for this Equal Access Rule in the last year. Online training materials meant to support homeless shelters in the implementation of the rule were ordered removed from the department's website (MacGillis, 2017).

## Literature Review

Using new policy proposals continues to be a central strategy between the LGBT rights social movement and countermovement. Stone (2012) describes different forms of tactical innovation the Religious Right has taken on sexual orientation and gender identity public policy. These innovations vary in terms of venue (e.g., local, statewide, or national), strategy (e.g., legislative, direct initiative, or referendum), and issue (e.g., gay teachers, same-sex marriage, transgender inclusion in public accommodations). As such, the Religious Right has played a large role in controlling the issue agenda of the LGBT rights movement (Fetner, 2008). The present case of carving out gender identity protections in public accommodations policies may be seen as another form of tactical innovation. As is the case of other issues of LGBT rights, many times these policies are seen as seeking solutions to problems that may not really exist, which may be linked to social perceptions of sexual and gender minorities as deviants (Fejes, 2008). For example, Anita Bryant's campaign and the Briggs Initiative to prohibit gay and lesbian school teachers are key moments when public policy and the general public were targeted for policy advancement against the rights of LGBT people.

The movement counter to the advancement of LGBT rights has increased its focus on transgender people (Andersen, 2017). The discursive strategy on transgender rights remains similar to gay rights discourses with a focus on the harms gender identity inclusive policies pose primarily to children. A social constructionist framework of social policy (Shneider and Ingram, 1993) would consider both the political power and social favorability of transgender people in the consideration of the types of policies getting passed. As Westbrook and Schilt (2014) identify, issues involving sex- segregated spaces become overly focused on biologic sex and anatomy, which increases the "gender panic" people experience relating to transgender people. By focusing on public accommodations, the discourses focus on sex-segregated spaces in ways that exacerbate "gender panics" which would further lower the social valence of transgender people (see also Miller et al., 2017). Thus, arguments against the inclusion of gender identity protections in such sex-segregated spaces are likely motivated by such social constructions of a politically powerless and negative valence group.

Critiques of anti-LGBT policies are abounding. Fogg Davis (2017), for example, argues for the abolishment of using sex as a criterion for separating facilities. In other LGBT policy areas, scholars have marshaled evidence that the claims made by those advocating against LGBT rights are unfounded in the arenas of marriage and family (Herek, 1991, 2006) and in employment (Badgett, 2001; Herek, 1991). The arguments used to justify anti-LGBT policies tend to be emotionally stirring, though of- ten lack empirical validity.

Given the recently targeted focus on transgender rights, it is important to understand and evaluate both the motivations for policy, as well as its negative externalities. The asserted motivations for proscribing transgender inclusion in public ac- commodations are the perceived negative externalities of in- creased harassment and victimization in public spaces such as bathrooms and locker rooms. The current project examines the policy motivation portion. In essence, we ask: "Are inclusive transgender public accommodations laws associated with these negative externalities?" If not, then public policy may be seeking a policy solution to solve a problem that does not exist or that would exist even if policies changed.

Some research has suggested that states with more supportive gay rights policies overall correlate with lower sexual orientation hate crimes and discrimination (Levy & Levy, 2017; Hasenbush, Flores, Kastanis, Sears, & Gates, 2014). Local gender identity accommodation protections may be one of many indicators that may, counter to arguments against such laws, reduce victimization rates with respect to sexual and gender minorities, which could make a discernable reduction in overall victimization rates. Given this research we propose three hypotheses:

H0: The passage of gender identity accommodations policies will have no effect on victimization rates.
H1: The passage of gender identity accommodations policies will reduce victimization rates.
H2: The passage of gender identity accommodations policies will increase victimization rates.

H0 is motivated both by previous scholarship dispelling myths in other areas of LGBT rights as well as the insufficiency of single policies to lead to vast changes in victimization. H1 is motivated by Levy and Levy (2017) who note that inclusive policies in localities indicate supportive environments where victimizations are lower. H3 is motivated by the standard arguments made by opponents to gender identity inclusive nondiscrimination policies.

## Methods

We sought to empirically assess whether reports of safety or privacy violations in public restrooms, locker rooms, and dressing rooms change in frequency in localities that have gender identity inclusive public accommodations nondiscrimination ordinances (GIPANDOs) as compared to matched localities without GIPANDOs. Massachusetts was selected as a case study for this analysis, because, for a period of time, Massachusetts had a statewide nondiscrimination law that was inclusive of gender identity in employment and housing, but not public accommodations. Thus, these conditions created an optimal context in which to compare rates of public restroom privacy and safety incidents in localities that had passed local GIPANDOs with matched localities that had not. All data col- lection, analysis, and results are inclusive of criminal incidents in public restrooms,

public locker rooms, and public changing rooms. For simplicity's sake, authors may refer to only "restrooms" when describing the results of this study.

Victimization rates can fluctuate both over time and place. Using matched pairs and difference-in-differences analysis allows a comparison between different locations over time in order to determine whether any changes can be attributed to normal fluctuations over time or whether the changes can be attributed to some distinct difference in one location versus the other (see e.g., Dimick & Ryan, 2014; Raifman, Moscoe, Austin, & McConnell, 2017). A difference-in-difference analysis was used in this study to compare similarly-situated localities in MA to determine whether differences in restroom crime rates over time can be attributed to the introduction of a GIPANDO.

Unlike some trends over time, crime rates do not consistently increase or decrease. Small fluctuations in crime rates over time may be based on random variability and may not be attributable to any one specific policy change. Using a matched pairs analysis allows timewise comparisons across policy con- texts to seek out differences that appear to be due to more than just small random fluctuations. The matched pairs analysis ensures that the localities being compared to each other in the difference-in-difference analysis are similar enough to make appropriate comparisons. For example, Fig. 1 shows the violent crime rates across five New England states as documented by the U.S. Department of Justice. The matched pairs design of this study accounts for such temporal instability in crime rates by finding localities that have the most similar trends. In Fig. 1, it would be more appropriate to draw comparisons between Massachusetts and Connecticut because they follow a similar trend, and it would be inappropriate to compare Massachusetts to New Hampshire because they do not. Likewise, the selection of comparison localities was designed in a way to minimize differences to draw accurate comparisons.

**Selection of Localities** The Commonwealth of Massachusetts has had a broad nondiscrimination policy protecting against sexual orientation discrimination since 1989 (Mass. Gen. Laws, 1989). Massachusetts also passed a law in November 2011 extending nondiscrimination protections for transgender people in employment, housing, credit, and services (Gender Identity Act, 2011). However, that extension of the law did not contain any explicit protections for transgender people in public accommodations. Some individual localities within Massachusetts expanded upon state law by incorporating explicit gender identity protections in public accommodations laws, which includes protections in public restrooms, locker rooms, and changing rooms. This allowed for a between- localities study, comparing localities that passed GIPANDOs with matched localities within the state that did not have GIPANDOs, but otherwise had gender identity nondiscrimination protections in employment, housing, credit, and services.[5] The matched pairs strategy means that the distinguishing factor between these localities is the existence or absence of a public accommodations-specific nondiscrimination law that applied to gender identity.

[5] Boston and Cambridge both had a GIPANDO prior to the 2011 state law. Neither locality is included in this analysis.

Fig. 1 Violent crime rate across New England states, 2005 to 2014. Source: Uniform Crime Reporting Statistics, FBI, U.S. Department of Justice




Table 1 reports the localities within Massachusetts that have ordinances that contain language that includes gender identity protections and the date when those ordinances went into effect. There were seven localities that had identifiable nondiscrimination ordinances relating to gender identity protections in public accommodations. Two other localities in close geographic proximity to the GIPANDO localities were also identified as having some gender identity protections, though their coverage was not as extensive as the seven other localities. Cambridge includes gender identity protections in public accommodations except for restroom access, which is of primary concern to this study. Brookline law contains a gender identity resolution, but it is unclear the extent to which this resolution resulted in actionable changes or any enforcement mechanism within the locality.

In October 2016, a new Massachusetts state law went into effect to provide for protection against discrimination in public accommodations based on gender identity (Transgender Anti- Discrimination Act, 2016). However, results of the public re- cords requests in this study did not overlap with the time that Massachusetts had this statewide gender identity inclusive public accommodations nondiscrimination law in effect, and thus, enable this study to focus on the period when localities introduced GIPANDOs in the absence of statewide protections.

Notably, after the law went into effect, enough signatures were gathered to put a repeal measure on the 2018 ballot to allow Massachusetts residents to vote on whether to repeal the non- discrimination law (Young, 2016).

**Matched Pairs Design** After identifying the localities with GIPANDOs, we used quantitative models to identify localities within Massachusetts to match for comparison. Matched localities were in the same geographic regions of Massachusetts as the GIPANDO localities and were matched on demographic and other characteristics that may relate to the likelihood that locations would pass a GIPANDO as well as characteristics that may be predictive of criminal incidents (or a lack thereof) in public restrooms. We started the matched pair locality selection by identifying a full list of localities within Massachusetts that did not have GIPANDOs and that were in the same regions of Massachusetts as the localities with GIPANDOs.[6] We then collected pre-policy introduction information about both the GIPANDO localities and the candidate pool of potential matched localities. These covariates included: population size, the percent of the population over the age of 65, the percent of population that is non-Hispanic white, the percent of population earning more than $200,000, median income, the percent of the population living below the poverty line, the percent of the population that identifies as Born Again, percentage of the vote for Barak Obama in the 2012 presidential election, and a composite crime score based on numerous indices.[7] Since all of the metrics of crime were highly intercorrelated, a composite score was created based on a factor analysis. The researchers then used a covariate balancing approach to create a propensity score to identify the most fitting matched localities for each of the GIPANDO localities (Imai & Ratkovic, 2014). The fitted propensity score was extracted and used in addition to the covariates in a genetic matching procedure (Diamond & Sekhon, 2013; Sekhon, 2011). The genetic matching procedure identifies appropriate comparison localities by examining the full distribution of covariates, which may improve the matching procedure that other matching processes may worsen.

---

[6] The initial design also planned to identify contiguous localities, treating boundary lines as regression discontinuities (Keele & Titiunik, 2015). However, since the occurrence of the crimes sought was rare, there was insufficient analytical power to utilize geographic variation to the full extent possible. Instead, the researchers opted for simpler analytical methods relying on data preprocessing and case selection to reduce analytical assumptions. However, the matched localities were limited to localities that had a shared
boundary with at least one of the GIPANDO localities.

[7] The indices were: the Neighborhood Scout Crime Index (retrieved from https://www.neighborhoodscout.com/ma/crime/), violent crimes per 1000 residents and property crimes per 1000 residents, the USA.com Crime Index (retrieved from http://www.usa.com/massachusetts-state-crime-and-crimerate.htm), and the City Data.com 2012 Index (retrieved from http://www.city-data.com/crime/crime-Massachusetts.html).

Table 1 Localities within MA that contain GIPANDOs

| Locality | GIPANDO | Date in effect | Statute |
|---|---|---|---|
| Boston | Yes | October 30, 2002 | Bos., Mass., Code § 12–9.7 (2002). |
| Medford | Yes | December 16, 2014 | Medford, Mass., Rev. Ordinances part 1, ch. 50, div. 2, § 50–61 (2014). |
| Melrose | Yes | December 17, 2014 | Melrose, Mass., Code ch. 15, art. X, § 15–50 (2014). |
| Newton | Yes | October 14, 2014 | Newton, Mass., Ordinances ch. 12, art. V, § 12–50 (2014). |
| Salem | Yes | February 27, 2014 | Salem, Mass., Code part III, ch. 2, art. XVI, §2–2056 (2014). |
| Somerville | Yes | May 29, 2014 | Somerville, Mass., Code ch. 2, art. V, div. 6, § 2–237 (2014). |
| Swampscott | Yes[a] | February, 18, 2015 | Swampscott, Mass. Nondiscrimination Policy (Feb. 18, 2015). |
| Cambridge | Yes, but contains a restroom exception | February 24, 1997 | Cambridge, Mass., Code tit. 2, ch. 2.76, §§ 2.76.030; 2.76.120 (1997). |
| Brookline | Unclear, a gender identity ʙresolution^ exists | November 18, 2014 | Brookline, Mass. Code, part III, art. 3.9 § 3.9.2 (2014). |

Note:

[a] Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because the Swampscott Police Department records division lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities (Marblehead and Milton)

While Cambridge and Brookline were categorized as limited GIPANDO localities and selected because of their geographic proximity to the clear GIPANDO localities, a few other localities in the state that were not in close geographic proximity to the clear GIPANDO localities also had gender identity ordinances that were unclear or limited as related to restroom access. These were: Northampton, Amherst, and Worcester, and they were not included in this analysis, since it was originally designed to include a boundary regression discontinuity that would have required localities to share physical borders. Northampton, Massachusetts has a Human Rights Commission with a voluntary advisory committee that does not have any investigative or enforcement authority. It is also unclear whether their Human Rights Commission prohibits discrimination based on gender identity (Simmons, 2015). Amherst, Massachusetts prohibits the denial of "any rights" based on gender identity (Human Rights Bylaw, 2009). However, the town's director of human resources and human rights, who investigates complaints of discrimination, was unable to confirm whether such rights included access to public accommodations and/or public restrooms (Radway, 2015). Worcester, Massachusetts has a local ordinance that states that its policy is "to assure that every individual shall have equal access to and benefit from all public services, accommodations and employment opportunities to protect every individual ..." and that, "behavior which denies equal treatment to any of our citizens as a result of their … gender identity …undermines civil order and deprives persons of the benefits of a free and open society." (Worcester, Mass., Rev. Ordinances §9(c), 2014). However, the local human rights commission only has explicit authority to investigate complaints of discrimination "based on race, color, religious creed, national origin, gender, age, ancestry, marital status, parental status, sexual orientation, disability or source of income." (Worcester, Mass., Rev. Ordinances §18(c)(1), 2014). Matched localities were selected for all of the localities with clear GIPANDOs that applied to public restrooms. The final GIPANDO localities and their matched localities for two different analyses are listed in Table 2.

## Data

Public Record Requests Through a thorough reading of municipal ordinances and consultation with local human rights commissions, town and city clerks, and attorneys, we ascertained an exhaustive list of all of the localities in Massachusetts with GIPANDOs. Localities with GIPANDOs and matched localities received two sets of public records requests from the investigators. In July 2015, a first set of requests under the Massachusetts Public Records Law (M.G.L.A. c. 66, §10, 2016) was sent to target localities. These letters requested, "All records documenting complaints made to [the local police] agency and records of crimes alleged or committed or incidents … that took place in a public bathroom, public restroom, public locker room, or public changing room."

Table 2 Localities with GIPANDOs and matched localities

| GIPANDO Locality | Matched locality (1) | Matched locality (2) |
|---|---|---|
| Boston | Cambridge[b] | Chelsea[c] |
| Medford | Beverly | Watertown |
| Melrose | Beverly | Beverly |
| Newton | Brookline | Arlington |
| Salem | Revere[b] | Waltham |
| Somerville | Cambridge[b] | Waltham |
| Swampscott[a] | Marblehead[a] | Milton[a] |
| Brookline (unclear enforceability) | | Arlington |
| Cambridge[b] (restroom exclusion) | | Everett |

Notes:

[a] Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because they lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities

[b] Cambridge and Revere were unable to supply results of the public records requests after repeated attempts over the course of nine months. Therefore, data from their matched localities, Salem, Somerville, Boston, and Everett were excluded from analyses that required the missing data

[c] Chelsea's results were excluded due to an incomplete response to the request

The request covered a one- to two-year timespan before and after the gender identity inclusive public accommodations nondiscrimination law had gone into effect in the localities that had such an ordinance and the same time period for the localities that were matched localities. In some cases, the local ordinance had been passed less than one or two years prior to the public records request. In those instances, records were requested "through the present." If matched localities were matched to more than one GIPANDO locality, the matched locality records request would cover the matching timespan for both of the GIPANDO localities to which they were matched. The total timespan covered (either two or four years) was selected based on the size and crime rate of the locality; smaller localities or those likely to have fewer incidents were given longer timespans to search, and larger localities or those in which more incidents were likely to occur were given shorter timespans. The investigators requested information on the type of crime/incident alleged, the gender of the victim(s) and the perpetrator(s) (as applicable), the date of the incident, and the address of the public bathroom, restroom, locker room, or changing room in which the alleged incident took place.

After mailing public records requests, follow-up emails and phone calls were placed with all of the records custodians to facilitate the process of data collection. Some larger localities were able to comply with the requests relatively quickly and easily, while others did not have the tools necessary to perform a key word search that would make such a request possible or feasible. Several record clerks noted that the cost to pay for staff time to complete a search by hand would be prohibitively expensive. After assessing the initial completed responses, the investigators noted that the majority of incidents occurring in restrooms were not related to the types of crimes that are the subject of concern related to public accommodations nondiscrimination ordinances. In other words, the fears projected as potential problems related to such ordinances are related to violations of safety and privacy, but most incidents were related to vandalism and drug use in public restrooms and theft in locker rooms.

Given the mismatching scope between the search and the crimes of concern and the challenges for smaller localities to respond to the public records requests, the researchers completed a second round of public records requests with a narrower scope in February 2016. In the second round of requests, the investigators requested, "All records documenting complaints

made to [the local police] agency and records of crimes alleged or committed or incidents … involving conduct that took place in a public bathroom, public restroom, public locker room, or public changing room" regarding criminal codes related to: murder, manslaughter and attempts; assault or assault and battery and attempts; theft involving assault or battery and kidnap- ping; rape, stalking, harassment, indecent exposure, public sex and voyeurism; and solicitation. The individual Massachusetts General Law sections were cited in the request. The full updated request was sent to all police departments that had not fully responded to the first round of public records requests. For those who had responded, but for whom the timespan was still continuing until "the present," a modified request was sent for any new records that may have arisen since the first round of requests.

Follow-up phone calls and emails were again used to assist in the facilitation of data collection until all of the localities had either responded with the results of their search or made it clear that they were unable to complete the search. By the end of the second round of data collection, two localities were unable to complete the search at all, and one locality provided an incomplete response. Records were then organized and reviewed to ensure only inclusion of incidents under the narrower scope related to assault, sexual assault, rape, voyeur- ism, public sex (including sex work), lewd behavior, and in- decent exposure.

As a result of the data collection, we received public re- cords of incidents occurring within our selected municipalities. The unit of analysis in this collection is an incident. Consistent with previous research, we transformed these incidents to average annual incident rates per 100,000 individuals. This normalizes our measure accounting for varying size of municipalities and time period.

## Analysis and Results

The first round of analysis was a simple comparison of the average annual number of incidents before and after the pas- sage of GIPANDOs in the localities with such nondiscrimination ordinances and their comparable matched localities. This comparison was made to determine whether the rate of reported incidents in public restrooms and locker rooms over the timespan in which the GIPANDOs were passed was different between the places with the ordinances and their matched localities. Since we use matched pairs for our analyses, we did not employ additional controls, and since time frames were equal between the GIPANDO localities and their matched localities, time is also controlled by design. The results are shown in Table 3. When a matched locality had missing results, the GIPANDO locality's results were excluded from the count.

Table 3 provides a contingency table showing the average number of incidents per year. There were fewer average annual incidents in the localities with clear GIPANDOs when compared to their matched localities. The differences in incident rates over time (comparing before and after GIPANDO passage) were not statistically significant in the GIPANDO localities or among the matched localities. Most importantly, a Fisher's exact test of the difference in crime rates between places with and without GIPANDOs before and after GIPANDOs were passed indicates no statistically significant relationship (at a one-sided alpha level of 0.10) between GIPANDO policy passage and victimization. A comparison of the change in the number of criminal incidents after passage of public accommodations protections between GIPANDO localities and their matched localities also showed no statistically significant difference. In these comparisons, there does not appear to be a relationship between passage of GIPANDOs and criminal incidents in restrooms between localities.

A finding of no difference between the GIPANDO localities and the matched localities may be driven by the small number of localities included in the analysis. However, we are able to assess whether our finding of no difference was a result of our small sample size. A power analysis shows that we would likely still find no statistically significant difference between the GIPANDO localities and matched localities even with a larger sample size. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.108, suggesting that there is no difference between the GIPANDO localities and the matched localities. By increasing the number of matched pairs, the inference with the observed effect size would increase the probability that GIPANDO localities have *lower* annual crime rates than their matched localities, though this inference would barely satisfy less stringent accounts of statistical significance. Beyond before-and-after differences, we can also assess trends in crime rates in public bathrooms between these localities. This way, it can be assessed whether trends in crime rates increase in GIPANDO localities compared to their matched localities. Figure 2 provides the timeframe from 24 months before to 24 months after the passage of the local GIPANDOs. A 24-month window was chosen because all localities in this analysis were asked to provide incidents within a four-year timeframe. Unlike a change in the annual incident rate before and after the introduction of GIPANDOs, this model com- pared the change in the average monthly incident rates in GIPANDO and matched localities. If the argument about GIPANDOs negatively impacting safety and privacy in restrooms is correct, then an increase in reported incidents among localities with GIPANDOs, above and beyond any increase in localities without GIPANDOs, would be expected after the introduction of such policies.

In Fig. 2, the model included the difference between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities. As can be seen in the graph, the rates over time showed no significant increases in victimization rates in GIPANDO localities compared to matched localities. To the contrary, localities introducing GIPANDOs had slightly, yet significantly, lower rates of criminal incidents than their matched localities at the time these ordinances were introduced. About 10 to 20 months after GIPANDO passage, the difference appeared to increase; during that time, the average monthly proportion of criminal incidents remained rather stable in GIPANDO localities but slightly increased among matched pairs. By 24 months after GIPANDO passage, rates between the two sets of localities appeared to have little difference.

Table 3 Average number of incidents per year documented by police departments by localities with clear GIPANDOS and matched pairs before and after policy passage

| | Localities with clear GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|
| Before passage | 0 (0 per 100,000) [0 per 100,000, 0 per 100,000] | 3.5 (2.54 per 100,000) [2.53 per 100,000, 2.55 per 100,000] | − 2.54 per 100,000 [− 2.55 per 100,000, − 2.53 per 100,000] |
| After passage | 0.5 (0.62 per 100,000) [− 0.49 per 100,000, 1.73 per 100,000] | 5.5 (4.50 per 100,000) [1.22 per 100,00, 7.78 per 100,00] | − 3.88 per 100,00 [− 7.34 per 100,000, − 0.42 per 100,000] |
| Change per 100,000 (After − before) | 0.62 per 100,000 [− 0.49 per 100,00, 1.73 per 100,000] | 1.96 per 100,000 [− 1.32 per 100,000, 5.24 per 100,000] | − 1.35 per 100,000 [− 4.30 per 100,00, 1.60 per 100,000] |
| Total annual average | 0.25 (0.31 per 100,000) [− 0.25 per 100,000, 0.86 per 100,000] | 4.5 (3.52 per 100,000) [1.86 per 100,000, 5.19 per 100,000] | |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_1$ ¼ 0:62; $p$ ¼ 0:43; Fisher's exact ¼ 1:00; one-sided Fisher's exact = 0.632.; difference-in-difference = − 1.35 bootstrapped S.E. = 1.80, $p = 0.454$

## Discussion

Opponents of gender identity nondiscrimination laws and policies have cited fears of attacks and privacy violations against women and children in restrooms as one of their main reasons for resistance to them, while proponents have asserted that such laws are necessary to protect transgender people and cause no increase in these kinds of crimes. However, no study, to our knowledge, has examined crime report data to assess changes in rates of crime before and after the introduction of GIPANDOs. This is the first study to do so. While this analysis initially chose Massachusetts as a case study because of its unique legal paradigm, it has taken on more direct importance in that state, because over the course of the data collection and analysis, Massachusetts passed a statewide public accommodations law that includes gender identity and that law is now up for repeal on the November 2018 ballot. By using public records and statistical modeling, we found no evidence that privacy and safety in public restrooms change as a result of the passage of GIPANDOs.[8]

The inclusion of GIPANDOs may signal a more inclusive context and thus relate to lower victimization rates, which we propose in H1. Based on previous empirical work on dispel- ling the myths to oppose LGBT rights in marriage, family, and employment, we suspected in H0 that GIPANDOs would have no relationship with victimization rates. We find greater support for H0. The inclusion of GIPANDOs had little relationship with victimization rates. Complimentary to research on hate crimes policies, sometimes, policy-specific provisions have little relationship to victimization. The cumulative addition of legal inclusion of marginalized groups may, however, reduce victimization rates (Levy & Levy, 2017).

**Limitations** Limitations of this study include issues inherent with the data source. For example, the data used to represent safety and privacy violations in public restrooms were police records of criminal incidents. While these records should have a relatively high level of reliability in their objective accuracy in recording the existence of such incidents, they fail to include any incidents that were not reported to local law enforcement. For example, it is estimated that only 30 to 35% of rapes and sexual assaults are reported to the police (Truman & Langton, 2014). Nevertheless, by assessing trends over time and using a matched pairs analysis, the authors sought to control for any issues related to unreported incidents. There is no reason to assume that incidents are more or less likely to be reported in a locality with a GIPANDO than in a matched locality.

The crime reports also were not recorded in a way that allows a reviewer to distinguish between incidents involving cisgender people and transgender people. Police departments generally do not distinguish between sex assigned at birth and gender identity. Therefore, there is no way to identify if there were any incidents that involved transgender people being attacked in public restrooms because of their externally perceived gender. A 2008 survey of 93 transgender people in the Washington, DC metropolitan area found that 9% reported experiencing physical assault in a public restroom (Herman, 2013). There was also no way to identify if there were incidents of transgender people or people pretending to be transgender accessing restrooms with intent to harm others. Among the incidents that had notes attached providing more detail, there was no evidence of transgender people being either victims or perpetrators of crimes or of people pretending to be transgender in order to harm others in public restrooms.

[8] We conducted a second analysis using a matching procedure that included localities with clear GIPANDOs, localities with limited GIPANDOs, and matched localities that clearly did not have a GIPANDO. This second analysis found similar results to the analysis presented above. See Appendix for a description and results of this second analysis




Fig. 2 Difference in the average monthly rate of criminal incidents in public restrooms, locker rooms, and changing rooms between localities with clear GIPANDOs and matched localities. Note: Dashed lines represent 90% confidence intervals; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction

It is also important to note that violent and other privacy- related crimes in public restrooms, locker rooms, and changing rooms are exceedingly rare. As a point of comparison, our findings indicated that reports of privacy or safety violations in these public spaces occurred annually at most at a rate of 4.5 per 100,000 population in the jurisdictions we studied; in the Commonwealth of Massachusetts in 2015, violent crimes were reported at a rate of 390.1 per 100,000 population, and rapes were reported at a rate of 32.6 per 100,000 (Federal Bureau of Investigation, 2016). While this may be comforting to those who have safety and privacy related concerns about those spaces, the rarity of such incidents may act as a limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest number of restroom incidents was the locality in which the police department sent their full criminal logs to the researchers and allowed the researchers to review the records to find incidents that met their search criteria. The higher number of incidents might be more likely to indicate that the researchers performed a more detailed and exhaustive search than the other searches performed within police departments, rather than that there were actually more incidents in that locality. That locality was a matched pair locality, so this may have contributed to the greater number of incidents reported in matched pair localities, as compared to GIPANDO localities. However, the difference-in-difference approach would account for any such bias because we do not rely on the numbers of individual incidents reported for the analyses, but instead rely on the differences within jurisdictions before and after passage of GIPANDOs. We can assume that data collection efforts were consistent within each jurisdiction, and therefore, our calculations produce differences that are comparable across jurisdictions.

Table 4 Average number of incidents per year as documented by police departments by localities with clear GIPANDOs, limited GIPANDOs and matched localities before-and-after policy passage

| | Localities with clear GIPANDOs | Localities with limited GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|---|
| Before passage | 1.0 (0.26 per 100,000) [− 0.91 per 100,000, 1.44 per 100,000] | 1.5 (2.55 per 100,000) [− 0.07 per 100,000, 5.18 per 100,000] | 2.5 (1.07 per 100,000) [− 0.00 per 100,000, 2.15 per 100,000] | − 0.81 per 100,000 [−2.40 per 100,000, 0.78 per 100,000] |
| After passage | 1.5 (0.63 per 100,000) [− 0.54 per 100,000, 1.81 per 100,000] | 0.5 (0.85 per 100,000) [− 1.78 per 100,000, 3.48 per 100,000] | 3 (1.32 per 100,000) [0.24 per 100,000, 2.39 per 100,000] | − 0.68 per 100,000 [−2.27 per 100,000, 0.91 per 100,000] |
| Change per 100,000 (after−before) | 0.37 per 100,000 [− 1.29 per 100,000, 2.03 per 100,000] | − 1.70 per 100,00 [− 5.42 per 100,000, 2.01 per 100,000] | 0.24 per 100,000 [− 1.27 per 100,000, 1.76 per 100,000] | 0.13 per 100,000 [−2.12 per 100,000, 2.38 per 100,000] |
| Total annual average | 1.25 (0.45 per 100,000) [0.05 per 100,000, 0.85 per 100,000] | 1.0 (1.70 per 100,000) [0.24 per 100,000, 3.16 per 100,000] | 2.75 (1.19 per 100,000) [0.29 per 100,000, 2.10 per 100,000] | |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_2$¼ 1:42; *p* ¼ 0:49; Fisher's exact ¼ 0:658. Difference-in-difference = 0.41, bootstrapped S.E. = 1.05, *p* = 0.699

Finally, though all of the requests were worded and followed up upon in the same manner, the depth of the results may have varied. Three localities were unable to provide complete incident data, which may decrease the internal validity of the current study. Cases where there was missing data from a matched locality led to the exclusion of the locality with a GIPANDO from the analysis because of the lack of comparable data, which may impact the external validity of the current study.

Despite these limitations, this study is able to empirically assess the relationship between nondiscrimination laws that are inclusive of gender identity in public accommodations and safety and privacy in public restrooms. While criminal incidents do, in fact, rarely occur in such spaces, these findings suggest that concerns over the safety in those spaces should be more generally related to community safety and policing, and not related to nondiscrimination laws.

Fig. 3 Differences in the average monthly rate of criminal incidents in public restrooms, locker rooms and changing rooms among localities with clear GIPANDOs and limited GIPANDOs compared to matched localities without GIPANDOs. Notes: 90% confidence intervals represented by dashed lines; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction.



## Conclusion

Opponents of gender identity nondiscrimination laws in public accommodations have largely cited fear of safety and privacy violations in public restrooms, locker rooms, and changing rooms if such laws are passed, while proponents have argued that the laws do not increase danger or harm in such spaces. To date, no evidence has been gathered to empirically test the hypothesized effect of these laws. This is the first study to collect public records and analytically compare the safety of public restrooms, locker rooms, and changing rooms in localities that have gender identity inclusive nondiscrimination laws that apply to public restrooms and matched localities that do not have such laws. The results show that the passage of such nondiscrimination laws is not related to the number or frequency of criminal incidents in such public spaces. Additionally, the results show that reports of privacy and safe- ty violations in public restrooms, locker rooms, and changing rooms were exceedingly rare and much lower than statewide rates of reporting violent crimes more generally. This study provides evidence that fears of increased safety and privacy violations as a result of nondiscrimination laws are not empirically grounded.

**Acknowledgements** The authors would like to thank Kerith Conron and Brad Sears for their extensive feedback on analytical approaches and presentation of findings. The authors would also like to thank the records keepers at the police departments throughout Massachusetts who assisted in responding to the public records requests that were a necessary part of the data collection for this project. The authors would also like to thank Chrissy Reinard and Joseph Rocha, who provided assistance in executing one round of public records requests. Thanks also go to Taylor Brown, who provided research assistance on crime rates throughout New England, and Fernanda Miramontes, who copy edited this paper. Finally, thank you to the editor and anonymous reviewers for their feed- back and publication assistance.

### Compliance with Ethical Standards

Ethical Approval This article does not contain any studies with human participants or animals performed by any of the authors. An IRB exemption was obtained by the authors for use of de-identified criminal record data (IRB#15-001060).

Conflict of Interest Amira Hasenbush declares that she has no conflict of interest. Andrew Flores declares that he has no conflict of interest. Jody Herman declares that she has no conflict of interest.

## Appendix: Placebo Matched Pairs Analysis

The analysis was re-conducted using a second matching procedure. Localities with clear GIPANDOs were matched to localities that clearly did not have a GIPANDO, and localities with limited GIPANDOs (i.e., Brookline and Cambridge) were also matched to localities that clearly did not have a GIPANDO (see Table 2). The limited GIPANDOs offer a type of placebo comparison, where a policy was introduced but not clearly inclusive of the protections that are afforded in localities with clear GIPANDOs.

Table 4 provides a contingency table showing the average annual number of incidents, similar to the analysis in the re- port. For this analysis, there were three levels of treatment: a group of localities with clear GIPANDOs, a limited GIPANDO group that introduced a gender identity policy, but made exceptions or lacked clarity on restrooms, and the matched localities group without GIPANDOs. There were fewer overall incidents in the group with clear GIPANDOs when compared to the matched localities, but there were no apparent patterns of an increase in victimization in the timeframe after passage. These differences were also not significantly different from one another. A Fisher's exact test indicated that there was no significant relationship between GIPANDOs and restroom crimes. An estimate of the before- and-after changes between the localities with clear GIPANDOs and their matched pairs of the average proportion of monthly incidents in locations also showed no statistically significant difference. There does not appear to be a relation- ship between policy introduction and restroom incidents. Again, here, even if there were many more localities, a statistical power analysis found that it is unlikely that there would be a statistically significant difference between GIPANDO localities and matched localities. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.85, suggesting that the null hypothesis of no difference would also fail to be rejected with a greater number of matched pairs.

Similar to before, we assessed trends in crime rates be- tween these localities. This way, it could be assessed whether trends in crime rates increased in clear GIPANDO localities and limited GIPANDO localities, as compared to their matched localities. The figure limits the timeframe to 12 months before and 12 months after the passage of the local GIPANDOs. A 12-month window was chosen because some localities in this analysis were asked to provide incidents with- in a two-year timeframe, so we restrict the plot to the timeframe common to all localities.

In Fig. 3, the model included differences between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities (black line), and differences be- tween the limited GIPANDOs with unclear enforceability or restroom exceptions and their matched localities (gray line). The local regressions showed a lot of overlap between and across these three groups. As opposed to the analysis in the body of the report, which showed slightly lower crime rates in the GIPANDO localities as compared to their matched pairs after policy introduction, there was no statistically significant difference in the average monthly proportion of criminal incidents in restrooms both over time and across contexts.

These results indicate that changes in the average rate of criminal incidents are not related to the passage of GIPANDOs. The limited GIPANDOs provide another source of comparison, and these additional comparisons indicate that clear GIPANDOs are not uniquely related to increases in aver- age rates of criminal incidents.

## References


American Civil Liberties Union. (2017). G.G. v. Gloucester County School Board. Retrieved March 16, 2018, from https://www.aclu.org/cases/gg-v-gloucester-county-school-board.

Andersen, E. A. (2017). Transformative events in the LGBTQ rights movement. *Indiana Journal of Law and Social Equality, 5*(2), 441–475.

Badgett, M. V. L. (2001). *Money, myths and change: Economic lives of lesbians and gay men*. Chicago: University of Chicago Press.

Department of Housing and Urban Development (2016, September 20). HUD issues final rule to ensure equal access to housing and services regardless of gender identity. Retrieved May 25, 2017, from https:// portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2016/HUDNo_16-137

Diamond, A., & Sekhon, J. S. (2013). Genetic matching for estimating causal effects: A general multivariate matching method for achiev- ing balance in observational studies. *The Review of Economics and Statistics, 95*(3), 932–945.

Dimick, J. B., & Ryan, A. M. (2014). Methods for evaluating changes in health care policy: The difference-in-differences approach. *Journal of the American Medical Association, 312*(22), 2401–2402.

Equal Employment Opportunity Commission v. Harris Funeral Homes, 884 F.3d 560 (6th Cir. 2018)

Fausset, R. (2017, March 29). Retrieved May 2, 2017, from https://www. nytimes.com/2017/03/29/us/north-carolina-lawmakers-reach-deal- to-repeal-so-called-bathroom-bill.html.

Federal Bureau of Investigation. (2016). Crime in the United States by region, geographic division, and state, 2014–201. Retrieved February 2, 2017, from https://ucr.fbi.gov/crime-in-the-u.s/2015/ crime-in-the-u.s.-2015/tables/table-4.

Fejes, F. (2008). *Gay rights and moral panic: The origins of America's debate on homosexuality*. New York: Palgrave Macmillan.

Fernandez, M., & Smith, M. (2015, November 3). Retrieved May 2, 2017, from http://www.nytimes.com/2015/11/04/us/houston- voters-repeal-anti-bias-measure.html?_r=0.

Fetner, T. (2008). *How the religious right shaped lesbian and gay activism*. Minneapolis: University of Minnesota Press.

Fogg Davis, H. (2017). Why the ʙtransgender^ bathroom controversy should make us rethink sex-segregated public bathrooms. *Politics, Groups, and Identities*, 1–18. https://doi.org/10.1080/21565503. 2017.1338971.

G. G. v. Gloucester County School Board, 137 S. Ct. 1239 (2017).

G.G. v. Gloucester County School Board, 132 F. Supp. 3d 736, 750 (E.D. Va. 2015)

Gender Identity Act, H.B. 3810, 187th Gen. Court (Mass. 2011). Hasenbush, A., Flores, A. R., Kastanis, A., Sears, B., & Gates, G. J. (2014). The LGBT divide: A data portrait of LGBT people in the Midwestern, Mountain & Southern states. The Williams Institute. Available from https://williamsinstitute.law.ucla.edu/wp-content/ uploads/LGBT-divide-Dec-2014.pdf.

Herek, G. M. (1991). Myths about sexual orientation: A lawyer's guide to social science research. *Law & Sexuality, 1*(133), 133–172.

Herek, G. M. (2006). Legal recognition of same-sex relationships in the United States: A social science perspective. *American Psychologist, 61*(6), 607–621.

Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management and Social Policy*, 65–80.

Holden, D. (2018, February 12). Retrieved March 16, 2018, from https:// www.buzzfeed.com/dominicholden/edu-dept-trans-student-bathrooms?utm_term=.mvmwQx3mb#.bwlqp5QlV.

House Bill 2: House Floor Debate on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 43 (2016) (testimony of Rodney W. Moore).

House Bill 2: Senate Floor Session on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 14–-16 (2016) (testimony of E. S. ʙBuck^ Newton).

Human Rights Bylaw, Amherst, Mass., Gen. Bylaws Art. 1 (2009).

Human Rights Campaign. (2016). Cities and counties with non- discrimination ordinances that include gender identity. Retrieved May 24, 2017, from http://www.hrc.org/resources/cities-and- counties-with-non-discrimination-ordinances-that-include-gender.

Imai, K., & Ratkovic, M. (2014). Covariate balancing propensity score. *Journal of the Royal Statistical Society, 76*(1), 243–263.

Jackson, C. (2017, June 6). *OCR instructions to the field re complaints involving transgender students [memorandum]*. Washington, DC: Office for Civil Rights, Department of Education Retrieved July 11, 2017, from https://assets.documentcloud.org/documents/ 3866816/OCR-Instructions-to-the-Field-Re-Transgender.pdf

Keele, L., & Titiunik, R. (2015). Geographic boundaries as regression discontinuities. *Political Analysis, 23*(1), 127–155.

Kelly, D. (2016, March 28). Anchorage LGBT rights law opponents seek amendments through initiative. Alaska Dispatch News. Retrieved May 2, 2017, from https://www.adn.com/alaska-news/article/ opponents-anchorage-equal-rights-law-seek-amendments/2016/03/29/.

Kralik, J. (2017, April 12). ʙBathroom bill^ legislative tracking. Retrieved May 2, 2017, from http://www.ncsl.org/research/ education/-bathroom-bill-legislative-tracking635951130.aspx.

Levy, B. L., & Levy, D. L. (2017). When love meets hate: The relation- ship between state policies on gay and lesbian rights and hate crime incidence. *Social Science Research, 61*, 142–159.

Lusardi v. Dep't of the Army, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Mar. 27, 2015).

MacGillis, A. (2017, August 22). Is anybody home at HUD? New York Magazine. Available from http://nymag.com/daily/intelligencer/2017/08/ben-carson-hud-secretary.html.

Mass. Gen. Laws ch. 151B § 4 (1989). Mass. Gen. Laws. ch. 66, §10 (2016).

Miller, P. R., Flores, A. R., Haider-Markel, D. P., Lewis, D. C., Tadlock,
B. L., & Taylor, J. K. (2017). Transgender politics as body politics: Effects of disgust sensitivity and authoritarianism on transgender rights attitudes. *Politics, Groups, and Identities, 5*(1), 4–24.

Minn. Stat. § 363A.11 (1993).

Movement Advancement Project. (2017). Non-discrimination laws. Retrieved May 24, 2017, from http://www.lgbtmap.org/equality-maps/non_discrimination_laws.

Nebraska v. U.S., No. 4:16-CV-03117, first amended complaint for de- claratory and injunctive relief (U.S.D. Neb. Oct. 21, 2016).

Nebraska v. U.S., No. 4:16-cv-03117-JMG-CRZ (U.S.D. Neb. Mar. 16, 2017).

Nebraska v. U.S., No. 4:16CV3117 (U.S.D. Neb. Nov. 23, 2016).

Occupational Safety and Health Administration. (2015). Best practices: A guide to restroom access for transgender workers. Retrieved May 25, 2017, from https://www.osha.gov/Publications/ OSHA3795.pdf.

Philipps, D. (2016, March 23). Retrieved May 25, 2017, from https:// www.nytimes.com/2016/03/24/us/north-carolina-to-limit- bathroom-use-by-birth-gender.html.

Radway, D. B., Town of Amherst, Mass. Director of Human Resources & Human Rights. (2015 April 23). [E-mail correspondence]. On file with the author.

Raifman, J., Moscoe, E., Austin, S. B., & McConnell, M. (2017). Difference-in-differences analysis of the association between state same-sex marriage policies and adolescent suicide attempts. *Journal of the American Medical Association Pediatrics, 171*(4), 350–356.

Schneider, A., & Ingram, H. (1993). Social construction of target popu- lation: Implications for politics and policy. *American Political Science Review, 87*(2), 334–347.

Sekhon, J. S. (2011). Multivariate and propensity score matching soft- ware with automated balance optimization: The matching package for R. *Journal of Statistical Software, 42*(7), 1–52.

Simmons, L. N., Chief of Staff, City of Northampton, Mass. Office of the Mayor. (2015, April 23–May 12). [E-mail correspondence]. On file with the author.

Stone, A. L. (2012). *Gay rights at the ballot box*. Minneapolis: University of Minnesota Press.

Texas v. U.S., 201 F. Supp. 3d 810 (N.D. Tex. Aug. 21, 2016).

Texas v. U.S., No. 16-11534, defendants-aAppellants' nNotice of wWithdrawal of mMotion for pPartial sStay pPending aAppeal and jJoint mMotion to cCancel oOral aArgument (2017).

Transgender Anti-Discrimination Act, Mass. Gen. Laws ch. 272 §§ 92A, 98 (2016).

Truman, J. L., & Langton, L. (2014). Criminal victimization, 2013. Retrieved from Bureau of Justice Statistics website May 2, 2017, http://www.bjs.gov/content/pub/pdf/cv13.pdf.

U.S. Department of Justice & U.S. Department of Education. (2016). . Retrieved May 2, 2017, from http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

U.S. Department of Justice & U.S. Department of Education. (2017). . Retrieved May 2, 2017, from https://www.justice.gov/crt/page/file/942021/download.

Westbrook, L., & Schilt, K. (2014). Doing gender, determining gender: Transgender people, gender panics, and the maintenance of the sex/gender/sexualitysystem. *Gender and Society, 28*(1), 32–57.

Worcester, Mass., Rev. Ordinances part 2, art. 10 §18(c)(1) (2014). Worcester, Mass., Rev. Ordinances Part 2, art. 10 §9(c) (2014).

Young, C. A. (2016, October 11). Question to repeal transgender accom- modations law qualifies for 2018 ballot. Retrieved May 2, 2017, from http://www.wbur.org/news/2016/10/11/ballot-question- transgender-accommodations-law.

# Exhibit 15

VISIT IDAHO

# THE IDAHO TOURISM EFFECT

Tourism is the state's **third-largest** industry, behind agriculture and technology

**TOP REASONS** visitors come to Idaho:

- visit friends and family
- tour the region
- experience the outdoors
- city trip

**Average Length of Stay**

**3.4** nights

**37.0 million** visitors to Idaho

**40%** overnight trips

**60%** day trips

**12.2%** **increase** in visitor spending compared to 2019

**$158** **average** spent per person on overnight trips

**$62** **average** spent per person on day trips

**$4.8** **billion** in direct travel spending

**84%** of tourism spending is generated from **out-of-state** visitors

**$1.36B** food service & stores

**$746M** local transportation

**$974M** accommodations

**$615M** entertainment

**$533M** retail sales




These percentages reflect visitor origins.

Longwoods International, Travel USA Visitor Profile, 2021 & Dean Runyan Associates, 2021 Idaho Economic Impact Report. Figures reflect domestic travel only through 2021.

FOLLOW US: VISITIDAHO.ORG

# Exhibit 16

UCLA School of Law Williams Institute

RESEARCH THAT MATTERS

# VIOLENCE AND HARASSMENT AGAINST TRANSGENDER ADULTS in California

November 2025

Jordan Grasso
Ilan Meyer

# CONTENTS

EXECUTIVE SUMMARY .... 2
KEY FINDINGS .... 2
INTRODUCTION .... 6
FINDINGS .... 9
SAMPLE CHARACTERISTICS .... 9
OVERALL EXPERIENCES OF VIOLENCE .... 10
PHYSICAL VIOLENCE .... 11
BATHROOM VIOLENCE AND HARASSMENT .... 16
THREATS OF PHYSICAL VIOLENCE .... 19
VERBAL HARASSMENT .... 23
ONLINE HARASSMENT .... 27
ANALYTIC PREDICTORS OF VIOLENCE OR HARASSMENT .... 31
DISCUSSION .... 34
METHODS .... 37
LIMITATIONS .... 37
AUTHORS .... 39
ACKNOWLEDGMENTS .... 39
SUGGESTED CITATION .... 39
APPENDIX .... 40

# EXECUTIVE SUMMARY

Transgender people in the United States consistently experience disproportionately high rates of violence compared with cisgender individuals. This report examines the victimization of transgender adults in California, a "high equality" state with some of the strongest legal and policy protections for transgender people and home to an estimated 263,700 transgender adults. Despite these protections, prior qualitative and small-scale research indicates that transgender individuals in California still face higher risks of victimization than their cisgender counterparts.

This report examines the experiences of victimization among transgender adults in California using data from the 2022 U.S. Transgender Survey—the largest community-based survey of transgender people in the United States. The analysis focuses on 9,146 California respondents aged 18 and older who identified as transgender men, transgender women, or nonbinary. It explores experiences of physical attacks, threats, verbal and online harassment, and bathroom-related violence, as well as how rates of victimization vary across demographic groups. The report also assesses whether individuals who are more visibly identifiable as transgender face greater risks of violence and harassment.

## KEY FINDINGS

Overall, 59% of California USTS adult respondents experienced at least one incident of violence or harassment in the year prior to completing the survey. The most common form of violence or harassment was online harassment (42%), followed by verbal harassment (38%), threats of physical violence (19%), bathroom-related violence or harassment (17%), and physical attacks (7%).

**Types of violence, threats, and harassment experienced in the past year among adult 2022 USTS respondents in California**



## Physical Attacks

Almost one in ten (7%) California USTS respondents reported experiencing one or more physical attacks in the past year. Among those who experienced physical attacks, the number of incidents ranged from one to five or more (average: 2), with 11% reporting five or more attacks.

- Physical attacks were significantly associated with education and income. Rates were about three times higher among respondents with less than a high school diploma (13%) or an annual income of $1–$24,999 (10%) compared with those holding a bachelor's degree or higher (4%) or earning $100,000 or more (3%).
- Hispanic or Latine transgender women reported disproportionately high rates of physical attacks (12%), particularly compared with Hispanic or Latine transgender men (5%) and nonbinary individuals (assigned female at birth: 5%; assigned male at birth: 2%).
- Transgender adults who believe they are perceived by others as transgender most or all of the time were more likely to experience physical attacks (10%) than those who are rarely or never perceived as transgender (6%).
- Physical attacks were primarily committed by strangers (66%), and 70% of respondents reported that the attacks involved grabbing, punching, or choking.

## Bathroom Violence and Harassment

One in six (17%) California USTS reported experiencing some form of violence or harassment while using a public restroom in the year prior to completing the survey. Respondents who experienced bathroom violence or harassment primarily indicated being told they were using the wrong bathroom (15%), followed by 7% of respondents who indicated other types of verbal harassment, 5% who were denied access, and 1% who experienced physical violence or unwanted sexual contact.

- Experiences of bathroom violence and harassment were particularly pronounced among California USTS respondents who have less than a high school diploma (13%), especially relative to those with a high school diploma (6%), some college experience (5%), or a bachelor's degree (5%).
- Transgender men had disproportionately high rates of bathroom violence or harassment: 19% of White, non-Hispanic transgender men, 25% of Black, non-Hispanic transgender men, and 20% of Hispanic or Latine transgender men. White, non-Hispanic AFAB nonbinary people (18%) and 21% of Hispanic or Latine AFAB nonbinary people also reported high rates of bathroom violence or harassment.
- Trans visibility significantly increased prevalence rates of bathroom violence and harassment. Approximately 20%–40% of transgender adults across gender identities who believed they were perceived as transgender most or all of the time reported experiencing bathroom violence or harassment, compared with 6%–11% among those who were rarely or never perceived as transgender.
- Over two in five (41%) AFAB nonbinary people who believe they are always or most of the time perceived as transgender reported experiencing bathroom violence or harassment in the preceding year, compared to 11% of AFAB nonbinary people who believe they are rarely or never perceived as transgender.

## Threats of Physical Violence

Nearly one in five (19%) California USTS respondents were threatened with physical violence in the year prior to completing the survey. On average, respondents who reported experiences of physical violence threats had an average of 2.9 threats in the prior year.

- Experiences of threats were related to income and education level. California USTS respondents with lower educational attainment or lower incomes experienced significantly higher rates of threats in the prior year.
- Over one-fourth (26%) of respondents with less than a high school degree experienced a threat of physical violence in the prior year, compared to 15% among those with a bachelor's degree or higher.
- Respondents with annual incomes between $1 and $24,999 were more than twice as likely to be threatened with physical violence (26%) as those with household incomes of $100,000 or more (12%).

## Verbal Harassment

Over one-third (38%) of California USTS respondents reported experiencing verbal harassment in the year prior to completing the survey. Among those who experienced verbal harassment, the vast majority (84%) believed it occurred because of their transgender status, gender identity, or gender expression. Put differently, nearly one-third (32%) of all California USTS respondents reported experiencing verbal harassment because of their transgender status, gender identity, or gender expression in the year prior to the survey.

- One in five (20%) respondents reported experiencing verbal harassment related to their transgender status or gender by a stranger in a public place in the past year.
- Verbal harassment was more commonly reported among White, non-Hispanic (40%) and Hispanic or Latine (38%) transgender adults.
- Rates of verbal harassment were higher among respondents with lower education and income levels. Nearly half (46%) of those with less than a high school education reported verbal harassment, compared with 35% of those with a bachelor's degree or higher. Similarly, those earning $1–$24,999 (42%) or $25,000–$49,999 (42%) reported significantly higher rates than those earning $100,000 or more (34%).
- Approximately half (47%–54%) of transgender adults across gender identities who believed they were perceived as transgender most or all of the time reported experiencing verbal harassment, compared with 24%–35% among those who were rarely or never perceived as transgender.

## Online Harassment

Online harassment was the most common form of violence or harassment experienced by California USTS respondents in the year prior to completing the survey. It included being called offensive names (33%), followed by intentional embarrassment (21%), sexual harassment (16%), physical threats (12%), sustained harassment (12%), and stalking (9%).

- Nearly half (48%) of younger respondents aged 18–24 reported experiencing online harassment in the past year, compared with 30% of those aged 45 and older.

- AFAB nonbinary respondents reported the lowest rates of online harassment (36%), compared with 46% of AMAB nonbinary respondents, 45% of transgender women, and 42% of transgender men.
- Online harassment rates were highest among several groups, including Hispanic or Latine (48%) and White, non-Hispanic (46%) transgender women; Hispanic or Latine transgender men (45%); White, non-Hispanic AFAB nonbinary people (42%); and AMAB nonbinary people who were Hispanic or Latine (56%) or multiracial/another race (55%).
- Online harassment was closely linked to socioeconomic status. About 35% of transgender adults with a bachelor's degree or higher or earning $100,000 or more reported experiencing online harassment. In contrast, between 41% and 46% of those with less than a bachelor's degree, and 44%–47% of those with household incomes between $1 and $74,999, reported similar experiences.

## Predictors of Violence and Harassment

Transgender visibility, or the extent to which respondents believed others could tell they are transgender even without disclosure, was the most consistent predictor of experiencing violence or harassment among California USTS respondents. The probability of experiencing each type of violence or harassment was significantly higher among those who believed they were perceived as transgender all or most of the time, compared with those who were rarely or never perceived as transgender, even after controlling for factors such as age, race and ethnicity, gender identity, education, and income.

**Predicted probability of experiencing different types of violence, threats, and harassment among adult 2022 USTS respondents in California over one year, by trans visibility**




Note: Predicted probabilities are derived from adjusted logistic regression models presented in Table 2, controlling for age, race/ethnicity, gender identity, education, and household income.

# INTRODUCTION

Transgender people[1] in the United States face significantly higher rates of criminal victimization compared to their cisgender counterparts.[2] Findings from the 2017-2018 National Crime Victimization Survey (NCVS)—a nationally representative sample of U.S. residents aged 16 and older—showed that transgender people experienced 86.2 victimizations per 1,000 individuals, a rate four times higher than their cisgender counterparts (21.7 per 1,000).[3] The 2015 U.S. Transgender Survey (USTS), the largest community survey of transgender people at that time, found that 13% of respondents experienced a physical attack in the year preceding the survey.[4] Such violence is often underreported to law enforcement due to distrust, causing police-reported data and criminal convictions to underestimate the true prevalence of victimization.[5] As a result, self-reported data from sources like the NCVS and USTS are particularly informative.

In this report, we examine the victimization of transgender individuals in California, which is home to an estimated 263,700 adults who identify as transgender.[6] California has some of the strongest legal protections for transgender people. The Movement Advancement Project classifies California as a "high equality state," and it holds one of the highest ratings for transgender-supportive laws and policies among all states.[7] State laws prohibit discrimination in areas of employment, education, housing, public accommodations, and credit and lending. California also has anti-bullying policies that enumerate LGBTQ status. It also recognizes gender identity and expression in hate crime laws,[8] prohibits the use of "trans-panic" defenses in criminal cases, and allows individuals to update their name and gender marker on official documents such as birth certificates and driver's licenses.[9]

---

[1] Throughout this report, we use the term "transgender" as an umbrella term to describe individuals whose gender identity differs from the sex they were assigned at birth, encompassing those who identify as transgender or nonbinary those who may identify or are transgender or nonbinary. We specify throughout the report when we are discussing particular groups, such as transgender women, transgender men, or nonbinary people.

[2] Flores, A. R., Meyer, I. H., Langton, L., & Herman, J. L. (2021). Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018. *American Journal of Public Health*, *111*(4), 726–729; Meyer, I. H., & Flores, A. R. (2025). *Anti-LGBT Victimization in the United States: Results from the National Crime Victimization Survey (2022-2023)*. The Williams Institute; For a comprehensive review of prior research on transgender victimization at the national and state level in California, see Arrayales, J., & Mallory, C. (Forthcoming). *Hate Crimes and Violence Against Transgender People in California and the US: A Review of Existing Research*. The Williams Institute.

[3] Flores, A. R., Meyer, I. H., Langton, L., & Herman, J. L. (2021). Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018. *American Journal of Public Health*, *111*(4), 726–729.

[4] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. National Center for Transgender Equality.

[5] Serpe, C. R., & Nadal, K. L. (2017). Perceptions of police: Experiences in the trans * community. *Journal of Gay & Lesbian Social Services*, *29*(3), 280–299; Shields, D. M. (2021). Stonewalling in the Brick City: Perceptions of and Experiences with Seeking Police Assistance among LGBTQ Citizens. *Social Sciences*, *10*(16), 2–37. Flores, A. R., Stotzer, R. L., Meyer, I. H., & Langton, L. L. (2022). Hate crimes against LGBT people: National crime victimization survey, 2017-2019. *PLoS one*, *17*(12), e0279363

[6] Herman, J. L.,& Flores, A. R. (2025). *How Many Adults and Youth Identify as Transgender in The United States?* The Williams Institute.

[7] Movement Advancement Project. (2025). *Mapping Transgender Equality in the United States.* https://www.lgbtmap.org/mapping-trans-equality

[8] For more on the robustness of California's hate crime laws, see Arrayales, J., & Mallory, C. (Forthcoming). *Overview of California and Federal Hate Crime Laws that Include Gender Identity as a Protected Characteristic*. The Williams Institute.

[9] Movement Advancement Project. (2025). *California: State equality profile*. https://www.lgbtmap.org/equality_maps/profile_state/CA

Prior research on transgender victimization in California has shown higher risks for victimization among transgender individuals compared with their cisgender counterparts. The California Violence Experiences Survey, for example, examined differences in physical violence, sexual assault or harassment, and intimate partner violence by gender identity.[10] The study found that transgender people, especially transgender men, reported higher rates of past-year physical and sexual violence compared to cisgender individuals, particularly cisgender women. Data from the California Health Interview Survey also indicate that approximately one in five (19%) transgender adults reported experiencing a hate act within the preceding year.[11] Over two-thirds (69%) of transgender adults who experienced a hate act reported that it took place in public spaces such as streets and sidewalks. The majority involved verbal abuse (89%) or cyberbullying (33%), while a smaller share (4%) reported physical violence.[12]

Other research has largely relied on qualitative and small-scale studies. In San Francisco, a survey study of transgender women found that over a third (37%) had experienced violence in the year prior to the study, including sexual violence (17%), intimate partner violence (15%), and other forms of physical violence (25%).[13] In another study of 32 transgender participants in Los Angeles—78% of whom were transgender women—focus group findings found that nearly all participants (94%) had experienced at least one incident of victimization in their lifetime;[14] 75% reported verbal harassment, 59% threats of violence, 53% physical attacks, and 38% sexual assault. The majority of these incidents were perpetrated by strangers (72%), followed by law enforcement (31%), family members (28%), and friends (25%).

One of the few available sources of administrative data on transgender-specific violence is the California Department of Justice's annual hate crime reports, which offer specific insight into violence motivated by anti-transgender or anti-gender nonconforming bias. These reports showed a sharp rise in such offenses over time, with an increase from 26 hate crime events in 2015 to 80 events in 2024—a 208% increase over the past decade.[15] A recent Williams Institute analysis of administrative data examined gender identity hate crimes against transgender and gender nonconforming people in California. The findings show that such crimes were more likely than other bias-motivated crimes—such as those based on sexual orientation, race/ethnicity, or religion—to involve violence targeting people rather than property. They also more frequently involve "personal weapons," where perpetrators use hands, fists, and feet to attack the victim.[16]

---

[10] Closson, K., Boyce, S. C., Johns, N., Inwards-Breland, D. J., Thomas, E. E., & Raj, A. (2024). Physical, Sexual, and Intimate Partner Violence Among Transgender and Gender-Diverse Individuals. *JAMA Network Open*, *7*(6), 1–11.

[11] UCLA Center for Health Policy Research. (2025). California Health Interview Survey (CHIS). UCLA Center for Health Policy Research. https://healthpolicy.ucla.edu/our-work/california-health-interview-survey-chis

[12] UCLA Center for Health Policy Research. (2025). California Health Interview Survey (CHIS). UCLA Center for Health Policy Research. https://healthpolicy.ucla.edu/our-work/california-health-interview-survey-chis (Analysis on file with author)

[13] Jackson, A., Hernandez, C., Scheer, S., Sicro, S., Trujillo, D., Arayasirikul, S., McFarland, W., & Wilson, E. C. (2022). Prevalence and Correlates of Violence Experienced by Trans Women. *Journal of Women's Health*, *31*(5), 648–655.

[14] Gauthier, J., Medina, K., & Dierkhising, C. (2021). Analysis of Hate Crimes in Transgender Communities. *Journal of Hate Studies*, *17*(2), 4–14.

[15] California Department of Justice. (2025). *Hate Crime in California 2024*.

[16] Grasso, J., Cisneros, N., & Meyer, I. (Forthcoming). *Gender Identity Hate Crimes in California*. The Williams Institute.

In this report, we use data from the 2022 U.S. Transgender Survey, the largest community-based convenience sample of transgender people in the United States, to describe experiences of victimization among transgender adults in California. We examined the prevalence of forms of victimization—including physical attacks, bathroom-related violence and harassment, threats of violence, and verbal and online harassment—with a particular focus on how these experiences vary across demographic factors including age, race/ethnicity, gender identity, education, and income. We also assess the role of transgender visibility in victimization.[17]

[17] Jackson, A., Hernandez, C., Scheer, S., Sicro, S., Trujillo, D., Arayasirikul, S., McFarland, W., & Wilson, E. C. (2022). Prevalence and Correlates of Violence Experienced by Trans Women. *Journal of Women's Health*, *31*(5), 648–655.

# FINDINGS

## SAMPLE CHARACTERISTICS

A total of 9,146 California adults (aged 18 years or older) identifying as transgender men, transgender women, or nonbinary responded to the 2022 U.S. Transgender Survey.[18] As shown in Table 1, respondents were relatively young, with 40% between the ages of 18 and 24 and an average age of 33 (*SD* = 15 years; median = 28 years).[19] Over one-third of California USTS respondents were white, non-Hispanic (37%); 35% were Hispanic/Latine; 17% were Asian, non-Hispanic; 6% were Black, non-Hispanic; and 6% identified as another race or multiracial.[20]

In terms of gender identity, respondents were distributed in a way that largely reflects recent estimates of the overall transgender population in the U.S.: 26% are transgender men, 35% are transgender women, and 39% are nonbinary.[21] Among nonbinary respondents, about 80% (31% of the total sample) were assigned female at birth (AFAB) and about 20% (8% of the total sample) were assigned male at birth (AMAB).

Approximately one-third of the sample (30%) held a high school diploma or GED, while 15% had not completed high school. The remaining respondents had higher levels of education: 35% had some college experience, and 21% held a bachelor's degree or higher.

Economic insecurity affected many respondents. Close to half of the respondents reported low income (below the U.S. mean household income): 8% reported having no household income at all, 23% reported less than $25,000 annually or had no household income, and 18% reported between $25,000 and $49,999.

We also examined the relationship between transgender visibility and experiences of violence. Nearly half (46%) of respondents reported they believed they are rarely or never perceived as transgender,

---

[18] For the purposes of this report, adults who identified as crossdressers on the survey and youth under 18 years old were not included in the analysis. For more on the sampling approach used for the U.S. Transgender Survey, see James, Sandy E., Jody L. Herman, Logan E. Durso, and Rodrigo Heng-Lehtinen. 2024. *Early Insights: A Report of the 2022 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality. (https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf

[19] This is younger than the overall California population (average age 38). That transgender people are younger than the general population is consistent with other estimates of the transgender population in the U.S., Herman, J. L.,& Flores, A. R. (2025). *How Many Adults and Youth Identify as Transgender in The United States?* The Williams Institute. See also U.S. Census Bureau. (2022). *American Community Survey, 2022: ACS 1-Year Estimates Subject Tables*, available at: https://data.census.gov/table/ACSST1Y2022.S0101?q=age+in+california+2022 (last accessed May 2, 2025).

[20] By comparison, recent estimates indicate that among transgender adults in California, 30% are White and non-Hispanic, 46% are Hispanic or Latine, 14% are Asian and non-Hispanic, 4% are Black and non-Hispanic, and 6% identify as another race or as multiracial; See, Herman, J. L.,& Flores, A. R. (2025). *How Many Adults and Youth Identify as Transgender in The United States?* The Williams Institute; Respondents identified as White, Black, or Asian are non-Hispanic. All respondents who identified as Hispanic or Latine are categorized as Hispanic/Latine.

[21] Recent estimates indicate that 33% of the state's transgender population identify as transgender women, 36% transgender men, and 31% nonbinary; Herman, J. L.,& Flores, A. R. (2025). *How Many Adults and Youth Identify as Transgender in The United States?* The Williams Institute.

39% said they believe they are sometimes recognized as transgender, and 16% indicated they believe they are visible as transgender always or most of the time.

**Table 1. Demographic characteristics among adult 2022 USTS respondents in California**

| CATEGORY | % | 95% CI |
|---|---|---|
| **AGE** | | |
| 18–24 | 39.9 | [37.9, 41.8] |
| 25–34 | 27.8 | [26.1, 29.5] |
| 35–44 | 10.8 | [9.6, 12.3] |
| 45+ | 21.5 | [19.5, 23.8] |
| **RACE** | | |
| White, non-Hispanic | 37.1 | [35.1, 39.1] |
| Black, non-Hispanic | 5.7 | [4.7, 7.0] |
| Asian, non-Hispanic | 16.8 | [15.3, 18.4] |
| Hispanic or Latine | 34.7 | [32.8, 36.8] |
| Other race/multiracial | 5.6 | [4.8, 6.6] |
| **GENDER** | | |
| Transgender women | 35.1 | [32.9, 37.3] |
| Trans men | 25.9 | [24.2, 27.7] |
| AFAB nonbinary | 31.3 | [29.5, 33.1] |
| AMAB nonbinary | 7.8 | [6.9, 8.9] |
| **EDUCATION** | | |
| Less than high school | 14.6 | [12.5, 16.9] |
| High school or GED | 29.5 | [27.4, 31.7] |
| Some college | 34.5 | [32.8, 36.2] |
| Bachelor’s degree or higher | 21.4 | [20.3, 22.6] |
| **HOUSEHOLD INCOME** | | |
| No Income | 8.2 | [6.9, 9.7] |
| $1 to $24,999 | 22.9 | [21.0, 24.9] |
| $25,000 to $49,999 | 17.5 | [15.8, 19.2] |
| $50,000 to $74,999 | 14.7 | [13.3, 16.3] |
| $75,000 to $99,999 | 10.6 | [9.4, 11.9] |
| $100,000+ | 26.1 | [24.3, 27.9] |

Note: CI = confidence interval; AFAB = assigned female at birth; AMAB = assigned male at birth; Percentages may not sum to 100 because of rounding.

## OVERALL EXPERIENCES OF VIOLENCE

Experiences of violence and harassment were common among USTS respondents from California. Overall, 59% experienced at least one physical attack, threat of violence, or act of harassment in the year before they were surveyed. The most common form of violence or harassment was online harassment (42%), followed by verbal harassment (38%), threats of physical violence (19%), bathroom-related violence or harassment (17%), and physical attacks (7%).

**Figure 1. Types of violence, threats, and harassment experienced in the past year among adult 2022 USTS respondents in California**




## PHYSICAL VIOLENCE

Among California USTS respondents, 7% experienced one or more acts of physical violence in the past year. Of those who were physically attacked, half (50%) reported a single incident, and 11% reported experiencing five or more incidents, with an average number of physical attacks of 2.1 (SD = 1.9) over the course of the year.

**Figure 2. Reported number of physical attacks in the past year among adult 2022 USTS respondents in California who reported experiencing at least one attack**




### Demographic Characteristics of Victims of Physical Attacks

Figure 3 presents the prevalence of experiencing at least one act of physical violence in the past year across various demographic groups among California USTS respondents. Rates of physical violence did not significantly vary by age, race and ethnicity, gender, and transgender visibility. However, those

with lower educational attainment and lower household incomes were significantly more likely to have experienced physical violence (see also Table A1).

Respondents without a high school diploma (13%) were more likely to experience physical violence in the past year compared to those with a bachelor's degree or higher (4%). Similarly, those with low household incomes—$1 to $24,999 (10%) and $25,000 to $49,999 (8%)—were approximately three times as likely to experience physical violence compared to those earning $100,000 or more (3%).

**Figure 3. Physical violence in the past year among adult 2022 USTS respondents in California, by demographic characteristics**




Among Hispanic or Latine respondents (Figure 4, see also Appendix Table A2), transgender women (12%) experienced physical violence at more than twice the rate of transgender men (5%) and AFAB nonbinary individuals (5%). They also experienced physical violence at approximately six times the rate of AMAB nonbinary people (2%).

Although past-year experiences of physical violence did not statistically differ across racial and ethnic groups, Hispanic or Latine (12%) and multiracial/another race (13%) transgender women were among the groups most likely to have experienced physical violence among California USTS respondents.

**Figure 4. Physical violence in the past year among adult 2022 USTS respondents in California, by race/ethnicity and gender identity**




## Trans Visibility

California USTS respondents who reported that they are more often perceived by others as transgender (always or most of the time: 10%) were more likely to experience physical violence than those who are rarely or never perceived as transgender (6%). For example, as shown in Figure 5 (see also Appendix Table A3), transgender women who were sometimes (10%) or always/most of the time (10%) perceived by others as transgender tended to experience more physical violence than transgender women who were rarely or never seen as transgender (5%).

However, among all individuals who are perceived by others as transgender always or most of the time, AMAB nonbinary people (2%) were less likely to have experienced physical violence compared to transgender women (10%), transgender men (12%), and AFAB nonbinary people (10%). AMAB nonbinary individuals who felt they were perceived as transgender all or most of the time reported lower rates of physical violence (2%) compared to those who believed they were perceived as transgender less frequently (4%–5%).

**Figure 5. Physical violence in the past year among adult 2022 USTS respondents in California, by trans visibility and gender identity**



## Attributions of Motivation for Victimization

Of respondents who experienced physical violence, 66% believed they were targeted one or more times because of their transgender status, gender identity, or gender expression—making it the most common attributed reason for being targeted (Figure 6 and Appendix Table A4).[22] Sexual orientation was the second most frequently reported attribution, cited by 37% of those who experienced one or more acts of physical violence in the past year.

**Figure 6. Attributed reasons for being targeted for physical violence in the past year among adult 2022 USTS respondents in California who reported experiencing a physical attack**




Respondents' perceptions of whether their experiences of physical violence were linked to their trans status, gender identity, or gender expression are related to their race and ethnicity. Across all groups, respondents more frequently attributed to their experiences of violence to their trans status than to other characteristics; however, this was reported most frequently by White, non-Hispanic transgender adults (86%) compared with Black, non-Hispanic (37%), Asian, non-Hispanic (45%), and Hispanic/Latine (56%) transgender adults (see Appendix Table A5).

## Relationship to the Attacker

As shown in Figure 7, 64% of California USTS respondents who experienced a physical attack reported that they were attacked by strangers. Physical attacks by people who were known to the victim were less common, with 16% of victims attacked by relatives, 9% by intimate partners, and 9% by friends.

[22] Attributions do not sum to 100% because respondents could select multiple reasons for why they believed they experienced physical attacks. In addition, some respondents experienced multiple physical attacks that may have been related to different statuses or identities.

**Figure 7. Relationship to the person committing physical violence against transgender people in the past year among adult 2022 USTS respondents in California who reported experiencing a physical attack**




The USTS also asked whether respondents were attacked by a stranger in a public space due to their trans status, gender identity, or gender expression. Nearly half (49%) of respondents who reported being attacked stated they were attacked by a stranger in a public space specifically because they were transgender. Overall, about 3% of California USTS respondents experienced such an attack.

## Weapons Used

Respondents who experienced physical attacks were asked to describe the nature of the violence they experienced and, if applicable, the types of weapons used across attacks. The most common types of physical attacks were close, interpersonal attacks. As shown in Figure 8, transgender adults most commonly reported experiences of being grabbed, punched, or choked (70%). Approximately 31% reported that objects, such as rocks or bottles, were thrown at them. Sexual assaults accounted for 16% of incidents.

**Figure 8. Type of physical violence attack(s) in the past year among adult 2022 USTS respondents in California who reported experiencing a physical attack**



# BATHROOM VIOLENCE AND HARASSMENT

One in six (17%) respondents reported experiencing some form of violence or harassment while using a public restroom in the past year (Figure 9). The most common experience was being questioned or told they were in the wrong restroom (15%). Other experiences in bathrooms included verbal harassment (7%) and having been denied access to a restroom altogether (5%). About 1% said they experienced physical violence or unwanted sexual contact in a public restroom in the same period.

**Figure 9. Type of bathroom violence or harassment in the past year among adult 2022 USTS respondents in California**




## Demographic Characteristics of Victims of Bathroom Violence and Harassment

Demographic characteristics of victims of bathroom violence and harassment are shown in Figure 10 (see also Appendix Table A1). Education level was associated with experiences of bathroom violence and harassment: over one in ten (13%) respondents with less than a high school education reported bathroom violence, compared with 6% of those with a high school diploma, 5% of those with some college experience, and 6% of those with a bachelor's degree or higher.

Fewer Asian, non-Hispanic transgender women (9%) and AMAB nonbinary individuals (5%) reported experiencing bathroom-related violence or harassment, compared with 32% of transgender women who are multiracial or of another race. Transgender men also had disproportionately high rates: 19% of White, non-Hispanic; 25% of Black, non-Hispanic; and 20% of Hispanic or Latine transgender men reported such experiences. Similarly, elevated rates were observed among AFAB nonbinary individuals, with 18% of White, non-Hispanic, and 21% of Hispanic or Latine individuals experiencing bathroom-related violence or harassment. Race/ethnic differences by gender are shown in Figure 11 (see also Appendix Table A2).

**Figure 10. Bathroom violence and harassment in the past year among adult 2022 USTS respondents in California, by demographic characteristics**



**Figure 11. Bathroom violence and harassment in the past year among adult 2022 USTS respondents in California, by race/ethnicity and gender**




## Trans Visibility

More respondents who believed they are seen by others as transgender most or all of the time (13%) reported an experience of bathroom violence or harassment than those who believed they are rarely or never seen as transgender 3%. This pattern is consistent across gender identities (see Figure 12 and Appendix Table A3).

**Figure 12. Bathroom violence and harassment in the past year among adult 2022 USTS respondents in California, by trans visibility and gender identity**



## THREATS OF PHYSICAL VIOLENCE

About one in five (19%) California USTS respondents reported being threatened with physical violence in the past year. Among those who experienced such threats, the average number of threatening incidents was nearly three (2.9, *SD* = 2.6; median = 2) over the year. The majority of respondents (63%) reported multiple threats of physical violence, while 37% experienced a single threat.

**Figure 13. Reported number of physical violence threats in the past year among adult 2022 USTS respondents in California who reported experiencing at least one threat**




### Demographic Characteristics of Respondents Who Experienced Threats

Threats of physical violence were related to socioeconomic status, including education and income (Figure 14, see also Appendix Table A1). Nearly twice as many respondents with less than a high school education (26%) reported being threatened compared to those with a bachelor's degree or higher (15%). Household income showed a similar pattern: those with incomes of $100,000 or more (12%) reported threats of physical violence about half as often as those with lower incomes: 26% of those earning $1–$24,999, 21% of those earning $25,000–$49,999, and 23% of those earning $50,000–$74,999.

By race and ethnicity and gender identity (Figure 15, see also Appendix Table A2), AMAB nonbinary respondents who are multiracial or of another race (39%) experienced more threats of physical violence than other groups, including White, non-Hispanic AFAB nonbinary individuals (18%); Asian, non-Hispanic transgender women (13%) and AFAB nonbinary individuals (14%); and Hispanic or Latine transgender men (15%) and AFAB nonbinary individuals (16%).

**Figure 14. Threats of physical violence in the past year among adult 2022 USTS respondents in California, by demographic characteristics**



Case 1:26-cv-00261-AKB Document 3-3 Filed 04/29/26 Page 247 of 368


**Figure 15. Threats of physical violence in the past year among adult 2022 USTS respondents in California, by race/ethnicity and gender**




## Trans Visibility

Respondents who believe they are perceived as transgender always or most of the time (24%) reported more threats of physical violence compared to those who are rarely or never perceived as transgender (15%). As shown in Figure 16 (see also Appendix Table A3), this pattern is consistent among transgender women (always or most of the time: 24% vs. rarely or never: 15%), transgender men (always or most of the time: 28% vs. rarely or never: 15%), AFAB nonbinary people (always or most of the time: 22% vs. rarely or never: 15%), and AMAB nonbinary people (always or most of the time: 26% vs. rarely or never: 17%).

**Figure 16. Threats of physical violence in the past year among adult 2022 USTS respondents in California, by trans visibility and gender identity**



## Attributions of Motivation for Victimization

About three-fourths (72%) of those who experienced any threats of physical violence in the past year believed their experience was related to their transgender status, gender identity, or gender expression, 59% attributed the threat to their race or ethnicity, and 38% to their sexual orientation (Figure 17 and Appendix Table A4).[23]

**Figure 17. Attributed reasons for threats of physical violence in the past year among adult 2022 USTS respondents in California who reported experiencing at least one threat**




Whether respondents who experienced threats of physical violence attributed those threats to their trans status, gender identity, or expression was related to their age, race/ethnicity, and gender identity (See Appendix, Table A5).

Older respondents were more likely than younger respondents to believe that threats of physical violence were due to their transgender status, gender identity, or gender expression. Nearly nine in 10 transgender adults aged 45 and older (88%) attributed threats to these factors, compared to 62% of those aged 18–24.

White, non-Hispanic respondents were the most likely to attribute threats to their trans status or identity (81%), especially compared to those who are Asian, non-Hispanic (54%). About two-thirds (62%) of Black, non-Hispanic respondents, 73% of Hispanic or Latine respondents, and 71% of multiracial respondents or those of another race made similar attributions.

In terms of gender, transgender women (84%) were the most likely to attribute their experience of physical threats to their gender identity. By comparison, 66% of transgender men and AFAB nonbinary people and 64% of AMAB nonbinary people believe they were threatened because of their trans status, gender identity, or gender expression.

[23] Attributions do not sum to 100% because respondents could select multiple reasons for why they believed they experienced threats of physical violence. In addition, some respondents experienced multiple threats that may have been related to different statuses or identities.

## VERBAL HARASSMENT

Nearly two in five (38%) California USTS respondents reported experiencing verbal harassment in the year prior to participating in the survey. The vast majority (85%) of those who experienced verbal harassment believed they were verbally harassed because of their trans status, gender identity, or expression, for a total of 32% of all respondents.

Participants who attributed their experience of verbal harassment to their trans status, gender identity, or gender expression were subsequently asked, "In the last 12 months, did any *stranger* verbally harass you out *in public* because of your *trans status, gender identity, or gender expression*?" The majority (52%) of respondents who experienced verbal harassment due to their trans status, gender identity, or expression said the harassment was perpetrated by a stranger in a public space.

Overall, 38% of California USTS respondents reported experiencing verbal harassment in the past year. One in five (20%) said they were verbally harassed by a stranger in a public place and believed the incident was related to their trans status or gender. Another 12% attributed their experiences of verbal harassment to their trans status or gender but did not report that it was committed by a stranger in a public place. Only 6% of respondents reported verbal harassment that they did not attribute to their trans status or gender.

**Figure 18. Experiences of verbal harassment in the past year among adult 2022 USTS respondents in California**




### Demographic Characteristics of Victims of Verbal Harassment

Experiences of verbal harassment among California USTS respondents were associated with age, race and ethnicity, transgender visibility, and socioeconomic status (Figure 19 and Appendix Table A1). About four in 10 of those aged 18–24 (39%) and 25–34 (40%) reported experiencing verbal harassment, while those aged 35–44 reported the highest prevalence of verbal harassment (45%). Respondents aged 45 or older reported the lowest prevalence of verbal harassment (28%).

By race and ethnicity, Asian, non-Hispanic respondents (31%) reported the lowest rates of verbal harassment, especially compared to White, non-Hispanic (40%) and Hispanic or Latine (38%) respondents.

Socioeconomic status was also related to experiences of verbal harassment (Figure 20). Nearly half of those with less than a high school education reported verbal harassment (46%), compared with 35% of those with a bachelor's degree or higher. By income, those earning $1–$24,999 (42%) and $25,000–$49,999 (42%) reported higher rates than those earning $100,000 or more (34%).

**Figure 19. Verbal harassment in the past year among adult 2022 USTS respondents in California, by demographic characteristics**




In terms of race/ethnicity and gender identity, Asian, non-Hispanic transgender women (24%) and men (25%) reported the lowest rates of verbal harassment. In contrast, higher rates were observed among White, non-Hispanic transgender women (39%) and Hispanic or Latine transgender women (39%). Among AFAB nonbinary respondents, rates were especially high for those who were White, non-Hispanic (43%), Hispanic or Latine (39%), and multiracial or of another race (50%, see Figure 20 and Appendix Table A2).

**Figure 20. Verbal harassment in the past year among adult 2022 USTS respondents in California, by race/ethnicity and gender**




## Trans Visibility

Experiences of verbal harassment also varied by how respondents believed they were seen by others. Half of California USTS respondents who believed they were perceived as transgender most of the time or always reported verbal harassment (50%), compared with 41% of those sometimes perceived as transgender and 30% of those rarely or never perceived as transgender (Figure 21 and Appendix Table A3).

Among transgender women, transgender men, and AFAB nonbinary respondents, visibility as transgender was closely related to experiences of verbal harassment in the past year. In each group, those who were perceived as transgender always or most of the time reported higher rates of verbal harassment compared with those rarely or never perceived as transgender. For example, half of transgender women who were perceived as transgender always or most of the time reported verbal harassment (50%), compared with 24% of transgender women who were rarely or never perceived as transgender.

**Figure 21. Verbal harassment in the past year among adult 2022 USTS respondents in California, by trans visibility and gender identity**




## Attributions of Motivation for Victimization

Among California USTS respondents who reported experiencing one or more instances of verbal harassment in the past year, nearly nine in ten (85%) attributed the harassment to their transgender status, gender identity, or gender expression (Figure 22 and Appendix Table A4).[24]

**Figure 22. Attributed reasons for verbal harassment in the past year among adult 2022 USTS respondents in California who reported experiencing verbal harassment**




[24] Attributions do not sum to 100% because respondents could select multiple reasons for why they believed they experienced verbal harassment. In addition, some respondents experienced multiple instances of verbal harassment that may have been related to different statuses or identities.

Whether respondents attributed their experiences of verbal harassment to their trans status, gender identity, or gender expression varied by age, gender identity, and trans visibility (see Appendix Table A5).

Nearly all California USTS respondents aged 45 and older attributed verbal harassment to their transgender identity (94%), compared with 80% of those aged 18–24 and 87% of those aged 25–34.

Transgender women (92%) were more likely to attribute verbal harassment to their trans status than transgender men (81%) and AFAB nonbinary individuals (81%). Trans visibility further shaped these perceptions. Among those who believed they were perceived as transgender always or most of the time, 91% attributed their experiences of verbal harassment to being transgender, compared with 77% of those who felt they were rarely or never perceived as transgender.

## ONLINE HARASSMENT

Online harassment was the most frequently reported form of violence or harassment experienced by USTS respondents in California over the year prior to completing the survey, with 42% experiencing some type of online harassment. As shown in Figure 23, respondents most commonly experienced being called offensive names (33%), followed by intentional embarrassment (21%), sexual harassment (16%), physical threats (12%), sustained harassment (12%), and stalking (9%).

**Figure 23. Type of online harassment experienced in the past year among adult 2022 USTS respondents in California**




### Demographic Characteristics of Victims of Online Harassment

Similar to experiences of verbal harassment, experiences of online harassment among respondents varied by age, gender identity, education, and income (Figure 24 and Appendix Table A1).

Nearly half of California USTS respondents aged 18–24 reported experiencing online harassment in the past year (48%), compared with 30% of those aged 45 and older.

In terms of gender identity, AFAB nonbinary respondents reported the lowest rate of online harassment (36%), compared with 46% of AMAB nonbinary respondents, 45% of transgender women, and 42% of transgender men.

Socioeconomic status was also closely related to online harassment among California USTS respondents. Those with a bachelor's degree or higher reported a lower rate of online harassment (35%) compared to those with a high school diploma (46%) or some college experience (43%). A similar pattern emerged for income. Respondents with household incomes of $100,000 or more reported lower rates of online harassment (35%) than those with lower incomes, including 44% of those earning $1–$24,999, 47% of those earning $25,000–$49,999, and 47% of those earning $50,000–$74,999.

**Figure 24. Online harassment in the past year among adult 2022 USTS respondents in California, by demographic characteristics**




Overall, experiences of online harassment among USTS adult respondents were similar across racial and ethnic groups, but some differences emerged within subgroups (Figure 25 and Appendix Table A2). Asian, non-Hispanic AFAB nonbinary people reported the lowest rate of online harassment (28%). In contrast, rates were higher among several groups, including White, non-Hispanic transgender women (46%) and Hispanic or Latine transgender women (48%); Hispanic or Latine transgender men

(45%); White, non-Hispanic AFAB nonbinary people (42%); and AMAB nonbinary people who were Hispanic or Latine (56%) or multiracial/another race (55%).

**Figure 25. Online harassment in the past year among adult 2022 USTS respondents in California, by race/ethnicity and gender**




## Trans Visibility

In terms of trans visibility, among those who believed they were perceived as transgender always or most of the time, 47% reported experiencing online harassment, compared with 38% of those who felt they were rarely or never perceived as transgender.

As shown in Figure 26 (see also Appendix Table A3), transgender men who were regularly perceived as transgender reported higher rates of online harassment (53%) compared with those who were rarely or never perceived as transgender (37%). The gap was even larger among AMAB nonbinary respondents. Nearly three-quarters of those frequently perceived as transgender reported online harassment (71%)—the highest rate among all transgender groups and nearly double the rate of their less-visible counterparts (39%).

**Figure 26. Online harassment in the past year among adult 2022 USTS respondents in California, by trans visibility and gender identity**




## Attributions of Motivation for Victimization

The vast majority (81%) of USTS California respondents who experienced online harassment attributed their experiences to their trans status, gender identity, or expression (Figure 27 and Appendix Table A4).[25]

**Figure 27. Attributed reasons for online harassment in the past year among adult 2022 USTS respondents in California who reported experiencing online harassment**




[25] Attributions do not sum to 100% because respondents could select multiple reasons for why they believed they experienced online harassment. In addition, some respondents experienced multiple instances of online harassment that may have been related to different statuses or identities.

Respondents' perceptions that online harassment was due to transgender status, gender identity, or gender expression varied by age, race and ethnicity, gender identity, and transgender visibility, but not by education or income.

Although older transgender respondents experienced lower rates of online harassment, they were more likely to attribute it to their transgender identity: 91% of those aged 45 or older did so, compared with 79% of those aged 18–24, 80% of those aged 25–34, and 81% of those aged 35–44.

Attributions also differed by race and ethnicity. Most white, non-Hispanic (85%, Hispanic or Latine (81%), and multiracial or another race (87%) respondents attributed their harassment to their trans identity, compared with 71% of Asian, non-Hispanic respondents. Black, non-Hispanic respondents did not significantly differ from other groups in attributing their experiences to their trans identity (77%).

By gender identity, transgender women (87%) attributed their experiences of online harassment to their trans status at higher rates than AFAB nonbinary respondents (74%). Transgender visibility was also associated with attributions: 90% of those who were perceived as transgender always or most of the time attributed harassment to their transgender status, compared with 78% of those who were rarely or never perceived as transgender.

## ANALYTIC PREDICTORS OF VIOLENCE OR HARASSMENT

In analyses adjusting for all demographic factors across each type of violence or harassment (see Table 2), transgender visibility emerged as one of the strongest predictors of these experiences.

Respondents who were perceived as transgender most of the time or always had significantly higher odds of victimization compared with those who were rarely or never perceived as transgender. For example, their odds of experiencing physical violence were 126% higher, bathroom-related violence or harassment 323% higher, verbal harassment 170% higher, and online harassment 35% higher.

Figure 28 presents the predicted probability of experiencing each type of violence or harassment by level of transgender visibility (see also Appendix Table A6). Controlling for other demographic factors, seven in 10 transgender respondents (70.4%) who believed they were perceived as transgender most or all of the time were predicted to have experienced some type of violence or harassment within a year, compared with one in two (51%) among those rarely or never perceived as transgender. These differences were consistent across all forms of violence and harassment.

Table 2. Adjusted logistic regression models predicting violence in the past year among adult 2022 USTS respondents in California

| | ANY VIOLENCE OR HARASSMENT | | BATHROOM VIOLENCE/ HARASSMENT | | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OR | 95% CI | OR | [95% CI] | OR | 95% CI | OR | [95% CI] | OR | [95% CI] | OR | [95% CI] |
| Age (Ref. Category: 45+) | | | | | | | | | | | | |
| 18-24 | **2.73** | [1.98,3.77] | 1.04 | [0.66,1.64] | 1.29 | [0.66,2.50] | 1.47 | [0.96,2.23] | **1.77** | [1.26,2.50] | **3.16** | [2.26,4.43] |
| 25-34 | **2.15** | [1.57,2.94] | 1.17 | [0.75,1.82] | 1.69 | [0.86,3.31] | **1.69** | [1.12,2.55] | **1.83** | [1.32,2.54] | **2.24** | [1.62,3.10] |
| 35-44 | **2.19** | [1.52,3.15] | 1.24 | [0.73,2.09] | **2.10** | [1.00,4.42] | **1.96** | [1.21,3.19] | **2.05** | [1.40,3.02] | **2.15** | [1.47,3.15] |
| Race/Ethnicity (Ref. Category: White, non-Hispanic) | | | | | | | | | | | | |
| Black, non-Hispanic | 1.25 | [0.75,2.08] | 1.19 | [0.61,2.33] | 0.89 | [0.38,2.08] | 1.49 | [0.86,2.60] | 1.08 | [0.66,1.75] | 0.87 | [0.55,1.38] |
| Asian, non-Hispanic | **0.66** | [0.51,0.86] | 0.99 | [0.69,1.42] | 1.21 | [0.64,2.27] | 0.80 | [0.55,1.16] | **0.66** | [0.51,0.86] | **0.65** | [0.49,0.85] |
| Hispanic or Latine | 0.89 | [0.71,1.12] | 1.31 | [0.97,1.78] | 0.93 | [0.57,1.51] | **0.74** | [0.56,0.99] | 0.86 | [0.69,1.07] | 0.94 | [0.76,1.16] |
| Another race/multiracial | 1.34 | [0.89,2.03] | 1.69 | [0.98,2.90] | 1.69 | [0.80,3.56] | 1.22 | [0.79,1.89] | 1.06 | [0.71,1.58] | 1.02 | [0.68,1.53] |
| Gender (Ref. Category: Trans Women) | | | | | | | | | | | | |
| Trans Men | **0.77** | [0.60,1.00] | **1.72** | [1.21,2.46] | 0.72 | [0.42,1.24] | 0.89 | [0.65,1.22] | 0.95 | [0.74,1.23] | **0.67** | [0.52,0.85] |
| AFAB Nonbinary | 0.91 | [0.71,1.16] | **1.67** | [1.20,2.33] | 0.77 | [0.46,1.30] | 0.88 | [0.65,1.18] | 1.21 | [0.95,1.54] | **0.51** | [0.40,0.65] |
| AMAB Nonbinary | 0.91 | [0.62,1.31] | 0.94 | [0.53,1.66] | 0.51 | [0.24,1.08] | 1.02 | [0.66,1.56] | 1.10 | [0.78,1.56] | 0.86 | [0.60,1.23] |
| Trans Visibility (Ref. Category: Rarely or Never) | | | | | | | | | | | | |
| Always or most of the time | **2.26** | [1.65,3.10] | **4.23** | [2.94,6.08] | **1.77** | [1.03,3.05] | **1.69** | [1.19,2.39] | **2.70** | [2.03,3.59] | **1.35** | [1.01,1.80] |
| Sometimes | **1.87** | [1.54,2.27] | **2.95** | [2.22,3.93] | 1.27 | [0.80,1.99] | **1.39** | [1.08,1.79] | **1.77** | [1.46,2.16] | **1.33** | [1.10,1.62] |
| Education (Ref. Category: Bachelor's Degree or Higher) | | | | | | | | | | | | |
| Less than high school | 1.17 | [0.75,1.85] | 1.70 | [0.99,2.91] | **2.64** | [1.28,5.45] | **1.75** | [1.08,2.86] | 1.48 | [0.96,2.28] | 1.01 | [0.66,1.54] |
| High school or GED | 0.98 | [0.74,1.31] | 1.21 | [0.84,1.74] | 1.70 | [0.96,3.02] | 1.18 | [0.84,1.67] | 1.06 | [0.79,1.41] | 1.13 | [0.86,1.50] |
| Some college | 0.95 | [0.80,1.14] | 0.93 | [0.72,1.19] | 1.21 | [0.83,1.76] | 1.17 | [0.92,1.48] | 0.96 | [0.80,1.14] | 1.10 | [0.92,1.31] |
| Household Income (Ref. Category: $100,000+) | | | | | | | | | | | | |
| No Income | 0.96 | [0.63,1.44] | 0.75 | [0.41,1.38] | 2.28 | [0.94,5.52] | 1.38 | [0.82,2.30] | 0.83 | [0.55,1.25] | 0.90 | [0.60,1.35] |
| $1 to $24,999 | 1.30 | [0.99,1.71] | 1.14 | [0.79,1.65] | **2.99** | [1.64,5.47] | **2.21** | [1.56,3.14] | 1.18 | [0.89,1.56] | 1.23 | [0.94,1.61] |
| $25,000 to $49,999 | 1.18 | [0.89,1.57] | 1.21 | [0.82,1.81] | **2.24** | [1.22,4.13] | **1.76** | [1.21,2.57] | 1.21 | [0.91,1.61] | **1.42** | [1.07,1.89] |
| $50,000 to $74,999 | **1.36** | [1.03,1.81] | 1.33 | [0.93,1.91] | **2.18** | [1.08,4.43] | **1.98** | [1.36,2.89] | 1.18 | [0.88,1.57] | **1.43** | [1.07,1.90] |
| $75,000 to $99,999 | 1.02 | [0.76,1.37] | 0.84 | [0.56,1.28] | **3.33** | [1.71,6.46] | **1.59** | [1.06,2.38] | 1.07 | [0.79,1.46] | 1.26 | [0.95,1.68] |
| CONSTANT | 0.55 | [0.42, 0.74] | 0.05 | [0.03, 0.08] | 0.02 | [0.01, 0.03] | 0.08 | [0.05, 0.12] | 0.24 | [0.17,0.32] | 0.34 | [0.25, 0.46] |
| OBSERVATIONS | 8145 | | 8023 | | 8137 | | 8133 | | 8136 | | 8058 | |

Note: Each model is fully adjusted for all demographic and socioeconomic covariates included in the table. The reported odds ratios represent associations between each predictor and the outcome, holding all other variables constant; OR = Odds Ratio; CI = Confidence Interval; **Bold text** indicates a significant difference relative to the reference category.

**Figure 28. Predicted probability of experiencing different types of violence, threats, and harassment among adult 2022 USTS respondents in California over one year, by trans visibility**




Note: Predicted probabilities are derived from the logistic regression models presented in Table 2, controlling for age, race/ethnicity, gender identity, education, and household income.

The adjusted models (Table 2) also show that experiences of violence and harassment generally did not differ significantly by gender identity, with two exceptions. First, transgender women experienced a higher prevalence of online harassment compared with transgender men, AFAB nonbinary, and AMAB nonbinary individuals. Second, AFAB nonbinary individuals reported a higher prevalence of bathroom-related violence or harassment than transgender women.

Age was a significant predictor of several forms of violence or harassment among California USTS respondents. Those who were younger had higher odds of experiencing verbal or online harassment compared to those who were aged 45 or older. Respondents aged 35-44 had higher odds of experiencing physical violence compared to those 45 and older; and those aged 25-34 and 35-44 had higher odds of experiencing threats of physical violence relative to those 45 and older. In contrast, there were no significant age differences in experiences of bathroom-related violence and harassment.

Socioeconomic status was also a strong predictor, particularly for experiences of physical violence and threats of physical violence. Respondents with less than a high school education had significantly higher odds of both physical violence and threats of physical violence compared with those holding a bachelor's degree or higher. Similarly, those with annual household incomes below $75,000 had significantly higher odds of these outcomes relative to respondents with incomes above $100,000.

# DISCUSSION

Overall, the findings show widespread exposure to diverse forms of violence and harassment among adult USTS respondents from California. The majority (59%) experienced some form of violence or harassment in the year prior to completing the 2022 U.S. Transgender Survey, with the most frequent experiences being online (42%) and verbal (38%) harassment. In general, younger, less educated, lower-income, and more visible respondents more frequently experienced online and verbal harassment. Transgender visibility was the strongest and most consistent predictor of all types of violence and harassment: individuals who believe they are more frequently perceived as transgender experienced higher rates of every form of violence and harassment.

When asked why they believed they were targeted for violence and harassment, respondents overwhelmingly attributed these experiences to their trans status, gender identity, or gender expression. While these attributions varied somewhat across races or ethnicities, age groups, and education levels, the majority of each group consistently identified their gender identity or expression as the primary reason for the discrimination and violence they faced.

These findings highlight the complexity of anti-transgender violence and harassment, which often stems from the intersecting forms of discrimination transgender individuals face.[26]

Transgender people in the U.S. have long been subjected to anti-transgender rhetoric and actions. These actions continue to the present day. For example, a presidential executive order issued in 2025 seeks to redefine gender in ways that eliminate the federal government's recognition of transgender people, thereby attempting to erase transgender people's existence.[27] Anti-transgender ideologies gain strength through the passage of laws and policies, resulting in harms to transgender communities, including heightened risks of interpersonal and structural violence.[28] The consequences extend heightened experiences of interpersonal crime and violence to include broader violations or denial of human rights, such as access to food, housing, and healthcare. Recent research, for example, has documented a concurrent rise in anti-transgender legislation, rhetoric, and homicides, highlighting the connection between rhetoric and violence.[29] Against this backdrop, anti-transgender rhetoric and actions continue to escalate.[30]

---

[26] Ritchie, A. J. (2017). *Invisible No More: Police Violence Against Black Women and Women of Color*. Beacon Press; Westbrook, L. (2023). The Matrix of Violence: Intersectionality and Necropolitics in the Murder of Transgender People in the United States, 1990–2019. *Gender & Society*, *37*(3), 413–446.

[27] Green, E. L., Benner, K., & Pear, R. (2018, October 21). 'Transgender' could be defined out of existence under Trump administration. *The New York Times*. https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html; Trump, D. J. (2025, January 20). *Executive order on defending women from gender ideology extremism and restoring biological truth to the federal government*. The White House. https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/; Quinan, C. (2025). From criminalization to erasure: Project 2025 and anti-trans legislation in the US. *Crime, Media, Culture: An International Journal*, 17416590241312149. https://doi.org/10.1177/17416590241312149

[28] Brightman, S., & Lenning, E. (2025). Advancing the Trifecta: An Integrated Theoretical Framework for Understanding Violence. *Victims & Offenders: An International Journal of Evidence-Based Research, Policy, and Practice*, *20*(5–6), 814–840.

[29] Brightman, S., Lenning, E., Lurie, K. J., & DeJong, C. (2024). Anti-Transgender Ideology, Laws, and Homicide: An Analysis of the Trifecta of Violence. *Homicide Studies*, *28*(3), 251–269.

[30] American Civil Liberties Union. (2025). *Mapping attacks on LGBTQ rights in U.S. state legislatures in 2025*. American Civil Liberties

But this is not a new trend. By late 2022, when the 2022 USTS was fielded, transgender people in the United States faced a wave of discriminatory state laws and policies targeting their rights and visibility. Among these were several "bathroom bills" designed to prevent individuals from using bathrooms that align with their gender identity, including North Carolina's HB2, which sparked national debates and inspired similar legislation in other states.[31] Florida had also passed what has become known as the "Don't Say Gay" law, restricting discussion of sexual orientation and gender identity in certain school settings.[32] Several other states, including Idaho, Utah, and South Carolina, had enacted laws barring transgender youth from participating in school sports consistent with their gender identity. At the same time, national news outlets amplified anti-transgender rhetoric. For example, some estimates suggest that Fox News promoted anti-LGBTQ and anti-transgender myths on at least 100 days within just the first six months of 2022.[33] Combined, these laws, policies, and rhetoric contributed to a broader environment of stigma and misinformation, which, in turn, likely contributed to the high rates of violence and harassment experienced by transgender people.[34]

Despite California's generally more accepting environment,[35] transgender people in the state are not insulated from the effects of laws and policies enacted elsewhere in the United States. Rhetoric happening across the country reaches everyone through media exposure and may be related to the prevalence of violence and harassment experienced by transgender people in the state. Considering that anti-transgender legislation and rhetoric have only grown since data were collected for the 2022 USTS, it is possible that anti-transgender violence and harassment have also increased. Some estimates suggest that the number of anti-transgender bills introduced across the country increased by 253% between 2022 and 2023.[36] Bills introduced in 2025 eclipsed those filed in previous years, with nearly 1,000 introduced, 122 of which have passed.[37] Additionally, at least eight anti-transgender bills have been introduced in California since 2022, when the USTS data were collected.[38] Even so, it

---

Union. https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2025; Trans Legislation Tracker. (2025). *Learn | U.S. anti-trans legislation history*. https://translegislation.com/learn

[31] NBC News. (2024, November 28). *Trans bathroom ban in 19 states threatens LGBTQ rights*. https://www.nbcnews.com/nbc-out/out-politics-and-policy/trans-bathroom-ban-19-states-lgbtq-rights-rcna220503; North Carolina General Assembly. (2016). *An act to provide for single-sex multiple occupancy bathroom and changing facilities in schools and public agencies and to create statewide consistency in regulation of employment and public accommodations* (H.B. 2, 2015 E2). https://www.ncleg.gov/Sessions/2015E2/Bills/House/PDF/H2v3.pdf.

[32] Florida House of Representatives. (2022). *CS/CS/HB 1557: Parental Rights in Education*. https://www.flsenate.gov/Session/Bill/2022/1557; Strauss, V. (2022, July 1). Florida's 'don't say gay' law takes effect. The Washington Post. https://www.washingtonpost.com/education/2022/07/01/dont-say-gay-florida-law/.

[33] Paterson, A. (2022, July 25). *Fox News attacked LGBTQ people on over 100 days in the first half of 2022 — including nearly 90% of days during Pride Month*. Media Matters for America. https://www.mediamatters.org/fox-news/fox-news-attacked-lgbtq-people-over-100-days-first-half-2022-including-nearly-90-days.

[34] Brightman, S., & Lenning, E. (2025). Advancing the Trifecta: An Integrated Theoretical Framework for Understanding Violence. *Victims & Offenders: An International Journal of Evidence-Based Research, Policy, and Practice*, *20*(5–6), 814–840.

[35] Movement Advancement Project. (2025). *Mapping Transgender Equality in the United States.* https://www.lgbtmap.org/mapping-trans-equality

[36] Trans Legislation Tracker. (2025). *Learn | U.S. anti-trans legislation history*. https://translegislation.com/learn

[37] Trans Legislation Tracker. (2025). *2025 anti-trans bills tracker*. https://translegislation.com

[38] Trans Legislation Tracker. (2023). *California bills | Anti-trans legislation*. https://translegislation.com/bills/2023/CA; Trans Legislation Tracker. (2024). *California bills | Anti-trans legislation*. https://translegislation.com/bills/2024/CA; Trans Legislation

is unclear whether the prevalence of violence among transgender adults in California is lower than in states with more hostile policy environments. Future research should examine experiences of violence across states, with particular attention to the effects of anti-transgender legislation.

Recent changes in federal data collection will limit opportunities to study violence and victimization against transgender people. Following a January 2025 memorandum instructing federal departments and agencies to comply with an executive order recognizing the existence of only "two sexes, male and female,"[39] gender identity measures have been removed from or revised on some national surveys and datasets, limiting the availability of comprehensive information on the experiences of transgender people.[40] Such data have previously been used to assess the rates of violence and victimization among transgender people relative to their cisgender counterparts.[41] Considering the findings presented in this report and the broader national context, it is essential that data collection not only continue but also be constantly refined to capture more representative samples and greater nuance in transgender people's experiences. This need is especially pressing in light of recent changes to federal datasets and crime surveys. To compensate for the loss of federal data collection, community-based and state-level surveys should be strengthened to capture localized patterns, the diversity of transgender people's experiences, and the contexts in which violence occurs.

---

Tracker. (2025). *California bills | Anti-trans legislation*. https://translegislation.com/bills/2025/CA

[39] Exec. Order No. 14168, 90 FR 8615 (2025). https://www.federalregister.gov/documents/2025/01/30/2025-02090/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal

[40] Meyer, I. H., & Bouton, L. J. (2025, February). *Impact of executive orders on access to federal data*. Williams Institute. https://williamsinstitute.law.ucla.edu/wp-content/uploads/SOGI-Data-Removal-EO-Feb-2025.pdf

[41] Flores, A. R., Langton, L., Meyer, I. H., & Romero, A. P. (2020). Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey, 2017. *Science Advances*, *6*(40), 1–10; Flores, A. R., Meyer, I. H., Langton, L., & Herman, J. L. (2021). Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018. *American Journal of Public Health*, *111*(4), 726–729; Flores, A. R., Wilson, B. D. M., Langton, L. L., & Meyer, I. H. (2023). Meyer, I. H., & Flores, A. R. (2025). *Anti-LGBT Victimization in the United States: Results from the National Crime Victimization Survey (2022-2023)*. The Williams Institute.

# METHODS

The 2022 U.S. Transgender Survey was an online survey of transgender individuals, conducted from October to December 2022.[42] Eligible for participation were individuals aged 16 and older residing in the United States, a U.S. territory, or on a U.S. military base, and who hold a variety of gender-expansive identities, including transgender, trans, nonbinary, and other gender identities.

Available in English and Spanish, the survey explored a wide range of topics, including demographics, workplace and school experiences, interactions with law enforcement, identity documents, political and civic participation, violence, family relationships, gender-affirming health care, mental health, substance use, and suicidal thoughts and attempts.

Outreach for participation began a year before the survey was conducted. The USTS Outreach Team contacted nearly 1,900 organizations and individuals across the U.S. to encourage participation and promote the survey within their networks. Participation was voluntary, and respondents had the option to enter a random drawing for one of three cash prizes: one $500 prize and two $250 prizes.

The final sample of 92,329 respondents represented all 50 U.S. states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and U.S. military bases overseas.[43] For this report, we focus on the 9,146 California adults (aged 18 years or older) identified as transgender men, transgender women, or nonbinary; these participants are described in further detail in the Sample Characteristics section above.

Survey weights were developed by the USTS team to minimize sampling bias and better reflect the U.S. transgender population in terms of age, race/ethnicity, education, and geographic region. These weights were based on data from the Centers for Disease Control and Prevention's Behavioral Risk Factor Surveillance System (BRFSS), one of the few sources of representative information on the U.S. transgender population. All findings in this report, including the following demographic statistics, are weighted to enhance their accuracy and ensure they are representative of the broader U.S. transgender population.

This report primarily presents descriptive analyses, using bivariate statistical techniques to examine the relationship between respondents' characteristics and their experiences of violence and harassment. Confidence intervals (95% CI) are included throughout the report to assess statistical significance and are also included in the Appendix to communicate the degree of uncertainty around estimates presented in the figures.

## LIMITATIONS

The findings presented here provide important insights into the everyday experiences of violence and harassment faced by transgender adults in California. The USTS data have some notable limitations. First, the survey relies on a nonprobability sample, which may not fully represent the broader

[42] In this report we present data of transgender adults only (aged 18 years and older).

[43] For more on the methodology of the USTS, see James, S. E., Herman, J. L., Durso, L. E., & Heng-Lehtinen, R. (2024). *Early insights: A report of the 2022 U.S. Transgender Survey*. National Center for Transgender Equality.

population of transgender people in the state. Nonprobability samples may be biased by including more people who are connected to LGBT organizations and are perhaps more strongly identified with the community. Probability samples may also have limitations, for example, they may not include transgender people who otherwise may be willing to participate in a community-based survey but may be afraid due to stigma to participate in surveys conducted by the government or other entities they do not know or trust. Such biases may lead to both over- and under-representation of prevalence of violence attacks and therefore is an unknown bias. Nonetheless, national analyses comparing the 2015 USTS results to data from a nationally representative sample (the TransPop Survey) have shown similar findings, suggesting that potential biases in the community survey did not impact the variables assessed for comparability of the two studies.[44] Similarly, the findings in this report align closely with those from other representative sources that assess hate acts specifically, including the California Health Interview Survey.[45] These findings give us confidence in the results reported here.

Second, although post-stratification sample weights are applied to improve representativeness of the USTS data, these weights are designed to reflect the national demographic composition of transgender people in the United States and may not accurately capture the population characteristics specific to California. Because weights were calculated to the general U.S. transgender population, they may bias some estimates where the California population is not similar to the general U.S. transgender population, but we have not been able to control for that potential bias in our analyses. This is especially the case for race and ethnicity: Compared with the U.S. as a whole, California's adult population has fewer non-Hispanic white adults (34.7% vs. 60.8%), fewer non-Hispanic Black adults (6.1% vs. 11.7%), and more Hispanic (38.5% vs. 16.8%) and Asian (15.2% vs. 5.7%) adults.[46]

Third, while the USTS provides more comprehensive information related to violence experienced by a large sample of transgender people, the data are limited in their timeliness and breadth of information. The most recent collection occurred in late 2022, and since then, multiple national and state-level changes may have affected the prevalence and nature of violence and harassment. Additionally, although several survey items address experiences of violence and harassment, the breadth of the overall survey limits the depth of questions in this domain. As a result, we lack information on the frequency of these experiences, the context and nature of each incident, and outcomes such as whether incidents were reported to law enforcement or other organizations, and the reasons for non-reporting. These limitations further reinforce the ongoing need for comprehensive collection of sexual orientation and gender identity data within federal surveys, such as the NCVS.

---

[44] Feldman, J. L., Luhur, W. E., Herman, J. L., Poteat, T., & Meyer, I. H. (2021). Health and health care access in the US transgender population health (TransPop) survey. *Andrology*, *9*(6), 1707–1718.

[45] UCLA Center for Health Policy Research. (2025). California Health Interview Survey (CHIS). UCLA Center for Health Policy Research. https://healthpolicy.ucla.edu/our-work/california-health-interview-survey-chis.

[46] U.S. Census Bureau - Racial and Ethnic Diversity in the United States: 2020 Census, U.S. Census Bureau - California 2020 Census Demographic Data, www.census.gov; California Department of Finance - Population Estimates by Race/Ethnicity (2021) cdfa.ca.gov

# AUTHORS

**Jordan Grasso, Ph.D.,** is a Research Data Analyst at The Williams Institute.

**Ilan Meyer, Ph.D.,** is the Williams Distinguished Senior Scholar for Public Policy at the Williams Institute and Professor Emeritus of Sociomedical Sciences at Columbia University.

## ACKNOWLEDGMENTS

The authors thank the Advocates for Trans Equality Education Fund (formerly the National Center for Transgender Equality) for use of the 2022 U.S. Transgender Survey dataset.

The authors thank Jody Herman, Ph.D., for her consultation on the use of the USTS data and for her thoughtful review of an earlier version of this manuscript. The authors also thank Christy Mallory for her helpful comments and feedback.

The authors thank the California Department of Civil Rights for their support of the work on this project.

## SUGGESTED CITATION

Grasso, J., & Meyer, I. (2025). *Violence and Harassment Against Transgender Adults in California*. Los Angeles, CA: The Williams Institute, UCLA School of Law.

## ABOUT THE WILLIAMS INSTITUTE

The Williams Institute is dedicated to conducting rigorous, independent research on sexual orientation and gender identity law and public policy. A think tank at UCLA Law, the Williams Institute produces high-quality research with real-world relevance and disseminates it to judges, legislators, policymakers, media, and the public. These studies can be accessed at the Williams Institute website.

### FOR MORE INFORMATION

The Williams Institute, UCLA School of Law
(310) 267-4382
williamsinstitute@law.ucla.edu
williamsinstitute.law.ucla.edu

RESEARCH THAT MATTERS

# APPENDIX

**Table A1. Types of violence experienced by transgender adults in California, U.S. Trans Survey 2022**

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | | BATHROOM VIOLENCE/ HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| All transgender adults | 6.7 | [5.5, 8.0] | 18.6 | [16.9, 20.3] | 37.5 | [35.5, 39.6] | 41.7 | [39.6, 43.8] | 16.7 | [15.0, 18.3] |
| **Age** | | | | | | | | | | |
| 18-24 | 6.2 | [4.7, 7.7] | 18.5 | [16.3, 20.9] | 38.9 | [36.2, 41.8] | 47.6 | [44.7, 50.5] | 5.5 | [4.3, 7.1] |
| 25-34 | 7.3 | [4.9, 9.7] | 20.5 | [17.4, 23.9] | 40.1 | [36.7, 43.5] | 41.9 | [38.6, 45.4] | 7.0 | [5.1, 9.4] |
| 35-44 | 10.5 | [5.6, 15.4] | 23.3 | [17.9, 29.7] | 45.4 | [38.8, 52.2] | 43.6 | [37.2, 50.3] | 10.6 | [6.6, 16.7] |
| 45+ | 5.1 | [2.1, 8.1] | 14.0 | [10.3, 18.9] | 27.7 | [22.5, 33.6] | 29.6 | [24.4, 35.3] | 7.3 | [4.4, 12.0] |
| **Race/Ethnicity** | | | | | | | | | | |
| White, non-Hispanic | 7.0 | [4.7, 9.2] | 19.7 | [16.9, 22.7] | 39.9 | [36.6, 43.3] | 43.0 | [39.8, 46.3] | 7.3 | [5.5, 9.6] |
| Black, non-Hispanic | 5.7 | [2.1, 9.3] | 25.4 | [17.0, 36.3] | 36.9 | [27.4, 47.5] | 35.7 | [26.9, 45.6] | 5.6 | [2.2, 13.6] |
| Asian, non-Hispanic | 5.6 | [3.0, 8.3] | 15.0 | [11.5, 19.3] | 30.6 | [26.1, 35.5] | 35.5 | [30.7, 40.6] | 4.7 | [2.9, 7.6] |
| Hispanic or Latine | 6.7 | [4.8, 8.5] | 17.5 | [14.9, 20.3] | 38.1 | [34.7, 41.7] | 44.6 | [41.0, 48.2] | 7.1 | [5.2, 9.5] |
| Another race/multiracial | 10.1 | [4.1, 16.1] | 22.6 | [16.6, 30.0] | 39.6 | [31.5, 48.4] | 40.9 | [32.8, 49.4] | 10.4 | [4.9, 20.7] |
| **Gender** | | | | | | | | | | |
| Trans Women | 8.1 | [5.6, 10.6] | 19.6 | [16.4, 23.2] | 36.2 | [32.3, 40.3] | 45.3 | [41.3, 49.5] | 8.1 | [5.7, 11.2] |
| Trans Men | 6.7 | [4.3, 9.1] | 18.2 | [15.3, 21.6] | 35.8 | [32.2, 39.7] | 42.1 | [38.4, 46.0] | 7.0 | [4.9, 9.8] |
| AFAB Nonbinary | 5.8 | [4.1, 7.6] | 17.5 | [14.9, 20.3] | 40.4 | [37.2, 43.7] | 36.2 | [33.1, 39.4] | 6.3 | [4.9, 8.0] |
| AMAB Nonbinary | 4.3 | [1.8, 6.8] | 20.1 | [15.2, 26.1] | 37.8 | [31.6, 44.5] | 46.3 | [39.6, 53.1] | 3.7 | [2.2, 6.2] |
| **Trans Visibility** | | | | | | | | | | |
| Always or most of the time | 9.6 | [6.1, 13.1] | 24.2 | [19.7, 29.3] | 50.3 | [44.6, 56.0] | 46.5 | [40.9, 52.2] | 12.6 | [8.9, 17.5] |
| Sometimes | 6.9 | [4.9, 8.9] | 20.3 | [17.6, 23.4] | 40.9 | [37.6, 44.3] | 44.4 | [41.1, 47.8] | 8.7 | [6.8, 11.1] |
| Rarely or never | 5.6 | [3.9, 7.3] | 15.1 | [16.7, 21.6] | 30.2 | [27.4, 33.1] | 37.7 | [34.8, 40.7] | 3.4 | [2.2, 5.1] |
| **Education** | | | | | | | | | | |
| Less than high school | 12.5 | [6.4, 18.5] | 26.1 | [19.0, 34.7] | 46.0 | [37.4, 54.8] | 41.2 | [32.9, 50.0] | 13.5 | [8.2, 21.5] |
| High school or GED | 7.0 | [4.4, 9.5] | 17.9 | [14.7, 21.6] | 37.3 | [33.0, 41.9] | 46.4 | [41.8, 51.1] | 5.9 | [4.2, 8.3] |
| Some college | 5.7 | [4.4, 6.8] | 18.4 | [16.5, 20.3] | 35.9 | [33.6, 38.2] | 42.5 | [40.1, 44.9] | 5.4 | [4.3, 6.8] |

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | | BATHROOM VIOLENCE/ HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| Bachelor's degree or higher | 4.3 | [3.3, 5.3] | 15.1 | [13.4, 17.0] | 35.2 | [33.0, 37.4] | 34.9 | [32.7, 37.2] | 6.1 | [4.9, 7.6] |
| **Household Income** | | | | | | | | | | |
| No Income | 7.7 | [3.9, 14.5] | 17.6 | [11.9, 25.2] | 33.3 | [25.6, 42.0] | 38.7 | [30.5, 47.5] | 4.4 | [2.0, 9.3] |
| $1 to $24,999 | 9.9 | [6.7, 14.2] | 25.6 | [21.1, 30.7] | 41.5 | [36.5, 46.7] | 43.9 | [39.0, 49.0] | 8.6 | [5.7, 12.9] |
| $25,000 to $49,999 | 7.7 | [5.2, 11.2] | 21.1 | [16.9, 26.0] | 41.6 | [36.3, 47.1] | 47.4 | [41.9, 52.8] | 9.4 | [6.2, 13.9] |
| $50,000 to $74,999 | 6.6 | [3.9, 11.0] | 22.6 | [18.0, 28.0] | 40.2 | [35.1, 45.6] | 46.7 | [41.4, 52.2] | 9.2 | [5.9, 14.3] |
| $75,000 to $99,999 | 9.1 | [5.7, 14.2] | 18.0 | [13.7, 23.3] | 36.9 | [31.3, 42.9] | 43.0 | [37.1, 49.0] | 4.4 | [2.6, 7.2] |
| $100,000+ | 3.0 | [1.9, 4.5] | 11.9 | [9.7, 14.6] | 33.9 | [30.1, 37.8] | 35.4 | [31.9, 39.1] | 6.0 | [4.2, 8.4] |

Note: CI = Confidence Interval; Among all transgender adults 59% (95% CI: [56.9, 61.1]) experienced any type of violence.

**Table A2. Types of violence experienced by transgender adults in California by race/ethnicity and gender, U.S. Trans Survey 2022**

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | | BATHROOM VIOLENCE/ HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| **Trans Women** | | | | | | | | | | |
| White, non-Hispanic | 7.0 | [4.1, 11.7] | 19.6 | [15.0, 25.1] | 39.1 | [33.3, 45.2] | 45.9 | [40.1, 51.7] | 12.7 | [9.0, 17.6] |
| Black, non-Hispanic | 4.7 | [1.1, 17.7] | 19.7 | [8.1, 40.4] | 24.8 | [11.6, 45.3] | 44.1 | [25.6, 64.3] | 8.7 | [1.9, 31.8] |
| Asian, non-Hispanic | 1.7 | [0.7, 4.3] | 13.3 | [8.2, 20.7] | 24.1 | [17.2, 32.6] | 40.1 | [30.9, 50.1] | 8.6 | [4.7, 15.2] |
| Hispanic or Latine | 12.3 | [7.9, 18.7] | 21.7 | [15.7, 29.2] | 39.1 | [31.7, 47.0] | 48.2 | [40.1, 56.3] | 17.0 | [11.5, 24.4] |
| Multiracial or Another Race | 12.8 | [4.2, 32.7] | 22.7 | [11.5, 40.0] | 36.1 | [21.1, 54.3] | 41.2 | [25.1, 59.4] | 31.7 | [16.1, 52.9] |
| **Trans Men** | | | | | | | | | | |
| White, non-Hispanic | 8.3 | [4.4,1 5.1] | 21.2 | [15.9, 27.8] | 38.1 | [31.7, 44.8] | 40.6 | [34.7, 46.9] | 18.7 | [13.5, 25.4] |
| Black, non-Hispanic | 8.3 | [2.9, 21.1] | 25.8 | [13.0, 44.9] | 41.5 | [25.2, 59.8] | 42.3 | [26.3, 60.1] | 25.4 | [12.2, 45.6] |
| Asian, non-Hispanic | 9.2 | [3.7, 21.1] | 17.3 | [9.9, 28.4] | 24.9 | [16.9, 35.2] | 38.1 | [28.3, 49.1] | 15.4 | [8.8, 25.6] |
| Hispanic or Latine | 4.5 | [2.6, 7.6] | 15.1 | [11.4, 19.7] | 38.3 | [32.6, 44.4] | 45.4 | [39.3, 51.6] | 19.8 | [15.4, 25.0] |
| Multiracial or Another Race | 5.8 | [2.6, 12.6] | 18.5 | [12.6, 26.4] | 26.7 | [19.9, 34.9] | 36.2 | [28.1, 45.1] | 14.3 | [9.4, 21.0] |
| **AFAB Nonbinary** | | | | | | | | | | |
| White, non-Hispanic | 6.7 | [3.5, 12.4] | 17.5 | [13.6, 22.3] | 42.6 | [37.6, 47.8] | 41.5 | [36.4, 46.7] | 18.4 | [15.0, 22.2] |

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | | BATHROOM VIOLENCE/ HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| Black, non-Hispanic | 5.6 | [2.0, 14.9] | 32.5 | [17.1, 52.9] | 42.3 | [26.0, 60.4] | 25.8 | [14.9, 40.6] | 10.3 | [5.1, 19.6] |
| Asian, non-Hispanic | 5.7 | [3.1, 10.2] | 14.3 | [9.2, 21.6] | 36.3 | [28.9, 44.3] | 28.1 | [21.2, 36.2] | 18.0 | [12.7, 24.9] |
| Hispanic or Latine | 4.6 | [2.9, 7.1] | 15.8 | [12.5, 19.8] | 38.9 | [33.7, 44.3] | 37.4 | [32.3, 42.7] | 20.7 | [16.3, 25.8] |
| Multiracial or Another Race | 9.8 | [4.9, 18.6] | 22.3 | [15.1, 31.8] | 50.1 | [38.7, 61.4] | 41.1 | [30.9, 52.1] | 16.6 | [11.4, 23.6] |
| **AMAB Nonbinary** | | | | | | | | | | |
| White, non-Hispanic | 4.3 | [2.5, 7.4] | 23.0 | [14.6, 34.3] | 40.3 | [31.1, 50.2] | 39.1 | [30.8, 48.0] | 11.7 | [7.2, 18.5] |
| Black, non-Hispanic | — | — | 11.5 | [2.6, 38.5] | 44.0 | [12.1, 81.7] | 22.4 | [6.4, 55.2] | 16.1 | [3.0, 54.6] |
| Asian, non-Hispanic | 7.9 | [1.7, 29.5] | 17.0 | [7.5, 34.0] | 40.9 | [25.8, 58.0] | 46.4 | [31.0, 62.4] | 5.3 | [2.2, 12.4] |
| Hispanic or Latine | 2.4 | [1.0, 5.6] | 17.6 | [10.9, 26.9] | 31.1 | [21.8, 42.2] | 56.3 | [43.8, 68.0] | 16.0 | [7.4, 31.1] |
| Multiracial or Another Race | 8.3 | [2.7, 22.8] | 38.6 | [22.7, 57.3] | 51.4 | [34.3, 68.0] | 54.8 | [37.6, 70.9] | 13.9 | [6.2, 28.3] |

Note: CI = Confidence Interval

**Table A3. Types of violence experienced by transgender adults in California by trans visibility and gender, U.S. Trans Survey 2022**

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | | BATHROOM VIOLENCE/ HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| **Trans Women** | | | | | | | | | | |
| Always or most of the time | 10.0 | [5.8, 16.8] | 23.6 | [17.0, 31.8] | 50.4 | [41.7, 59.1] | 43.9 | [35.7, 52.5] | 19.6 | [13.3, 27.9] |
| Sometimes | 9.8 | [6.2, 15.2] | 21.0 | [15.9, 27.3] | 38.8 | [32.5, 45.5] | 49.7 | [43.0, 56.4] | 19.4 | [14.1, 26.0] |
| Rarely or never | 4.9 | [2.4, 9.8] | 15.3 | [11.1, 20.7] | 23.7 | [18.8, 29.5] | 41.4 | [35.1, 48.1] | 6.0 | [3.5, 10.1] |
| **Trans Men** | | | | | | | | | | |
| Always or most of the time | 12.2 | [5.6, 24.5] | 27.9 | [18.8, 39.1] | 47.4 | [36.6, 58.4] | 52.6 | [41.6, 63.4] | 30.5 | [21.5, 41.3] |
| Sometimes | 5.2 | [2.7, 9.9] | 19.9 | [15.1, 25.9] | 40.1 | [34.0, 46.5] | 47.1 | [40.9, 53.5] | 26.2 | [20.8, 32.5] |
| Rarely or never | 6.7 | [4.0, 11.1] | 15.0 | [11.4, 19.6] | 30.4 | [25.5, 35.8] | 36.5 | [31.5, 41.8] | 11.1 | [7.7, 15.7] |
| **AFAB Nonbinary** | | | | | | | | | | |
| Always or most of the time | 9.7 | [5.2, 17.4] | 22.0 | [15.5, 30.3] | 50.8 | [40.9, 60.6] | 38.2 | [29.0, 48.2] | 40.7 | [31.6, 50.4] |
| Sometimes | 5.4 | [3.2, 9.0] | 19.9 | [15.7, 25.0] | 44.8 | [39.7, 49.9] | 36.6 | [32.1, 41.4] | 22.3 | [18.5, 26.6] |
| Rarely or never | 5.4 | [3.4, 8.5] | 14.6 | [11.3, 18.5] | 34.8 | [30.2, 39.6] | 35.5 | [30.9, 40.3] | 11.0 | [8.3, 14.4] |

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | | BATHROOM VIOLENCE/ HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| **AMAB Nonbinary** | | | | | | | | | | |
| Always or most of the time | 1.7 | [0.8, 3.9] | 26.0 | [13.6, 44.0] | 53.6 | [36.1, 70.3] | 70.6 | [56.3, 81.8] | 27.5 | [12.7, 49.8] |
| Sometimes | 5.3 | [3.0, 9.3] | 20.2 | [14.2, 27.9] | 37.6 | [28.2, 48.0] | 43.7 | [33.4, 54.5] | 12.8 | [8.1, 19.6] |
| Rarely or never | 4.5 | [1.5, 12.9] | 17.3 | [10.1, 28.0] | 31.6 | [22.8, 41.9] | 38.9 | [30.3, 48.3] | 5.9 | [3.0, 11.2] |

Note: CI = Confidence Interval

**Table A4. Transgender adults' attributions for experiences of violence in California, U.S. Trans Survey (2022)**

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | |
|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | [95% CI] | % | [95% CI] | % | [95% CI] |
| Trans Status, Identity, or Expression | 66.1 | [57.6, 74.5] | 72.3 | [68.0, 76.7] | 85.2 | [83.1, 87.4] | 81.5 | [79.0, 83.9] |
| Sexual Orientation | 37.2 | [27.2, 47.1] | 37.5 | [32.3, 42.7] | 40.5 | [37.0, 44.0] | 39.6 | [36.6, 42.7] |
| Age | 4.4 | [2.1, 6.6] | 5.6 | [3.8, 7.3] | 8.9 | [7.0, 10.9] | 5.8 | [4.5, 7.1] |
| Disability | 11.7 | [4.9, 18.5] | 8.8 | [6.1, 11.4] | 10.8 | [8.8, 12.9] | 11.8 | [9.8, 13.7] |
| Income or Education | 5.2 | [0.4, 9.9] | 5.9 | [3.5, 8.3] | 6.2 | [4.5, 7.9] | 5.0 | [3.6, 6.3] |
| Race or Ethnicity | 13.6 | [6.7, 20.6] | 58.6 | [53.5, 63.8] | 19.8 | [16.9, 22.7] | 14.2 | [12.1, 16.4] |
| Religion or Spirituality | 4.0 | [0.0, 8.8] | 3.5 | [2.0, 5.0] | 4.6 | [3.0, 6.3] | 5.6 | [4.3, 7.0] |
| Size or Weight | 15.0 | [8.2, 21.7] | 14.4 | [11.0, 17.8] | 17.8 | [15.2, 20.4] | 14.5 | [12.3, 16.8] |
| None or Other | 22.6 | [15.8, 29.4] | 20.7 | [16.9, 24.6] | 8.2 | [6.6, 9.8] | 13.0 | [10.9, 15.2] |

Note: CI = Confidence Interval

**Table A5. Violence attributed to trans status, gender identity, or gender expression by transgender adults in California, U.S. Trans Survey 2022**

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | |
|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | [95% CI] | % | [95% CI] | % | [95% CI] |
| **Age** | | | | | | | | |
| 18-24 | 53.9 | [40.7, 66.5] | 61.7 | [54.5, 68.5] | 80.3 | [76.4, 83.7] | 78.8 | [74.9, 82.1] |
| 25-34 | 66.1 | [49.4, 79.6] | 75.9 | [68.4, 82.1] | 87.1 | [83.9, 89.8] | 80.4 | [75.3, 84.7] |
| 35-44 | 77.4 | [58.0, 89.5] | 75.9 | [61.2, 86.2] | 85.7 | [75.1, 92.3] | 81.3 | [70.6, 88.7] |
| 45+ | 81.8 | [60.4, 93.0] | 88.4 | [79.9, 93.6] | 94.2 | [89.7, 96.8] | 91.9 | [87.3, 94.9] |
| **Race/Ethnicity** | | | | | | | | |
| White, non-Hispanic | 85.6 | [78.3, 90.8] | 80.5 | [74.7, 85.2] | 87.8 | [84.2, 90.7] | 85.4 | [81.5, 88.6] |
| Black, non-Hispanic | 37.4 | [13.2, 70.2] | 62.0 | [38.5, 80.9] | 87.4 | [76.2, 93.7] | 77.7 | [63.4, 87.5] |
| Asian, non-Hispanic | 44.8 | [22.7, 69.1] | 53.6 | [39.9, 66.7] | 79.3 | [72.0, 85.1] | 70.8 | [62.3, 77.9] |
| Hispanic or Latine | 56.0 | [40.9, 70.1] | 72.7 | [64.9, 79.3] | 85.6 | [81.4, 89.0] | 81.2 | [76.6, 85.1] |
| Another race/multiracial | 68.5 | [40.7, 87.2] | 70.5 | [57.6, 80.8] | 77.9 | [67.2, 85.9] | 86.8 | [79.0, 92.0] |
| **Gender** | | | | | | | | |
| Trans Women | 76.9 | [62.2, 87.0] | 84.3 | [76.9, 89.6] | 92.1 | [88.1, 94.8] | 87.1 | [82.3, 90.8] |
| Trans Men | 60.0 | [42.0, 75.7] | 65.9 | [56.4, 74.2] | 81.3 | [75.9, 85.8] | 80.4 | [75.3, 84.6] |
| AFAB Nonbinary | 60.2 | [44.8, 73.8] | 65.7 | [57.2, 73.2] | 80.9 | [76.6, 84.5] | 74.3 | [69.3, 78.7] |
| AMAB Nonbinary | 38.5 | [17.2, 65.4] | 63.5 | [48.4, 76.3] | 86.9 | [80.2, 91.6] | 82.4 | [74.6, 88.1] |
| **Trans Visibility** | | | | | | | | |
| Always or most of the time | 75.0 | [55.0, 88.0] | 79.7 | [69.2, 87.3] | 91.2 | [86.7, 94.2] | 89.8 | [84.4, 93.4] |
| Sometimes | 68.6 | [55.4, 79.4] | 76.6 | [69.6, 82.4] | 89.1 | [86.3, 91.4] | 81.5 | [77.1, 85.2] |
| Rarely or never | 58.3 | [42.7, 72.5] | 63.8 | [55.9, 71.0] | 77.3 | [72.4, 81.5] | 78.0 | [73.8, 81.8] |
| **Education** | | | | | | | | |
| Less than high school | 85.8 | [61.0, 95.9] | 79.9 | [62.2, 90.6] | 84.5 | [74.1, 91.3] | 80.4 | [67.0, 89.2] |
| High school or GED | 57.5 | [39.0, 74.1] | 69.0 | [58.5, 77.8] | 87.5 | [82.7, 91.1] | 80.5 | [75.1, 85.0] |
| Some college | 57.6 | [47.5, 67.1] | 70.9 | [65.9, 75.5] | 84.0 | [81.1, 86.5] | 82.5 | [79.8, 84.9] |
| Bachelor's degree or higher | 64.4 | [52.4, 74.9] | 72.3 | [66.2, 77.7] | 84.8 | [81.8, 87.4] | 82.0 | [78.5, 85.0] |

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | |
|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | [95% CI] | % | [95% CI] | % | [95% CI] |
| **Household Income** | | | | | | | | |
| No Income | 74.2 | [47.1, 90.3] | 70.9 | [51.4, 84.9] | 80.3 | [68.3, 88.5] | 82.7 | [72.6, 89.6] |
| $1 to $24,999 | 73.7 | [54.5, 86.7] | 74.0 | [63.5, 82.4] | 87.0 | [81.5, 91.1] | 80.0 | [73.7, 85.1] |
| $25,000 to $49,999 | 52.4 | [32.9, 71.2] | 74.7 | [63.9, 83.1] | 86.6 | [80.9, 90.8] | 80.8 | [73.1, 86.6] |
| $50,000 to $74,999 | 84.7 | [66.7, 93.9] | 79.3 | [69.2, 86.8] | 86.0 | [80.3, 90.3] | 87.6 | [82.4, 91.4] |
| $75,000 to $99,999 | 59.8 | [35.8, 79.9] | 60.7 | [46.5, 73.3] | 82.4 | [73.8, 88.7] | 81.2 | [73.5, 87.1] |
| $100,000+ | 50.3 | [29.9, 70.6] | 67.1 | [56.8, 76.0] | 87.6 | [83.4, 90.9] | 82.8 | [77.6, 86.9] |

Note: CI = Confidence Interval

**Table A6. Predicted probabilities of experiencing different types of violence, threats, and harassment among transgender adults in California over one year, by trans visibility, U.S. Trans Survey 2022**

| | ANY VIOLENCE | | PHYSICAL VIOLENCE | | BATHROOM VIOLENCE/ HARASSMENT | | THREAT OF PHYSICAL VIOLENCE | | VERBAL HARASSMENT | | ONLINE HARASSMENT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI | % | 95% CI |
| Always or most of the time | 70.4 | [64.5, 76.3] | 8.3 | [5.0, 11.5] | 28.8 | [22.9, 34.6] | 23.1 | [17.7, 28.5] | 52.4 | [46.3, 58.6] | 45.1 | [38.9, 51.3] |
| Sometimes | 66.3 | [63.0, 69.6] | 6.0 | [4.3, 7.8] | 22.0 | [18.98, 25.0] | 19.8 | [17.0, 22.7] | 42.0 | [38.5, 45.5] | 44.8 | [41.3, 48.2] |
| Rarely or never | 51.2 | [48.0, 54.5] | 4.8 | [3.4, 6.3] | 8.7 | [6.9, 10.5] | 15.1 | [12.9, 17.4] | 29.0 | [26.1, 31.9] | 37.8 | [34.5, 41.1] |

Note: Predicted probabilities are derived from the logistic regression models presented in Table 2, controlling for age, race/ethnicity, gender identity, education, and household income.

**Table A7. Reported number of physical attacks or threats of physical attacks among transgender adults in California, U.S. Trans Survey 2022**

| | PHYSICAL VIOLENCE | | THREAT OF PHYSICAL VIOLENCE | |
|---|---|---|---|---|
| | % | 95% CI | % | 95% CI |
| 1 attack/threat | 50.1 | [40.6, 59.6] | 37.0 | [32.2, 42.1] |
| 2 attacks/threats | 28.0 | [20.0, 37.9] | 25.1 | [21.0, 29.8] |
| 3 attacks/threats | 8.7 | [4.0, 18.0] | 14.1 | [10.8, 19.1] |
| 4 attacks/threats | 2.4 | [1.2, 4.8] | 8.5 | [5.8, 12.5] |
| 5+ attacks/threats | 10.8 | [6.1, 18.4] | 14.9 | [11.8, 18.7] |

**Table A8. Relationship to the person committing physical violence against transgender adults in California, U.S. Trans Survey 2022**

| RELATIONSHIP | % | 95% CI |
|---|---|---|
| Stranger | 64.0 | [55.2, 72.8] |
| Relative | 15.5 | [9.4, 21.6] |
| Partner | 9 | [3.4, 14.6] |
| Former Partner | 1.9 | [0.8, 3.0] |
| Friend | 8.8 | [3.4, 14.2] |
| Coworker | 4.8 | [1.2, 8.3] |
| Teacher | 4.8 | [1.2, 8.3] |
| Law Enforcement | 5.5 | [0.4, 10.7] |
| Health Official | 0.5 | [0.0, 1.1] |
| Boss | 0.3 | [0.0, 0.8] |
| Other Relationship | 11.5 | [5.0, 18.0] |

**Table A9. Type of physical attack experienced by transgender adults in California, U.S. Trans Survey 2022**

| TYPE OF ATTACK | % | 95% CI |
|---|---|---|
| Grabbing, Punching, or Choking | 69.7 | [60.7, 78.7] |
| Thrown Object | 31.3 | [21.6, 41.1] |
| Sex Attack | 16.3 | [10.0, 22.6] |
| Gun | 4.3 | [0.9, 7.7] |
| Knife or Other Weapon | 9.3 | [2.8, 15.7] |
| Hard Object | 4.0 | [1.0, 6.9] |
| Other Physical Attack | 25.7 | [15.9, 35.3] |

**Table A10. Type of bathroom violence experienced by transgender adults in California, U.S. Trans Survey 2022**

| TYPE OF BATHROOM VIOLENCE | % | 95% CI |
|---|---|---|
| Any Bathroom Violence or Harassment | 16.7 | [15.0, 18.3] |
| Told Using Wrong Bathroom | 15.0 | [13.4, 16.5] |
| Verbal Harassment | 6.6 | [5.4, 7.9] |
| Denied Access | 4.6 | [3.6, 5.6]] |
| Physical Violence or Sexual Assault | 0.7 | [0.3, 1.1] |

**Table A11. Type of online harassment experienced by transgender adults in California, U.S. Trans Survey 2022**

| TYPE OF ONLINE HARASSMENT | % | 95% CI |
|---|---|---|
| Called Offensive Names | 33.3 | [31.4, 35.3] |
| Purposefully Embarrassed | 21.3 | [19.6, 23.0] |
| Sexually Harassed | 16.2 | [14.7, 17.8] |
| Physically Threatened | 11.7 | [10.4, 13.1] |
| Sustained Harassment | 12.1 | [10.7, 13.5] |
| Stalked | 8.5 | [7.3, 9.7] |

# Exhibit 17

UCLA School of Law Williams Institute

RESEARCH THAT MATTERS

# HATE CRIMES AND VIOLENCE AGAINST TRANSGENDER PEOPLE IN CALIFORNIA AND THE US

## A Review of Existing Research

March 2026

Joshua Arrayales
Christy Mallory

# CONTENTS

EXECUTIVE SUMMARY ..... 2
Key Findings ..... 2
GENDER IDENTITY HATE CRIMES AND ANTI-TRANSGENDER VIOLENCE IN CALIFORNIA ..... 6
Reports of Hate Crimes in California Collected by Government Entities ..... 6
Surveys of Transgender People in California ..... 10
Reports From Community-Based Organizations, College Campuses, and Other Sources in California ..... 12
GENDER IDENTITY HATE CRIMES AND ANTI-TRANSGENDER VIOLENCE ACROSS THE U.S. ..... 14
Hate Crime Records Collected by the Federal Government ..... 14
National Surveys of Transgender People ..... 16
Other Sources of Information About Gender Identity Hate Crimes and Violence Against Transgender People in the US ..... 19
LEGAL OUTCOMES OF VIOLENCE AGAINST TRANSGENDER PEOPLE ..... 23
CONCLUSION ..... 24
AUTHORS ..... 25
Acknowledgements ..... 25
Suggested Citations ..... 25

# EXECUTIVE SUMMARY

Transgender people reside in every state across the nation and are diverse in terms of age, race, and other personal characteristics.[1] In 2025, the Williams Institute at UCLA School of Law estimated that 2.1 million adults in the U.S. identify as transgender (0.8% of adults).[2] Of adults who identify as transgender, 698,500 are transgender women, 730,500 are transgender men, and about 707,100 are transgender nonbinary;[3] 43.8% of transgender adults identify as people of color, compared to 40.1% of the general population.[4] Using data from the Centers for Disease Control and Prevention's Behavioral Risk Factor Surveillance System and the Youth Risk Behavior Survey, researchers further estimated that 723,700 youth aged 13-17 identify as transgender, with 48% of transgender youth also identifying as people of color.[5]

This report presents data from the last 25 years on hate crimes and violence against transgender and nonbinary people. The report includes data specific to the state of California and localities within California, as well as research on anti-transgender violence and hate crimes at the national level.

## KEY FINDINGS

Hate crimes and violence against transgender people have been documented in a variety of sources, including law enforcement reports, surveys of transgender people, and incident reports collected by community-based organizations that serve victims of violence.[6]

### California

#### Hate Crime Reports Collected by Government Entities in California

- Data compiled annually by the California Department of Justice (DOJ) show an increase in anti-transgender and anti-gender nonconforming hate crimes over time. The California DOJ began to collect data on hate crimes motivated by anti-transgender bias in 1999. In that year, law enforcement reported 13 anti-transgender hate crime events. In 2013, when the California DOJ began to track anti-gender nonconforming hate crimes, law enforcement reported one hate crime event on this basis. In 2024, the California DOJ documented 73 anti-transgender and seven anti-gender nonconforming hate crime events.
- The Los Angeles County Commission on Human Relations collects data on hate crimes that occurred within the county from law enforcement, school districts, universities, community-based organizations, and victim reports. In 2000, the county recorded eight anti-transgender hate crimes. In 2024, the most recent year of available data, the county recorded 102 anti-transgender hate crimes, the highest number ever recorded within the county in a single year.

---

[1] Jody L. Herman & Andrew R. Flores, Williams Inst., How Many Adults and Youth Identify as Transgender in the United States? 10 11 (2025), https://williamsinstitute.law.ucla.edu/wp content/uploads/Trans Pop Update Aug 2025.pdf.

[2] *Id*. at 6.

[3] *Id*.

[4] *Id*. at 9.

[5] *Id*. at 6, 9, 22.

[6] All sources referred to in the Executive Summary are fully cited in the report below. We use the term "victims" to refer to individuals who have reported experiencing hate crimes in the cited studies and reports.

## Survey Data from California

- The California Health Interview Survey gathers data on hate acts perpetrated against transgender and gender expansive people. Data from the 2023 survey showed that 19% of transgender adults reported experiencing at least one hate act in the past year, and 48% said they had witnessed at least one. By comparison, only 7% of cisgender adults reported experiencing a hate act, and 13% reported witnessing one. Among transgender adults who experienced a hate act, 54% believed they were targeted because of their gender, sex, or gender identity, and 39% cited their sexual orientation as the reason.
- A 2024 Williams Institute study based on a survey of 322 transgender and nonbinary people in Los Angeles found that 26% reported experiencing verbal harassment, physical attacks, or unwanted sexual contact at work within the last year because of their transgender or nonbinary identity.
- The 2015 United States Transgender Survey report on 3,453 respondents from California found that, within the year prior to taking the survey, 2% had been physically attacked in a public accommodation, 1% were physically attacked in a restroom, and 1% were attacked at work because of their gender identity.
- Another 2021 study by Jane Gauthier et al. found that among 32 transgender focus group participants in Los Angeles, all except two experienced a hate incident or crime based on gender identity or expression. On average, participants reported experiencing 3.48 types of incidents measured in the study.
- A 2021 study by Akua Gyamerah et al. based on a survey of 629 transgender women in the San Francisco Bay Area found that 45.8% of respondents reported experiencing an anti-transgender hate crime. Many hate crimes involved personal violence (as opposed to destruction of property), with 39.8% of participants reporting physical assault, 37.3% reporting battery with a weapon, and 19.3% reporting sexual assault.

## Reports from Community-Based Organizations, College Campuses, and Other Sources in California

- The National Coalition of Anti-Violence Programs (NCAVP) partners with local organizations across the United States to assist hate violence survivors[7] who are LGBTQ+ or are living with HIV. Between 1998 and 2017, NCAVP published reports based on information collected from these organizations. Two California-based organizations that were part of this coalition, the Community United Against Violence (CUAV) in San Francisco and the Los Angeles LGBT Center, reported that:
    - In 2016, the Los Angeles LGBT Center assisted 208 survivors of anti-LGBTQ hate violence. Twenty-six percent of survivors were transgender. In San Francisco, CUAV assisted 66 survivors of anti-LGBTQ hate violence. About one-third (32%) were transgender women.
    - In 2015, the Los Angeles LGBT Center assisted 205 survivors of anti-LGBTQ hate violence. Twenty-six percent of them were transgender. In San Francisco, CUAV assisted 123 survivors of anti-LGBTQ hate violence, 22% of whom identified as transgender.

[7] NCAVP uses the term “survivors” to refer to victims of hate violence who survive the incident and “victims” to refer to those who die as a result of hate violence. This report will mirror the NCAVP language when discussing those reports. In all other places, we use “victims” to refer to anyone who has experienced hate violence.

## United States

### Hate Crime Records Collected by the Federal Government

- Comparing data from 2018 to data from 2024, the Federal Bureau of Investigation (FBI) recorded an increase in the number of reported anti-transgender and anti-gender nonconforming hate crimes. In 2018, there were 184 hate crimes involving anti-transgender and anti-gender nonconforming bias. In 2024, the FBI reported 527 hate crimes involving anti-transgender and anti-gender nonconforming bias.
- The FBI also documented an increase in the proportion of hate crimes that were motivated by anti-transgender and anti-gender nonconforming bias over this time period. In 2018, 2.2% of all hate crimes were motivated by gender identity; in 2024, that proportion rose to 3.9%.

### National Survey Data

- A 2025 Williams Institute analysis of 2022-2023 National Crime Victimization Survey (NCVS) data found that transgender people experienced violence at a rate of 93.7 per 1,000 persons, compared with 21.1 per 1,000 among non-LGBT persons. Similarly, an earlier Williams Institute analysis of 2017-2018 NCVS data found that transgender people encountered violence at a rate of 86.2 victimizations per 1,000 persons, compared with cisgender people, who had a rate of 21.7 victimizations per 1,000 persons.
- A 2021 Williams Institute national probability survey of transgender people in the U.S. found that nearly half of transgender people (47.6%) reported being physically attacked or sexually assaulted, and 45.1% had property damaged, stolen, or were robbed.
- The Report of the 2015 United States Transgender Survey, which included 27,000 transgender respondents nationwide, found that 13% of all transgender respondents had been physically attacked in the past year, and 9% of all respondents believed they had been attacked because of their transgender identity or gender expression. Transgender people of color were more likely to have been physically attacked than white respondents, particularly American Indian (25%), Middle Eastern (25%), and multiracial (19%) respondents. Twenty-four percent of undocumented transgender U.S. residents reported being attacked within the year prior to taking the survey.

### Reports from Community-Based Organizations and Other Sources

- The most recent reports published by the National Coalition of Anti-Violence Programs, based on data collected from several member organizations that serve LGBTQ survivors and survivors living with HIV across the country, found that:
    - In 2017, NCAVP collected information about 52 hate-related homicides. Twenty-seven victims were transgender or gender nonconforming, 22 of whom were transgender women of color. NCAVP also documented 825 reports of hate violence against LGBTQ people and people living with HIV, 142 of which involved anti-transgender bias.
    - In 2016, NCAVP collected information about 77 hate-related homicides, including 49 victims of the mass shooting at the Pulse Nightclub in Orlando. While data on the gender identity of the victims of the Pulse Nightclub shooting are not available, among the other 28 victims of

hate-related homicides, 19 were transgender and gender nonconforming people, including 17 transgender women of color. NCAVP also documented 1,036 incidents of hate violence against LGBTQ people and people living with HIV. Of the 929 reports that indicated a bias motivation, 210 involved anti-transgender bias.

  - In 2015, NCAVP collected information about 24 hate-related homicides. Sixteen homicide victims were transgender or gender nonconforming and 13 were transgender women of color. NCAVP also documented 1,253 reports of hate violence against LGBTQ people and people living with HIV, 293 of which involved anti-transgender bias.

- A 2024 study by Lantz et al. found that of 305 documented homicides of transgender people in the U.S. between 2010-2021, 92 were either confirmed or suspected hate crimes. Most transgender homicide victims were women of color: 70.5% were Black and 16.1% were Hispanic or Latinx.

# GENDER IDENTITY HATE CRIMES AND ANTI-TRANSGENDER VIOLENCE IN CALIFORNIA

According to estimates from the Williams Institute, approximately 263,700 transgender adults and 84,600 transgender teenagers aged 13-17 reside in California.[8] The majority of transgender adults in California identify as either Latinx (122,100) or white (78,300).[9] Though existing research is limited, hate crimes,[10] hate incidents,[11] and violence against transgender people[12] in California have been documented in several sources, including reports collected by government entities, surveys of transgender people, community-based reports, and qualitative studies.[13]

## REPORTS OF HATE CRIMES IN CALIFORNIA COLLECTED BY GOVERNMENT ENTITIES

Data collected by government entities in California indicate that reports of anti-transgender hate crimes have risen over time and make up an increasingly larger share of all hate crimes reported in the state. State and local law enforcement agencies report their crime statistics, including hate crime statistics, to the California Department of Justice (DOJ), which subsequently publishes annual reports using this data.[14] Data compiled by the California DOJ show an increase in the number of reported anti-transgender and anti-gender nonconforming hate crimes over time. The California DOJ began to collect data on hate crimes motivated by anti-transgender bias in 1999. In that year, law enforcement reported 13 anti-transgender hate crime events.[15] In 2013, when the California DOJ began to track anti-gender nonconforming hate crimes, law enforcement reported one hate crime event on this basis.[16] In 2024, the state recorded 73 anti-transgender hate crime events and seven anti-gender nonconforming hate crime events.[17] These data also show that gender identity hate crimes make up an increasingly larger share of all hate crimes reported in the state. In 1999, anti-transgender hate crimes accounted for 0.7%, and in 2013, anti-gender nonconforming hate crimes accounted for 0.1% of all hate crimes reported in California. In 2024, the percentages rose to 3.6% and 0.3%, respectively.[18]

---

[8] Herman & Flores, *supra* note 1, at 13.

[9] *Id*. at 15.

[10] A hate crime is defined as a crime that is motivated by bias against a person for their actual or perceived characteristics. *Learn About Hate Crime*, U.S. Dep't Justice (July 2, 2024), https://www.justice.gov/hatecrimes/learn about hate crimes.

[11] A hate incident is defined as an expression or action that may be motivated by a person's actual or perceived characteristics. The CA Civil Rights Department demonstrates that there are two main kinds of hate incidents: acts of hate that are not crimes but which violate civil rights laws, and acts of hate that may not violate the law but significantly harm a community. *CA vs Hate*, State Cal. Civil Rights Dep't, https://calcivilrights.ca.gov/ca vs hate page/ (last visited Sept. 8, 2025).

[12] Violence against transgender people may or may not be motivated by anti transgender bias. In this piece, we use violence against transgender people broadly to cover violence that may not be motivated by anti transgender bias but which still targets transgender people.

[13] *Quick Facts California*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/CA/PST045223 (last visited June 30, 2025).

[14] Cal. Penal Code § 13023 (Deering 2024).

[15] Cal. Dep't Just., Hate Crime in California 1999, at 7 (2000), https://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/hatecrimes/hc99 full report.pdf.

[16] Cal. Dep't Just., Hate Crime in California, 2013, at 5 (2014) https://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/hatecrimes/hc13/preface13.pdf

[17] Cal. Dep't Just., Hate Crime in California 2024, at 9 (2025), https://data openjustice.doj.ca.gov/sites/default/files/2025 06/Hate%20Crime%20In%20CA%202024.pdf. The FBI documented 84 anti transgender hate crimes and 8 anti gender non conforming hate crimes. Fed. Bureau Investigation: Unif. Crime Reporting Program, *Hate Crime*, Fed. Bureau Investigation: Crime Data Explorer (Sept. 15, 2025), https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate crime (under "Time Frame" set Start Date as January 2023 and End Date as December 2023).

[18] Cal. Dep't Just., *supra* note 15; Cal. Dep't Just., *supra* note 16; Cal. Dep't Just., *supra* note 17.

**Figure 1. Anti-transgender hate crime events recorded by the California DOJ (1999-2024)**




**Figure 2. Anti-gender nonconforming hate crime events recorded by California DOJ (2013-2024)**




While these reports represent an important source of information about the existence and prevalence of hate crimes in California, they likely do not capture the full extent of hate violence occurring in the state. These data and the resulting state reports are limited to incidents that are reported to law enforcement, classified by law enforcement as hate crimes, and then successfully reported to the DOJ.[19] As a result, the state's records do not fully capture the scope of such incidents.

Some organizations, like the Los Angeles County Commission on Human Relations, compile more comprehensive data, which includes not only law enforcement reports but also data collected by school districts, universities, community-based organizations, and victim reports.[20] The Commission documented eight anti-transgender hate crimes[21] within the county in 2000.[22] In 2012, 13 hate crimes were documented.[23] Most recently, in 2024, the Commission documented 102 anti-transgender hate crimes.[24]

---

[19] *See* Jordan Grasso, Nathan Cisneros & Ilan H. Meyer, Williams Inst., Gender Identity Hate Crimes in California 27 28 (2025), https://williamsinstitute.law.ucla.edu/wp content/uploads/CA GI Hate Crimes Dec 2025.pdf.

[20] L.A. Cnty. Comm'n Hum. Rels., 2022 Hate Crime Report 42 (2023), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/aefb9bbb 8328 449d 82b0 6ad2f330169b/LA%20County%202022%20Report%20of%20Hate%20Crime.pdf.

[21] The Commission includes only reports that it determines "meet the criteria of the legal definition of hate crime in the California penal code." *Id*. at 42.

[22] L.A. Cnty. Comm'n Hum. Rels., 2000 Hate Crime Report 22 (2001), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/0da49da2 7d32 4f5f b2a6 d6a97a11e859/2000_hateCrimeReport.pdf.

[23] L.A. Cnty. Comm'n Hum. Rels., 2012 Hate Crime Report 8 (2013),https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/18de4564 a183 4411 908b a1e0387ccdc8/2012_hateCrimeReport.pdf.

[24] L.A. Cnty. Comm'n Hum. Rels., 2024 L.A. County Hate Crime Report 36 (2025),https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/958661b6 c74e 4b9a ac6c 5108d1142356/Final_2024%20Hate%20Crime%20Report Digital.pdf.

**Figure 3. Anti-transgender hate crimes recorded by the LA County Human Relations Commission (2000-2024)**




In 2002, when the County began to report anti-transgender hate crimes by gender, 15 anti-transgender hate crimes targeted transgender women.[25] Twenty years later, in 2024, 71 anti-transgender hate crimes against transgender women were recorded.[26] The proportion of anti-transgender hate crimes reported by transgender women over this time period has remained consistently high. Nine different years—2003, 2004, 2006, 2008, 2009, 2011, 2012, 2014, and 2015—all saw 100% of anti-transgender crimes involving transgender women.[27] The lowest proportion of victims who were transgender women since 2002 was seen in 2007, with a rate of 64.3%.[28]

[25] L.A. Cnty. Comm'n Hum. Rels., 2002 Hate Crime Report 3, 31 (2003), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949 b70a2/4ccf8298 89d5 4e4c 8b47 cfa9bcd70af6/2002_hateCrimeReport.pdf.

[26] L.A. Cnty. Comm'n Hum. Rels., *supra* note 24.

[27] L.A. Cnty. Comm'n Hum. Rels., 2003 Hate Crime Report 26 (2004), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/b89613db c1f5 4d42 804f 9ef677c09f27/2003_hateCrimeReport.pdf [hereinafter 2003 Hate Crime Report]; L.A. Cnty. Comm'n Hum. Rels., 2004 Hate Crime Report 28 (2005), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/a8ee2e41 ceb6 4f49 bb14 b6cd7a3bce21/2004_hateCrimeReport.pdf [hereinafter 2004 Hate Crime Report]; L.A. Cnty. Comm'n Hum. Rels., 2006 Hate Crime Report 26 (2007), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/0ef5d548 dff3 4ed4 aa97 261500d4581b/2006_hateCrimeReport.pdf [hereinafter 2006 Hate Crime Report]; L.A. Cnty., Comm'n Hum. Rels., Hate Crime Report 2008, at 32 (2009), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/5a83d08f ba88 4bf3 adc4 b80889aaa34a/2008_hateCrimeReport.pdf [hereinafter 2008 Hate Crime Report]; L.A. Cnty. Comm'n Hum. Rels., 2009 Hate Crime Report 32 (2010), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/028bf61c b70b 4d60 b1e0 fb0ada4c5ad5/2009_hateCrimeReport.pdf [hereinafter 2009 Hate Crime Report]; L.A. Cnty. Comm'n Hum. Rels., 2011 Hate Crime Report 33 (2012), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/8f8d3d56 bf0e 4321 aa8e 49cb0e660a42/2011_hateCrimeReport.pdf [hereinafter 2011 Hate Crime Report]; L.A. Cnty. Comm'n Hum. Rels., *supra* note 23, at 33; L.A. Cnty. Comm'n Hum. Rels., 2014 Hate Crime Report 37 (2015), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/8dd3832e 470e 46b7 a911 edcd33f8e826/2014_hateCrimeReport.pdf [hereinafter 2014 Hate Crime Report].

[28] L.A. Cnty. Comm'n Hum. Rels., 2007 Hate Crime Report 24 (2008), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/7106e381 30ff 4b2d 908e 817b2991e74c/2007_hateCrimeReport.pdf [hereinafter 2007 Hate Crime Report].

**Figure 4. Proportion of anti-transgender hate crimes in Los Angeles County targeting transgender women (2002-2024)**[29]




Many anti-transgender hate crimes documented in Los Angeles County have been classified by the County as violent crimes, such as crimes that involve physical assault, criminal threats, intimidation, and robbery, as distinguished from less severe offenses like vandalism.[30] Over the past 20 years, the rate of hate crimes involving violence in Los Angeles ranged from 50% to 100% of all anti-transgender hate crimes.[31] In eight years—2003, 2005, 2007, 2008, 2009, 2010, 2013, and 2015—all reported hate crimes involved an act of violence.[32]

---

[29] Information on the number of transgender women victimized is unavailable for 2000 and 2001. Numbers are rounded to the nearest whole number.

[30] L.A. Cnty. Comm'n Hum. Rels., 2013 Hate Crime Report 37 (2014), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/acdf9218 9c95 4e8d 9993 5c73ded9646d/2013_hateCrimeReport.pdf [hereinafter 2013 Hate Crime Report]; L.A. Cnty. Comm'n Hum. Rels., 2015 Hate Crime Report 36 (2016), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/d9cb9274 f8c8 4da0 b6e3 0d0289efbf47/2015 Hate Crime Report PDF.pdf [hereinafter 2015 Hate Crime Report]. See reports for a full explanation of crimes categorized by the agency as "violent" versus other crimes.

[31] L.A. Cnty. Comm'n Hum. Rels., *supra* note 25, at 31; 2003 Hate Crime Report, *supra* note 27 (rate of violence was 100%); 2004 Hate Crime Report, *supra* note 27 (rate of violence was 93%); L.A. Cnty. Comm'n Hum. Rels., 2005 Hate Crime Report (2006), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/004c9fa1 d63d 4fe9 a71d ad6cbf8db6fb/2005_hateCrimeReport.pdf (rate of violence was 100%) [hereinafter 2005 Hate Crime Report]; 2006 Hate Crime Report, *supra* note 27 (rate of violence was 50%); 2007 Hate Crime Report, *supra* note 28 (rate of violence was 100%); 2008 Hate Crime Report, *supra* note 27 (rate of violence was 100%); 2009 Hate Crime Report, *supra* note 27 (rate of violence was 100%); L.A. Cnty. Comm'n Hum. Rels., *supra* note 23, at 29 (rate of violence was 100%); 2011 Hate Crime Report, *supra* note 27 (rate of violence was 86%); L.A. Cnty. Comm'n Hum. Rels., *supra* note 23 (rate of violence was 92%); 2013 Hate Crime Report, *supra* note 30 (rate of violence was 100%); 2014 Hate Crime Report, *supra* note 27 (rate of violence was 93%); 2015 Hate Crime Report, *supra* note 30 (rate of violence was 100%); L.A. Cnty. Comm'n Hum. Rels., 2016 Hate Crime Report 35 (2017), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/bb3a0043 88ae 4539 bb29 36066d8bf60e/2016 Annual Report of Hate Crime in Los Angeles County.pdf (rate of violence was 97%); L.A. Cnty. Comm'n Hum. Rels., 2017 Hate Crime Report 37 (2018), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/8e86c89d 0a5c 446b 935a e53dd74918c8/2017 Hate Crime Report.pdf (rate of violence was 94%); L.A. Cnty. Comm'n Hum. Rels., 2018 Hate Crime Report 38 (2019), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/370cab3a f3bb 4cdd 8f13 1e5cabc18d5c/2018 Hate Crime Report.pdf (rate of violence was 92%); L.A. Cnty. Comm'n Hum. Rels., 2019 Hate Crime Report 38 (2020), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/81f7f8a3 2edf 4a98 9ee8 09899c8d91d7/2019%20Hate%20Crime%20Report%20LA%20County.pdf (rate of violence was 93%); L.A. Cnty. Comm'n Hum. Rels., 2020 Hate Crime Report 40 (2021), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/a0061e60 542f 4ca7 a79b 4b4cbdfe9f82/2020 Hate Crime Report LA County.pdf (rate of violence was 94%); L.A. Cnty. Comm'n Hum. Rels., 2021 Hate Crime Report 38 (2022), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/caa802e9 00f0 455e 9c44 db7ef7a06e4c/2021%20LA%20County%20Hate%20Crime%20Report.pdf; L.A. Cnty. Comm'n Hum. Rels., *supra* note 20, at 38; LA. Cnty. Comm'n Hum. Rels, 2023 L.A County Hate Crime Report 38 (2024), https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/20d12b6c 7e 71 4244 802a ce1fe5103c7e/2023%20Hate%20Crime%20Report_FINAL.pdf; L.A. Cnty. Comm'n Hum. Rels., *supra* note 24.

[32] 2015 Hate Crime Report, *supra* note 30; 2013 Hate Crime Report, *supra* note 30; L.A. Cnty. Comm'n Hum. Rels., *supra* note 23, at 29; 2009 Hate Crime Report, *supra* note 27; 2008 Hate Crime Report, *supra* note 27; 2007 Hate Crime Report, *supra* note 28; 2005 Hate Crime Report, *supra* note 31; 2003 Hate Crime Report, *supra* note 27.

In 2025, the Los Angeles County Commission on Human Relations announced the release of its first Hate Incident Report, which examined hate incidents that occurred in the county in 2022 and 2023. Hate incidents were defined as "noncriminal acts motivated by prejudice or bias against a person or group's actual or perceived identit(ies). Hate incidents can include non-criminal verbal abuse, harassment, and display of offensive materials."[33] The county documented 40 hate incidents involving transgender people, a 48% rise from 27 incidents in 2022.[34] In 2023, all of these incidents involved hate speech, with the most common location being a public setting (38%).[35]

## SURVEYS OF TRANSGENDER PEOPLE IN CALIFORNIA

Although survey research on hate crimes and violence against transgender people in California is limited, existing data indicate that transgender people continue to experience violence because of their gender identity in the state.

The California Health Interview Survey gathers data on hate acts against transgender people, which can include hate crimes and non-criminal hate incidents. Findings from the 2023 survey showed that 19% of transgender and gender expansive adults reported experiencing a hate act in the past year, and 48% said they had witnessed one.[36] By comparison, only 7% of cisgender adults reported experiencing a hate act, and 13% reported witnessing one.[37] Among transgender and gender-expansive adults who experienced a hate act, 54% believed they were targeted because of their gender, sex, or gender identity, and 39% cited their sexual orientation as the reason.[38] Most respondents (69%) reported that the hate incidents they experienced occurred on public streets or sidewalks, though 34% of transgender and gender expansive adults said they experienced a hate incident in their own home.[39] Nearly all victims reported that incidents they experienced involved verbal abuse or insults (89%) or cyberbullying (33%), and 4% of respondents experienced physical violence.[40]

A 2017 analysis of data from the 2015 U.S. Transgender Survey, which included 3,453 respondents from California, found that some transgender respondents in the state had experienced physical violence in public spaces within the year prior to taking the survey because of their gender identity.[41] More specifically, 2% of California respondents had been physically attacked at a place of public accommodation, 1% reported being physically attacked in a restroom, and 1% of those who held jobs reported being physically attacked at work within the prior year because of their transgender identity.[42]

---

[33] L.A. Cnty. Commission Hum. Rels., 2023 L.A. County Hate Incident Report (2025) 5, 9, https://assets us 01.kc usercontent.com/0234f496 d2b7 00b6 17a4 b43e949b70a2/0dd2d243 f30e 453a 96ec 73c061535a53/2023%20Hate%20Incident%20Report%20Final.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=.

[34] *Id*. at 3.

[35] *Id*. at 9.

[36] *California Health Interview Survey*, UCLA Ctr. Health Pol'y Rsch., https://healthpolicy.ucla.edu/our work/california health interview survey chis (last visited Sept. 30, 2025) (analysis on file with author).

[37] *Id*.

[38] *Id*.

[39] *Id*.

[40] *Id*.

[41] Nat'l Ctr. for Transgender Equal., 2015 U.S. Transgender Survey: California State Report 1 (2017), https://transequality.org/sites/default/files/docs/usts/USTSCAStateReport(1017).pdf

[42] *Id*. at 2.

A few community-based surveys have collected information about violence from transgender people in Los Angeles. For example, a 2021 study based on a survey of 150 transgender women in Los Angeles between 2014 and 2018 found 47% of participants reported being victims of violence perpetrated by acquaintances or strangers.[43] Additionally, a 2024 Williams Institute study based on a 2023-2024 survey of 322 transgender and nonbinary people in Los Angeles found that 38% of respondents named violence as an issue that was a serious problem for transgender and nonbinary people in Los Angeles.[44]

A mixed-methods study published in 2021 collected information about anti-transgender hate incidents and violence through focus groups with a total of 32 participants in Los Angeles.[45] The participants in those focus groups also completed a survey.[46] Researchers found that, with the exception of two participants, all experienced a hate incident or crime based on gender identity or expression.[47] Of the six types of potential hate incidents measured by the researchers, respondents reported, on average, experiencing 3.48 types of incidents in their lives.[48] The types of hate incidents measured included discrimination, verbal harassment, vandalism, threats, physical attacks, and sexual assaults.[49] More than half of the participants reported being physically assaulted because of their gender at some point in their lives.[50]

Another study surveyed 629 transgender women in person in the San Francisco Bay Area from 2016 to 2018 to assess whether certain factors influenced exposure to anti-transgender violence.[51] Almost half of respondents (45.8%) reported ever experiencing an anti-transgender hate crime.[52] Many crimes involved violence against the person (as opposed to a property crime), with 39.8% of participants reporting physical assault, 37.3% reporting battery with a weapon, and 19.3% reporting sexual assault.[53] The types of violence experienced by respondents differed by race and ethnicity: nearly half of Latina (49%) and Black (47.9%) transgender women reported an experience of battery with a weapon, compared to 28% of white transgender women.[54] In contrast, 26.7% of white transgender women and 25% of those of another race or ethnicity reported sexual assaults, compared to 12.5% of Black and 13.5% of Latina transgender women.[55] The study found several factors associated with higher odds of experiencing an anti-transgender hate crime. Transgender women who had ever experienced homelessness, engaged in sex work, been undocumented, had lower educational attainment, or felt that others questioned their gender identity were more likely to have experienced a hate crime.[56]

---

[43] Frank H. Galvan, et al. *Violence Inflicted on Latina Transgender Women Living with HIV: Rates and Associated Factors by Perpetrator Type*, 25 AIDS & Behav. (Suppl 1), S116, S116, S121, S124 (2021).

[44] Jody L. Herman et al., Williams Inst., Para Mi Punto de Vista/From My Point of View: results of the 2023 LA County Trans & Nonbinary Survey 89, 91 (2024), https://williamsinstitute.law.ucla.edu/wp content/uploads/LACo Trans NB Jun 2024.pdf.

[45] Jane Gauthier, Kevin Medina & Carly Dierkhising, *Analysis of Hate Crimes in Transgender Communities*, 17 J. Hate Stud. 4, 6 (2021).

[46] *Id*. at 6 7

[47] *Id*.

[48] *Id*. at 7.

[49] *Id*. at 7 8.

[50] *Id*. at 7.

[51] Akua O. Gyamerah et al., *Experiences and Factors Associated with Transphobic Hate Crimes Among Transgender Women in the San Francisco Bay Area: Comparisons Across Race*, 21 BMC Pub. Health 1053, 1, 3 (2021).

[52] *Id*. at 4.

[53] *Id*.

[54] *Id*.

[55] *Id*.

[56] *Id*. at 4, 6.

## REPORTS FROM COMMUNITY-BASED ORGANIZATIONS, COLLEGE CAMPUSES, AND OTHER SOURCES IN CALIFORNIA

Gender identity hate crimes and incidents of anti-transgender violence have also been documented in other sources, including in reports collected by community-based organizations and college campuses, and in qualitative studies.

The National Coalition for Anti-Violence Programs (NCAVP) is "comprised of organizations and groups across the country that work to prevent and respond to violence against LGBTQ+ survivors and survivors living with HIV."[57] Historically, NCAVP partnered with community organizations to gather information for an annual national report on hate violence against LGBTQ and HIV-affected communities.[58] These organizations draw from victim reports and public sources, such as media and police reports, to compile an annual report.[59] As a result of the dependence on voluntary participation from community organizations, each report varies in its coverage of incidents. While NCAVP has not published a report since 2017, its data helps characterize hate crimes and trends from years prior.[60] Two California organizations, Community United Against Violence (CUAV) in San Francisco and the LGBT Center Anti-Violence Project in Los Angeles, provided information about anti-LGBTQ+ hate violence for these reports.[61] Both CUAV and the Los Angeles LGBT Center reported to NCAVP for over sixteen years, though not all years included information on transgender victims specifically.[62] Notable statistics throughout the years included the following:

### 2016

- In San Francisco, CUAV assisted 66 survivors of anti-LGBTQ hate violence.[63] Thirty-two percent of survivors were transgender women.[64]
- The Los Angeles LGBT Center assisted 208 survivors of anti-LGBTQ hate violence.[65] Twenty-six percent of survivors were transgender.[66]

### 2015

- CUAV assisted 123 survivors of anti-LGBTQ hate violence, and 22% identified as transgender.[67]
- The Los Angeles LGBT Center assisted 205 survivors of anti-LGBTQ hate violence.[68] Twenty-six percent were transgender.[69]

---

[57] Nat'l Coal. Anti Violence Programs, https://avp.org/ncavp/ (last visited Sept. 12, 2025).

[58] Emily Waters et al., Nat'l Coal. Anti Violence Programs, Lesbian, Gay, Bisexual, Transgender, Queer, and HIV Affected Hate Violence in 2016, at 25 (2017), https://avp.org/wp content/uploads/2017/06/NCAVP_2016HateViolence_REPORT.pdf.

[59] *See* Beverly Tillery et al., Nat'l Coal. Anti Violence Programs, Lesbian, Gay, Bisexual, Transgender, Queer, and HIV Affected Hate and Intimate Partner Violence in 2017, at 33 (2018), https://avp.org/wp content/uploads/2019/01/NCAVP HV IPV 2017 report.pdf; *id*. at 30; Emily Waters et al., Nat'l Coal. Anti Violence Programs, Lesbian, Gay, Bisexual, Transgender, Queer, and HIV Affected Hate Violence in 2015, at 14 (2016), https://avp.org/wp content/uploads/2017/04/ncavp_hvreport_2015_final.pdf.

[60] *See* Nat'l Coal Anti Violence Programs, *supra* note 57.

[61] *Id*. at 42, 55.

[62] Here, reports from 2010 2017 are only included if they reported information on transgender victims.

[63] Waters et al., *supra* note 58, at 42.

[64] *Id*.

[65] *Id*. at 55.

[66] *Id*. at 56.

[67] Waters et al., *supra* note 59, at 48.

[68] *Id*. at 44.

[69] *Id*.

### 2012

- CUAV assisted 95 survivors of anti-LGBTQ hate violence.[70] Twenty-nine percent of survivors identified as transgender.[71]
- The Los Angeles LGBT Center assisted 435 survivors of anti-LGBTQ hate violence, of which 21.4% identified as transgender.[72]

### 2011

- CUAV assisted 141 survivors of anti-LGBTQ hate violence; 13% identified as transgender.[73]
- The Los Angeles LGBT Center assisted 515 survivors of anti-LGBTQ hate violence.[74] Of those who identified as transgender, 76% were transgender women of color, and more than half primarily spoke Spanish.[75] One homicide was documented.[76] The victim was a Black transgender woman.[77]

### 2010

- CUAV assisted 213 survivors of anti-LGBT hate violence.[78] Twenty-five percent of incidents reported by survivors involved anti-transgender bias.[79]

---

[70] Shelby Chestnut et al., Nat'l Coal. Anti Violence Programs, Lesbian, Gay, Bisexual, Transgender, Queer and HIV Affected Hate Violence in 2012, at 75, https://avp.org/wp content/uploads/2017/04/ncavp_2012_hvreport_final.pdf.

[71] *Id*.

[72] *Id*. at 83 84.

[73] Ejeris Dixon et al., Nat'l Coal. Anti Violence Programs, Hate Violence Against Lesbian, Gay, Bisexual, Transgender, Queer, and HIV Affected Communities in the United States in 2011, at 69 (2012), https://avp.org/wp content/uploads/2017/04/2011_ncavp_hate_violence_report.pdf.

[74] *Id*. at 79.

[75] *Id*. at 79 80.

[76] *Id*. at 80.

[77] *Id*.

[78] Ejeris Dixon et al., Nat'l Coal. Anti Violence Programs, Hate Violence Against Lesbian, Gay, Bisexual, Transgender, Queer, and HIV Affected Communities in the United States in 2010, at 55 (2011), https://avp.org/wp content/uploads/2017/04/2011_NCAVP_HV_Reports.pdf.

[79] *Id*.

# GENDER IDENTITY HATE CRIMES AND ANTI-TRANSGENDER VIOLENCE ACROSS THE US

National data sources, such as FBI data, also collect information on violence against transgender people across the country. Data and information from these sources indicate that such hate crimes and incidents are widespread and persistent.

## HATE CRIME RECORDS COLLECTED BY THE FEDERAL GOVERNMENT

The Federal Bureau of Investigation (FBI), within the U.S. Department of Justice, collects and compiles hate crime data from law enforcement and government agencies each year.[80] For the purposes of data collection, the FBI defines a hate crime as "a committed criminal offense which is motivated, in whole or in part, by an offender's bias(es) against" a person based on their "race, religion, disability, sexual orientation, ethnicity, gender, or gender identity."[81]

Data collected by the FBI over the past six years show an increase in the number of reported hate crimes and an increase in the share of those crimes motivated by gender identity bias, which includes anti-transgender and anti-gender nonconforming hate crimes.[82] In 2018, gender identity bias motivated 2.2% of 8,327 single-bias hate crime offenses.[83] Specifically, anti-transgender bias motivated 157 single-bias hate crime offenses, while anti-gender nonconforming bias motivated 27 offenses.[84]

Most recently, in 2024, the FBI reported 13,683 single-bias hate crime offenses.[85] Gender identity bias motivated 3.9% of those crimes.[86] Anti-transgender bias and anti-gender nonconforming bias motivated 382 and 145 hate crimes, respectively.[87]

---

[80] Fed. Bureau Investigation, Hate Crime Statistics, 2023: About Hate Crime Statistics 5 (2024).

[81] *Hate Crime Statistics*, Fed. Bureau Investigation: How We Can Help You, https://www.fbi.gov/how we can help you/more fbi services and information/ucr/hate crime (last visited Sept. 16, 2025).

[82] Fed. Bureau Investigation, *supra* note 17 (set time frame from "January 2018" to "December 2024", toggle between "anti transgender" and "anti gender non conforming" bias to view data).

[83] *Incidents and Offenses*, Fed. Bureau Investigation: Unif. Crime Reporting Program, https://ucr.fbi.gov/hate crime/2018/topic pages/incidents and offenses (last visited Sept. 16, 2025).

[84] *Id*. at 4.

[85] Fed. Bureau Investigation, Table 1: Incidents, Offenses, Victims, and Known Offenders by Bias Motivation, 2024 (2025), https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/downloads (download "2024" under "Hate Crime Statistics Annual Reports"). Statistics, 2023: Incidents and Offenses 2 (2024).

[86] *Id*.

[87] *Id*.

**Table 1. Hate crime offenses reported to the FBI (2018-2024)**

| YEAR | SINGLE BIAS OFFENSES TOTAL[88] | SINGLE BIAS OFFENSES MOTIVATED BY GENDER IDENTITY BIAS[89] | ANTI-TRANSGENDER HATE CRIME OFFENSES[90] | ANTI-GENDER NONCONFORMING HATE OFFENSES[91] |
|---|---|---|---|---|
| 2024 | 13,683 | 3.9% | 382 | 145 |
| 2023 | 13,298 | 4.1% | 401 | 146 |
| 2022 | 12,913 | 4.0% | 374 | 141 |
| 2021 | 8,419 | 3.6% | 200 | 107 |
| 2020 | 10,790 | 2.7% | 237 | 57 |
| 2019 | 8,302 | 2.7% | 173 | 51 |
| 2018 | 8,327 | 2.2% | 157 | 27 |

Currently, federal law does not require state and local law enforcement departments to report data—participation is voluntary.[92] For example, from January 2020 to January 2025, the highest percentage of Mississippi's population that was covered by the data provided to the FBI was 73.19% in 2020.[93] As a result, data collected by the FBI likely do not provide a complete picture of reported hate crimes against transgender people, and people more generally, across the U.S.

The U.S. Centers for Disease Control and Prevention (CDC) at the Department of Health and Human Services collects information about homicides against transgender people, including whether they were motivated by anti-transgender bias, through the National Violent Death Reporting System (NVDRS).[94] One study published in 2022 analyzed 2003-2018 NVDRS data on homicides committed against transgender people.[95] Of 147 homicides committed against transgender people in the NVDRS, 6.1% were categorized as hate crimes.[96] Compared to other victims, homicides of transgender individuals were more likely to be classified as hate crimes (6.1% vs. 0.1%).[97] The study also showed that, compared to all other victims, a larger portion of transgender victims were Black, sex workers, and had a history of a mental health

[88] Fed. Bureau Investigation, *supra* note 83; *Incidents and Offenses*, Fed. Bureau Investigation: Unif. Crime Reporting Program, https://ucr.fbi.gov/hate crime/2019/topic pages/incidents and offenses (last visited Sept. 16, 2025) [hereinafter 2019 Incidents and Offenses]; Fed. Bureau Investigation, Hate Crime Statistics, 2020: Incidents and Offenses 2 (2021) [hereinafter 2020 Incidents and Offenses]; Fed. Bureau Investigation, Hate Crime Statistics, 2021: Incidents and Offenses 2 (2022) [hereinafter 2021 Incidents and Offenses]; Fed. Bureau Investigation, Hate Crime Statistics, 2022: Incidents and Offenses 2 (2023) [hereinafter 2022 Incidents and Offenses]; Fed. Bureau Investigation, Hate Crime Statistics 2023: Incidents and Offenses 2 (2024) [hereinafter 2023 Incidents and Offenses].

[89] *Id*.

[90] Fed. Bureau Investigation, *supra* 83; 2019 Incidents and Offenses, *supra* note 88; 2020 Incidents and Offenses, *supra* note 88, at 4; 2021 Incidents and Offenses, *supra* note 88, at 4; 2022 Incidents and Offenses, *supra* note 88, at 4; 2023 Incidents and Offenses, *supra* note 88, at 5; Fed. Bureau Investigation, *supra* note 85.

[91] *Id*.

[92] Fed. Bureau Investigation, *supra* note 81.

[93] Fed. Bureau Investigation, *supra* note 17 (in left sidebar select "Mississippi" under "Location.") Population coverage means the percent of the population that is under reporting agencies.

[94] *National Violent Death Reporting System*, Ctrs. Disease Control (Aug. 25, 2025), https://www.cdc.gov/nvdrs/about/index.html.

[95] Tom W. Fouche, et al., *Demographic and Regional Factors Associated With Reporting Homicides of Transgender People in the United States*, 279 J. Surgical Rsch. 72, 73 (2022).

[96] *Id*. at 74.

[97] *Id*.

diagnosis.[98] The authors of the study highlighted that while homicides against transgender people appear disproportionately low (0.1% of all homicides), the discrepancy is likely due to underreporting or inaccurate reporting of victims' gender identity.[99] When a person dies, their survivors may lack information about that person's identification as an LGBTQ individual.[100] Since the NVDRS relies on a third party to classify a person as LGBTQ, those who are not open about their identity or refuse to use a label are likely missed by the death reporting system.[101]

## NATIONAL SURVEYS OF TRANSGENDER PEOPLE

Several national surveys, including surveys by governmental, private, and non-profit organizations, have documented experiences of hate crimes, hate incidents, and violence against transgender people.

In terms of federal government data, the most comprehensive survey about violence and victimization is the National Crime Victimization Survey (NCVS).[102] The NCVS is a nationally representative survey administered by the U.S. Bureau of Justice Statistics that gathers information about non-fatal crimes and, historically, included questions about respondents' gender identity and anti-transgender hate crimes.[103] As of May 2025, the federal government intends to stop collecting this information from NCVS respondents.[104] However, in the past, researchers have used NCVS data to study violence and perceived hate crimes against transgender people. For example, a 2025 Williams Institute analysis of 2022-2023 NCVS data found that transgender people experienced violence at a rate of 93.7 per 1,000 persons, compared with 21.1 per 1,000 among non-LGBT persons.[105] Similarly, an earlier Williams Institute analysis of 2017-2018 NCVS data found that transgender people experience much higher rates of violent victimization than cisgender people.[106] Specifically, transgender people encountered violence at a rate of 86.2 victimizations per 1,000 persons, while cisgender people encountered violence at a rate of 21.7 victimizations per 1,000 persons.[107] Transgender women experienced violence at a rate of 86.1 per 1,000 persons compared to 23.7 per 1,000 persons for cisgender women.[108] Transgender men had a rate of 107.5 victimizations per 1,000 persons, while cisgender men had a rate of 19.8 victimizations per 1,000 persons.[109] A large, though not statistically significant, difference was found in the percentage of violent victimizations that transgender and cisgender victims, overall, perceived as hate crimes: 19% of victimizations against transgender people and 9% of victimizations against cisgender people were

---

[98] *Id*.

[99] *Id*. at 75.

[100] Ann. P. Haas et al., *Collecting Sexual Orientation and Gender Identity Information at Death*, 109 Am. J. Pub. Health 255, 257 (2019).

[101] *Id*.

[102] *National Crime Victimization Survey (NCVS)*, U.S. Dep't Just.: Bureau of Just. Stat., https://bjs.ojp.gov/data collection/ncvs (last visited Sept. 16, 2025).

[103] Andrew R. Flores, et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017 2018*, 111 Am. J. Pub. Health 726, 726 (2021).

[104] Ethan Corey, *Trump DOJ Erases Trans People from Crime Data Surveys*, Appeal (May 5, 2025), https://theappeal.org/trump doj erases trans people from crime data surveys/.

[105] Ilan H. Meyer & Andrew R. Flores, Williams Inst., Anti LGBT Victimization in the United States: Results from the National Crime Victimization Survey (2022 2023) 3 (2025), https://williamsinstitute.law.ucla.edu/wp content/uploads/Anti LGBT Violence Feb 2025.pdf.

[106] Flores et al., *supra* note 103.

[107] Flores et al., *supra* note 103, at 727.

[108] Flores et al., *supra* note 103, at 727.

[109] *Id*.

perceived as hate crimes.[110] However, the study's authors did find a large and statistically significant difference between perceptions of hate-motivated violent crime among cisgender and transgender women: 28% of violent victimizations against transgender women were perceived by the victims to be hate-motivated, while the same was true for 9% of violent victimizations against cisgender women.[111]

Large, national surveys of transgender people have documented similarly high rates of violence, including hate violence, against transgender people. For example, data from the TransPop study, a nationally representative survey of 274 transgender people in the U.S. administered between 2016 and 2018, showed high rates of lifetime violence against transgender people.[112] Nearly half of transgender people (47.6%) reported being physically attacked or sexually assaulted as an adult, and 45.1% had property damaged, stolen, or were robbed.[113] More than a quarter (28.5%) reported experiencing an attempted but unsuccessful attack, robbery, or damage to property.[114]

The Report of the 2015 U.S. Transgender Survey (USTS), a survey of over 27,000 transgender people, found that 13% of all transgender respondents had been physically attacked in the past year and 9% of all respondents believed they had been attacked because of their transgender status or gender expression.[115] People who worked in the underground economy, such as by doing sex work or drug sales, were more than three times more likely than all other respondents to report being physically attacked in the last year (41%).[116] Twenty-four percent of undocumented residents reported being physically attacked.[117] Transgender people of color were more likely to report being physically attacked than white respondents, particularly American Indian (25%), Middle Eastern (25%), and multiracial respondents (19%).[118] The survey also found that Black (11%) and Latina (11%) transgender women were almost four times more likely to report being attacked with a gun than the general population of transgender people (3%).[119]

Similarly, a 2022 academic study based on the same dataset found that 6.3% of respondents reported that they had been physically attacked specifically because of their transgender status within the prior year.[120] Similar to findings related to physical violence based on both transgender status and gender

---

[110] *Id*. at 728.

[111] *Id*.

[112] Ilan H. Meyer, Bianca D.M. Wilson & Kathryn O'Neill, Williams Inst., LGBTQ People in the US: Select Findings from the Generations and TransPop Studies 36 (2021), https://williamsinstitute.law.ucla.edu/wp content/uploads/Generations TransPop Toplines Jun 2021.pdf; TransPop: U.S. Transgender Population Health Survey, https://www.transpop.org/ (last visited Sept. 30, 2025).

[113] *Id*. at 18.

[114] *Id*.

[115] Sandy E. James et al., Nat'l Ctr. Transgender Equal., The Report of the 2015 U.S. Transgender Survey 202 03 (2016), https://transequality.org/sites/default/files/docs/usts/USTS Full Report Dec17.pdf [hereinafter 2015 U.S. Transgender Survey Report]. Under the 2022 USTS data, 3% of the sample reported being physically attacked in the last 12 months because of their gender identity or expression; 63% of those who were physically attacked believed it was because of their transgender identity. Sandy E. James et al., Nat'l Ctr. Transgender Equal., Early Insights: A Report of the 2022 U.S. Transgender Survey 21 (2024), https://transequality.org/sites/default/files/2024 02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf; Ankit Rastogi et al., Advocs. Transgender Equal. 81 (2025), https://transequality.org/sites/default/files/2025 06/USTS_2022Health%26WellbeingReport_WEB.pdf.

[116] 2015 U.S. Transgender Survey Report, *supra* note 115, at 41, 202.

[117] *Id*.

[118] *Id*. at 202 03.

[119] *Id*. at 204.

[120] Adam M. Messinger, Xavier L. Guadalupe Diaz & Victoria Kurdyla, *Transgender Polyvictimization in the U.S. Transgender Survey*, 37 J. Interpersonal Violence NP118810, NP18819 (2022). This percentage differs from the percentage of past year violence reported in the 2015 U.S. Transgender Survey report. The difference may be due to the types of bias motivations considered in each study. The 2015 USTS presented the percentage of respondents

expression discussed above, this study found higher rates of violence motivated by gender identity among transgender respondents of color compared to white respondents. When analyzing victimization by race, people who identified as Alaskan Natives or American Indians, who were multiracial, or belonged to an "unlisted"[121] race or ethnicity had greater odds of experiencing anti-transgender violence within the past year.[122] Respondents who had ever been homeless, had a disability, or were more open about their transgender identity were also significantly more likely to have experienced anti-transgender violence in the past year.[123] By contrast, respondents faced lower odds of past-year anti-transgender violence if they were more visually conforming (or less visible as someone who is transgender), identified as genderqueer or nonbinary and were assigned female at birth, were older, or had a higher household income.[124]

Surveys of subpopulations of transgender people have also documented hate violence. For example, a national survey conducted in 2017 by the National Korean American Coalition to End Domestic Abuse specifically focused on the experiences of queer and transgender Koreans in the United States.[125] Sixty-two percent reported that coming out as queer directly resulted in harassment and violence, while 75% experienced harassment or violence after coming out as transgender.[126] Sixty-four percent reported harassment or violence based on gender expression, with 79% continuing to fear the threat of violence due to their gender expression.[127]

A 2005 study, based on a survey of transgender people assigned male at birth, assessed the frequency of potentially traumatic events, including violence.[128] The survey asked whether participants had ever experienced a potentially traumatic event, what kind of event, how often, and whether they perceived that the event happened because of their transgender status.[129] A "potentially traumatic event" captured a range of incidents, including car accidents, natural disasters, physical assault, and sexual assault.[130] The study found that of the 98% of respondents who experienced a potentially traumatic event, 42% reported experiencing a potentially traumatic event motivated by anti-transgender bias.[131] Respondents who experienced traumatic events with anti-transgender bias often reported particularly violent events, with 77% having been hit, beaten, or badly injured by a stranger, 75% suffering sexual abuse or rape as an adult, and 72% being victims of stalking.[132]

who experienced violence based on either their transgender status and/or gender expression, while Messinger, Guadalupe Diaz & Kurdyla assessed only violence motivated by transgender status.

[121] An "unlisted" race or ethnicity means the respondent's identity is not listed as an option on the survey. The options listed for race/ethnicity on the survey were: African American, Alaska Native/American Indian, Asian American, Native Hawaiian/Pacific Islander, Latinx, white, Middle Eastern/North African, multiracial.

[122] Messinger, Guadalupe Diaz & Kurdyla, *supra* note 120, at NP18821.

[123] *Id*. at NP18821, NP18824.

[124] *Id*. at NP18824 25.

[125] Hyejin Shim, KACEDA, With You: Queer and Trans Koreans Surviving Violence: A Community Based Research Report (2018), https://view.publitas.com/survived and punished/with you queer trans koreans surviving violence english/page/1.

[126] *Id*. at 17, 18.

[127] *Id*. at 22.

[128] Jillian Shipherd, et al., *Potentially Traumatic Events in a Transgender Sample: Frequency and Associated Symptoms*, 17 Traumatology 56, 56, 59 (2011).

[129] *Id*. at 59 60.

[130] *Id*. at 59.

[131] *Id*. at 60 61.

[132] *Id*. at 63.

## OTHER SOURCES OF INFORMATION ABOUT GENDER IDENTITY HATE CRIMES AND VIOLENCE AGAINST TRANSGENDER PEOPLE IN THE US

Hate violence against transgender people nationally has also been documented in community-based reports, media articles, and other anecdotal reports. One source of this information are the annual reports that were published by NCAVP through 2017. As a result of the dependence on voluntary participation from community organizations, each report varies in overall coverage. The reports gather information from NCAVP member organizations across the United States. Notable facts from the reports included the following:

- In 2017, NCAVP collected information about 52 hate-related homicides.[133] Twenty-seven victims were transgender or gender nonconforming, 22 of whom were transgender women of color.[134] NCAVP also documented 825 reports of hate violence against LGBTQ people and people living with HIV, 142 of which involved anti-transgender bias.[135] Among survivors of hate violence, 228 were transgender, nonbinary, or gender nonconforming.[136]
- In 2016, NCAVP collected information about 77 hate-related homicides, including 49 victims of the mass shooting at the Pulse Nightclub in Orlando.[137] While data on the gender identity of the victims of the Pulse Nightclub shooting are not available, among the other 28 victims of hate-related homicides, 19 were transgender and gender nonconforming people, including 17 transgender women of color.[138] NCAVP also documented 1,036 incidents of hate violence against LGBTQ people and people living with HIV.[139] Of the 929 reports that indicated a bias motivation, 210 (23%) involved anti-transgender bias.[140] Among 912 survivors of hate violence whose gender identity was reported, 193 were transgender women, 44 were transgender men, and 52 were nonbinary or gender nonconforming people.[141]
- In 2015, NCAVP collected information about 24 hate-related homicides.[142] Sixteen homicide victims were transgender or gender nonconforming, and 13 were transgender women of color.[143] NCAVP also documented 1,253 reports of hate violence against LGBTQ people and people living with HIV, 293 (26%) of which involved anti-transgender bias.[144] Among survivors of hate violence, 22% were transgender.[145]

---

133 TILLERY ET AL., *supra* note 59, at 13.

134 *Id*. at 13, 33.

135 *Id*. at 17, 55.

136 *Id*. at 52.

137 WATERS ET AL., *supra* note 58, at 28.

138 *Id*.

139 *Id*. at 30.

140 *Id*. at 39.

141 *Id*. at 31. "Nonbinary or gender non conforming people" captures the gender categories of "transgender nonbinary", "gender nonconforming", "genderfluid", and "genderqueer".

142 WATERS ET AL., *supra* note 59, at 18.

143 *Id*.

144 *Id*. at 21, 41.

145 *Id*. at 19.

- In 2014, NCAVP collected information about 20 hate-related homicides.[146] Eleven victims were transgender women, 10 of whom were transgender women of color.[147] NCAVP also documented 1,359 reports of hate violence against LGBTQ people and people living with HIV.[148] Of the 848 reports that specified a bias motivation, one-fifth (20.64%) involved anti-transgender bias.[149] Among 691 reports of hate violence that included survivors' gender identity, 12% involved transgender survivors.[150] More than three-fourths (80.9%) of these survivors were transgender women.[151]
- In 2013, NCAVP collected information about 18 hate-related homicides.[152] Twelve victims were transgender women of color.[153] NCAVP also documented 2,001 reports of hate violence against LGBTQ people and people living with HIV, 18.48% of which involved anti-transgender bias.[154] Among survivors of hate violence, 13% were transgender.[155]
- In 2012, NCAVP collected information about 25 hate-related homicides.[156] Over half (53.8%) of these victims were transgender women.[157] NCAVP also documented 2,016 reports of hate violence against LGBTQ people and people living with HIV, 18.3% of which involved anti-transgender bias.[158] Among victims and survivors of hate violence, 10.5% were transgender.[159]
- In 2011, NCAVP collected information about 30 hate-related homicides.[160] Among the victims, 40% were transgender women and 3% were gender nonconforming.[161] NCAVP also documented 2,092 reports of hate violence against LGBTQ people and people living with HIV.[162] Of the 898 reports that specified a bias motivation, 14% involved anti-transgender bias.[163] Among victims and survivors of hate violence, 18% were transgender.[164]
- In 2010, NCAVP collected information about 27 hate-related homicides.[165] Among the victims, 44% were transgender women.[166] NCAVP also documented 2,476 reports of hate violence against

[146] OSMAN AHMED ET AL., NAT'L COAL. ANTI VIOLENCE PROGRAMS, LESBIAN, GAY, BISEXUAL, TRANSGENDER, QUEER, AND HIV AFFECTED HATE VIOLENCE IN 2014, at 24 (2015), https://avp.org/wp content/uploads/2017/04/2014_HV_Report Final.pdf.

[147] *Id*. at 55.

[148] *Id*. at 20.

[149] *Id*. at 43.

[150] *Id*. at 28.

[151] *Id*. at 66.

[152] OSMAN AHMED ET AL., NAT'L COAL. ANTI VIOLENCE PROGRAMS, LESBIAN, GAY, BISEXUAL, TRANSGENDER, QUEER, AND HIV AFFECTED HATE VIOLENCE IN 2013, at 22 (2014), https://avp.org/wp content/uploads/2017/04/2013_ncavp_hvreport_final.pdf.

[153] *Id*.

[154] *Id*. at 45.

[155] *Id*. at 27.

[156] CHESTNUT ET AL., *supra* note 70, at 21.

[157] *Id*. at 21.

[158] *Id*. at 19, 37.

[159] *Id*. at 25.

[160] DIXON ET AL., *supra* note 73, at 19.

[161] *Id*. at 20.

[162] *Id*. at 19.

[163] *Id*. at 34.

[164] *Id*. at 23.

[165] DIXON ET AL., *supra* note 78, at 17, 19.

[166] DIXON ET AL., *supra* note 78, at 19.

LGBTQ people and people living with HIV.[167] Among all hate violence survivors and homicide victims, 17.2% were transgender, gender nonconforming, or intersex.[168]

Another organization, the Human Rights Campaign (HRC), tracked incidents of fatal violence against transgender people by working with local advocates, the media, and law enforcement.[169] Since starting data collection in 2013, HRC documented the highest number of homicides against transgender people in 2021, with at least 60 deaths.[170] HRC reports also show a high proportion of transgender homicide victims are people of color. In 2022, 83% of victims were people of color, and 54% were Black transgender women.[171] In 2023, 84% of the 32 transgender and gender expansive individuals lost to violence were people of color, and at least 50% of all victims were Black transgender women.[172] Finally, in 2024, HRC recorded 32 homicides of transgender people.[173] Seventy-eight percent were people of color, and more than half (56%) were Black transgender women.[174]

An academic study published in 2024 tracked fatal violence against transgender people using open-source data, including news articles, from 2010-2021.[175] Of the 305 documented homicides of transgender people, 92 were either confirmed or suspected hate crimes.[176] Most transgender homicide victims were women of color: 64.3% of transgender homicide victims were Black transgender women, and 14.8% were Hispanic/Latinx transgender women.[177] The study also looked at the characteristics of perpetrators who committed homicide against transgender people. Black offenders made up 63.9% of perpetrators, and Hispanic/Latinx offenders made up 13.2% of perpetrators.[178] Researchers found that white perpetrators (23%) were slightly overrepresented compared to the number of white victims (10.8%).[179] More than three-fourths (82.7%) of perpetrators were age 39 or younger, with 62.6% aged 18-29 and 20.1% aged 30-39.[180] More than 90% of perpetrators were men.[181] Even in cases where women perpetrators were involved, several acted as co-offenders alongside a male perpetrator.[182]

---

167 *Id*. at 17. This number represented the reported number of homicide and hate violence victims and survivors (2,503) minus the number of homicide victims (27).

168 *Id*. at 25.

169 Hum. Rts. Campaign Found., *Fatal Violence Against the Transgender and Gender Expansive Community in 2023*, Hum. Rts. Campaign, https://www.hrc.org/resources/fatal violence against the transgender and gender expansive community in 2023 (last visited Sept. 30, 2025).

170 Hum. Rts. Campaign Found., *Fatal Violence Against the Transgender and Gender Expansive Community in 2021*, Hum. Rts. Campaign, https://www.hrc.org/resources/fatal violence against the transgender and gender expansive community in 2021 (last visited Sept. 15, 2025).

171 Hum. Rts. Campaign Found., *Fatal Violence Against the Transgender and Gender Expansive Community in 2022*, Hum. Rts. Campaign, https://www.hrc.org/resources/fatal violence against the transgender and gender expansive community in 2022 (last visited Sept. 15, 2025).

172 Hum. Rts. Campaign, *supra* note 169.

173 Hum. Rts. Campaign Found., *Fatal Violence Against the Transgender and Gender Expansive Community in 2024*, Hum. Rts. Campaign, https://www.hrc.org/resources/fatal violence against the transgender and gender expansive community in 2024 (last visited Sept. 15, 2025).

174 *Id*.

175 Brendan Lantz, Lexi Faulker & Jack M. Mills, *A Descriptive Account of the Nature and Extent of Transgender Homicide in America, 2010 to 2021*, 39 J. Interpersonal Violence 341, 343 (2024).

176 *Id*. at 353.

177 *Id*. at 352.

178 *Id*. at 353.

179 *Id*. at 352.

180 *Id*. at 351 52.

181 *Id*. at 353.

182 *Id*. at 352.

Other studies have used qualitative methods, or interviews, to examine hate crimes against transgender people. For example, a study published in 2022 interviewed LGBTQ people in the Miami-Dade area to assess the existence and underreporting of hate crimes.[183] From 2018-2019, researchers conducted 400 interviews with LGBTQ people who experienced crimes within the prior five years.[184] Thirty-six transgender, nonbinary, and gender nonconforming hate crime victims were interviewed.[185] A quarter of these respondents were assaulted at least once within the prior five years.[186] Of those assaulted, 22.2% were assaulted physically, and 2.8% were sexually assaulted.[187] On average, gender minority respondents who were assaulted experienced at least one incident annually.[188] Of the 36 respondents, only three reported the incident to the police.[189]

[183] Neal A. Palmer & Besiki Luka Kutateladze, *What Prosecutors and the Police Should Do About Underreporting of Anti LGBTQ Hate Crime*, 19 SEXUALITY RSCH. & SOC. POL'Y 1190, 1190 1193 (2022).

[184] *Id*.

[185] *Id*. at 1200.

[186] *Id*. at 1200, 1201.

[187] *Id*. at 1201.

[188] *Id*.

[189] *Id*.

# LEGAL OUTCOMES OF VIOLENCE AGAINST TRANSGENDER PEOPLE

A study published in 2020 focused on the legal outcomes of 105 transgender homicide cases between 2010 and 2016.[190] While the researchers were unable to determine if cases were hate crimes, the data provide insight into the legal aftermath of fatal violence against transgender people. The study found that 40.95% of cases received a guilty verdict and 59.05% had an outcome other than guilty.[191] Reasons for non-guilty outcomes included 38.1% unsolved cases, 11.43% pending cases, and 3.81% of cases ending in a verdict of not guilty.[192] The authors note that in 2010, the unsolved case rate for homicides not involving transgender victims was 37%.[193] The vast majority of cases involved transgender women and Black victims. Among cases with guilty outcomes, 86.05% involved transgender women victims and 69.77% involved Black victims.[194] Similar percentages of cases without guilty outcomes involved transgender women (93.55%) and Black victims (80.65%).[195]

---

[190] Rayna E. Momen & Lisa M. Dilks, *Examining Case Outcomes in US Transgender Homicides: An Exploratory Investigation of the Intersectionality of Victim Characteristics*, 41 SOCIO. SPECTRUM 53, 53, 62 (2020).

[191] *Id*. at 62.

[192] *Id*. at 63.

[193] *Id*. at 59, *citing* Meredith Talusan, *Documenting Trans Homicides*, MIC, HTTPS://WWW.MIC.COM/UNERASED (last visited Feb. 7, 2017).

[194] *Id*. at 64.

[195] *Id*.

# CONCLUSION

Over the past 25 years, data and research on hate crimes against transgender people have expanded substantially, though gaps remain. Law enforcement data collected by the California Department of Justice and the Los Angeles Commission on Human Relations indicate that reported hate crimes against transgender people have increased annually at the state level and in the state's largest county by population. The California DOJ has seen a rise in anti-transgender hate crimes from 13 in 1999 to 73 in 2024, and the LA Commission on Human Relations documented an increase from eight anti-transgender hate crimes in 2000 to 102 in 2024. These patterns are mirrored in national data on hate crimes collected by the FBI. Surveys of transgender people nationally and in California have found high rates of hate crimes, hate incidents, and violence against transgender people, particularly transgender women of color. Community-based reports, qualitative studies, and other sources have provided additional information about the existence and characteristics of anti-transgender violence and hate crimes. Despite this evidence, challenges to studying the prevalence of hate crimes against transgender people remain due to gaps in data collection and reporting.

# AUTHORS

**Joshua Arrayales, J.D.**, is the Renberg Legal Fellow at the Williams Institute.

**Christy Mallory, J.D.**, is the Roberta A. Conroy Interim Executive Director and Legal Director at the Williams Institute.

## ACKNOWLEDGEMENTS

The authors would like to thank Jordan Grasso and Ilan Meyer for their invaluable feedback on drafts of this report.

## SUGGESTED CITATIONS

Arrayales, J. and Mallory, C. (2026). Hate Crimes and Violence Against Transgender People in California and the US: A Review of Existing Research. Los Angeles, CA: The Williams Institute, UCLA School of Law.

J. Arrayales & C. Mallory, Williams Inst., Hate Crimes and Violence Against Transgender People in California and the US: A Review of Existing Research (2026).

## ABOUT THE WILLIAMS INSTITUTE

The Williams Institute is dedicated to conducting rigorous, independent research on sexual orientation and gender identity law and public policy. A think tank at UCLA Law, the Williams Institute produces high-quality research with real-world relevance and disseminates it to judges, legislators, policymakers, media, and the public. These studies can be accessed at the Williams Institute website.

## FOR MORE INFORMATION

The Williams Institute, UCLA School of Law
williamsinstitute@law.ucla.edu
williamsinstitute.law.ucla.edu

RESEARCH THAT MATTERS

# Exhibit 18

| State | Bill Name | Issues | Status | Status Detail | Status Date | In Court Link |
|---|---|---|---|---|---|---|
| Tennessee | S.B.1741 | Other school restrictions \| Restricting student & educator rights | Advancing | Passed Senate and House; transmitted to Governor | 4/17/2026 | |
| Tennessee | H.B.1665 | Healthcare restrictions \| Other healthcare barriers | Passed into Law | Governor signed | 4/13/2026 | |
| Tennessee | S.B.0936 | Re-definition of sex \| Weakening Civil Rights Laws | Advancing | Companion House bill HB 1271 substituted | 4/24/2026 | |
| Tennessee | H.B.2498 | Healthcare funding restrictions \| Healthcare restrictions \| | Passed into Law | Governor signed | 4/16/2026 | |
| Tennessee | S.B.1664 | Healthcare restrictions \| Other healthcare barriers | Advancing | Companion House bill HB 1665 passed into law | 4/23/2026 | |
| Tennessee | H.B.1666 | Other school restrictions \| Restricting student & educator rights | Advancing | Senate companion SB 1665 substituted | 4/21/2026 | |
| Tennessee | S.B.1665 | Other school restrictions \| Restricting student & educator rights | Advancing | Passed House as amended; Senate concurred with House amendments | 4/22/2026 | |
| Tennessee | S.B.1989 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Advancing | Passed Senate and House; transmitted to Governor | 4/17/2026 | |
| Tennessee | S.B.0468 | Other anti-LGBTQ bills \| Other civil rights restrictions \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Advancing | Senate refused to concur in amendment; House conference committee report adopted | 4/22/2026 | |
| Oklahoma | H.B.3586 | Healthcare restrictions \| Other healthcare barriers | Advancing | Passed House; Senate placed on General Order | 4/22/2026 | |
| Oklahoma | H.B.1225 | Barriers to accurate IDs \| | Advancing | Passed House; Senate placed on General Order | 4/22/2026 | |
| Oklahoma | H.B.3242 | Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Advancing | Passed House; Senate placed on General Order | 4/22/2026 | |
| Oklahoma | H.B.1219 | Free speech & expression bans \| Other anti-LGBTQ bills \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | Passed House; Senate placed on General Order | 4/9/2026 | |

| | | | | | |
|---|---|---|---|---|---|
| Oklahoma | S.B.904 | Healthcare funding restrictions \| Healthcare restrictions \| Other healthcare barriers | Advancing | Passed Senate; House committee reported favorably | 4/16/2026 |
| New York | A.7741 | Restricting student & educator rights \| School sports bans | Advancing | Held for consideration in Assembly committee | 4/22/2026 |
| New Hampshire | H.B.1376 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Advancing | Passed House as amended; Senate committee reported favorably as amended | 4/20/2026 |
| New Hampshire | S.B.459 | Other anti-LGBTQ bills \| Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | Senate passed as amended; House reported inexpedient to legislate | 4/23/2026 |
| Missouri | S.B. 1476 | Drag bans \| Free speech & expression bans \| | Advancing | Senate combined with SB 1164 | 4/15/2026 |
| Missouri | S.B. 861 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Reported favorably by Senate committee | 4/8/2026 |
| Missouri | S.B. 1389 | Public accommodation bans | Advancing | Second read and referred to committee | 1/27/2026 |
| Missouri | S.B. 1264 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Senate second read and referred to committee | 1/27/2026 |
| Minnesota | H.F.2685 | Restricting student & educator rights \| School sports bans | Advancing | House motion to suspend rules failed | 4/7/2026 |
| Kansas | S.B.244 | Barriers to accurate IDs \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Passed into Law | Senate and House override of Governor's veto | 2/18/2026 |
| Missouri | H.B. 2536 | Other school restrictions \| Public accommodation bans \| Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | Passed House; Senate second read and referred to committee | 4/21/2026 |
| Missouri | H.B. 2009 | Healthcare restrictions \| Prison healthcare restrictions | Advancing | Passed Senate as amended | 4/22/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Missouri | S.B. 1085 | Curriculum censorship \| Forced outing in schools \| Other school restrictions \| Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | Sent to Senate informal calendar for Perfection | 4/27/2026 |
| Missouri | S.B. 1164 | Drag bans \| Free speech & expression bans \| | Advancing | Senate committee substitute reported favorably | 4/15/2026 |
| Louisiana | H.B.1137 | Other anti-LGBTQ bills | Advancing | Passed House; Senate second read and referred to committee | 4/21/2026 |
| Louisiana | H.B.578 | Re-definition of sex \| Weakening Civil Rights Laws | Advancing | House passed to third reading and scheduled for floor debate on | 4/28/2026 |
| Florida | S.B. 1134 | Other anti-LGBTQ bills | Passed into Law | Governor signed | 4/22/2026 |
| Arizona | S.B.1015 | Healthcare restrictions \| Other healthcare barriers | Advancing | House Committee of the Whole reported favorably | 4/21/2026 |
| Arizona | H.B.2249 | Forced outing in schools \| Restricting student & educator rights | Advancing | Senate passed and transmitted to the House | 4/21/2026 |
| Tennessee | H.B.0304 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| Tennessee | S.B.0266 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| Pennsylvania | S.B.1293 | Restricting student & educator rights \| School sports bans | Advancing | Passed House; Senate referred to committee | 4/23/2026 |
| North Carolina | H244 | Free speech & expression bans \| Other expression restrictions | Introduced | Carried over | 4/21/2026 |
| Iowa | H.F.694 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/12/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Illinois | H.B.2876 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.3229 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/14/2026 |
| Tennessee | H.B.0754 | Healthcare restrictions \| Other healthcare barriers | Advancing | Passed House and Senate as amended; House enrolled and pending Speaker signature | 4/15/2026 |
| Tennessee | S.B.0676 | Healthcare restrictions \| Other healthcare barriers | Advancing | Companion House bill H.B.0754 substituted | 4/13/2026 |
| Tennessee | H.B.2082 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Advancing | Companion Senate bill SB 1989 substituted | 4/14/2026 |
| Tennessee | S.B.2031 | Healthcare restrictions \| Other healthcare barriers | Advancing | Passed Senate and House; transmitted to Governor for action | 4/15/2026 |
| South Carolina | H.B.4756 | Restricting student & educator rights \| School facilities bans | Advancing | Passed Senate as amended; House concurred in amendment and enrolled | 4/15/2026 |
| New Hampshire | H.B.1447 | Other anti-LGBTQ bills \| Other civil rights restrictions \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Advancing | Passed House; Senate committee hearing scheduled for | 4/21/2026 |
| New Hampshire | H.B.1442 | Other anti-LGBTQ bills \| Other civil rights restrictions \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Advancing | House passed; Senate committee reported favorably as amended | 4/16/2026 |

| | | | | | |
|---|---|---|---|---|---|
| New Hampshire | H.B.1356 | Healthcare restrictions \| Other healthcare barriers | Advancing | Passed House; Senate committee reported favorably | 4/16/2026 |
| New Hampshire | H.B.1299 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Passed House as amended; Senate scheduled for | 4/21/2026 |
| New Hampshire | H.B.1217 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Passed House; Senate hearing scheduled for | 4/21/2026 |
| Idaho | H.822 | Forced outing in schools \| Other anti-LGBTQ bills \| Restricting student & educator rights | Passed into Law | Governor signed | 4/10/2026 |
| Idaho | H.516 | Curriculum censorship \| Restricting student & educator rights | Passed into Law | Governor signed | 4/10/2026 |
| Arizona | S.B.1095 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | House Committee of the Whole reported favorably | 4/15/2026 |
| Alaska | H.B. 342 | Healthcare age restrictions \| Healthcare restrictions \| Other healthcare barriers | Advancing | (H) Cosponsor(S): Mccabe | 3/27/2026 |
| Mississippi | S.B. 2322 | Barriers to accurate IDs \| | Passed into Law | Governor signed | 4/8/2026 |
| Minnesota | S.F.5043 | Healthcare restrictions \| Other healthcare barriers | Advancing | Senate first read and referred to committee | 4/9/2026 |
| Maine | L.D. 2239 | Other civil rights restrictions \| Restricting student & educator rights \| School facilities bans \| School sports bans \| Weakening Civil Rights Laws | Advancing | House referred to committee and sent for concurrence; Senate referred to committee and ordered printed in concurrence | 3/19/2026 |
| Idaho | H.928 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Passed into Law | Governor signed | 4/2/2026 |
| New Hampshire | S.B.268 | Healthcare age restrictions \| Healthcare restrictions \| Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Vetoed by Governor | 2/6/2026 |
| Utah | S.B.174 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Passed into Law | Governor signed | 3/25/2026 |
| Wisconsin | S.B.405 | Healthcare restrictions \| Other healthcare barriers | Advancing | Vetoed by Governor | 3/31/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Wisconsin | A.B.102 | Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | Vetoed by Governor | 3/31/2026 |
| Wisconsin | A.B.103 | Other school restrictions \| Restricting student & educator rights | Advancing | Vetoed by Governor | 3/31/2026 |
| Wisconsin | S.B.116 | Restricting student & educator rights \| School facilities bans \| School sports bans | Defeated | Legislative session adjourned | 3/23/2026 |
| Wisconsin | S.B.120 | Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/19/2026 |
| Wisconsin | A.B.311 | Barriers to accurate IDs \| | Defeated | Legislative session adjourned | 3/23/2026 |
| Wisconsin | A.B.400 | Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 3/19/2026 |
| Utah | H.B.404 | Other civil rights restrictions \| Weakening Civil Rights Laws | Passed into Law | Governor signed | 3/23/2026 |
| Oklahoma | H.B.3132 | Other school restrictions \| Restricting student & educator rights | Advancing | Passed House; Senate second read and referred to committee | 4/1/2026 |
| Ohio | H.B.693 | Forced outing in schools \| Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers \| Restricting student & educator rights | Advancing | House committee hearing | 3/25/2026 |
| New Hampshire | S.B.552 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Passed Senate; House executive session scheduled | 4/8/2026 |
| New Hampshire | H.B.1132 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | House passed as amended; Senate committee hearing scheduled | 4/8/2026 |
| Minnesota | H.F.12 | Restricting student & educator rights \| School sports bans | Advancing | House motion to suspend rules failed | 4/7/2026 |
| Minnesota | H.F.1233 | Restricting student & educator rights \| School sports bans | Advancing | House motion to suspend rules failed | 4/7/2026 |
| Wyoming | H.B.0001 | Healthcare funding restrictions \| Healthcare restrictions \| | Advancing | Companion bill SF0001 became law | 3/2/2026 |
| Wisconsin | S.B.146 | Barriers to accurate IDs \| | Advancing | Vetoed by Governor | 3/20/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Wisconsin | A.B.58 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/19/2026 |
| Wisconsin | S.B.40 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/19/2026 |
| Wisconsin | S.B.157 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/19/2026 |
| Wisconsin | S.B.312 | Barriers to accurate IDs \| | Defeated | Legislative session adjourned | 3/19/2026 |
| Wisconsin | A.B.100 | Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | Vetoed by Governor | 3/31/2026 |
| Wisconsin | A.B.124 | Barriers to accurate IDs \| | Defeated | Legislative session adjourned | 3/19/2026 |
| Wisconsin | A.B.104 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Vetoed by Governor | 3/31/2026 |
| Wisconsin | S.B.117 | Restricting student & educator rights \| School facilities bans \| School sports bans | Defeated | Legislative session adjourned | 3/19/2026 |
| Tennessee | H.B.1476 | Other school restrictions \| Restricting student & educator rights | Advancing | Placed on regular House calendar for | 4/13/2026 |
| Tennessee | H.B.1271 | Re-definition of sex \| Weakening Civil Rights Laws | Advancing | Passed House; Senate received and passed on first consideration | 4/2/2026 |
| Tennessee | H.B.1472 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Taken off notice for calendar in House committee | 4/1/2026 |
| Tennessee | H.B.1474 | Free speech & expression bans \| Other expression restrictions | Advancing | Taken off notice for calendar in House committee | 4/1/2026 |
| Tennessee | H.B.0315 | Other anti-LGBTQ bills | Advancing | Taken off notice for calendar in House committee | 4/1/2026 |
| Tennessee | S.B.2118 | Healthcare funding restrictions \| Healthcare restrictions \| | Advancing | Companion House bill substituted in Senate | 3/30/2026 |
| Tennessee | S.B.0737 | Other anti-LGBTQ bills | Advancing | Action deferred in Senate committee to 2027 | 3/23/2026 |

| | | | | | |
|---|---|---|---|---|---|
| South Dakota | H.B.1184 | Other anti-LGBTQ bills \| Re-definition of sex \| Weakening Civil Rights Laws | Passed into Law | Governor signed | 3/30/2026 |
| Oklahoma | H.B.3130 | Healthcare age restrictions \| Healthcare funding restrictions \| Healthcare restrictions \| Other healthcare barriers | Advancing | Passed House; Senate second read and referred to committee | 4/1/2026 |
| New Hampshire | H.B.1332 | Free speech & expression bans \| Other expression restrictions | Advancing | Passed House; Senate hearing held | 4/8/2026 |
| Missouri | H.B. 2033 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | House passed; Senate executive session reported favorably | 4/8/2026 |
| Missouri | S.B. 1558 | Other school restrictions \| Restricting student & educator rights | Advancing | Reported favorably by Senate committee | 3/31/2026 |
| Iowa | H.F.571 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Advancing | Passed Senate and House as amended; House explanation of vote | 3/31/2026 |
| Iowa | H.F.2487 | Other anti-LGBTQ bills | Advancing | Passed House; Senate placed on calendar under unfinished business | 3/19/2026 |
| Iowa | H.F.2557 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Advancing | House placed on calendar under unfinished business | 3/26/2026 |
| Iowa | S.F.473 | Religious exemptions \| Weakening Civil Rights Laws | Advancing | Passed Senate; House placed on calendar under unfinished business | 3/26/2026 |
| Illinois | S.B.2079 | Restricting student & educator rights \| School sports bans | Advancing | Senate re-referred to committee | 3/27/2026 |
| Idaho | H.752 | Public accommodation bans | Passed into Law | Governor signed | 4/1/2026 |
| Idaho | H.828 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 4/2/2026 |
| Idaho | H.561 | Free speech & expression bans \| Other expression restrictions | Passed into Law | Governor signed | 4/1/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Georgia | H.B.267 | Barriers to accurate IDs \| Other civil rights restrictions \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| School sports bans \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | S.B.39 | Healthcare funding restrictions \| Healthcare restrictions \| Other healthcare barriers \| Prison healthcare restrictions | Defeated | Legislative session adjourned | 4/3/2026 |
| Florida | C.S./S.B. 1( | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Died in Senate committee | 3/13/2026 |
| Florida | S.B. 1444 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Died in Senate committee | 3/13/2026 |
| Florida | S.B. 1642 | Other anti-LGBTQ bills \| Religious exemptions \| Weakening Civil Rights Laws | Defeated | Died in Senate committee | 3/13/2026 |
| Florida | S.B. 426 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Defeated | Died in Senate committee | 3/13/2026 |
| Arizona | S.B.1099 | Healthcare restrictions \| Other healthcare barriers | Advancing | Senate Passed; House Committee of the Whole Do Pass | 4/2/2026 |
| Arizona | S.B.1177 | Healthcare funding restrictions \| Healthcare restrictions \| | Advancing | Passed Senate; House second read | 3/24/2026 |
| Arizona | S.B.1094 | Healthcare restrictions \| Other healthcare barriers | Advancing | House Committee of the Whole reported favorably | 4/8/2026 |
| Arizona | H.B.2589 | Drag bans \| Free speech & expression bans \| | Advancing | Passed House; Senate committee reported favorably as amended | 3/25/2026 |
| Arizona | H.C.R.2044 | Other school restrictions \| Restricting student & educator rights | Advancing | Passed House; Senate committee reported favorably | 3/25/2026 |
| Alaska | H.B. 40 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/21/2026 |
| Ohio | H.B.796 | Other anti-LGBTQ bills | Introduced | | 3/25/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Ohio | H.B.798 | Barriers to accurate IDs \| Other anti-LGBTQ bills \| Other school restrictions \| Public accommodation bans \| Restricting student & educator rights | Introduced | | 3/31/2026 |
| New Jersey | A.4776 | Forced outing in schools \| Restricting student & educator rights | Advancing | Referred to Assembly committee | 3/19/2026 |
| Minnesota | S.F.4912 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Senate first read and referred to committee | 3/26/2026 |
| Minnesota | H.F.4755 | Healthcare restrictions \| Other healthcare barriers | Advancing | House first read and referred to committee | 3/26/2026 |
| Minnesota | S.F.4964 | Other civil rights restrictions \| Other school restrictions \| Restricting student & educator rights \| Weakening Civil Rights Laws | Advancing | Senate first read and referred to committee | 4/7/2026 |
| Minnesota | H.F.4805 | Other civil rights restrictions \| Other school restrictions \| Restricting student & educator rights \| Weakening Civil Rights Laws | Advancing | House first read and referred to committee | 4/7/2026 |
| Louisiana | H.B.1121 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Advancing | House first read and referred to committee | 4/1/2026 |
| Puerto Rico | P.C.0166 | Other anti-LGBTQ bills | Advancing | House committee hearing | 2/26/2026 |
| Puerto Rico | P.C.0162 | Barriers to accurate IDs \| Healthcare age restrictions \| Healthcare funding restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/12/2026 |
| Puerto Rico | R.C.C.0185 | Barriers to accurate IDs \| Other anti-LGBTQ bills | Introduced | Carried over | 1/12/2026 |
| Puerto Rico | P.C.0912 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/12/2026 |
| Puerto Rico | P.C.0165 | Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Passed into Law | Governor signed | 2/25/2026 |
| Puerto Rico | P.C.0164 | Restricting student & educator rights \| School sports bans | Advancing | Passed House; Senate first read and referred to committee | 3/16/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Pennsylvania | S.B.9 | Restricting student & educator rights \| School sports bans | Advancing | Passed Senate; House re-referred to committee | 3/19/2026 |
| Utah | H.B.174 | Healthcare age restrictions \| Healthcare restrictions \| | Passed into Law | Governor signed | 3/18/2026 |
| Tennessee | H.B.1872 | Healthcare restrictions \| Other healthcare barriers | Advancing | Placed on House subcommittee calendar for | 3/23/2026 |
| Tennessee | S.B.2208 | Other anti-LGBTQ bills | Advancing | Placed on Senate committee calendar for | 3/24/2026 |
| Tennessee | S.B.1746 | Other anti-LGBTQ bills \| Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Placed on Senate committee calendar for | 3/23/2026 |
| Tennessee | S.B.1745 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Placed on Senate committee calendar for | 3/23/2026 |
| Tennessee | S.B.2409 | Free speech & expression bans \| Other expression restrictions | Advancing | Placed on Senate committee calendar for | 3/24/2026 |
| Missouri | H.B. 1893 | Restricting student & educator rights \| School facilities bans | Advancing | House committee reported favorably as substituted | 3/16/2026 |
| Missouri | H.B. 2075 | Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Advancing | Reported favorably by House committee | 3/16/2026 |
| Florida | H.B. 347 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/13/2026 |
| Florida | H.B. 1227 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/13/2026 |
| Florida | H.B. 641 | Other anti-LGBTQ bills \| Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/13/2026 |
| Florida | H.B. 743 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/13/2026 |
| Oklahoma | S.B.1742 | Other anti-LGBTQ bills | Advancing | Senate second read and referred to committee | 2/3/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Missouri | H.B. 3315 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | House second read | 2/17/2026 |
| Georgia | S.B.537 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 4/3/2026 |
| Kentucky | S.B.351 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 4/15/2026 |
| Iowa | H.F.922 | Other anti-LGBTQ bills | Advancing | House amendment filed | 3/4/2026 |
| Utah | H.B.95 | Other school restrictions \| Religious exemptions \| Restricting student & educator rights \| Weakening Civil Rights Laws | Advancing | Legislative session adjourned | 3/6/2026 |
| Utah | H.B.193 | Healthcare funding restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/6/2026 |
| Utah | S.B.212 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/6/2026 |
| Utah | H.B.183 | Barriers to accurate IDs \| Healthcare restrictions \| Other anti-LGBTQ bills \| Other civil rights restrictions \| Other healthcare barriers \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/6/2026 |
| Utah | H.B.81 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/6/2026 |
| Tennessee | H.B.2198 | Other anti-LGBTQ bills | Advancing | Placed on House subcommittee calendar for | 3/17/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Rhode Island | H.B.7732 | Restricting student & educator rights \| School sports bans | Advancing | Withdrawn at sponsor's request | 3/6/2026 |
| New York | S.4496 | Restricting student & educator rights \| School sports bans | Advancing | Notice of Senate committee consideration requested | 3/9/2026 |
| Missouri | H.B. 1663 | Restricting student & educator rights \| School sports bans | Advancing | Passed House; Senate second read and referred to committee | 3/12/2026 |
| Kentucky | H.B.867 | Public accommodation bans | Defeated | Legislative session adjourned | 4/15/2026 |
| Iowa | H.F.2488 | Other school restrictions \| Restricting student & educator rights | Advancing | House passed; Senate subcommittee meeting scheduled for | 3/16/2026 |
| Wyoming | H.B.0122 | Healthcare restrictions \| Other healthcare barriers | Passed into Law | Governor signed | 3/6/2026 |
| Florida | H.B. 1001 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 3/13/2026 |
| Florida | H.B. 1329 | Other anti-LGBTQ bills | Advancing | Passed House and Senate as amended; ordered engrossed, then enrolled | 3/12/2026 |
| Florida | S.B. 1566 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 3/13/2026 |
| Colorado | HB26-1083 | Restricting student & educator rights \| School sports bans | Advancing | Postponed indefinitely by House committee | 3/9/2026 |
| Colorado | HB26-1128 | Healthcare restrictions \| Other healthcare barriers | Advancing | Postponed indefinitely by House committee | 3/9/2026 |
| Arizona | H.B.2085 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | House passed; Senate re-referred to committee | 3/11/2026 |
| Arizona | S.C.R.1006 | Other school restrictions \| Religious exemptions \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Advancing | Senate passed; House Majority and Minority Caucus consent | 3/10/2026 |
| Arizona | H.C.R.2003 | Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | House passed; Senate committee reported favorably | 3/11/2026 |
| West Virginia | S.B.1039 | Public accommodation bans | Defeated | Legislative session adjourned | 3/14/2026 |
| South Carolina | H.B.5354 | Other anti-LGBTQ bills | Advancing | House first read and referred to committee | 3/11/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Minnesota | S.F.4243 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Senate first read and referred to committee | 3/9/2026 |
| Wyoming | S.F.0001 | Healthcare funding restrictions \| Healthcare restrictions \| | Passed into Law | Governor signed | 3/6/2026 |
| West Virginia | S.B.590 | Drag bans \| Free speech & expression bans \| | Defeated | Legislative session adjourned | 3/14/2026 |
| South Dakota | S.B.190 | Curriculum censorship \| Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/30/2026 |
| Rhode Island | S.B.2293 | Restricting student & educator rights \| School sports bans | Advancing | Withdrawn at sponsor's request | 3/4/2026 |
| New Hampshir | H.B.1345 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | House reported inexpedient to legislate | 3/5/2026 |
| New Hampshir | H.B.1165 | Barriers to accurate IDs \| | Advancing | House Minority committee reported ought to pass; Majority committee reported inexpedient to legislate | 3/4/2026 |
| New Hampshir | H.B.1564 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | House reported inexpedient to legislate | 3/5/2026 |
| Mississippi | S.B. 2735 | Healthcare funding restrictions \| Healthcare restrictions \| | Defeated | Died in House committee | 3/3/2026 |
| Mississippi | H.B. 1072 | Healthcare restrictions \| Other healthcare barriers | Defeated | Died in Senate committee | 3/3/2026 |
| West Virginia | S.B.1083 | Other anti-LGBTQ bills \| Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Defeated | Legislative session adjourned | 3/14/2026 |
| Tennessee | H.B.1473 | Other anti-LGBTQ bills \| Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Passed House; Senate passed on first consideration | 2/23/2026 |
| South Carolina | H.B.4637 | Other anti-LGBTQ bills | Advancing | First read and referred to House committee | 1/13/2026 |
| Rhode Island | S.B.2790 | Restricting student & educator rights \| School sports bans | Advancing | Senate referred to committee | 3/4/2026 |

| | | | | | |
|---|---|---|---|---|---|
| New Hampshire | H.B.1792 | Other school restrictions \| Restricting student & educator rights | Advancing | House passed; Senate hearing | 3/10/2026 |
| Kentucky | H.B.553 | Healthcare funding restrictions \| Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 4/15/2026 |
| Virginia | H.B. 532 | Forced outing in schools \| Healthcare restrictions \| Other healthcare barriers \| Other school restrictions \| Restricting student & educator rights | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |
| Virginia | H.B. 1242 | Restricting student & educator rights \| School sports bans | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |
| Ohio | H.B.457 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | House committee hearing | 2/25/2026 |
| Iowa | H.F.2026 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | House subcommittee meeting cancelled | 2/11/2026 |
| Indiana | H.B.1389 | Religious exemptions \| Weakening Civil Rights Laws | Passed into Law | Governor signed | 2/26/2026 |
| Washington | S.B. 5012 | Restricting student & educator rights \| School sports bans | Defeated | Legislative session adjourned | 3/12/2026 |
| Tennessee | H.B.0470 | Religious exemptions \| Weakening Civil Rights Laws | Advancing | Placed on House committee calendar | 3/4/2026 |
| Tennessee | H.B.2310 | Healthcare restrictions \| Other healthcare barriers | Advancing | House passed on second consideration held on desk pending amendment | 2/5/2026 |
| Tennessee | S.B.2045 | Healthcare restrictions \| Other healthcare barriers | Advancing | Senate passed on second consideration, referred to committee | 2/5/2026 |
| Oklahoma | S.B.1398 | Other anti-LGBTQ bills | Advancing | Re-referred to Senate committee | 2/23/2026 |
| Oklahoma | S.B.1515 | Other anti-LGBTQ bills | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | S.B.1787 | Other anti-LGBTQ bills | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | S.B.1798 | Religious exemptions \| Weakening Civil Rights Laws | Advancing | Senate first read | 2/2/2026 |

| | | | | | |
|---|---|---|---|---|---|
| New York | A.8239 | Restricting student & educator rights \| School sports bans | Advancing | Referred to House committee | 1/7/2026 |
| Nebraska | L.B.730 | Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Advancing | Senate placed on General File as amended | 2/19/2026 |
| Missouri | H.B. 2526 | Other civil rights restrictions \| Re-definition of sex \| Weakening Civil Rights Laws | Advancing | House second read | 1/8/2026 |
| Mississippi | H.B. 1375 | Barriers to accurate IDs \| | Defeated | Died in House committee | 2/3/2026 |
| Mississippi | H.B. 1154 | Barriers to accurate IDs \| | Defeated | Died in House committee | 2/3/2026 |
| Minnesota | H.F.3538 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Advancing | First read and referred to House committee | 2/19/2026 |
| Minnesota | H.F.3533 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Advancing | First read and referred to House committee | 2/19/2026 |
| Minnesota | S.F.3979 | Restricting student & educator rights \| School sports bans | Advancing | First read and referred to Senate committee | 2/26/2026 |
| Minnesota | S.F.3812 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Advancing | First read and referred to Senate committee | 2/23/2026 |
| Minnesota | S.F.3811 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Advancing | First read and referred to Senate committee | 2/23/2026 |
| Idaho | H.739 | Forced outing in schools \| Other anti-LGBTQ bills \| Restricting student & educator rights | Defeated | Legislative session adjourned | 4/3/2026 |
| Alabama | S.B.331 | Curriculum censorship \| Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | First read and referred to House committee | 2/26/2026 |
| California | A.B.1998 | Public accommodation bans | Advancing | Received from printer; may be heard in House committee on | 3/20/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Oklahoma | H.B.3502 | Healthcare restrictions \| Other healthcare barriers | Advancing | Reported favorably by House committee | 2/18/2026 |
| Wyoming | H.B.0113 | Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/11/2026 |
| New Hampshire | H.B.1778 | Curriculum censorship \| Restricting student & educator rights | Advancing | House committee reported inexpedient to legislate | 2/19/2026 |
| Nebraska | L.B.732 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Senate placed on General File | 2/17/2026 |
| Michigan | H.B.4576 | Curriculum censorship \| Other school restrictions \| Restricting student & educator rights | Advancing | Re-referred to House committee | 2/18/2026 |
| Iowa | H.S.B.669 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Advancing | House committee renumbered as HF 2557 | 2/16/2026 |
| Iowa | H.S.B.537 | Other anti-LGBTQ bills | Advancing | House committee renumbered as HF 2488 | 2/16/2026 |
| Iowa | S.F.2063 | Other school restrictions \| Restricting student & educator rights | Advancing | Senate committee renumbered as SF 2303 | 2/12/2026 |
| Iowa | H.S.B.542 | Other anti-LGBTQ bills | Advancing | House committee renumbered as HF 2487 | 2/16/2026 |
| Colorado | HB26-1087 | Forced outing in schools \| Healthcare age restrictions \| Healthcare restrictions \| Other healthcare barriers \| Restricting student & educator rights | Advancing | Postponed indefinitely by House committee | 2/18/2026 |
| West Virginia | S.B.687 | Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.921 | Healthcare funding restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/14/2026 |
| South Carolina | H.B.5207 | Barriers to accurate IDs \| | Advancing | First read and referred to House committee | 2/18/2026 |
| Rhode Island | S.B.2598 | Healthcare age restrictions \| Healthcare restrictions \| Other healthcare barriers | Advancing | Referred to Senate committee | 2/13/2026 |
| Missouri | H.B. 2314 | Other civil rights restrictions \| Public accommodation bans \| Weakening Civil Rights Laws | Advancing | House second read | 1/8/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Missouri | H.B. 1609 | Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | House second read | 1/8/2026 |
| Kentucky | S.B.72 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/15/2026 |
| Kentucky | H.B.475 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 4/15/2026 |
| Indiana | H.B.1198 | Public accommodation bans | Defeated | Legislative session adjourned | 2/27/2026 |
| Idaho | H.607 | Public accommodation bans | Defeated | Legislative session adjourned | 4/2/2026 |
| Idaho | H.538 | Free speech & expression bans \| Other expression restrictions | Defeated | Legislative session adjourned | 4/2/2026 |
| Georgia | H.B.54 | Healthcare funding restrictions \| Healthcare restrictions \| | Advancing | Passed House; Senate agreed as substituted by House | 2/10/2026 |
| South Dakota | H.B.1116 | Free speech & expression bans \| Other expression restrictions | Defeated | Legislative session adjourned | 3/30/2026 |
| South Dakota | H.B.1153 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/30/2026 |
| Georgia | H.B.1210 | Forced outing in schools \| Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers \| Religious exemptions \| Restricting student & educator rights \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/3/2026 |
| California | A.B.579 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Defeated | Died at desk | 2/2/2026 |
| California | A.B.600 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Defeated | Died at desk | 2/2/2026 |
| West Virginia | S.B.630 | Drag bans \| Free speech & expression bans \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.5440 | Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 3/14/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Tennessee | S.B.2368 | Healthcare restrictions \| Other healthcare barriers | Advancing | Passed on second consideration and referred to Senate committee | 2/5/2026 |
| Kentucky | S.B.179 | Other civil rights restrictions \| Re-definition of sex \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/15/2026 |
| Kansas | H.B.2741 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/11/2026 |
| Iowa | H.F.2338 | Curriculum censorship \| Restricting student & educator rights | Advancing | Placed on House calendar | 2/6/2026 |
| Illinois | S.B.3842 | Other anti-LGBTQ bills | Advancing | First read and referred to committee | 2/6/2026 |
| Illinois | S.B.3920 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | First read and referred to Senate committee | 2/6/2026 |
| Idaho | H.572 | Forced outing in schools \| Other anti-LGBTQ bills \| Restricting student & educator rights | Defeated | Legislative session adjourned | 4/2/2026 |
| Idaho | H.606 | Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Defeated | Legislative session adjourned | 4/2/2026 |
| Connecticut | S.B.192 | Other anti-LGBTQ bills | Advancing | Public Senate hearing | 2/18/2026 |
| Virginia | S.B. 411 | Healthcare age restrictions \| Healthcare funding restrictions \| Healthcare restrictions \| | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |
| Oklahoma | S.B.1866 | Curriculum censorship \| Restricting student & educator rights | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | S.B.1793 | Healthcare funding restrictions \| Healthcare restrictions \| | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | H.B.3136 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | H.B.3138 | Other school restrictions \| Restricting student & educator rights | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | H.B.3798 | Healthcare funding restrictions \| Healthcare restrictions \| | Advancing | House second read and referred to committee | 2/3/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Mississippi | S.B. 2719 | Drag bans \| Free speech & expression bans \| | Defeated | Died in Senate committee | 2/3/2026 |
| Mississippi | H.B. 1200 | Restricting student & educator rights \| School facilities bans | Defeated | Died in House committee | 2/3/2026 |
| Mississippi | H.B. 866 | Healthcare restrictions \| Other healthcare barriers | Defeated | Died in House committee | 2/3/2026 |
| Mississippi | S.B. 2342 | Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Defeated | Died in Senate committee | 2/3/2026 |
| Mississippi | S.B. 2345 | Restricting student & educator rights \| School facilities bans | Defeated | Died in Senate committee | 2/3/2026 |
| Mississippi | S.B. 2602 | Curriculum censorship \| Other school restrictions \| Restricting student & educator rights | Defeated | Died in Senate committee | 2/3/2026 |
| Mississippi | H.B. 1659 | Curriculum censorship \| Other school restrictions \| Restricting student & educator rights | Defeated | Died in House committee | 2/3/2026 |
| Mississippi | S.B. 2525 | Curriculum censorship \| Restricting student & educator rights | Defeated | Died in Senate committee | 2/3/2026 |
| Mississippi | H.B. 1309 | Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Defeated | Died in House committee | 2/3/2026 |
| Iowa | H.F.2121 | Curriculum censorship \| Restricting student & educator rights | Advancing | House committee renumbered as HF 2338 | 2/6/2026 |
| HawaiÊ»i | H.B.257 | Barriers to accurate IDs \| | Introduced | Carried over | 1/21/2026 |
| HawaiÊ»i | H.B.268 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/21/2026 |
| HawaiÊ»i | H.B.207 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/21/2026 |
| HawaiÊ»i | H.B.2513 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Referred to House committee | 2/2/2026 |
| California | A.B.1464 | Other anti-LGBTQ bills | Advancing | House committee filed with Chief Clerk | 2/2/2026 |
| California | S.B.311 | Other anti-LGBTQ bills | Advancing | Returned to Secretary of Senate | 2/2/2026 |

| | | | | | |
|---|---|---|---|---|---|
| West Virginia | S.B.775 | Curriculum censorship \| Healthcare funding restrictions \| Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| Rhode Island | S.B.2483 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Advancing | Referred to Senate committee | 2/6/2026 |
| New Mexico | H.B. 273 | Other civil rights restrictions \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 2/19/2026 |
| Maryland | H.B.0679 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 4/13/2026 |
| Illinois | S.B.3758 | Restricting student & educator rights \| School facilities bans | Advancing | First read and referred to Senate committee | 2/5/2026 |
| Illinois | S.B.3724 | Restricting student & educator rights \| School sports bans | Advancing | First read and referred to Senate committee | 2/5/2026 |
| West Virginia | H.B.2795 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers \| Other school restrictions \| Public accommodation bans \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| Virginia | H.B. 158 | Healthcare restrictions \| Other healthcare barriers | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |
| Virginia | S.B. 561 | Restricting student & educator rights \| School facilities bans | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |
| Virginia | S.B. 703 | Restricting student & educator rights \| School sports bans | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |
| Virginia | S.B. 560 | Restricting student & educator rights \| School sports bans | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |
| Virginia | S.B. 295 | Restricting student & educator rights \| School sports bans | Advancing | Legislative session adjourned, carries over to 2027 | 3/14/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Oklahoma | S.B.2003 | Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | S.B.1912 | Healthcare age restrictions \| Healthcare restrictions \| Other healthcare barriers | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | S.B.1736 | Curriculum censorship \| Restricting student & educator rights | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Oklahoma | S.B.1905 | Healthcare funding restrictions \| Healthcare restrictions \| Total healthcare bans | Advancing | Senate second read and referred to committee | 2/3/2026 |
| Missouri | H.B. 1973 | Restricting student & educator rights \| School sports bans | Advancing | Reported favorably by House committee | 1/28/2026 |
| Missouri | H.B. 1607 | Restricting student & educator rights \| School sports bans | Advancing | Reported favorably by House committee | 1/28/2026 |
| Missouri | H.B. 1672 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Reported favorably by House committee | 1/28/2026 |
| Missouri | H.B. 1854 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Reported favorably by House committee | 1/28/2026 |
| Missouri | H.B. 1608 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Reported favorably by House committee | 1/28/2026 |
| Missouri | S.B. 1204 | Other civil rights restrictions \| Weakening Civil Rights Laws | Advancing | Senate second read and referred to committee | 1/27/2026 |
| Missouri | S.B. 1200 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Senate second read and referred to committee | 1/27/2026 |
| Missouri | S.B. 1334 | Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Advancing | Senate second read and referred to committee | 1/27/2026 |
| Missouri | S.B. 1278 | Restricting student & educator rights \| School sports bans | Advancing | Senate second read and referred to committee | 1/27/2026 |
| Missouri | S.B. 1333 | Other anti-LGBTQ bills | Advancing | Second read and referred to committee | 1/27/2026 |
| Missouri | S.B. 1190 | Healthcare restrictions \| Other healthcare barriers | Advancing | Senate second read and referred to committee | 1/27/2026 |
| Maryland | H.B.0356 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/13/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Maryland | S.B.0050 | Restricting student & educator rights \| School sports bans | Defeated | Legislative session adjourned | 4/13/2026 |
| Indiana | S.B.0182 | Barriers to accurate IDs \| Other anti-LGBTQ bills \| Re-definition of sex \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 2/27/2026 |
| West Virginia | S.B.629 | Healthcare age restrictions \| Healthcare funding restrictions \| Healthcare restrictions \| Other healthcare barriers \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| New Mexico | H.B. 233 | Restricting student & educator rights \| School sports bans | Defeated | Legislative session adjourned | 2/19/2026 |
| New Jersey | A.1847 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | Referred to Assembly committee | 1/13/2026 |
| New Jersey | A.673 | Restricting student & educator rights \| School sports bans | Advancing | Referred to Assembly committee | 1/13/2026 |
| New Jersey | A.1605 | Curriculum censorship \| Restricting student & educator rights | Advancing | Referred to Assembly committee | 1/13/2026 |
| New Jersey | A.3021 | Curriculum censorship \| Restricting student & educator rights | Advancing | Referred to Assembly committee | 1/13/2026 |
| Michigan | H.B.5491 | Other anti-LGBTQ bills | Advancing | House first read and referred to committee | 1/29/2026 |
| Maryland | H.B.0063 | Restricting student & educator rights \| School facilities bans \| School sports bans | Defeated | Legislative session adjourned | 4/13/2026 |
| Kentucky | H.B.334 | Other civil rights restrictions \| Re-definition of sex \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/15/2026 |
| Iowa | S.F.2003 | Curriculum censorship \| Restricting student & educator rights | Advancing | Reported favorably by Senate subcommittee | 1/21/2026 |
| West Virginia | H.B.4171 | Barriers to accurate IDs \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.507 | Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 3/14/2026 |
| South Carolina | S.B.0840 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Advancing | Senate first read and referred to committee | 1/21/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Illinois | H.B.4482 | Healthcare age restrictions \| Healthcare restrictions \| | Advancing | House first read and referred to committee | 1/20/2026 |
| Delaware | S.B. 215 | Restricting student & educator rights \| School sports bans | Advancing | Referred to Senate committee | 1/8/2026 |
| West Virginia | H.B.4083 | Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.4143 | Other anti-LGBTQ bills \| Other civil rights restrictions \| Re-definition of sex \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.4356 | Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 3/14/2026 |
| Washington | S.B. 6191 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/12/2026 |
| South Carolina | S.B.0733 | Drag bans \| Free speech & expression bans \| | Advancing | Senate first read and referred to committee | 1/13/2026 |
| Pennsylvania | H.B.1956 | Other civil rights restrictions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/6/2026 |
| New Jersey | S.856 | Restricting student & educator rights \| School sports bans | Advancing | Referred to Senate committee | 1/13/2026 |
| Nebraska | L.B.731 | Healthcare restrictions \| Other healthcare barriers | Advancing | Senate committee hearing | 1/29/2026 |
| Missouri | H.B. 2076 | Barriers to accurate IDs \| | Advancing | House second read | 1/8/2026 |
| Missouri | H.B. 2973 | Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | House second read | 1/15/2026 |
| Missouri | S.B. 1028 | Re-definition of sex \| Restricting student & educator rights \| School sports bans \| Weakening Civil Rights Laws | Advancing | Senate second read and referred to committee | 1/15/2026 |
| Missouri | S.B. 1141 | Religious exemptions \| Weakening Civil Rights Laws | Advancing | Senate second read and referred to committee | 1/15/2026 |
| Missouri | H.B. 2407 | Drag bans \| Free speech & expression bans \| | Advancing | House second read | 1/8/2026 |
| Missouri | H.B. 1779 | Re-definition of sex \| Weakening Civil Rights Laws | Advancing | Senate second read | 1/8/2026 |
| Missouri | H.B. 2565 | Restricting student & educator rights \| School sports bans | Advancing | House second read | 1/8/2026 |
| Missouri | H.B. 2548 | Other anti-LGBTQ bills | Advancing | House second read | 1/8/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Missouri | S.B. 1010 | Healthcare restrictions \| Other healthcare barriers | Advancing | Senate second read and referred to committee | 1/8/2026 |
| Missouri | H.B. 2580 | Curriculum censorship \| Forced outing in schools \| Other school restrictions \| Restricting student & educator rights \| School facilities bans \| School sports bans | Advancing | House second read and referred to committee | 1/8/2026 |
| Missouri | H.B. 1702 | Drag bans \| Free speech & expression bans \| | Advancing | House second read | 1/8/2026 |
| Kentucky | H.B.170 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/15/2026 |
| Kansas | H.B.2426 | Barriers to accurate IDs \| Other anti-LGBTQ bills \| Re-definition of sex \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 4/11/2026 |
| Indiana | S.B.0215 | Barriers to accurate IDs \| Curriculum censorship \| Other anti-LGBTQ bills \| Other school restrictions \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 2/27/2026 |
| Indiana | S.B.0174 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 2/27/2026 |
| Indiana | H.B.1316 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 2/27/2026 |
| Indiana | H.B.1427 | Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 2/27/2026 |
| Indiana | H.B.1362 | Other anti-LGBTQ bills \| Public accommodation bans \| Restricting student & educator rights \| School facilities bans | Defeated | Legislative session adjourned | 2/27/2026 |
| Illinois | H.B.4241 | Other school restrictions \| Restricting student & educator rights | Advancing | House first read and referred to committee | 1/14/2026 |
| Connecticut | S.B.872 | Restricting student & educator rights \| School sports bans | Introduced | Pre-filed | 2/4/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Alabama | H.B.23 | Curriculum censorship \| Free speech & expression bans \| Other expression restrictions \| Other school restrictions \| Restricting student & educator rights | Advancing | House first read and referred to committee | 1/13/2026 |
| West Virginia | S.B.278 | Drag bans \| Free speech & expression bans \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.207 | Drag bans \| Free speech & expression bans \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2127 | Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2153 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.244 | Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2071 | Forced outing in schools \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.279 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.276 | Drag bans \| Free speech & expression bans \| | Advancing | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.431 | Drag bans \| Free speech & expression bans \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.424 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2375 | Healthcare restrictions \| Other healthcare barriers | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2072 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.507 | Drag bans \| Free speech & expression bans \| | Defeated | Legislative session adjourned | 3/14/2026 |

| | | | | | |
|---|---|---|---|---|---|
| West Virginia | H.B.2403 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2466 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2574 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2005 | Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2526 | Restricting student & educator rights \| School facilities bans | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2033 | Religious exemptions \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2962 | Barriers to accurate IDs \| | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.2006 | Other anti-LGBTQ bills \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | H.B.3319 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.841 | Curriculum censorship \| Healthcare funding restrictions \| Healthcare restrictions \| Other anti-LGBTQ bills \| Restricting student & educator rights | Defeated | Legislative session adjourned | 3/14/2026 |
| West Virginia | S.B.663 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 3/14/2026 |
| Washington | S.B. 5136 | Other school restrictions \| Religious exemptions \| Restricting student & educator rights \| Weakening Civil Rights Laws | Defeated | Legislative session adjourned | 3/12/2026 |
| Washington | H.B. 1038 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 3/12/2026 |
| Washington | H.B. 1027 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 3/12/2026 |
| Washington | H.B. 1699 | Restricting student & educator rights \| School sports bans | Defeated | Legislative session adjourned | 3/12/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Tennessee | S.B.1126 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| Tennessee | H.B.1262 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| Tennessee | H.B.1044 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/13/2026 |
| Tennessee | S.B.1252 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| Tennessee | H.B.0571 | Other anti-LGBTQ bills \| Other civil rights restrictions \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3433 | Other anti-LGBTQ bills | Introduced | Carried over | 1/13/2026 |
| South Carolina | S.B.0162 | Barriers to accurate IDs \| | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3095 | Barriers to accurate IDs \| | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3263 | Restricting student & educator rights \| School facilities bans | Introduced | Carried over | 1/13/2026 |
| South Carolina | S.B.0199 | Restricting student & educator rights \| School facilities bans | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3506 | Re-definition of sex \| Weakening Civil Rights Laws | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3121 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3118 | Curriculum censorship \| Forced outing in schools \| Other anti-LGBTQ bills \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3011 | Forced outing in schools \| Other anti-LGBTQ bills \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3094 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Introduced | Carried over | 1/13/2026 |

| | | | | | |
|---|---|---|---|---|---|
| South Carolina | S.B.0243 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| South Carolina | S.B.0240 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers | Introduced | Carried over | 1/13/2026 |
| South Carolina | S.B.0322 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| South Carolina | S.B.0368 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| South Carolina | S.B.0540 | Healthcare restrictions \| Other anti-LGBTQ bills \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.4302 | Other anti-LGBTQ bills | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.3927 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/13/2026 |
| South Carolina | S.B.0054 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.4465 | Other anti-LGBTQ bills \| Restricting student & educator rights \| School facilities bans | Introduced | Carried over | 1/13/2026 |
| South Carolina | H.B.4515 | Barriers to accurate IDs \| Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/13/2026 |
| Pennsylvania | S.B.213 | Barriers to accurate IDs \| Healthcare restrictions \| Other anti-LGBTQ bills \| Prison healthcare restrictions \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Introduced | Carried over | 1/6/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Pennsylvania | H.B.581 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Introduced | Carried over | 1/6/2026 |
| Pennsylvania | H.B.987 | Other anti-LGBTQ bills | Introduced | Carried over | 1/6/2026 |
| Pennsylvania | H.B.1033 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 2/2/2026 |
| Pennsylvania | S.B.843 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/6/2026 |
| Pennsylvania | H.B.158 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/2/2026 |
| Pennsylvania | H.B.1849 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/6/2026 |
| Oklahoma | S.B.591 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.228 | Other anti-LGBTQ bills | Introduced | Carried over | 2/2/2026 |
| Oklahoma | H.B.2149 | Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.413 | Curriculum censorship \| Restricting student & educator rights | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.958 | Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 2/2/2026 |
| Oklahoma | H.B.1361 | Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.550 | Drag bans \| Free speech & expression bans \| | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.759 | Curriculum censorship \| Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.977 | Drag bans \| Free speech & expression bans \| | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.1049 | Healthcare age restrictions \| Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.959 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 2/2/2026 |
| Oklahoma | H.B.1344 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 2/2/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Oklahoma | S.B.665 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.210 | Other anti-LGBTQ bills | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.848 | Curriculum censorship \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.847 | Curriculum censorship \| Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.1002 | Healthcare funding restrictions \| Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 2/2/2026 |
| Oklahoma | H.B.1964 | Curriculum censorship \| Other anti-LGBTQ bills \| Restricting student & educator rights | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.1107 | Other anti-LGBTQ bills | Introduced | Carried over | 2/2/2026 |
| Oklahoma | S.B.845 | Other anti-LGBTQ bills | Introduced | Carried over | 2/2/2026 |
| Oklahoma | H.B.1224 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 2/2/2026 |
| Ohio | H.B.172 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/5/2026 |
| Ohio | H.B.190 | Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/5/2026 |
| Ohio | S.B.209 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/5/2026 |
| North Carolina | S516 | Barriers to accurate IDs \| Other anti-LGBTQ bills \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Introduced | Carried over | 4/21/2026 |
| North Carolina | H595 | Curriculum censorship \| Other anti-LGBTQ bills \| Restricting student & educator rights | Introduced | Carried over | 4/21/2026 |
| North Carolina | H776 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 4/21/2026 |

| | | | | | |
|---|---|---|---|---|---|
| North Carolina | H791 | Barriers to accurate IDs \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Introduced | Carried over | 4/21/2026 |
| North Carolina | H1000 | Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 4/21/2026 |
| North Carolina | H606 | Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 4/21/2026 |
| North Carolina | H560 | Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 4/21/2026 |
| New York | S.460 | Restricting student & educator rights \| School sports bans | Advancing | Referred to Senate committee | 1/7/2026 |
| New York | S.7489 | Restricting student & educator rights \| School facilities bans | Advancing | Referred to Senate committee | 1/7/2026 |
| Nebraska | L.B.655 | Religious exemptions \| Weakening Civil Rights Laws | Advancing | Title printed | 1/7/2026 |
| Nebraska | L.B.552 | Other anti-LGBTQ bills | Advancing | Title printed | 1/7/2026 |
| Nebraska | L.B.605 | Other school restrictions \| Restricting student & educator rights \| School facilities bans \| School sports bans | Introduced | Carried over | 1/7/2026 |
| Minnesota | S.F.716 | Drag bans \| Free speech & expression bans \| | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.744 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.802 | Restricting student & educator rights \| School facilities bans \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.886 | Re-definition of sex \| Weakening Civil Rights Laws | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.916 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | H.F.565 | Restricting student & educator rights \| School facilities bans \| School sports bans | Introduced | Carried over | 2/17/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Minnesota | H.F.700 | Other civil rights restrictions \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.1651 | Other civil rights restrictions \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.1883 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.2294 | Restricting student & educator rights \| School facilities bans \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.2531 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.2817 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | H.F.3151 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 2/17/2026 |
| Minnesota | H.F.3170 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | S.F.10 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Minnesota | H.F.19 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 2/17/2026 |
| Michigan | S.B.0230 | Forced outing in schools \| Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4467 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |
| Michigan | S.B.0289 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Michigan | H.B.4466 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |
| Michigan | S.B.0290 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4469 | Other civil rights restrictions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4066 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4578 | Curriculum censorship \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4577 | Restricting student & educator rights \| School facilities bans \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4579 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4580 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4752 | Other anti-LGBTQ bills | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4751 | Other civil rights restrictions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4776 | Other anti-LGBTQ bills | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4777 | Other civil rights restrictions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4829 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4024 | Restricting student & educator rights \| School facilities bans | Introduced | Carried over | 1/14/2026 |
| Massachusetts | H.D.4542 | Healthcare age restrictions \| Healthcare restrictions \| Other healthcare barriers | Introduced | Carried over | 1/7/2026 |
| Massachusetts | H.584 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/7/2026 |
| Iowa | S.F.220 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Advancing | Senate subcommittee meeting | 1/22/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Iowa | S.F.8 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/12/2026 |
| Illinois | H.B.1214 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.1216 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.1161 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.1204 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.1209 | Re-definition of sex \| Weakening Civil Rights Laws | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.1117 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Illinois | S.B.1226 | Restricting student & educator rights \| School facilities bans | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.2915 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Illinois | S.B.1783 | Drag bans \| Free speech & expression bans \| | Introduced | Carried over | 1/14/2026 |
| Illinois | S.B.2078 | Barriers to accurate IDs \| Healthcare restrictions \| Other anti-LGBTQ bills \| Prison healthcare restrictions \| Public accommodation bans \| Re-definition of sex \| Restricting student & educator rights \| School facilities bans \| Weakening Civil Rights Laws | Introduced | Carried over | 1/14/2026 |
| Illinois | S.B.2474 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.3819 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.4027 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Illinois | H.B.4030 | Re-definition of sex \| Weakening Civil Rights Laws | Introduced | Carried over | 1/14/2026 |

| | | | | | |
|---|---|---|---|---|---|
| California | A.B.844 | Restricting student & educator rights \| School facilities bans \| School sports bans | Introduced | Carried over | 1/5/2026 |
| Michigan | S.B.0009 | Restricting student & educator rights \| School facilities bans | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4031 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/14/2026 |
| Michigan | H.B.4190 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/14/2026 |
| Massachusetts | H.737 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/7/2026 |
| Massachusetts | H.551 | Curriculum censorship \| Forced outing in schools \| Restricting student & educator rights | Introduced | Carried over | 1/7/2026 |
| Kansas | S.B.16 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 4/11/2026 |
| Kansas | H.B.2071 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 4/11/2026 |
| Kansas | S.B.76 | Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 4/11/2026 |
| Iowa | H.F.80 | Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/12/2026 |
| Iowa | S.F.156 | Public accommodation bans | Introduced | Carried over | 1/12/2026 |
| Iowa | H.S.B.84 | Curriculum censorship \| Restricting student & educator rights | Introduced | Carried over | 1/12/2026 |
| Iowa | H.S.B.139 | Healthcare restrictions \| Other healthcare barriers \| Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/12/2026 |
| Iowa | H.S.B.242 | Barriers to accurate IDs \| Curriculum censorship \| Other civil rights restrictions \| Other school restrictions \| Re-definition of sex \| Restricting student & educator rights \| Weakening Civil Rights Laws | Introduced | Carried over | 1/12/2026 |

| | | | | | |
|---|---|---|---|---|---|
| Iowa | S.F.335 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Introduced | Carried over | 1/12/2026 |
| Iowa | S.F.236 | Religious exemptions \| Weakening Civil Rights Laws | Introduced | Carried over | 1/12/2026 |
| Iowa | S.S.B.1150 | Other anti-LGBTQ bills | Introduced | Carried over | 1/12/2026 |
| Iowa | H.F.721 | Other anti-LGBTQ bills | Introduced | Carried over | 1/12/2026 |
| Iowa | H.S.B.155 | Other anti-LGBTQ bills | Introduced | Carried over | 1/12/2026 |
| Iowa | H.S.B.158 | Drag bans \| Free speech & expression bans \| | Introduced | Carried over | 1/12/2026 |
| Iowa | H.F.594 | Other anti-LGBTQ bills | Introduced | Carried over | 1/12/2026 |
| Iowa | S.F.507 | Other anti-LGBTQ bills | Introduced | Carried over | 1/12/2026 |
| Georgia | H.B.104 | Restricting student & educator rights \| School sports bans | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | S.B.248 | Curriculum censorship \| Forced outing in schools \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | H.B.660 | Healthcare funding restrictions \| Healthcare restrictions \| Prison healthcare restrictions | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | S.B.120 | Other anti-LGBTQ bills \| Other school restrictions \| Restricting student & educator rights | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | S.B.57 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | S.B.341 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | S.B.30 | Healthcare age restrictions \| Healthcare restrictions \| | Defeated | Legislative session adjourned | 4/3/2026 |
| Georgia | H.B.127 | Other anti-LGBTQ bills | Defeated | Legislative session adjourned | 4/3/2026 |
| Delaware | S.B. 55 | Healthcare age restrictions \| Healthcare restrictions \| | Introduced | Carried over | 1/13/2026 |
| California | A.B.89 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/5/2026 |
| Massachusetts | S.350 | Restricting student & educator rights \| School sports bans | Introduced | Carried over | 1/7/2026 |

Data is current as of April 24 2026

# Exhibit 19

**RESOURCES** | Transgender State & Local Policy Laws & Legislation Research

# Map: Attacks on Gender Affirming Care by State

Produced by the **HRC Foundation**



SHARE

In a coordinated push led by national anti-LGBTQ+ hate groups, legislators across the country have overridden the recommendations of the American medical establishment

and introduced hundreds of bills that target transgender, non-binary and gender-expansive youth's access to age-appropriate, medically necessary care.

This attack on healthcare care is relentless and constantly shifting. We've provided a snapshot of the assault against access to age-appropriate and medically necessary gender-affirming care in the United States.

# 39.4%

## of transgender youth live in states that have passed bans on gender-affirming care

As reported by The Williams Institute, there are more than 300,000 high school-aged (ages 13-17) transgender youth in the United States today, many of whom need gender-affirming care.

As of July 2025, **40.1% or 120,400 trans youth** aged 13-17 are living in the 27 states that have passed bans on gender-affirming care. This includes 2,300 youth living in the two states–Arkansas and Montana–where bans are currently on hold or blocked from enforcement through court orders.

While our map focuses solely on high school-aged youth (age 13-17), some states, such as

Oklahoma, Texas, and South Carolina, have considered banning care for transgender people up to 26 years of age. Additionally, several states prohibit public funds from being used to provide transgender health care for anyone, so adults are also unable to access critical health services if they receive their healthcare through Medicaid, if they work in the public sector, or are incarcerated.

Gender-affirming care is age-appropriate care that is medically necessary for the well-being of many transgender, non-binary, and gender-expansive people who experience symptoms of gender dysphoria or distress that result from having one's gender identity not match their sex assigned at birth.

By preventing doctors from providing this care or threatening to take children away from parents who support their child in their transition, these bills prevent transgender, non-binary, and gender-expansive youth from accessing medically necessary, safe health care backed by decades of research and supported by every major medical association representing over 1.3 million US doctors.

## Data Source and Methodology +

*This figure adapts a methodology employed by The Williams Institute in their April 2024 report, "The Impact of 2024 Anti-Transgender Legislation on Youth."*

*The number of trans youth in each state, as well as the total number of transgender youth nationwide (n=300,100), come from The Williams Institute's June 2022 report, "How Many Adults and Youth Identify as Transgender in the United States?" Williams Institute estimates were derived from the 2017 and 2019 Youth Risk Behavior Surveillance Survey, as described further in the linked report.*

*The status of law/policy in each state is based on the HRC Foundation's own internal tracking of bills, laws and policies. States were categorized as either having no legislation or having passed/enacted legislation (bans signed into law or implemented via administrative actions). States where court injunctions are currently halting implementation of an existing ban, as well as states where bills have*

*passed but have not yet gone into effect are included in the total of youth living in states where GAC bans are enacted. The status of state legislation and litigation is current as of the date listed under the map.*

*The number and percentage of transgender youth impacted by GAC bans are computed by summing the estimated number of high school-aged transgender youth (age 13-17) living in each state with an enacted GAC ban (including those where the ban is currently enjoined or on hold), and then dividing this sum by the total estimated number of transgender youth nationwide (300,100). Estimates reflect the total number of transgender youth living in each state (all of whom are assumed to be at risk of losing care), rather than the number of youth receiving gender-affirming care in each state (and thus may /have lost access), as the latter numbers are unavailable.*

---

## These bills have real world impact.

**These bills are not based on medical fact and have real world consequences for transgender youth and adults.**

Transgender medical care for youth is supported by every major medical association in the country and has multiple positive benefits for transgender youth and adults.

As attacks on the LGBTQ+ community continue, it is important to get the facts about this critically important care.

Visit HRC's resource, Get the Facts on Gender Affirming Care, to learn more about Gender Affirming Care, its benefits for transgender youth and adults, and get critical information to combat misinformation about transgender health care.

# Exhibit 20

Idaho Capital Sun

# For a Boise family of medical providers, Idaho criminal trans bathroom ban was the last straw

This year, Idaho Legislature approved trans bathroom ban, forcing teachers to out trans kids to parents, and re-banning LGBTQ+ pride flag displays by government

BY: **KYLE PFANNENSTIEL** - APRIL 16, 2026 4:30 AM



Michael and Dr. Angie Devitt reflect on their decision to move from Idaho after years of the Legislature and the governor approving anti-LGBTQ+ bills. (Photo by Kyle Pfannenstiel/Idaho Capital Sun)

The Devitts have seen the Idaho Legislature and the governor approve a wave of anti-LGBTQ+ bills in recent years.

Michael and Dr. Angie Devitt, both medical professionals, watched their trans daughter, Eve, testify against a bill years ago that outlawed gender-affirming care for minors.

But this year's criminal transgender bathroom ban – described by advocates as the most extreme in the nation for extending to private businesses – was the couple's last straw.

So early this month, Michael Devitt notified patients that his practice, Focus Physical Therapy, would shut down at the end of August as his family prepared to move out of Idaho.

"Obviously, this law is a disaster for families like ours," he wrote in a letter. "We can no longer take a road trip across our beloved state, or even enjoy a family night out at a restaurant, or a

movie, without running the risk of Eve being charged and sent to a prison merely for using the facilities."

Michael said he and his wife – who is the president of a large group of doctors, called the Idaho Academy of Family Physicians – draw the line at human dignity. He's heard next year's legislative session will be even worse.

"We say 'We're in an abusive relationship with the state of Idaho' – all people with transgender relatives, or all transgender people. And you always think, 'Oh, they'll stop hitting me.' But they're not gonna," Michael said.

In addition to the bathroom ban, the Republican supermajority-controlled Idaho Legislature and Gov. Brad Little approved a bill to require teachers and doctors to out transgender children to their parents, and to re-ban local and state government agencies from flying the LGBTQ+ pride flag.

The city of Boise already found a workaround to the latest ban: Making the flagpoles themselves rainbow colored.

## Idaho's anti-LGBTQ+ bills this year follow a trend

Three became law: The trans bathroom ban, the bill requiring forced outing of youth, and the expanded flag ban.

The bills follow years of anti-LGBTQ+ legislation in Idaho.

In 2020, Idaho became the first state to ban transgender girls and women from competing on sports teams that align with their gender identity. In 2023, state lawmakers made it a felony for doctors to provide gender-affirming health care to transgender youth. In 2024, lawmakers expanded the ban to apply to taxpayer funds and government property, which forbids Medicaid from covering gender-affirming care.

And for more than a decade, efforts to add anti-discrimination protections for LGBTQ+ people to state law have failed.

"Over the last several years, legislators have gone from refusing to protect us to actively targeting us," Nikson Mathews, a trans man who serves as chair of the Idaho Democratic Queer Caucus, said at a news conference in February. He was among nine protestors arrested for trespassing after a sit-in protest over anti-trans bills at the governor's office early this month.

Nampa Republican Rep. Bruce Skaug pushed for several of the bills – including this year's bill to require teachers and doctors to out trans kids to their parents. He says he's trying to protect traditional families.

"I know that some people have sent me emails … saying 'Why are you so genital focused?' Well, I'm trying to protect families and children from those who are genuinely genital focused. And that would be the transgenders and those who would go after our children," Skaug told the Sun.

Some see these bills as a distraction.

"I think what we see nationally and here in Idaho is lots of money being used to manufacture outrage and a crisis around trans people, rather than focus on the issues that really matter to Idahoans," ACLU of Idaho's LGBTQ+ Rights Strategist Jenna Damron told the Sun.

Boise Democratic Sen. Melissa Wintrow sees it similarly, arguing that the Republican party has chosen the LTBTQ+ community as a scapegoat while things aren't going well.

"While we're worried about toilet seats and bathrooms, we're going to pilfer the coffers over here and take the money that is the public wealth, and we're going to give it all the way back. We're going to give it back to rich corporations and wealthy folks," she said.



Sen. Melissa Wintrow, D-Boise, asks a question during a Senate Health and Welfare Committee hearing on March 10, 2025, at the Idaho Capitol Building in Boise. (Pat Sutphin for the Idaho Capital Sun)

## Why some call Idaho's trans bathroom ban the nation's most extreme

House Bill 752 criminalizes transgender people using bathrooms that align with their gender identity, including in private businesses. The law takes effect July 1.

A first offense carries a misdemeanor, punishable by up to one year in prison. A second offense within five years is a felony, punishable by up to five years in prison.

Only three states – Utah, Florida and Kansas – have criminal bans on trans people using bathrooms that align with their gender identity, according to the Movement Advancement Project, an LGBTQ+ advocacy group.

Mathews, a trans man with a beard, told a House committee earlier this year that the bathroom bill would force him to use the women's restroom.

"Every single day when I'm out in public, I have to decide: Do I feel like going to jail today, or do I feel like being attacked," Mathews told lawmakers.

Skaug said he supported the bill to protect women in women's spaces. He said it has nothing to do with transgender people's rights, citing conversations with the bill's sponsor, Rep. Cornel Rasor, R-Sagle.



Nikson Mathews, chair of the Idaho Democratic Queer Caucus, joined activists and local elected officials to push back against anti-LGBTQ+ bills in the Idaho Legislature in a news conference on Feb. 16, 2026. (Photo by Kyle Pfannenstiel/Idaho Capital Sun)

ACLU of Idaho Legal Director Paul Carlos Southwick told the Sun that the ban is the most extreme in the nation mainly because it applies to places of public accommodations, which includes many private businesses, like grocery stores, restaurants and movie theaters.

"Most places that people would go about in their ordinary life are going to be impacted by this bill," he said.

A 2025 study by the UCLA School of Law's Williams Institute found "no evidence of increased harms to people who are not transgender when transgender people are allowed to use restrooms and other gendered facilities according to their identity."

But when trans people are refused access to facilities that align with their gender, the study found that trans people report verbal harassment and physical assault.

Little signed the bill into law on Trans Day of Visibility.

## Bill to force teachers, doctors to out trans kids to parents takes effect July 1

House Bill 822 forces teachers and doctors to out transgender minors to their parents, or face lawsuits. The law takes effect July 1.

Supporters argued the bill protects parental rights. But critics say it risks exposing some trans youth to abuse from parents.

Major medical groups say gender-affirming care is medically necessary and safe. The American Medical Association last month reiterated that gender-affirming care is "medically necessary." Some European nations are tightening standards for gender affirming-care.

The bill was brought by Skaug. The lawmaker led efforts to criminalize gender-affirming care for all minors in Idaho and expand the ban to taxpayer funds, which prevented Medicaid from covering gender-affirming care and prompted an eastern Idaho clinic to halt offering gender-affirming care.



Idaho Rep. Bruce D. Skaug, R-Nampa, listens to proceedings on the House floor at the State Capitol

Skaug told the Sun he got started on the bill years earlier, when he pushed for the bill to outlaw gender-affirming care for minors. He

said he encountered parents whose children were secretly transitioned.

building on Jan. 9, 2023. (Otto Kitsinger for Idaho Capital Sun)

Skaug dismissed concerns that his bill could risk trans kids' safety.

"I don't know what that situation could possibly be. If Billy wants to be Sally, that's a pretty serious mental health issue that any parent should know about, first and foremost," he said. "So I don't know of a situation where that has actually occurred, where there's an abusive parent that is going to harm their child because they want to change their sex."

## Boise quickly found another workaround to another ban on the LGBTQ+ pride flag

After the governor signed a bill to fine cities for flying flags that aren't on the Legislature's pre-approved list, the city of Boise took down an LGBTQ+ pride flag that flew in front of its City Hall.

Just blocks away from the state Capitol, Boise had flown a pride flag for more than a decade. The city council declared it an official flag of the city to workaround a flag ban law passed last year.



A pride flag flies in front of Boise City Hall, just blocks from the Idaho Capitol. The flag flies below the city's own banner and in April shared the flagpole with a flag honoring organ donation. The city also displays the U.S. flag, a POW/MIA flag and a state of Idaho flag. (Photo by Erika Bolstad/Stateline)

But House Bill 561 this year made it clear that the pride flag can't be flown. It banned city flags made official after 2023. Eagle Republican Rep. Ted Hill has said his bill is meant to target the city of Boise.

But less than two weeks after the bill became law, Boise found more workarounds, KTVB reported: Adorning the flag pole with rainbow wrap, hanging a pride banner on the front of city hall, and decking the building with lights colored after the trans pride flag.

Michael Devitt bets there'll be a bill next year to regulate what color government flagpoles can be.

## What's next for the Devitts

The Devitts aren't sure how soon they'll move.

Their daughter, Eve is now 20 years old, attending college in New York City. But what about when she comes to Boise to visit? Her dad worries she could be subjected to a physical exam.

"How do you navigate a community like that when we literally are penalizing people for their presence more than we would penalize somebody for assault, more than we would penalize somebody for, oh say, manslaughter," Michael Devitt said. "I mean, there are all kinds of things you can do in Idaho that will get you prison time that are less than the second offense for using the bathroom that aligns with your gender identity."

In a book about raising their trans daughter in Idaho, Michael and Dr. Angie Devitt chronicle Eve's growth, and the couple's frustration with the Legislature's hyperfocus on "persecuting transgender people."

"I recently had someone tell me they were sick and tired of hearing about transgender people all of the time," they wrote toward the end of their book, "Finding Eve," which is written from Michael's perspective. "I told them, speaking for every parent of a trans kid in Idaho, that I am sick of it too, and so is Angie. Every time we turn around our legislature or governor are talking about transgender people and how the state of Idaho is working to make their lives more difficult."

Dr. Angie Devitt said she'll keep seeing patients, and may even continue to work in Idaho while she lives in another state.

But part of what hurts so much as a physician testifying in the Legislature, she said, is seeing local experts, like doctors who took time out of their day to testify, be passed over as committees rush through bills. That happened at the House hearing on the bill to force teachers and doctors to out trans kids, where no doctors testified, but several people not from Idaho were allowed to speak.

As she waits to be called to testify, Dr. Angie Devitt said she's often juggling treating patients.

"I tell my patient, 'I'm doing two things right now, and if I get called, because I'm signed up, and you never know – if I get called, I'm going to take two it's only two minutes, unless they ask questions, and I'm going to step out,'" she said.

## One bill that didn't pass is coming back. It would repeal local LGBTQ+ anti-discrimination protections.

Some anti-LGBTQ+ bills didn't pass this year, like an attempt to ask the U.S. Supreme Court to overturn its ruling that legalized gay marriage across the U.S.

But that doesn't mean they won't return. The gay marriage repeal resolution is at least the second version introduced in the Legislature in recent years.

A bill to repeal local policies that protect LGBTQ+ people from discrimination is coming back, one lawmaker confirmed.

House Bill 557 passed the House, but never got a committee hearing in the Senate. Skaug, who sponsored the bill, says he's planning to carry the bill again next year. The bill was written by the Idaho Family Policy Center, a conservative Christian lobbying group.

The bill would prevent local governments in Idaho from having or enforcing antidiscrimination policies that go beyond state law. The bill comes after more than a decade of failed efforts in the Legislature to add LGBTQ+ discrimination protections to state law.

More than a third of Idahoans – over 720,000 people – live in Idaho communities with local nondiscrimination ordinances, the ACLU of Idaho estimates. Since 2011, 12 Idaho cities and towns passed nondiscrimination ordinances including Boise, Idaho Falls, Moscow, Lewiston, Meridian, Ketchum, Hailey, Bellevue, Driggs, Victor, Pocatello and Coeur d'Alene. In 2020, Ada County, home to Boise, passed its own.

A separate trans bathroom ban – which would have let people sue to enforce it, instead of allowing prison sentences – never got a hearing in the Senate after passing the House. The bill, House Bill 607, was also written by the Idaho Family Policy Center.

But Michael Devitt doesn't think the bathroom ban that passed is going to work as intended.

"They say, 'Oh, we don't want men in women's bathrooms.' Well, guess what? That's what you're going to get, because you're going to get people who look very much like the gender they identify with," he said.

# Exhibit 21

OUT NEWS

# Oregon man sentenced for LGBTQ hate crimes in Idaho, including trying to hit people with car

The 32-year-old punched and threatened a transgender librarian before trying to run over a security guard with his vehicle, according to court documents.



People unroll a large rainbow flag at the Idaho state Capitol during a Boise Gay Pride celebration.

Kyle Green / The Idaho Statesman via AP file

Nov. 3, 2023, 10:16 AM PDT / Source: The Associated Press

By Associated Press

BOISE, Idaho. – An Oregon man who pleaded guilty in connection with LGBTQ hate crimes, including trying to hit people with a car in Idaho last year, has been sentenced to just over three years in prison.

**Subscribe to read this story ad-free**
**Get unlimited access to ad-free articles and exclusive content.**

Matthew Lehigh was sentenced Thursday to 37 months followed by three years of supervised release and he must pay restitution, according to the U.S. Justice Department. Lehigh, 32, previously pleaded guilty to two felony charges of violating the Hate Crimes Prevention Act as part of a plea agreement.

ADVERTISING

Last October, Lehigh punched and threatened a transgender librarian in Boise before trying to run over a library security guard with his vehicle, according to court documents.

Days later, he saw two women he "assumed, based on their appearance and dress" were lesbians, documents said. Lehigh shouted threats and slurs at them and accelerated his car toward them. The women jumped out of the way and Lehigh's vehicle hit the car belonging to one of the women, documents said.

The Justice Department said Lehigh, as part of the agreement, also admitted responsibility for punching someone else after using an anti-LGBTQ+ slur and setting on fire a pride flag that was on a same-sex couple's porch.

Lehigh's attorney said as a Christian, Lehigh believes homosexuality is a sin, the Idaho Statesman reported. The attorney also said Lehigh didn't wish to harm members of the LGBTQ community until his mental health worsened.

Lehigh, who has been in treatment, apologized in court. "I don't have too much to say other than just my regret and my great gratitude that things didn't end up worse than they did," Lehigh said.

Local law enforcement could not pursue a hate crime case against Lehigh because the state's malicious harassment statute does not cover sexual orientation or gender identity. Boise and Ada County prosecutors dismissed assault and other charges after the federal charges were brought.

Vegas Shegrud, one of the people Lehigh tried to hit with his vehicle, said in court that she struggled with her mental health after the incident and eventually dropped out of school.

"The fear I felt that day is unparalleled by any other event in my life," Shegrud said.

# Exhibit 22

KUNC is off the air on FM 88.3 in Yuma. We are not sure when service will resume.

## Mountain West News Bureau

MOUNTAIN WEST NEWS BUREAU

KUNC is among the founding partners of the Mountain West News Bureau, a collaboration of public media stations that serve the Western states of Colorado, Idaho, Nevada, New Mexico, Utah and Wyoming. Our mission is to tell stories about the people, places and issues of the Mountain West.

# Deadly Club Q shooting reflects escalation in anti-LGBTQ hate around the Mountain West

**KUNC | By Emma VandenEinde**

Published November 23, 2022 at 11:30 AM MST

LISTEN • 1:13

Reading Time: 2 minutes, 53 seconds



kunc

Donate

KUNC

Think

Zakalinka / Adobe Stock

Colorado reported 308 hate crimes motivated by sexual orientation from 2010 to 2020 – the most in the Mountain West, according to data from the FBI.

*News brief*

The mass shooting that left five people dead at Club Q in Colorado Springs Saturday night is a tragedy that underscores a troubling pattern of hate crimes against the LGBTQ community in the Mountain West.

Colorado reported 308 hate crimes motivated by sexual orientation from 2010 to 2020 – the most in the region, according to data from the FBI. The next highest was Nevada, with 118 cases.

"I think we are seeing anecdotally, but also through reports, a genuine increase in the number of these types of crimes," said Jeremy Shaver, the mountain states director of the Anti-Defamation League.

These crimes can happen more often for those with multiple marginalized identities. A survey conducted by Hate Free Colorado found that "nearly 6 in 10 people of color who are 18-24 and LGBTQ+ experienced a hate crime or incident" in Colorado.

These crimes also do not always occur in-person. The ADL conducted a survey of online harassment for adults that were 18 years of age or older and found that the LGBTQ community was more likely to experience harassment online than any other group surveyed.

On a national scale, the FBI reported in 2020 that of the 8,000 hate crimes recorded, 20% of them were motivated by sexual orientation, the second-highest category behind those motivated by race and ancestry. The same is true in Colorado and New Mexico over the last couple of years.

It can be difficult to track the numbers since some states and local law enforcement agencies don't report hate crimes to the federal government. The FBI's 2020 data, for example, accounts for only about 11,000 of the close to 19,000 law enforcement agencies in the country.

KUNC
Think

"We know that the number of hate crimes and hate incidents targeting LGBTQ Coloradans is underreported, and most of them, in fact, go unreported," Shaver said. "I think we also need to recognize that many of the communities that are most frequently targeted with hate crimes – particularly black Coloradans, LGBTQ Coloradans – those are also communities that have some of the lowest levels of trust and confidence in law enforcement right now. So they're less likely to report to law enforcement."

Wyoming doesn't have a hate crimes law at all, as ADL's Hate Crime Map shows. Montana and Idaho do, but their laws don't cover sexual orientation or gender identity.

Separately, Montana, Idaho and Utah are among the states that have passed legislation in recent years restricting the rights of those in the LGBTQ community. All three, for example, have passed laws banning transgender athletes (though a judge in Utah reversed the ban there).

Shaver said such anti-LGBTQ laws show that these attacks aren't happening in a vacuum.

"Politicians, extremists and pundits alike are fanning the flames of this hateful campaign," he said, "And we need to call it out for what it is. It's anti-gay, it's anti-transgender, it's hateful. And it's putting people's lives in danger."

Shaver wants more training for law enforcement officers on hate crimes and for prosecutors to apply the bias penalty when applicable. He also wants to see more resources and hotlines available to victims who do not want to go straight to law enforcement.

At the end of the day, he wants the community to feel safe.

"What we're talking about are real people, real families, real communities that are impacted," Shaver said. "People can believe and think the ugliest things they want. But there is a line. When you cross that line into actively harming somebody else, there should be consequences and and that we need to enforce the law."

For LBGTQ resources and how to help in the wake of the Club Q shooting, visit KUNC's Club Q Resources page.

KUNC
Think

*This story was produced by the Mountain West News Bureau, a collaboration between Wyoming Public Media, Nevada Public Radio, Boise State Public Radio in Idaho, KUNR in Nevada, the O'Connor Center for the Rocky Mountain West in Montana, KUNC in Colorado, KUNM in New Mexico, with support from affiliate stations across the region. Funding for the Mountain West News Bureau is provided in part by the Corporation for Public Broadcasting.*

**Tags** Regional News | LGBTQ | Club Q | Colorado Springs | Mass Shootings | Gun Violence | Hate Crimes | Guns & America | Sexuality | Gender Identity | Gender | Montana | Utah | Idaho | Wyoming | Federal Bureau of Investigation (FBI) | Anti-Defamation League | Hate Free Colorado | Transgender | Mountain West News Bureau



**Emma VandenEinde**

I'm the General Assignment Reporter for KUNC, here to keep you up-to-date on news in your backyard. Each town throughout Northern Colorado contains detailed stories about its citizens and their challenges, and I love sitting with members of the community and hearing what they have to say.

See stories by Emma VandenEinde

# Exhibit 23

# Online right-wing extremists amp up anti-LGBTQ rhetoric during Pride Month

**Nation** Jun 13, 2022 7:15 PM EDT

BOISE, Idaho (AP) — A few weeks before **31 members of a white supremacist group were arrested** for allegedly planning to riot at a northern Idaho LGBTQ pride event, a fundamentalist Idaho pastor told his Boise congregation that gay, lesbian and **transgender people** should be executed by the government.

Around the same time, a lawmaker from the northernmost region of the state, Republican Rep. Heather Scott, told an audience that drag queens and other LGBTQ supporters are waging "a war of perversion against our children."

A toxic brew of hateful rhetoric has been percolating in Idaho and elsewhere around the U.S., well ahead of the arrests of the Patriot Front members at the pride event Saturday in Coeur d'Alene.

**WATCH: 2021 has set a record in anti-trans bills in America**

Police say dozens of men from the white supremacist group piled into a U-Haul truck wearing balaclavas and bearing riot gear, with plans to instigate a riot at the park where families, children and supporters were gathered to celebrate the LGBTQ community.

Those arrested came from at least 11 states, including Illinois, Arkansas and Virginia. The defendants were booked on misdemeanor charges of conspiracy to riot and released on bail. As of Monday afternoon, online court records did not show if the men had retained defense attorneys.

Thomas Rousseau, a 23-year-old from Grapevine, Texas, who has been identified by the Southern Poverty Law Center as the Patriot Front founder and was among those arrested, did not immediately respond to an email requesting comment.

Jon Lewis, a George Washington University researcher who specializes in homegrown violent extremism, said outrage directed at LGBTQ people had been growing for months online, often in chat rooms frequented by members of groups like the Patriot Front.

In the same way that it mobilized against Black Lives Matter in the nation's capital in December, the Patriot Front harnesses what's in the news cycle — in this case, drag queen story hours, disputes about transgender people in schools, and LGBTQ visibility more broadly.

**READ MORE: Transgender kids tend to maintain their identities as they grow up, study suggests**

A "massive right-wing media ecosystem" has been promoting the notion that "there are people who are trying to take your kids to drag shows, there are trans people trying to 'groom' your children," Lewis said.

The rhetoric has been amplified by right-wing sochttps://www.pbs.org/newshour/nation/transgender-kids-tend-to-maintain-their-identities-as-they-grow-up-study-suggestsial media accounts that use photos and videos of LGBTQ individuals to drive outrage among their followers.

Several posts have falsely sought to label teachers and librarians who accept the LGBTQ community as abusers or groomers of children. Others have lambasted pride events or drag performances as "depraved."

One photo shared widely on **social media** this week falsely claimed a "Drag Queen Story Hour" performer flashed their genitals to children while reading aloud. But the photograph, from a suburban Minneapolis library in 2019, clearly shows the performer was wearing tan undergarments.

A spokesman for Hennepin County Library confirmed to The Associated Press that the performer did not expose themselves to children.

**WATCH: How misinformation and the partisan divide drove a surge in U.S. COVID deaths**

Northern Idaho has long been associated with extremist groups, most prominently the Aryan Nations, which was often in the news in the 1990s. The area drew disaffected people after white supremacist Richard Butler moved there in 1973 from California.

After the Aryan Nations' heyday, many local officials tried to disassociate the region from extremism. But in recent years, some politicians, civic leaders and real estate agents have boasted about northern Idaho's conservatism to draw like-minded people.

At a news conference Monday, Coeur d'Alene Mayor Jim Hammond said the city is no longer a locus of hate.

"We are not going back to the days of the Aryan Nations. We are past that," he declared.

Scott, the northern Idaho lawmaker, did not immediately respond to an email request for comment.

At her public appearance weeks ago, she introduced two members of the Panhandle Patriots motorcycle club, who urged watchers to join them in "the fight" against LGBTQ people at the Coeur d'Alene pride celebration. They dubbed their counter-protest "Gun d'Alene."

"Stand up, take it to the head, go to the fight. ... We say, 'Damn the repercussions,'" the motorcycle club members said. "They are trying to take your children."

The Panhandle Patriots later changed their event to a prayer rally, saying they are "a Christian group that stands against violence in all its forms."

Elsewhere around the country, authorities in the San Francisco Bay Area are investigating a possible hate crime after a group of men allegedly shouted anti-LGBTQ slurs during Drag Queen Story Hour at the San Lorenzo Library over the weekend.

*Associated Press journalists Ali Swenson in New York City and Sam Metz in Salt Lake City contributed.*


# A free press is a cornerstone of a healthy democracy.

Support trusted journalism and civil dialogue.

# Exhibit 24

archive.today
webpage capture
Saved from https://www.oregonlive.com/crime/2020/01/idaho-man-found-guilty-of-hate-cr search
no other snapshots from this url
All snapshots from host www.oregonlive.com
20 Feb 2023 18:15:37 UTC
Webpage Screenshot
share download .zip report bug or abuse Buy me a coffee

Set weather Subscribe Sign in

President's Day Sale - Start today for $1 - Expires 2/20/23

Crime

# Idaho man found guilty of hate crime after beating transgender woman over bathroom use on Oregon coast

Updated: Jan. 30, 2020, 3:01 p.m. | Published: Jan. 30, 2020, 2:52 p.m.



Lauren Jackson, a transgender woman, suffered a broken jaw and fractured skull after she was attacked Aug. 24 for using a woman's bathroom at a park on the Oregon coast.

2,425
shares

NEW!

By Shane Dixon Kavanaugh | The Oregonian/OregonLive

An unemployed man from Idaho was convicted of brutally beating a transgender woman after she used a women's bathroom at an Oregon coast park.

Fred Costanza, 37, was found guilty Wednesday of a first-degree bias crime, second-degree assault and harassment in the Aug. 24 attack that shattered Lauren Jackson's jaw and fractured her skull, court records show.

According to witnesses, Costanza walked over 100 yards across Agate Beach State Recreation Site in Newport to confront Jackson, 29, after she used the women's public restroom at the park.



Fred Joseph Costanza (Lincoln County Sheriff's Office)

The man pulled Jackson by the hair and struck her more than 10 times before leaving the park with his wife, witnesses told police.

Jackson, who was visiting Oregon for the first time, spent the next week in the hospital.

Jailed in Lincoln County since his arrest, Costanza will be sentenced Feb. 7.

Second-degree assault, a Measure 11 crime, carries a mandatory minimum sentence of five years and 10 months.



**Transgender woman beaten over bathroom use on Oregon coast is healing, flourishing**

-- Shane Dixon Kavanaugh; 503-294-7632

Email at skavanaugh@oregonian.com

Follow on Twitter @shanedkavanaugh

**Subscribe to Oregonian/OregonLive newsletters and podcasts for the latest news and top stories.**

If you purchase a product or register for an account through one of the links on our site, we may receive compensation.

OREGONLIVE

**About Us**

Our Journalists
About OregonLive.com
Contact The Newsroom
Technical Support
Search Our Archives
Advertise With Us
Subscribe to The Oregonian
Subscriber Services
Digital Subscription FAQ
Delivery Opportunities

**Subscriptions**

The Oregonian
eNewspaper
Email Newsletters

**Already a Subscriber**

Manage your Subscription
Place a Vacation Hold
Make a Payment
Delivery Feedback

**Read More Top News**

Today's Top News
Politics
Crime
Business
Commuting
Weather
Education
Coronavirus News Home
Homes & Gardens
Letters to the Editor
Video
Environment
Tom Hallman
Special Sections
Here is Oregon
Sports
High School Sports
Ducks
Beavers
Trail Blazers
Timbers
Thorns
Recruiting News
Entertainment
Travel
TV & Movies
Eat, Drink, Cook
Comics
Archives

**Your Regional News Pages**

Portland
Washington County
Clackamas County
Clark County
Pacific Northwest

**Follow Us**

Email Newsletters
News on Alexa or Google Home
YouTube
Twitter
Facebook
Instagram
RSS

**Mobile**

iPhone, Android apps
Tablet apps

**More on OregonLive.com**

Classifieds
Autos
Rentals
Jobs
Real Estate
Business Shopping
Post a Classified Ad
Sponsor Content
Sell Your Car
Sell/Rent Your Home
Post a Job

ADVANCE LOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement, Privacy Policy and Cookie Statement, and Your Privacy Choices and Rights (each updated 1/26/2023).

Cookie Settings/Do Not Sell My Personal Information

© 2023 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

YouTube's privacy policy is available here and YouTube's terms of service is available here.

Ad Choices